Daniel C. Girard (SBN # 114826)
  dcg@girardgibbs.com
Elizabeth C. Pritzker (SBN # 146267)
  ecp@girardgibbs.com
Aaron M. Sheanin (SBN # 214472)
  ams@girardgibbs.com
Christina C. Sharp (SBN# 245869)
  chc@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

*Lead-Liaison Counsel for Plaintiffs*

[Additional Counsel Listed On Signature Page]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE:  MUSICAL INSTRUMENTS AND EQUIPMENT ANTITRUST LITIGATION** | No. MDL 2121 |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| This Document Relates To: | |
| ALL ACTIONS | DEMAND FOR JURY TRIAL |

Plaintiffs, individually and on behalf of all others similarly situated, allege as follows:

**NATURE OF THE ACTION**

1. This case arises out of an alleged conspiracy to raise, fix, maintain or stabilize the prices of new, high-quality fretted instruments[1] and guitar amplifiers (defined below as "Musical Instruments and Equipment") by the National Association of Music Merchants ("NAMM"), Guitar Center, Inc. ("Guitar Center"), and manufacturers and retailers of Musical Instruments and Equipment. The membership of NAMM, the primary trade association for the music industry, includes most U.S. manufacturers, distributors and dealers of musical instruments and related products. Guitar Center, the dominant specialty retailer of Musical Instruments and Equipment, has market power that permits it to threaten and/or coerce manufacturers in their dealings with other specialty music retailers, most of which are small privately held businesses.

2. In the late 1990s, manufacturers and retailers in the retail music industry entered into and/or agreed to observe Minimum Advertised Price Policies ("MAPPs") that precluded retailers from advertising prices for Musical Instruments and Equipment below a specified amount, or communicating to potential customers their willingness to discount or sell Musical Instruments and Equipment below the MAPP price. These MAPPs were vertical contracts between individual manufacturers and retailers and were not enforced rigorously.

3. Starting in the early 2000s, the retail music industry was threatened by the emergence of internet-based retailers and big box retailers in the music business. These retailers sold Musical Instruments and Equipment at prices below those the specialty music retailers could offer. In response, beginning in or about 2004, Guitar Center, other retailers, and manufacturers of Musical Instruments and Equipment, acting through NAMM, entered into a contract, combination or conspiracy to raise, fix, maintain or stabilize the prices of Musical Instruments and Equipment through strict enforcement of the MAPPs. The conspiracy to implement and enforce the MAPPs served no

---

[1] A fretted instrument is a stringed instrument, such as a guitar, banjo, bass or mandolin that is played by striking or plucking the strings, either with fingers or a pick.

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
CONSOLIDATED CLASS ACTION COMPLAINT

legitimate pro-competitive function and was designed solely to fix retail prices for Musical Instruments and Equipment.

4. The MAPPs between Defendants Fender, Gibson, Yamaha, Kaman, Ibanez, and Roland, (defined below as the "Manufacturer Defendants"), on the one hand, and the retailers of Musical Instruments and Equipment on the other, were neither independent contracts implemented unilaterally by manufacturers nor designed to increase inter-brand competition. Rather, the MAPPs were the product of conspiratorial conduct and were substantially standardized across the industry so that all retailers would have the same minimum prices.

5. The conspiracy was developed and implemented through NAMM. As the dominant specialty music retailer, Guitar Center was able to and did use its dominant position in the market to enforce the conspiracy by threatening manufacturers that were lax in their own enforcement of the MAPPs. The conspiracy therefore took the form of a series of vertical restrains on trade (the MAPPs), but had the effect of a horizontal restraint on trade because the Manufacturer Defendants agreed to enforce similar MAPPs.

6. On March 4, 2009, the Federal Trade Commission ("FTC") filed a complaint alleging that "[b]etween 2005 and 2007, NAMM organized various meetings and programs at which competing retailers of musical instruments were permitted to and encouraged to discuss strategies for implementing minimum advertised price policies, the restriction of retail price competition, and the need for higher retail prices." *In the Matter of National Association of Music Merchants, Inc.*, FTC File No. 001 0203. After reviewing and analyzing documents subpoenaed from various industry participants, the FTC issued a cease and desist order to NAMM. The FTC found that NAMM's acts and practices "constitute unfair methods of competition in or affecting commerce" in violation of 15 U.S.C. § 45. The published FTC analysis of the NAMM complaint and settlement stated, "the allegation is that here – taking into account the type of information involved, the level of detail, the absence of procedural safeguards, and overall market conditions – the exchange of information engineered by NAMM lacked a pro-competitive justification."

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
CONSOLIDATED CLASS ACTION COMPLAINT

7.     Plaintiffs are direct purchasers of Musical Instruments and Equipment which, as used in this Complaint, refers to:  (1) fretted instruments, including acoustic and electric guitars, bass guitars, banjos, and mandolins; and (2) guitar amplifiers.

8.     Plaintiffs bring this action on behalf of themselves and a proposed nationwide Class of purchasers of Musical Instruments and Equipment from Guitar Center from January 1, 2004 through March 4, 2009 ("Class Period").  Plaintiffs and the proposed Class assert that NAMM, Guitar Center, and other Defendants and unnamed co-conspirators violated the Sherman Antitrust Act, 15 U.S.C. § 1 and the laws of California.  Plaintiffs also assert claims on behalf of a subclass under the laws of Massachusetts.

## JURISDICTION AND VENUE

9.     Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  The Court has subject matter jurisdiction pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a) and 28 U.S.C. § 1331 and 1337.  The Court also has jurisdiction over the state law claims under 28 U.S.C. §§ 1332(d)(2) and 1367(a).

10.     Venue is proper in this federal judicial district under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

## PARTIES

### A.     Plaintiffs

11.     Plaintiff Alex Bohl is a resident of Sacramento, California.  During the Class Period, Mr. Bohl purchased a Gibson Epiphone hollow body electric guitar and a Fender Hot Rod Deluxe guitar amplifier from Guitar Center retail stores in California.

12.     Plaintiff David Giambusso is a resident of Jersey City, New Jersey.  During the Class Period, Mr. Giambusso purchased a Fender Stratocaster guitar from a Guitar Center retail store in New Jersey.

13.     Plaintiff Jeremy Haskell is a resident of Portland, Maine.  During the Class Period, Mr. Haskell purchased an Ibanez Artcore AF75D guitar from a Guitar Center retail store in Massachusetts.

14.     Plaintiff David Keel is a resident of Corona Del Mar, California.  During the Class Period, Mr. Keel purchased a Fender guitar from a Guitar Center retail store in California.

15.     Plaintiff Robert Lesko is a resident of Modesto, California.  During the Class Period, Mr. Lesko purchased a Gibson Les Paul guitar, an Ovation CSD225-RRB double neck acoustic guitar, and a Fender '65 Deluxe Reverb guitar amplifier from Guitar Center retail stores in California.

16.     Plaintiff Kenneth Manyin is a resident of Cherry Hill, New Jersey.  During the Class Period, Mr. Manyin purchased a Fender Rumble 100/115 Combo guitar amplifier from a Guitar Center retail store in Illinois.

17.     Plaintiff Ronald A McCain is a resident of Austin, Texas.  During the Class Period, Mr. McCain purchased a Gibson Flying V Guitar, a Fender Geddy Lee Jazz Bass Guitar and a Yamaha FG750S Acoustic Guitar from Guitar Center retail stores in Texas.

18.     Plaintiff Suzanne Ondre is a resident of San Francisco, California.  During the Class Period, Ms. Ondre purchased a Takamine guitar from a Guitar Center retail store in California.

19.     Plaintiff Bonnie Ornitz is a resident of Granada Hills, California.  During the Class Period, Ms. Ortiz purchased a Fender Stratocaster guitar from a Guitar Center retail store in California.

20.     Plaintiff Dr. David Palmer is a resident of Portland, Maine.  During the Class Period, Dr. Palmer purchased a Fender guitar, a Fender American Standard Stratocaster guitar, and a Roland guitar amplifier from Guitar Center retail stores in Maine.

21.     Plaintiff Niranjan Parikh is a resident of Houston Texas.  During the Class Period, Mr. Parikh purchased a Fender guitar and a Fender guitar amplifier from a Guitar Center retail store in Texas.

22.    Plaintiff Lisa Pritchett is a resident of San Mateo, California.  During the Class Period, Ms. Pritchett purchased an Ibanez AF75D-TOR Artcore Series Hollowbody Transparent Orange guitar from a Guitar Center retail store in California.

23.    Plaintiff Johan Edward Rigor is a resident of Burlingame, California.  During the Class Period, Mr. Rigor purchased a Sound Gear by Ibanez SR 305DX bass guitar from a Guitar Center retail store in California.

24.    Plaintiff Joshua Seiler is a resident of Allston, Massachusetts.  During the Class Period, Mr. Seiler purchased a Fender Telecaster guitar from a Guitar Center retail store in Massachusetts.

25.    Plaintiff Alexander Teller is a resident of Chicago, Illinois.  During the Class Period, Mr. Teller purchased a Fender FB-54 Banjo from a Guitar Center retail store in Illinois.

**B.    Defendants**

26.    Defendant National Association of Music Merchants, Inc. ("NAMM") is a New York corporation with its principal place of business located at 5790 Armada Drive, Carlsbad, California 92008.  NAMM is a music industry trade association comprised of more than 9,000 members.  Most U.S. manufacturers, distributors and dealers of musical instruments and related products, including Guitar Center and the named manufacturer or distributor Defendants in this case, are members of NAMM.

27.    Defendant Guitar Center, Inc. ("Guitar Center") is a Delaware corporation with its principal place of business at 5795 Lindero Canyon Road, Westlake Village, California.  Guitar Center is the leading retailer of Musical Instruments and Equipment in the United States with 315 stores and the nation's largest direct response retailer (both catalog and online) of musical instruments.

28.    Defendant Fender Music Instruments Corporation ("Fender") is a Delaware corporation with its principal place of business at 8860 East Chaparral Road, Suite 100, Scottsdale, Arizona. Fender manufactures and distributes fretted musical instruments and guitar amplifiers, and produces the highest-selling line of guitars in the United States.  Fender's Chief Executive Officer, Bill Mendello, served on the NAMM board from 2006 to 2009.

29.    Defendant Gibson Guitar Corporation d/b/a Gibson U.S.A. ("Gibson") is a Delaware corporation with its principal place of business located at 309 Plus Park Boulevard, Nashville, Tennessee 37217.  Gibson manufactures and distributes fretted musical instruments and guitar amplifiers.  Gibson is best known for its specialty-product lines such as the Les Paul guitar.

30.    Defendant Yamaha Corporation of America ("Yamaha") is a California corporation with its principal place of business located at 6600 Orangethrope Avenue, Buena Park, CA 90620.  Yamaha manufactures or distributes fretted musical instruments and guitar amplifiers.  Terry Lewis, as Senior Vice President at Yamaha, served on the NAMM board of directors from 2003-2005.  In 2009, Yamaha Senior Vice President, Rick Young, was elected to the NAMM board of directors.  Mr. Young's board term ends in 2012.

31.    Defendant Hoshino U.S.A., Inc. ("Hoshino" or "Ibanez") is a Pennsylvania corporation with its principal place of business located at 1726 Winchester Rd, Bensalem, PA 19020-4542.  Hoshino manufactures or distributes fretted instruments and guitar amplifiers under the Ibanez brand.  Hoshino's President, Bill Reim, served on the NAMM board of directors from 2006 to 2009.

32.    Defendant Kaman Music Corp. ("Kaman") has been a wholly owned subsidiary of Fender since 2008, and has its principal place of business located at 55 Griffin Road South, Bloomfield, Connecticut, 06002-0507.  Kaman manufactures and distributes fretted instruments under the Ovation, Adamas, Takamine, and Hamer brands, as well as guitar amplifiers.  Paul Damiano, Kaman's Vice President of Marketing and Sales, served on the NAMM board of directors from 2003 to 2006.  Fender purchased Kaman in early 2008 for $124 million.

33.    Defendant Roland Corporation U.S.  ("Roland") is a Delaware corporation with its principal place of business located at 5100 S. Eastern Ave., Los Angeles, CA 90040-2938.  Roland manufactures and distributes electronic guitars, guitar amplifiers and other musical instrument products.  Roland's CEO and President, Dennis Houlihan, served on the NAMM board of directors for a decade, culminating in NAMM's first commercial chairman, a position held by Mr. Houlihan from 2005 through 2007.

34.    Fender, Gibson, Yamaha, Ibanez, Kaman, and Roland, collectively the "Manufacturer Defendants") are members of NAMM and each regularly attended NAMM's biannual trade show and convention as product manufacturers and/or as participants in NAMM-sponsored seminars and roundtables.  Before and during the Class Period, the Manufacturer Defendants participated in meetings and discussions organized and facilitated by NAMM, and conspired with NAMM, Guitar Center, and other Defendants and their co-conspirators to exchange pricing information; adopt, implement and enforce MAPPs; restrict retail price competition; eliminate price discounting; restrain competition and/or artificially increase the retail price of Musical Instruments and Equipment.

35.    Various persons or entities not named as Defendants participated as co-conspirators in the wrongful conduct and violations of law alleged herein and performed acts or made statements in furtherance thereof.  Following additional investigation and the opportunity for discovery, Plaintiffs may seek leave to name additional persons or entities as Defendants at a later date.

## AGENCY AND AIDING AND ABETTING

36.    The acts herein alleged against the Defendants were authorized, ordered or performed by their officers, agents, employees or representatives while actively engaged in the management or operation of Defendants' business or affairs.

37.    Plaintiffs are informed and believe and thereupon allege that as to all transactions relevant herein, each Defendant was the agent of one or more Defendants named herein and, as such, each Defendant was acting within the purpose, course and scope of such agency.  Plaintiff is further informed and believes that each Defendant aided and abetted, acted in concert with or conspired with each and every Defendant to commit the acts and engage in a course of conduct in the acts and business practices complained of herein.

## CLASS ACTION ALLEGATIONS

38.   Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), (b)(2) and/or (b)(3), and 23(c)(4) on behalf of the following Class:

All persons who directly purchased one or more of the products within the below defined subclasses from Guitar Center, Inc. in the United States from January 1, 2004 through March 4, 2009:

a.   All purchasers of new fretted instruments or guitar amplifiers manufactured or distributed by Fender Music Instruments Corporation or its affiliates, including Kaman;

b.   All purchasers of new fretted instruments or guitar amplifiers manufactured or distributed by Gibson Guitars d/b/a Gibson USA or its affiliates;

c.   All purchasers of new fretted instruments or guitar amplifiers manufactured or distributed by Hoshino U.S.A., Inc. or its affiliates;

d.   All purchasers of new fretted instruments or guitar amplifiers manufactured or distributed by Yamaha Corporation of America USA or its affiliates;

e.   All purchasers of new guitar amplifiers manufactured or distributed by Roland Corporation U.S. or its affiliates;

39.   Excluded from the Class are Defendants; the subsidiaries and affiliates of any Defendant; any person or entity who is a partner, officer, director, or controlling person of any Defendant; members of Defendants' immediate families and their legal representatives, heirs, successors or assigns; and any entity in which any Defendant has or had a controlling interest.

40.   This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

41.   **Numerosity.**  Members of the Class are so numerous that their individual joiner is impracticable.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of Class members.  Plaintiffs also believe that Class members are sufficiently numerous and

geographically dispersed throughout the United States that joinder of all Class members is impracticable.

42. **Existence and predominance of common questions.**  Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members.  These common questions include:

a.     Whether Defendants conspired or engaged in concerted action in restraint of trade;

b.     The identities of the co-conspirators;

c.     The duration of the alleged combination or conspiracy and nature and character of the acts done in furtherance of the alleged combination or conspiracy;

d.     Whether Defendants' conduct as alleged herein caused Plaintiffs and Class members to pay more for Musical Instruments and Equipment than they otherwise would have paid in an unrestrained, competitive market;

e.     Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

f.     Whether the alleged combination or conspiracy, and the nature and character of the acts done in furtherance of the alleged combination or conspiracy, violated the California Cartwright Act, California Business and Professions Code §§ 16700 *et seq.*, the California Unfair Competition Law, California Business and Professions Code §§ 17200 *et seq.*, and/or the unfair business practices law of Massachusetts;

g.     Whether Defendants actively concealed the contract, combination or conspiracy from Plaintiffs and other Class members;

h.     Whether Plaintiffs and other members of the Class were injured by the conduct of defendants and their co-conspirators and, if so, the appropriate class-wide measure of damages and appropriate injunctive relief; and

i.      Whether Plaintiffs and the Class are entitled to declaratory, equitable or injunctive relief.

43.    **Typicality.**  Plaintiffs' claims are typical of the claims of the Class in that each of the Plaintiffs, like other Class members:   purchased Musical Instruments and Equipment described in the Class definition from Guitar Center; lost money or property and/or were damaged as a result of the same wrongful conduct of the Defendants as alleged herein; and seek relief common to the Class.

44.    **Adequacy.**  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and intend to prosecute this action vigorously.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

45.    **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joiner of all members is impracticable.  Furthermore, while the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

46.    Even if the Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, is in fact manageable, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  The benefits of adjudicating this controversy as a class action far outweigh any difficulties that may occur in managing the Class.

47.    In the alternative, the Class may be certified under the provisions of Federal Rules of Civil Procedure 23(b)(1), (b)(2), and/or 23(c)(4) because:

a.     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members and would establish incompatible standards of conduct for defendants;

b.     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be disparities of the interests of other Class members not parties to the adjudications, or substantially impair or impede the ability of other Class members to protect their interests;

c.     Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief with respect to the members of the Class as a whole an appropriate form of relief; and

d.     The claims of Class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

## TRADE AND COMMERCE

48.     The activities of Defendants, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

49.     In the conduct of their businesses, Defendants directly or indirectly have used the means and instrumentalities of interstate commerce in furtherance of the acts and communications alleged herein.  The alleged meetings and exchanges of information arranged by Defendant NAMM were initiated and effectuated by and through, among other things, the United States postal system, nationwide telecommunication networks and/or the nation's common carrier or transportation systems. Guitar Center and the Manufacturer Defendants were members of NAMM.

50.     During the Class Period, these Defendants marketed, sold, distributed or shipped substantial quantities of Musical Instruments and Equipment in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which these Defendants manufactured, produced, distributed, marketed or sold such Products.

## SUBSTANTIVE ALLEGATIONS

**A.** **Guitar Center Is The Dominant Retailer Of Musical Instruments And Equipment And Enjoys Market Power In Its Dealings With Manufacturers**

51. The music products industry includes companies that manufacture, supply, distribute or sell musical instruments, accessories, and products for amplifying and recording music.

52. *The Music Trades*, a leading industry publication, reported that in 2004-2007, retail sales of musical instruments and related products in the United States ranged from approximately $7.3 billion to $7.5 billion. Sales of fretted instruments, plus guitar amplifiers, generated $1.545 billion in retail sails in 2004 and almost $1.667 billion in retail sales in 2007 – roughly 20% of the total sales of musical instruments and related products in the United States.

53. Specialty music retail stores, such as Guitar Center, are the main retail sales venue for music instrument sales in the United States. According to a national Gallup Poll sponsored by NAMM, 57% of all poll respondents preferred specialty music stores, as compared to 23% who prefer to shop on line, and 15% who preferred big box retailers such as Best Buy, Costco or Wal-Mart.

54. Guitar Center is the dominant retail outlet for Musical Instruments and Equipment. Over the last decade, Guitar Center has grown through acquisitions of former competitors, and achieved dominance in an ever-more-concentrated retail market. In June 1999, Guitar Center acquired Musicians Friend, Inc., an Oregon-based catalog and e-commerce instrument retailer. In April 2001, Guitar Center bought American Music Group, Ltd., a musical instrument retailer, with 12 retail stores, specializing in the sale and rental of band instruments and accessories serving the student and family market. In April 2005, Guitar Center purchased Music and Arts Center, Inc., a Maryland-based musical instruments retailer with 80 store locations. In February 2007, Guitar Center acquired out of a bankruptcy proceeding substantially all of the assets of Dennis Bamber, Inc., also known as The Woodwind & The Brasswind, a catalog and internet retailer. As a result of acquisitions and decreased competition, Guitar Center's share of the retail market for musical instruments and related products grew from 6.1% to 26.6% during the period 1997-2007.

55.   As of 2008, Guitar Center had 315 retail stores – eight times the number of retail stores of its next largest competitor, Sam Ash Music Corporation ("Sam Ash").  Guitar Center is also the nation's largest catalog and online retailer musical instruments.

56.   Guitar Center consistently ranks as nation's retail sales leader in *The Music Trades* annual report, Retail Top 200.  *The Music Trades* estimated that Guitar Center's estimated sales were $1.5 billion in 2004 and rose to $2.1 billion in 2007.  Based on these estimates, during the Class Period, Guitar Center had nearly 30% of the total music industry retail sales in the United States. Guitar Center had an even greater percentage of total retail sales of high-quality fretted instruments and related products in the United States.

57.   Guitar Center's market dominance increased over the Class Period.  Guitar Center's estimated annual revenues of $1.5 billion in 2004 were approximately equal to the combined annual revenues of the 28 next largest specialty music retailers, according to data published by *The Music Trades*.  By 2007, Guitar Center's estimated annual revenues of $2.1 billion exceeded the combined revenues of the 100 next largest specialty music retailers.  Guitar Center's 2007 estimated annual revenues were almost five times those of its next largest competitor, Sam Ash.  Sam Ash, in turn, had over three times the revenues of American Music Supply, the third largest specialty music retailer.

58.   The retail industry for Musical Instruments and Equipment is characterized by significant entry barriers.  To compete with existing retailers, new entrants, including warehouse retailers seeking to sell Musical Instruments and Equipment effectively, must make large investments in real estate, retail selling space and inventory.

59.   As one NAMM observer reported in the March 1, 2008 issue of *The Music Trades*:  "To generate reasonable sales volumes, you need a lot of SKUs.  I am not sure [Best Buy] will be able will be able to achieve the kind of volume they're hoping for in just 2500 square feet of space."  To emphasize the point, Guitar Center has publicly reported that its average large store selling space is 12,000 to 30,000 square feet and includes average inventory of approximately 7,200 core SKUs.  By contrast, Best Buy devotes relatively few (2500) square feet within its retail store to musical

instruments and related products, and offers consumers only approximately 1000 SKUs – or approximately one-seventh of the product inventory offered at a large Guitar Center store.

60.    According to publicly-available financial reports filed in 2007, Guitar Center serves as the largest retail customer of many of its instrument manufacturers and suppliers, including Fender and Gibson.  Guitar Center had significant market power in its relationships with the manufacturers of Musical Instruments and Equipment during the Class Period, because the volume of its purchases and its dominance as a distribution channel enabled it to control prices and exclude competition. Manufacturers, including the Manufacturing Defendants, had little choice but to accommodate Guitar Center's demands for vertical price restraints (the MAPPs), because they needed access to Guitar Center's retail customer base.

61.    Guitar Center's market power manifested itself in various ways.  For example, according to former Guitar Center employees, Guitar Center "strong armed" guitar manufacturers, including Yamaha and Fender, into not selling their products to competing stores that planned to open near Guitar Center store locations.  In addition, Guitar Center corporate personnel have acknowledged to store managers that Guitar Center dictated the MAPPs for fretted instruments to manufacturers, including Gibson.

62.    According to independent retailers, Guitar Center wields enormous power in the Musical Instruments and Equipment market, enabling it to influence product offerings and pricing factors.  For instance, in an interview in the April 2007 issue of *Musical Merchandise Review*, Alan Levin of Chuck Levin's Washington Music Center stated:  "The biggest concern [for independent retailers] is Guitar Center.  They are many [Music Product] manufacturers' biggest customers and changes are being made . . . to suit them alone."

63.    At a discussion published in *The Music Trades* in February 2007, a retailer commented on Guitar Center's power, stating, "As big as GC is, what's a little manufacturer to do?  Not surprisingly, they do what GC demands."  Another retailer similarly stated, "With CG's deep pockets, I suspect that they're getting special deals . . . ."  Similarly, another member of NAMM was quoted in

the March 1, 2008 issue of *The Music Trades* as saying, "Guitar Center has too much leverage [with suppliers]. . . ."

64.    Guitar Center exercised its market power, as a matter of common practice, by obtaining exclusive rights to sell new "limited edition" fretted instruments from the Manufacturer Defendants. For example, Gibson offered Guitar Center the exclusive right to sell its limited edition Billy Gibbons "Pearly Gates" electric guitar, a replica of a rare 1959 Gibson Les Paul Standard electric guitar named after a guitarist from ZZ Top.

**B.    The Manufacturer Defendants Enjoy Market Power In Their Dealings With Retailers Other Than Guitar Center**

65.    Fretted instruments are among one of the largest segments of the music products industry. Throughout the Class Period, sales of fretted instruments in the United States constituted approximately 16% to 17% of total domestic music product sales.  The Manufacturer Defendants rank among the largest manufacturers and distributors of fretted instruments.

66.    The manufacturing industry for Musical Instruments and Equipment is characterized by significant barriers to entry.  For example, new production facilities, such as the plant that Fender opened in 1998, can cost as much as $20 million.

67.    High-quality fretted instruments and guitar amplifiers constitute the relevant product market(s) in the litigation.  The Manufacturer Defendants dominate the relevant product market(s). The limited publicly-available data shows that the Manufacturer Defendants collectively possess market power over the relevant product market(s).

68.    During the Class Period, the Manufacturer Defendants and their affiliates collectively had significant market power in their relationships with retailers other than Guitar Center, because the volume of their sales and their dominance in the relevant product market(s) enabled them to coerce these retailers to agree to MAPPs in their distribution contracts.

69.   Most famous rock guitarists play the Manufacturer Defendants' fretted instruments, giving these companies dominant stature in the relevant product market(s) and serving as an additional barrier to entry by potential new competitors.

### C.   Pricing Changes In The Market For Musical Instruments And Equipment During The Class Period

70.   **Fretted Instruments.**  The Manufacturer Defendants and their affiliates manufactured and distributed guitars and other fretted instruments.  In the years leading up to the Class Period, the guitar segment of the music products industry (exclusive of other fretted instruments) saw a significant increase in unit volume sales.  The number of units sold between 1997 and 2004 increased over 300 percent.  As indicated in Table 1 below, the number of guitar units sold leveled off in 2004, and thereafter declined.[2]

### Table 1:  Electric and Acoustic Guitars

| Year | Electric and Acoustic Guitars units sold | % Change year over year | Average retail price per unit | % change year over year |
|------|------|------|------|------|
| 1997 | 1,090,329 | -0.33% | $652 | 0.93% |
| 1998 | 1,153,915 | 5.83% | $602 | -7.67% |
| 1999 | 1,337,347 | 15.90% | $570 | -5.32% |
| 2000 | 1,648,595 | 23.30% | $560 | -1.75% |
| 2001 | 1,742,498 | 5.70% | $529 | -5.52% |
| 2002 | 1,942,625 | 11.49% | $474 | -10.42% |
| 2003 | 2,341,551 | 20.54% | $386 | -18.64% |
| 2004 | 3,302,670 | 41.05% | $310 | -19.71% |
| 2005 | 3,309,722 | 0.21% | $350 | 13.03% |
| 2006 | 2,991,260 | -9.62% | $372 | 6.13% |
| 2007 | 2,868,000 | -4.12% | $389 | 4.82% |
| 2008 | 2,769,650 | -3.43% | $375 | -3.65% |

---

[2]  Tables 1 and 2 represent data from publicly-available sources.  The information in these tables is over-inclusive in that the underlying data includes products outside of the relevant product market(s), such as low-cost imports.

71.     Although the demand for guitars increased steadily from 1997 to 2004, when the Class Period begins, the increase in demand did not translate to higher prices.  Instead, the estimated average retail sales price of guitars decreased, falling steadily from 1997 to 2001 and then plummeting from $529 in 2001 down to $310 in 2004.

72.     Beginning in 2004, Defendants reversed the decline in unit sales prices by engaging in the collusive activities described below.  Consistent with the formation of the alleged conspiracy, retail unit prices leveled off and began to rise from 2004 to 2007, as shown in Table 1, above.  Although prices fell somewhat during the course of the FTC's investigation in 2008, the conspiracy enabled Defendants to continue to maintain or stabilize these prices at higher levels than they would have been in a competitive market.

73.     **Guitar amplifiers**:   The Manufacturer Defendants and their affiliates manufactured and distributed guitar amplifiers.  From 1997 to 2003 the number of units sold increased gradually, peaked in 2004 and thereafter began to fall.  Retail unit prices of guitar amplifiers steadily decreased from 1997 to 2004, and then, consistent with the formation of the alleged conspiracy, leveled off and began to rise after 2004.  As with fretted instruments, although prices for guitar amplifiers fell somewhat during the course of the FTC's investigation in 2008, the conspiracy enabled Defendants to continue to maintain or stabilize these prices at higher levels than they would have been in a competitive market. The relevant data is as follows:

**Table 2:  Guitar Amplifiers**

| Year | Guitar amplifier units sold | % Change year over year | Average retail price per unit | %  change year over year |
|------|------|------|------|------|
| 1997 | 574,250 | 0.34% | $630 | -4.00% |
| 1998 | 562,760 | -2.00% | $605 | -8.93% |
| 1999 | 635,900 | 13.00% | $551 | -11.07% |
| 2000 | 749,500 | 17.86% | $490 | -3.47% |
| 2001 | 764,496 | 2.00% | $473 | 3.56% |
| 2002 | 825,120 | 7.93% | $435 | -7.93% |
| 2003 | 974,000 | 18.04% | $348 | -20.02% |
| 2004 | 1,279,300 | 31.34% | $291 | -16.38% |

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
CONSOLIDATED CLASS ACTION COMPLAINT

| Year | Guitar amplifier units sold | % Change year over year | Average retail price per unit | %  change year over year |
|------|------------------------------|--------------------------|--------------------------------|---------------------------|
| 2005 | 1,240,921 | -3.00% | $320 | 9.97% |
| 2006 | 1,092,000 | -12.00% | $330 | 3.13% |
| 2007 | 1,112,000 | 1.83% | $339 | 2.73% |
| 2008 | 1,096,000 | -0.01% | $310 | -8.55% |

**D.     NAMM Was The Industry Vehicle For Discussing And Controlling Prices**

74.     NAMM is the predominant trade association for the music product industry.  NAMM is comprised of more than 9,000 members, including most U.S. manufacturers, distributors and dealers of musical instruments and related products.  As the FTC observed in its March 4, 2009 press release, entitled *National Association of Music Merchants Settles FTC Charges of Illegally Restraining Competition*, NAMM "serves the economic interests of its members by, among other things, promoting consumer demand for musical instruments, lobbying the government, offering seminars and organizing trade shows.  In the United States, NAMM sponsors two major trade shows each year, where manufacturers introduce new products and meet with dealers and competing manufacturers, distributors and retailers of musical instruments meet and discuss issues of concern to the industry."

75.     From the mid-1990s through at least 2008, NAMM sponsored two major trade shows each year where manufacturers introduced new products and met with dealers and competing manufacturers, distributors and retailers to discuss issues of concern to the industry.  NAMM also hosted an invitation-only "Global Economic Summit" or "Global Summit" once every three years where key industry leaders, including representatives of the Defendants named herein, met to explore emerging markets, reinforce relationships and share visions for industry growth.  At each of these meetings and programs, NAMM members were encouraged to and did exchange cost and pricing information, and discussed strategies for implementing MAPPs, restricting retail price competition and increasing retail prices for Musical Instruments and Equipment.

76.    NAMM trade shows are considered an indispensable resource by Music Product retailers. As one NAMM member stated in an interview published in the *Musical Merchandise Review* in February 2007:

> Many years ago, the importance of attending a NAMM show may not have seemed important, today it is absolutely necessary.  Owners and key personnel should be at NAMM . . . the education seminars are priceless.  The interaction with the industry people and colleagues is priceless.

### E.    Before The Class Period, Defendants' Efforts To Fix Prices Had Limited Success

77.    Commencing in the late 1990s and continuing thereafter, NAMM and the other Defendants and their co-conspirators fashioned, encouraged and adopted MAPP pricing as a means to maintain or increase high profit margins.

78.    The FTC Complaint asserts that numerous leading musical instrument manufacturers adopted MAPPs beginning in 1999.  *Musical Merchandise Review* reported in 2006 that MAPPs had been a staple of the music instruments industry for more than a decade.

79.    Certain manufacturers enforced MAPPs in the late 1990s or early 2000s, sanctioning or terminating retailers that sold below the MAPP approved retail price.  The MAPPs were not, however, enforced consistently by all manufacturers in the late 1990s and early 2000s.

80.    On August 1, 2001, *The Music Trades* published a report on how Music Product manufacturers and retailers could use MAPPs to protect or increase revenues.  The report stated:

> Last year [2000] when we polled leading m.i. dealers about the value of minimum advertised price (MAP) policies, only 31% said they had a positive effect on gross margins.  60% said that MAP had no effect at all on selling prices, while 9% said the programs actually decreased margins.  When asked the same questions this year [2001], retailers expressed a major change of heart.  51% said that MAP policies had improved their gross margins during the past 12 months, and only 44% deemed the policies ineffectual.

81.    *The Music Trades* concluded that this 20-point shift in opinion, over the one-year period from 2000 to 2001, was due to the fact that "the biggest benefit of MAP policies has been to rid the internet of loss-leader pricing."  The report continues:

> As a result [of the MAP policies], these days when you type the name of a popular product into a search engine, you'll get a screen full of results offering the same MAP

19

regulated price.  As our poll indicates, brick-and-mortar retailers obviously appreciate the fact that they don't have to deal with a legion of customers coming into the store brandishing a computer printout and demanding, "Why can't you beat this price?"

82.    At the January 2001 NAMM trade show there was significant discussion of MAPPs.  *The Music Trades* reported on the trade show as follows:

For the first time in memory, manufacturers seemed to be doing more than paying lip service to retail profit concerns, as evidenced by the flurry of new and more restrictive Minimum Advertised Price (MAP) policies that were rolled out at NAMM. … The trend is towards more expansive MAP policies that prohibit phone or email price quotes below MAP price, all in a bid to give brick and mortar stores an incentive to lay in inventory.

83.    The existence and effectiveness of MAPPs remained a concern a year later at the January 2002 NAMM trade show.  *The Music Trades* reported on the trade show and stated, "Manufacturers have acknowledged the retail concern with profitability by instituting minimum advertised price, or MAP policies.  In fact, mention of MAP pricing was routinely included in just about every new product presentation."

**F.    During The Class Period Defendants Entered Into A Contract, Combination Or Conspiracy To Fix Prices For Musical Instruments And Equipment Through Strict Enforcement Of MAPPs**

84.    Starting in or about 2004, NAMM facilitated discussions among its members to prop up retail prices for fretted instruments and other Musical Instruments and Equipment by preventing discounting from MAPPs.  These discussions were designed to eliminate retail price competition.

85.    NAMM, Guitar Center, the Manufacturer Defendants, and NAMM's retailer members agreed to set MAPPs at higher levels than before and to strictly enforce the MAPPs.  By uniformly requiring and enforcing MAPPs with higher retail prices, the Manufacturer Defendants could maintain and increase their wholesale prices to the Guitar Center and other retailers, which could then sell to consumers without the risk of inter- or intra-brand price competition.

86.    The conspiracy took the form of a series of vertical restraints on trade (the MAPPs), but had the effect of a horizontal restraint on trade, because the Manufacturer Defendants and other manufacturers agreed to require and enforce MAPPs with similar terms.  The Manufacturer Defendants required retailers to enter into and accept MAPPs as part of written retail distribution

contracts.  The MAPPs were substantially similar across the industry.  They were not distinct contracts implemented by manufacturers to increase inter-brand competition.

87.   NAMM and its constituent retailer members provided the impetus for the conspiracy. The conspiracy benefited NAMM, because it was composed primarily of small independent specialty music retailers, and it had seen a steady year-to-year erosion of its member base before the Class Period.  The conspiracy was intended to protect NAMM's dwindling members from competition from internet-based retailers and other low-cost retailers.

88.   The conspiracy benefited Guitar Center which, as the largest traditional bricks and mortar specialty music retailer, was threatened by competition from internet-based retailers and other low-cost retailers.  Maintaining stability in the industry permitted Guitar Center to continue enjoying its advantages over small independent retailers (name recognition, volume discounts from wholesalers, etc.), increase its profits, and remain the dominant specialty music retailer.  Moreover, the conspiracy enabled Guitar Center to use its market power to procure and enter into preferential contracts with manufacturers.  Guitar Center continued to seek and obtain quantity discounts, free goods, discontinued goods and close outs, preferential pricing from manufacturers, and other preferences relating to transportation, shipping, and warehousing.

89.   Guitar Center was at the hub of the conspiracy.  Guitar Center was the dominant retailer for high-quality fretted instruments and guitar amplifiers.  Guitar Center had market power over the relevant product market(s) to enforce violations of MAPPs and was in a position to monitor industry prices.  Guitar Center could and did threaten to order fewer products or terminate its relationship with the manufacturers that failed to enforce their MAPPs.  Because Guitar Center was the most important distribution outlet for all manufacturers, it could enforce the MAPPs for all Musical Instruments and Equipment and thereby limit price erosion of its own products.

90.   The conspiracy benefited the smaller independent specialty music retailers, because it protected them from competition from internet-based retailers and other low-cost retailers of Musical Instruments and Equipment.  Maintaining stability in the industry permitted the independent specialty

21

music retailers to continue competing with Guitar Center, internet-based retailers, and low-cost retailers on service and convenience, but eliminated retail price competition.

91.    The conspiracy benefited the Manufacturer Defendants, because it permitted them to stabilize and increase wholesale prices.  In addition, maintaining higher retail prices assisted the individual Manufacturer Defendants in preserving their brand images.

92.    NAMM held industry shows twice every year, providing an opportunity for competitors to meet, to exchange information, and to collude regarding the setting of prices in an effort to increase profits for manufacturers and retailers to the detriment of consumers.  The shows were not open to the general public.  NAMM held the following semi-annual shows during the Class Period:

**Table 3:  NAMM Semi-Annual Shows**

| Show | Dates | Location |
|---|---|---|
| 2004 NAMM Winter Show | January 16-18, 2004 | Anaheim, California |
| 2004 NAMM Summer Show | July 23-25, 2004 | Nashville, Tennessee |
| 2005 NAMM Winter Show | January 20-23, 2005 | Anaheim, California |
| 2005 NAMM Summer Show | July 22-24, 2005 | Indianapolis, Indiana |
| 2006 NAMM Winter Show | January 19-22, 2006 | Anaheim, California |
| 2006 NAMM Summer Show | July 14-16, 2006 | Austin, Texas |
| 2007 NAMM Winter Show | January 18-21, 2007 | Anaheim, California |
| 2007 NAMM Summer Show | July 27-29, 2007 | Austin, Texas |
| 2008 NAMM Winter Show | January 17-20, 2008 | Anaheim, California |
| 2008 NAMM Summer Show | July 20-22, 2008 | Nashville, Tennessee |

93.    The Manufacturer Defendants attended NAMM events and met with each other, Guitar Center, NAMM and other co-conspirators to exchange information and discuss strategies for implementing MAPPs, restricting price competition, and maintaining or increasing retail prices for Musical Instruments and Equipment.

94.    As most of the Manufacturer Defendants were represented on NAMM's Board of Directors during the Class Period, they knew or were aware of, participated in or approved NAMM's

encouragement, implementation and enforcement of MAPPs, and assisted NAMM in facilitating the conspiracy.

95.    At the 2004 NAMM Summer Show, manufacturers and retailers discussed the need for and effectiveness of MAPPs.  Reporting on the 2004 NAMM Summer Show, *The Music Trades* wrote: "A number of exhibitors also announced higher MAP prices in a bid to shore up dealer margins."

96.    NAMM hosted its Fifth Global Economic Summit or Global Summit in August 2004 in Carlsbad, California.  This was an invitation-only meeting to bring key industry leaders, media and advisors together "to explore emerging markets, reinforce global relationships and share different visions of the path to long-term, sustainable industry growth."

97.    At the 2005 NAMM Summer Show, NAMM hosted a discussion entitled "Does the Industry Need a MAP makeover?"  According to a November 2005 article published in *The Music Trades*, Music for Everyone, at this session, an association of thirteen Greater Los Angeles musical instrument retailers, presented a "voluntary MAP formula/guideline" which was urged and "recommended for general use" by Music Product retailers.

98.    At the 2006 NAMM Winter Show, NAMM again hosted a panel discussion on MAPPs. The panel included several industry leaders, including Tom Sumner, vice-president and general manager of Yamaha's Pro-Audio and Combo Division; Bob LeClaire, sales manager of Avedis Zildjian; and Robert Lee, sales manager at Kaman; and several retailers.  As reported in the March 1, 2006 edition of *The Music Trades*, the panelists were "unanimous, offering a guardedly positive assessment of MAP policies."

99.    At this panel discussion, only one independent internet retailer, Bryan Junk of massmusic.net, spoke in favor of price competition for the benefit of consumers, stating:  "We're supposed to compete, aren't we?"  *The Music Trades* captured some of the dialogue in its March 1, 2006 publication:

> Whether or not you agree with him, Bryan Junk, an internet retailer, deserves credit for staring down an auditorium packed with independent retailers and stating that MAP should be scrapped.  To audible boos, he declared, "*Consumers like low prices, and we try to give them what they want.  Why shouldn't we be able to grow our business by*

23

*offering the lowest possible prices without interference from the manufacturers*?" [Emphasis added.]

100. Mr. Junk did not sway his fellow panelists, however. As reported in *The Music Trades*, panel members persisted in their views that: (i) absent MAPPs "prices would rapidly migrate down to 10% over cost..."; (ii) MAPPs are "only as effective as [their] enforcement"; and (iii) current MAPP pricing guidelines should be revised "upwards to give retailers a better profit margin."

101. At a separate session hosted by NAMM at the 2006 NAMM Winter Show, Music for Everyone published and presented with NAMM's participation and consent two MAP pricing formula schedules based on retail costs, which were proposed and "designed for all instruments and all combo and audio products":

Proposed MAP Formula
Recommended Minimum Profit Formulas for A & B Discounts

Retail [$1-$149] x.05 x.2.00 = MAP (0% off retail)*
Retail [$150-$249] x 0.5 x. 1.90 = MAP (5% off retail)*
Retail [$240-$299] x 0.5 x 1.85 = MAP (7.5% off retail)*
Retail [$300-$349] x 0.5 x 1.80 = MAP (10% off retail)**
Retail [$350-$399] x 0.5 x 1.75 = MAP (12.5% off retail)**
Retail [$400-$449] x. 0.5 x. 1.70 = MAP (15% off retail)*
Retail [$450-$499] x 0.5 x 1.65 = MAP (17.5% off retail)*
Retail [$500 and up] x 0.5 x. 1.60 = MAP (20% off retail)*
Retail [$500-$599] x 0.5 x. 1.55 = MAP (22.5% off retail)**

*    Formula A
**  Formula B

102. In its NAMM January 2006 presentation, Music for Everyone encouraged manufacturers to adopt the MAP pricing reflected in the Formula A schedule, capping permitted discounts at 20 percent. Music For Everyone urged that no MAPP price should be lower than that reflected in the Formula B schedule, stating "the formula B profits are the minimum the brick-and-mortar full service music instrument retailers require to survive, and hopefully thrive."

103. At the 2006 NAMM Summer Show, NAMM again sponsored a roundtable discussion on MAPPs, profitability and competition. This session featured NAMM President and CEO Joe Lammond, Tom Sumner of Yamaha Electronics Corporation, and Fender Chairman and CEO, Bill Mendelo, among others. NAMM described this discussion in its preview materials as follows: "In the

two-hour session suppliers and retailers of all sizes will be able to share views about critical issues affecting profitability, including MAP pricing . . . and the entrance of mass consumer merchandisers into the industry."  Among the topics discussed at this session were MAPP prices that were set too low and industry profit margins.

104.  A roundtable discussion of dealers conducted by *The Music Trades* in February 2007 highlighted that retailers knew MAPPs were designed to limit competition and prop up retail prices for Musical Instruments and Equipment.  As part of the roundtable discussion, George Hines, of George's Music Stores located in Berwyn, Pennsylvania, and a member of NAMM's Board of Directors from 2003-2005, stated that the industry's "great challenge" was to get "all distribution channels [independents, national chains, mass merchants and internet providers] working together for the health of the industry."  He expressed his view that MAPPs could keep the industry profitable as long as retailers and suppliers understood each others' needs in setting the best MAPP pricing.  Hines stated that allowing market forces to control the industry would "not necessarily be for the better" and that what was needed was a "joint effort" to keep independents as the "heart and soul" of the industry with "manufacturer support."  He noted that the internet had commoditized products and pricing in the music industry.

105.  Also during the roundtable, Frank Hayhurst of Zone Music in Cotati, California stated that manufacturers would follow the lead of Guitar Center.  He urged retailers to join together with those "whom they used to consider their 'competitors' and create strategic alliances for their mutual benefit."  Regarding the use of MAPPs specifically, Hayhurst said:

> Some very clever work was done suggesting a sliding scale of much higher MAPs on lower price point products, higher MAPs on medium price point products, and slightly higher MAPs on higher cost products. The common theme is that MAPs need to go up, but everyone is afraid to do that because some other manufacturer might not. The solution? Independents need to band together and favor manufacturers that provide a MAP system that allows for independents to stay in business.

106.  NAMM continued to facilitate industry discussions of MAPPs and MAPP pricing at the 2007 NAMM Winter Show.  At least one roundtable discussion focused on, among other things, profit

margins and MAPP pricing.  *See, e.g., The Music Trades* (Jan. 1, 2007), "Why Going to NAMM is a total no-brainer: new products, smart people, and tons of educational seminars add up to the single biggest business opportunity of the year.  If you're serious, there's only one thing to do:  Show Up!"; NAMM 2007 PREVIEW; Calendar.

107.  NAMM held its Sixth Global Summit in 2007, in Carlsbad, California.  According to one press account published in the October 17, 2007 issue of *The Music and Sound Retailer*, NAMM Global Summit attendees "primarily consist[] of supplier decision makers as well as retailers."  Guitar Center's Chief Executive Officer, Marty Albertson, addressed the assembly at the NAMM Sixth Global Summit in 2007.  Albertson or other key representatives of Guitar Center also attended or participated in prior Global Summit events.

### G.    Defendants Unreasonably Restrained Trade, Prevented Competition, And Imposed Supra-Competitive Prices On Consumers

108.  Defendants agreed to and did adopt, impose or enforce MAPPs throughout the Class Period.  The MAPPs imposed and enforced by Defendants went well beyond typical cooperative advertising programs where manufacturers place restraints on the prices dealers may advertise in advertisements funded in whole or in part by the manufacturer.  Instead, with NAMM's knowledge, cooperation and assistance, Defendants and other unnamed co-conspirators devised a plan to exact agreements from Music Product manufacturers sold through Guitar Center and other NAMM retailers to require, on penalty of termination and as a condition of doing business, that the manufacturer ensure that its other retailers maintain the MAPPs and/or refrain from discounting.

109.  The MAPPs imposed on music retailers by Defendants are anticompetitive.  According to a *Wall Street Journal* report dated October 23, 2008, Bradley Reed, sales manager for Musician's Advocate, Inc., said that his company "had very little choice but to honor manufacturer's policies on advertised prices because otherwise it risks having its supplies cut off or being delisted as an authorized distributor."

110. As detailed above, NAMM arranged meetings and discussions, assisted and encouraged its members to exchange competitively sensitive information, and sought and obtained the agreement of its members, to impose and enforce these MAPPs, which had no legitimate pro-competitive purpose.

111. The Manufacturer Defendants did not simply enter into a series of vertical restrains on trade or unilaterally suggest retail prices to retailers; require retailers to maintain minimum retail prices to protect brand image; require retailers to provide levels of advertising or service and in return assure retailers that they would not be undercut by other retailers in intra-brand completion; announce or enforce policies of sanctioning or terminating retailers that failed to maintain the MAPP price; and sanction or terminate retailers that failed to maintain the MAPP price.

112. Rather, Defendants and their co-conspirators entered into a contract, combination or conspiracy that had the effect of a horizontal restraint on trade.  The Manufacturer Defendants did not act or unilaterally or merely in their own economic interest when they entered into written MAPPs with retailers; sought to have all retailers, including internet retailers and big box retailers, charge minimum retail prices; or sanctioned or terminated retailers that failed to maintain the MAPP price.

113. The efforts of Defendants to implement and enforce MAPPs during the Class Period paid off in the form of higher retail prices.  After falling for several years, the average unit prices of Musical Instruments and Equipment all leveled off or started to rise in 2004 and 2005.  Consumers paid the higher prices that manufacturers required and retailers charged under the MAPPs.

### H. The Anticompetitive Effects Of Defendants' Conduct

114. Defendants' actions in adopting, implementing and enforcing MAPPs have had the following anticompetitive effects:

a. Competition has been unreasonably restrained or suppressed;

b. Purchasers of Musical Instruments and Equipment have been denied the benefits of competition in a free and open market and have been forced to pay artificially high prices for such products;

1       c.      Defendants have enjoyed, and will continue to enjoy, supra-competitive profits to

2   the detriment of competitors and purchasers of Musical Instruments and Equipment.

3       115.  These anticompetitive effects of Defendants' conduct in the relevant product market(s)

4   outweigh any conceivable pro-competitive benefits.

5   **I.      The FTC Found That NAMM's Actions Were Anticompetitive And Served No**
        **Legitimate Business Purpose**
6

7       116.  On March 7, 2007, the FTC initiated a non-public investigation into price fixing in the

8   music products industry.  The FTC subsequently issued subpoenas to Guitar Center, Fender, Gibson,

9   Yamaha, Ibanez, Roland, and others regarding price fixing, MAPPs, and the sharing of confidential

10  cost, pricing and other business information at NAMM events.

11      117.  Following a two year investigation, on March 4, 2009, the FTC publicly issued a

12  proposed cease and desist order to NAMM and at the same time announced that it had tentatively

13  settled FTC charges that NAMM had "permitted and encouraged" acts constituting violations of

14  Section 5 of the FTC Act, 15 U.S.C. §45 and had engaged in acts and practices that "constitute unfair

15  methods of competition in or affecting commerce," also in violation of 15 U.S.C. § 45.  The FTC's

16  press release stated that the proposed consent order was "designed to remedy NAMM's

17  anticompetitive conduct."

18      118.  The FTC's Complaint alleged that between 2005 and 2007, NAMM organized various

19  meetings and programs for its members, such as Defendants herein, at which competing retailers of

20  Musical Instruments and Equipment and others "were permitted and encouraged to discuss strategies

21  for implementing MAPPs, the restriction of retail price competition, and the need for higher retail

22  prices."  The FTC asserted that NAMM was the lynchpin of this anticompetitive activity, stating

23  "Representatives of NAMM determined the scope of information exchange and discussion by

24  selecting moderators and setting the agenda for these programs."  The FTC complaint further alleged

25  that "[a]t these NAMM sponsored events, competitors discussed the adoption, implementation, and

26  enforcement of minimum advertised price policies; the details and workings of such policies,

27

28

appropriate and optimal retail prices and margins; and other competitively sensitive issues."  The Commission voted to approve the complaint and proposed consent order by a 4-0 vote.

119.  Following a 30 day period for comment, the FTC issued its Decision and Order on April 10, 2009.  The FTC states in its "Analysis of Agreement" that NAMM settled charges that it violated Section 5 "by arranging and encouraging the exchange among its members of competitively sensitive information that had the purpose, tendency, and capacity to facilitate price coordination and collusion among competitors."  Although the FTC's Decision and Order is directed to NAMM, the FTC's conclusion that an order was required to stop NAMM from arranging and encouraging collusive behavior presupposes the existence of the collusive behavior between and among NAMM's members, including Guitar Center and the other Defendants.

120.  In assessing NAMM's conduct, the FTC was cognizant of the fact that trade associations may "serve numerous valuable and pro-competitive functions, such as expanding the market in which its members sell; educating association members, the public and government officials; conducting market research; establishing inter-operability standards; and otherwise helping firms to function more efficiently."  Nonetheless, the FTC concluded that, "NAMM's activities crossed the line that distinguishes legitimate trade association activity from unfair methods of competition."

121.  In its Analysis of Agreement, the FTC offered the following reasoning for its finding that NAMM's conduct during the Class Period lacked a legitimate business purpose:

> A Respondent violates Section 1 of the Sherman Act and Section 5 of the FTC Act when it engages in concerted conduct that had the principal tendency or the likely effect of harming competition and consumers.  *California Dental Ass'n v. Federal Trade Commission*, 526 U.S. 756 (1999) (footnote omitted).  The conduct of a trade association or its authorized agents is generally treated as concerted action.  *E.g., California Dental Ass'n v. Federal Trade Commission*, 526 U.S. 756 (1999); *North Texas Specialty Physicians v. FTC*, 528 F.3d 346, 356 (5th Cir. 2008) ("When an organization is controlled by a group of competitors, it is considered to be a conspiracy of its members.").

> The Complaint alleges that at meetings and programs sponsored by NAMM, competing retailers of musical instruments and other NAMM members discussed strategies for raising retail prices.  Firms also exchanged information on competitively-sensitive subjects – prices, margins, minimum advertised price policies and their enforcement.

And not only did NAMM sponsor these meetings, but its representatives set the agenda and helped steer the discussions.  The antitrust concern is that this joint conduct can facilitate the implementation of collusive strategies going forward (footnote omitted). For example, such discussions could lead competing NAMM members to refuse to deal with a manufacturer, distributor, or retailer unless minimum advertised price policies, or increases in minimum advertised prices, were observed and enforced against discounters (footnote omitted).  Alternatively, NAMM members could lessen price competition in local retail markets.  Any or all of these strategies may result in higher prices and harm consumers of musical instruments.  Any savings from lower manufacturing costs would be reserved to NAMM members, and not shared with consumers in the form of lower retail prices.

The potential for competitive harm from industry-wide discussions must be weighed against the prospect of legitimate efficiency benefits.  Here, the Complaint alleges that no significant pro-competitive benefit was derived from the challenged conduct.  The Commission does not contend the exchange of information among competitors is categorically without benefit (footnote omitted).  Rather, the allegation is that here – taking into account the type of information involved, the level of detail, the absence of procedural safeguards, and the overall market conditions – the exchange of information engineered by NAMM lacked a pro-competitive justification.

122.  As part of the settlement and consent order, the FTC ordered NAMM to cease and desist from:

1.   Urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers or Musical Product Dealers relating to:

a.   the retail price of any Musical Product; or

b.   any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including but not limited to Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies.

2.   Entering into, adhering to, enforcing, urging, encouraging, advocating, suggesting, assisting or otherwise facilitating any Musical Product Manufacturer or Musical Product Dealer to enter into, adhere to or enforce any combination, conspiracy, agreement or understanding between or among any Musical Product Manufacturers or Musical Product Dealers relating to:

a.   the retail price of any Musical Product;

b.   any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer, including, but not limited to,

30

Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies; or

c.   the refusal to do business, or the reduction of business, with particular Musical Product Manufacturers or Musical Product Dealers.

123.  The Commission approved the NAMM consent order by a 4-0 vote.

124.  The FTC's consent order requires NAMM to file periodic compliance reports.  In those reports, NAMM represented to the FTC that it has provided antitrust training to its board of directors, has revised its Antitrust Policy, and has had antitrust counsel attend NAMM events.  NAMM represented that it provided each speaker at a recent NAMM show with a copy of its Antitrust Policy and required the speakers to provide NAMM with advance notice if the speaker intended to present any remarks or written materials regarding price terms, margins, profits, minimum advertised price policies, or resale price maintenance policies.  NAMM also represented to the FTC that it distributed copies of its Antitrust Policies to its members and provided approximately 1,000 attendees with an overview of the antitrust laws and guidance on how to comply with those laws.

125.  Before future meetings, NAMM will read a statement to attendees that states, in pertinent part:  "Any meeting such as this, where direct competitors such as manufacturers and retailers come together, has the potential to create antitrust problems. . . . NAMM must not facilitate, encourage, or allow participants at its events to engage in any conduct which restricts competition on price or output. . . . Remember, all NAMM members must make pricing decisions independently of any agreement or understanding with competitors."

126.  These substantial changes in NAMM's policies, practices and procedures confirm that during the Class Period, NAMM had violated the antitrust laws by facilitating the price-fixing conspiracy among Defendants.

127.  Even after the FTC's investigation, its cease and desist order, and the revisions to NAMM's antitrust policies, practices, and procedures, not all NAMM members appreciate the seriousness of price-fixing.  After hearing the NAMM antitrust statement at the start of a recent trade association meeting, one NAMM member stated, "MAP is legal; you just can't talk about it."

128.  The FTC continued its investigation following the entry of the NAMM consent order on April 10, 2009.  Several months later, on August 24, 2009, the FTC closed the investigation.  The FTC's letters to the other subjects of the investigation stated, "This action [the closure] is not to be construed as a determination that a violation may not have occurred. . . . The Commission reserves the right to take such action as the public interest may require."

## TOLLING OF STATUTE OF LIMITATIONS, ESTOPPEL, FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

129.  Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until March 4, 2009, when the FTC announced its investigation had resulted in a proposed cease and desist order.

130.  Defendants' actions were unlawful, unfair and deceptive.  As a consequence, unwary consumers were injured by Defendants' unlawful conduct.  Defendants are estopped from relying on any statute of limitations defense because of their unlawful, unfair or deceptive conduct.

131.  Defendants' conduct was, by its nature, self-concealing.  Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and actively foreclosed Plaintiffs and the Class from learning of their anti-competitive, illegal, unfair and/or deceptive acts.

132.  Any applicable statutes of limitations have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations.  Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiffs and the Class assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

133.  By reason of the foregoing, the claims of Plaintiffs and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, estoppel principles, and the equitable tolling and fraudulent concealment doctrines.

1
2

## FIRST CLAIM FOR RELIEF
### (Against all Defendants for Violations of Section 1
### of the Sherman Antitrust Act, 15 U.S.C. § 1)

3       134.  Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set

4   forth herein.

5       135.  Beginning on or about January 1, 2004, Defendants and their co-conspirators entered into

6   a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in

7   violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by artificially reducing or

8   elimination competition in the relevant market(s) for Musical Instruments and Equipment sold in the

9   United States.

10      136.  Defendants combined or conspired to raise, fix, maintain or stabilize the price of Musical

11   Instruments and Equipment sold in the United States.

12      137.  The contract, combination or conspiracy among Defendants consisted of a continuing

13   agreement, understanding or concerted action among Defendants and their co-conspirators.

14      138.  Defendants and their co-conspirators committed acts or made statements in furtherance of

15   formulating and effectuating their contract, combination or conspiracy, including:

16          a.      Participating in meetings and conversations to discuss the prices and supply of

17   Musical Instruments and Equipment;

18          b.      Communicating in writing or orally to fix target prices, floor prices or price

19   margins for Musical Instruments and Equipment;

20          c.      Exchanging competitively sensitive information to facilitate their combination or

21   conspiracy, including information concerning minimum advertising pricing factors, schedules and

22   policies, the details and workings of such policies, appropriate and optimal retail prices and margins,

23   strategies for raising retail prices for Musical Instruments and Equipment, and other commercially or

24   competitively sensitive information;

25
26
27
28

33

d.      Agreeing to manipulate prices and the supply of Musical Instruments and Equipment sold in the United States in a manner that deprived the market of free and open competition; and

e.      Selling Musical Instruments and Equipment to customers in the United States at artificially-inflated, noncompetitive prices.

139.  The actions of the Defendants directly or through NAMM constitute a combination in restraint of trade.  NAMM and the other Defendants are liable for the creation, maintenance and enforcement of their agreements under a "quick look" or "rule of reason" standard.  There was no legitimate, pro-competitive business justification for Defendants' combination or conspiracy, or their constituent agreements to restrain competition and artificially inflate the price of Musical Instruments and Equipment.  Even if there were some conceivable justification, the individual agreements were broader than necessary to achieve any legitimate purpose.

140.  Plaintiffs and members of the Class were injured in their business or property by the collusion and combination or conspiracy alleged above, which facilitated, enabled, assisted or furthered Defendants' actions to substantially limit competition in the relevant market(s).  Plaintiffs and the other members of the Class have been forced to pay higher prices for Musical Instruments and Equipment than they would have paid in the absence of Defendants' unlawful conduct.

## SECOND CLAIM FOR RELIEF
### (Against Defendants for Violations of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)

141.  Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set forth herein.

142.  Defendants entered into the unlawful conspiracy and combination described above in the State of California and the effects of that conspiracy occurred within and emanated from the State of California.  As alleged above, NAMM and Guitar Center devised, implemented and directed a scheme from their principal places of business in California through which Guitar Center, Manufacturer Defendants and other co-conspirators met and exchanged information, discussed strategies for

1  implementing MAPPs, and combined or conspired to restrict price competition and/or maintain or

2  increased the retail price for Musical Instruments and Equipment.

3  143. Defendants' acts and practices, as described herein, constitute unlawful combinations in

4  restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16700 *et seq*.

5  144. Defendants Guitar Center, NAMM, and the other Defendants combined or conspired with

6  each other and co-conspirators to unreasonably restrain trade and commerce by artificially reducing or

7  eliminating competition in the United States and/or by raising, fixing, maintaining or stabilizing the

8  prices for Musical Instruments and Equipment in the United States.

9  145. Plaintiffs and members of the Class were injured in their business or property by the

10  collusion and combination or conspiracy alleged above, which facilitated, enabled, assisted or

11  furthered Defendants' actions to substantially limit competition in the relevant market(s).  Plaintiffs

12  and the other members of the Class have been forced to pay higher prices for Musical Instruments and

13  Equipment than they would have paid in the absence of Defendants' unlawful conduct.

**THIRD CLAIM FOR RELIEF**
14  **(Against Defendants for Violations of California's Unfair Competition Law,**
15  **Cal. Bus. & Prof. Code § 17200 *et seq*.)**

16  146. Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set

17  forth herein.

18  147. Defendants entered into the unlawful conspiracy and combination described above in the

19  State of California and the effects of that conspiracy occurred within and emanated from the State of

20  California.  As alleged above, NAMM and Guitar Center devised, implemented and directed a scheme

21  from their principal places of business in California through which Guitar Center, Manufacturer

22  Defendants and other co-conspirators met and exchanged information, discussed strategies for

23  implementing MAPPs, and combined or conspired to restrict price competition and/or maintain or

24  increased the retail price for Musical Instruments and Equipment.

25  148. The acts and practices of Defendants as described herein, constitute unlawful business

26  practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq*., in that Defendants combined or

27

28

conspired with other Defendants and co-conspirators to unreasonably restrain trade and commerce by artificially reducing or eliminating competition in the United States and/or by raising, fixing, maintaining or stabilizing the prices for Musical Instruments and Equipment in the United States, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*

149.  The acts and practices of Defendants, as described herein, also constitute unfair business practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*, because the utility of Defendants' alleged  acts and practices in restricting competition in the Musical Instruments and Equipment market in the United States is significantly outweighed by the gravity of the harm that such acts and practices impose on Plaintiffs and Class members.  Defendants' acts and practices also are oppressive, unscrupulous or substantially injurious to Plaintiffs and Class members.

150.  Plaintiffs and Class members have suffered injury in fact and have lost money or property as a result of these Defendants' acts and practices, in that Plaintiffs and Class members paid artificially high prices for Musical Instruments and Equipment due to Defendants' unlawful agreement, combination or conspiracy and their unlawful, anticompetitive practices.

151.  Plaintiffs and Class members have suffered harm as a proximate result of the wrongful conduct of Defendants, and Plaintiffs therefore seek appropriate restitution.

152.  Plaintiffs and Class members also seek an order, pursuant to Cal. Bus. & Prof. Code § §17200 and 17203, enjoining Defendants from continuing to engage in the unlawful, unfair and fraudulent acts and practices described herein.

**FOURTH CLAIM FOR RELIEF**
**(Against Defendants for Violation Massachusetts Consumer Protection Act,**
**Mass. G. L.93A § 2 *et seq.*)**

153.  Plaintiffs Haskell and Seiler hereby incorporate by reference each preceding paragraph as though fully set forth herein.

154.  Plaintiffs Haskell and Seiler assert this claim on behalf of themselves and a Subclass of persons who directly purchased new Musical Instruments and Equipment from Guitar Center, Inc. in Massachusetts during the Class Period ("Massachusetts Subclass").

155.  Defendants are engaged in trade or commerce as defined by M.G.L. c. 93A, § 1(b).

156.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Mass. G.L. c. 93A § 2.  The acts committed by Defendants as alleged herein were unlawful contracts, combinations and conspiracies were in violation of M.G.L. c. 93A, § 2, and against public policy.  As set forth in detail above, Defendants illegally combined the acts of two or more persons for the purpose of:  (a) creating or carrying out unreasonable restraints of trade or commerce; (b) preventing competition in the manufacture and sale of Musical Instruments and Equipment sold in and/or distributed to Massachusetts; (c) entering into, executing, and carrying out contracts, obligations, and agreements in which they established and settled the price of Musical Instruments and Equipment so as to directly or indirectly preclude a free and unrestricted competition among themselves.

157.  Defendants' intentional and purposeful anticompetitive acts described above, including but not limited to, acts of collusion to set prices and the actual act of price fixing itself, were intended to and did in fact cause Plaintiffs Haskell and Seiler and the Massachusetts Subclass members to pay supra-competitive prices for Musical Instruments and Equipment purchased from Defendants or their Co-Conspirators in the Commonwealth of Massachusetts.

158.  The violations of Massachusetts G.L. c. 93A by Defendants were done willfully, knowingly, or in bad faith, entitling Plaintiffs Haskell and Seiler and the Massachusetts Subclass to double or treble damages.

159.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Haskell and Seiler and the Massachusetts Subclass have been injured in their businesses and property in that they paid more for Musical Instruments and Equipment than they otherwise would have paid in the absence of Defendants' unlawful conduct.

160.  Demand has been made upon Defendants pursuant to Mass. G.L. c. 93A, §§ 2, 9 more than 30 days prior to filing this claim for relief under Mass. G.L. c.  93A.  More than thirty days have passed since the demand letter was served, and each Defendant served has failed to make a settlement offer.  In the alternative, service of a demand letter on Defendants that did not maintain a place of business within Massachusetts was excused.

161.  As a result of Defendants' and their co-conspirators' violation of Mass. G.L. 93A, Defendants are liable to Plaintiffs Haskell and Seiler and the Massachusetts Subclass for up to three times the damages that they incurred, or at the very least the statutory minimum award of $25 per purchase of Musical Instruments or Equipment, together with all related court costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

A.     The Court determine that his action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and enter an order appointing Plaintiffs as class representatives for the Class and appointing Plaintiffs' counsel as Class Counsel;

B.     The acts and practices herein alleged be adjudged and decreed to violate Section 1 of the Sherman Act, the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.,* the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and the Massachusetts Consumer Protection Act, Mass. G. L. c. 93A *et seq.*, and that Defendants be enjoined from further violative conduct;

C.     Plaintiffs and each member of the Class recover damages determined to have been sustained by each of them, plus treble damages and any statutory or liquidated damages;

D.     Plaintiffs and each member of the Class recover restitution determined to be owed to them as permitted by the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17203;

E.     Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, litigation costs and expert fees as provided by law;

1   F.   Judgment be entered against Defendants and in favor of Plaintiffs and the Class; and

2   G.   Plaintiffs and the Class be granted such other appropriate relief as may be determined to

3   be just, equitable and proper by this Court.

### JURY TRIAL DEMANDED

5   Plaintiffs hereby demand a trial by jury on those claims that can be tried to a jury.

DATED:  July 16, 2010                         Respectfully submitted,

**GIRARD GIBBS LLP**

By: */s/ Elizabeth C. Pritzker*
     Elizabeth C. Pritzker

Daniel C. Girard
Aaron M. Sheanin
Christina C. Sharp
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

*Lead-Liaison Counsel for Plaintiffs*

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
CONSOLIDATED CLASS ACTION COMPLAINT

Additional Counsel for Plaintiffs:

Kenneth Gilman
**GILMAN AND PASTOR LLP**
16 14th Avenue
Wareham, Massachusetts 02571
Telephone: (508) 291-8400
Facsimile: (508) 291-3258

Gerald J. Rodos
Jeffrey B. Gittleman
**BARRACK, RODOS, & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

Gilbert T. Adams, III
**LAW OFFICES OF GILBERT T. ADAMS**
1855 Calder Avenue at Third Street
PO Box Drawer 3688
Beaumont, Texas 77704
Telephone: (409) 835-3000
Facsimile: (409) 832-6162

Bruce W. Steckler
Denyse F. Clancy
Melissa K. Hutts
**BARON & BUDD PC**
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Telephone: (214) 251-3605
Facsimile: (214) 520-1181

Shpetim Ademi
Guri Ademi
**ADEMI & O'REILLY LLP**
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Telephone: (866) 264-3995
Facsimile: (414) 482-8001

Eric L. Brown
**BARON & BUDD PC**
9465 Wilshire Blvd., Suite 460
Beverly Hills, California 90212
Telephone: (310) 860-0476
Facsimile: (310) 860-0480

Donald Amamgbo
**AMAMGBO & ASSOCIATES**
7901 Oakport Street, Suite 4900
Oakland, California 94621
Telephone: (510) 615-6000
Facsimile: (510) 615-6025

J. Burton Leblanc, IV
**BARON & BUDD PC**
9015 Bluebonnet Blvd.
Baton Rouge, Louisiana 70810
Telephone: (225) 927-5441
Facsimile: (225) 927-5449

Stephen R. Basser
Samuel M. Ward
**BARRACK, RODOS, & BACINE**
One American Plaza
600 West Broadway, Suite 900
San Diego, California 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

Heather A. Barnes
**ATTORNEY AT LAW**
86 Longview Drive
Vacaville, California 95687
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
CONSOLIDATED CLASS ACTION COMPLAINT

James G. Stranch, III
J. Gerard Stranch, IV
Steven J. Simerlein
**BRANSETTER STRANCH**
 **& JENNINGS PLLC**
227 2nd Avenue North, 4th Floor
Nashville, Tennessee 37201
Telephone: (615) 254-8801

Gregory L. Davis
**LAW OFFICES OF GREGORY L.**
**DAVIS LLC**
6987 Halcyon Park Drive
Montgomery, Alabama 36117
Telephone: (334) 832-9080
Facsimile: (334) 409-7001

Michael J. Flannery
James J. Rosemergy
**CAREY & DANIS LLC**
8235 Forsyth Blvd., Suite 1100
St. Louis, Missouri 63105
Telephone: (314) 725-7700
Facsimile: (314) 721-0905

William J. Doyle, II
John A. Lowther
**DOYLE LOWTHER LLP**
9466 Black Mountain Road, Suite 210
San Diego, California 92126
Telephone: (619) 573-1700
Facsimile: (619) 573-1701

Kathleen C. Chavez
**CHAVEZ LAW FIRM PC**
28 North First Street, #2
Geneva, Illinois 60134
Telephone: (630) 232-4480
Facsimile: (630) 845-8982

Robert M. Foote
Matthew J. Herman
**FOOTE MEYERS MIELKE &**
**FLOWERS LLC**
3 North Second Street, Ste. 300
St. Charles, Illinois 60174
Telephone: (630) 232-6333
Facsimile: (630) 845-8982

Steven N. Williams
Neil J. Swarztberg
**COTCHETT, PITRE & MCCARTHY**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Mark K. Gray
Doris A. Kim
**FRANKLIN GRAY & WHITE**
The Speed Mansion
505 W. Ormsby Avenue
Louisville, Kentucky 40202
Telephone: (502) 585-2060
Facsimile: (502) 581-1933

Peter L. Currie
**THE LAW FIRM OF PETER L.**
**CURRIE**
536 Wing Lane
St. Charles, Illinois 60174
Telephone: (630) 862-1130
Facsimile: (630) 845-8982

Eric D. Freed
Jeffrey A. Leon
**FREED & WEISS LLC**
111 West Washington Street, Suite 1331
Chicago, Illinois 60602
Telephone: (866) 779-9610
Facsimile: (312) 220-7777

41

Gary B. Friedman
**FRIEDMAN LAW GROUP**
270 Lafayette Street, 14th Floor
New York, New York 10012
Telephone: (212) 680-5150

Steve W. Berman
Anthony D. Shapiro
**HAGENS BERMAN SOBOL**
 **SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Robert J. Gralweski Jr.
Brooke E. Hodge
**GERGOSIAN & GRALEWSKI LLP**
750 Broadway Street, Suite 1250
San Diego, California 92101
Telephone: (619) 237-9500
Facsimile: (619) 237-9555

Elizabeth A. Fegan
**HAGENS BERMAN SOBOL**
 **SHAPIRO LLP**
820 North Blvd., Suite B
Oak Park, Illinois 60301
Telephone: (708) 776-5600
Facsimile: (708) 776-5601

Daniel E. Gustafson
Daniel Hedlund
**GUSTAFSON & GLUEK**
650 Northstar East
608 Second Avenue South
Minneapolis, Minnesota 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622

Michael D. Hausfeld
Hilary K. Ratway
**HAUSFELD LLP**
1700 K Street, NW Suite 650
Washington D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201

Lee M. Gordon
Elaine T. Byszewski
**HAGENS BERMAN SOBOL**
 **SHAPIRO LLP**
700 South Flower Street, Suite 2940
Los Angeles, California 90017
Telephone: (213) 330-7150
Facsimile: (213) 330-7152

Laurie A. Traktman
Jay E. Smith
Michael D. Weiner
**GILBERT & SACKMAN ALC**
3699 Wilshire Blvd., Suite 1200
Los Angeles, California 90010
Telephone: (323) 938-3000
Facsimile: (323) 937-9139

Steve W. Berman
Anthony D. Shapiro
**HAGENS BERMAN SOBOL**
 **SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Mark S. Goldman
Brian D. Penny
**GOLDMAN SCARLATO & KARON**
101 West Elm Street, Suite 360
Conshohocken, Pennsylvania 19428
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
CONSOLIDATED CLASS ACTION COMPLAINT

Eric D. Holland
Steven J. Stolze
**HOLLAND GROVES SCHNELLER &**
**STOLZE LLC**
300 North Tucker Blvd., Suite 801
St. Louis, Missouri 63101
Telephone: (314) 241-8111
Facsimile: (314) 241-5554

J. Barton Goplerud
**HUDSON, MALLANEY,**
 **SCHINDLER, P.C.**
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Telephone: (515) 223-4567
Facsimile: (515) 223-8887

Raymond P. Boucher
Paul R. Kiesel
Michael C. Eyerly
**KIESEL, BOUCHER, & LARSON LLP**
8648 Wilshire Blvd.
Beverly Hills, California 90211
Telephone: (310) 854-4444
Facsimile: (310) 854-0812

Kimberly A. Kralowec
**THE KRALOWEC LAW GROUP**
188 Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 546-6800
Facsimile: (415) 546-6801

Mark I. Labaton
**KREINDLER AND KREINDLER**
707 Wilshire Blvd., Suite 4100
Los Angeles, California 90017
Telephone: (866) 386-2531

Hollis Salzman
Kellie Lerner
**LABATON SUCHAROW**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

William C. Wright
**LEOPOLD-KUVIN, P.A.**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, Florida 33410
Telephone: (561) 515-1400
Facsimile: (561) 515-1401

L. Tracee Lorens
**LORENS & ASSOCIATES, APLC**
701 "B" Street, Suite 1400
San Diego, California 92101
Telephone: (619) 239-1233
Facsimile: (619) 239-1178

Donna F. Solen
**MASON LLP**
1625 Massachusetts Avenue NW, Ste. 605
Washington, District of Columbia 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294

John P. McCarthy
Philip A. Steinberg
**LAW OFFICE OF JOHN P.**
**McCARTHY**
217 Bay Avenue
Somers Point, New Jersey 08244
Telephone: (609) 653-1094
Facsimile: (609) 653-3029

Patricia A. Meyer
**PATRICIA A. MEYER**
**& ASSOCIATES APC**
444 West C Street, Suite 330
San Diego, California 92101
Telephone: (619) 235-8636
Facsimile: (619) 235-0510

Paul F. Novak
Peter G. Safirstein
Peggy J. Wedgworth
**MILBERG LLP**
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 617-1975

Jeff Westerman
**MILBERG LLP**
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, California 90017
Telephone: (213) 617-1200
Facsimile: (213) 617-1975

Daniel J. Mogin
Kristy L. Fischer
**THE MOGIN LAW FIRM PC**
110 Juniper Street
San Diego, California 92101
Telephone: (619) 687-6611
Facsimile: (619) 687-6610

G. Scott Emblidge
Sylvia M. Sokol
**MOSCONE EMBLIDGE LLP**
220 Montgomery Street, Suite 2100
San Francisco, California 94104
Telephone: (415) 362-3599
Facsimile: (415) 362-2006

Jeffrey S. Goldenberg
**MURDOCK GOLDENBERG**
**SCHNEIDER & GROH, LPA**
35 East Seventh Street, Suite 600
Cincinnati, Ohio 45202
Telephone: (513) 345-8291
Facsimile: (513) 345-8294

Brian P. Murray
Lee Albert
Brian D. Brooks
**MURRAY FRANK & SAILER LLP**
275 Madison Avenue, 8th Floor
New York, New York 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

William N. Riley
Joseph N. Williams
**PRICE WAICUKAUSKI**
**& RILEY LLC**
301 Massachusetts Avenue
Indianapolis, Indiana 46204
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

Mark Reinhardt
Garrett D. Blanchfield
**REINHARDT WENDORF**
**& BLANCHFILED**
E1250 First National Bank Bldg.
332 Minnesota Street
St. Paul, Minnesota 55101
Telephone: (651) 287-2100
Facsimile: (651) 287-2103

Christopher Paul Ridout
Devon M. Lyon
**RIDOUT & LYON LLP**
555 East Ocean Blvd., Suite 500
Long Beach, California 90802
Telephone: (562) 216-7383
Facsimile: (562) 216-7385

Bonny E. Sweeney
David W. Mitchell
Carmen A. Medici
**ROBBINS GELLER RUDMAN**
 **& DOWD LLP**
655 West Broadway, Suite 1900
San Diego, California 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

Joseph P. Guglielmo
**SCOTT & SCOTT LLP**
500 5th Avenue, Floor 40
New York, New York 10110
Telephone: (800) 404-7770
Facsimile: (212) 223-6364

Brian J. Robbins
George C. Aguilar
Ashley R. Palmer
**ROBBINS UMEDA LLP**
600 B. Street, Suite 1900
San Diego, California 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Mark Shane
**SHANE AND WHITE LLC**
1676 Route 27
Edison, New Jersey 08817
Telephone: (732) 819-9100
Facsimile: (732) 572-9641

Kathleen S. Rogers
**LAW OFFICES OF KATHLEEN S.**
**ROGERS**
140 Fourteenth Ave.
San Mateo, California 94402
Telephone: (650) 766-3126

Charles E. Tompkins
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, Massachusetts 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

Simon B. Paris
**SALTZ MONGELUZZI BARRETT &**
**BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, Pennsylvania, 19103
Telephone: (215) 496-8282
Facsimile: (215) 496-0999

Jeffrey L. Kodroff
Jeffrey J. Corrigan
Jay S. Cohen
Jonathan M. Jagher
**SPECTOR ROSEMAN KODROFF &**
**WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Christopher M. Burke
**SCOTT & SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508

Ryan F. Stephen
James B. Zouras
**STEPHAN ZOURAS, LLP**
205 N. Michigan Avenue, Suite 2560
Chicago, Illinois 60601
Telephone: (312) 233-1550
Facsimile: (312) 233-1560

45

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY LLP**
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067
Telephone: (310) 789-3100

Kenneth A. Wexler
**WEXLER WALLACE LLP**
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 589-6270
Facsimile: (312) 589-6271

Olimpio L. Squitieri
**SQUITIERI & FEARON LLP**
32 East 57th Street, 12th floor
New York, New York 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553

Mark J. Tamblyn
**WEXLER WALLACE LLP**
455 Capitol Mall, Suite 231
Sacramento, California 95814
Telephone: (916) 492-1100
Facsimile: (916) 492-1124

Reginald V. Terrell
**THE TERRELL LAW GROUP**
PO Box 13315, PMB #148
Oakland, California 94661
Telephone: (510) 237-9700
Facsimile: (510) 237-4616

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
CONSOLIDATED CLASS ACTION COMPLAINT

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2010 I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.  Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

I also certify that I will cause the forgoing to be served along with a court issued summons in accordance with Rule 4 of the Federal Rules of Civil Procedure on all defendants who have not been previously been served in this litigation.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 16, 2010.

                         _/s/    Elizabeth C. Pritzker_____
                         Elizabeth C. Pritzker

                         GIRARD GIBBS LLP
                         601 California Street, 14th Floor
                         San Francisco, CA 94108
                         Telephone:  (415) 981-4800
                         Facsimile:  (415) 981-4846

47

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
CONSOLIDATED CLASS ACTION COMPLAINT