1  Daniel C. Girard (SBN # 114826)
     dcg@girardgibbs.com
2  Elizabeth C. Pritzker (SBN # 146267)
     ecp@girardgibbs.com
3  Aaron M. Sheanin (SBN # 214472)
     ams@girardgibbs.com
4  Philip B. Obbard  (SBN # 135372)
     pbo@girardgibbs.com
5  Todd I. Espinosa (SBN # 209591)
     tie@girardgibbs.com
6  **GIRARD GIBBS LLP**
   601 California Street, 14th Floor
7  San Francisco, CA 94108
   Telephone:  (415) 981-4800
8  Facsimile:  (415) 981-4846

9  *Lead-Liaison Counsel for Plaintiffs*

10

                        UNITED STATES DISTRICT COURT

11                   SOUTHERN DISTRICT OF CALIFORNIA

12

13  **IN RE: MUSICAL INSTRUMENTS AND**            )   No. MDL 2121
                                                  )
14  **EQUIPMENT ANTITRUST LITIGATION**            )   CLASS ACTION
                                                  )
15  ————————————————————                          )   **PLAINTIFFS' OPPOSITION TO**
                                                  )   **THE NATIONAL ASSOCIATION**
16  This Document Relates To:                     )   **OF MUSIC MERCHANTS, INC.'S**
                                                  )   **MOTION TO DISMISS**
17      ALL ACTIONS                               )
                                                  )   Honorable Larry A. Burns
18                                                )   Location:   Courtroom 9, 2nd Floor
                                                  )   Date:  November 1, 2010
19                                                )   Time:  12:15 p.m.
                                                  )
20                                                )
                                                  )
21  ————————————————————                          )

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2

3     I.     INTRODUCTION ..........................................................................................................1

4     II.    FACTUAL ALLEGATIONS ......................................................................................2

5     III.   ARGUMENT ...............................................................................................................4

6            A.     Plaintiffs' Allegations Against NAMM Are Plausible ...................................4

7            B.     NAMM Is Not Entitled To Any "Presumption" Of Lawfulness Or Immunity
8                   From Antitrust Liability Merely Because It Is A Trade Association...................5

9            C.     NAMM's Piecemeal Reading Of The Complaint Cannot Support Dismissal...................6

10           D.     NAMM's "Implausibility" Argument Lacks Merit ........................................8

11           E.     The FTC's Investigation And Enforcement Action Support Plaintiffs'
                    Allegations ....................................................................................................9

12    IV.    CONCLUSION ..........................................................................................................10

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO NAMM'S MOTION TO DISMISS

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3

*ADA v. Cigna Corp.*

4
    605 F.3d 1283 (11th Cir. 2010) ................................................................5

5

*Alvord-Polk, Inc. v. F. Schumacher & Co.*
    37 F.3d 996 (3d Cir. 1994).........................................................................5

6

7

*Bell Atlantic Corp. v. Twombly*
    550 U.S. 544 (2007)...............................................................................1, 5

8

*Continental Ore Co. v. Union Carbide & Carbon Corp.*

9
    370 U.S. 690 (1962)...................................................................................6

10

*Corum Real Estate Group, Inc. v. Blackrock Realty Advisors, Inc.*
    2010 U.S. Dist. LEXIS 47782 (D. Colo. May 14, 2010)...........................10

11

12

*FTC v. Ind. Fed'n of Dentists*
    476 U.S. 447 (1986) .................................................................................9

13

14

*Hackman v. Dickerson Realtors, Inc.*
    520 F. Supp. 2d 954 (N.D. Ill. 2007) ........................................................5

15

*Hinds County, Miss. v. Wachovia Bank N.A.*

16
    700 F. Supp. 2d 378 (S.D.N.Y. 2010).................................................2, 10

17

*Hyland v. Homeservices of America, Inc.*
    2007 U.S. Dist. LEXIS 65731 (W.D. Ky. Aug. 17, 2007) ........................10

18

19

*In re Citric Acid Litig.*
    191 F.3d 1090 (9th Cir. 1999) ..................................................................5

20

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*

21
    782 F. Supp. 481 (C.D. Cal. 1991) ...........................................................9

22

*In re Easysaver Rewards Litig.*
    2010 U.S. Dist. LEXIS 84043 (S.D. Cal. Aug. 13, 2010) ..........................6

23

24

*In re Flash Memory Antitrust Litig.*
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) .................................................6, 7

25

26

*In re Flat Glass Antitrust Litig.*
    385 F.3d 350 (3d Cir. 2004)......................................................................4

27

28

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO NAMM'S MOTION TO DISMISS

*In re Graphics Processing Units Antitrust Litig.*
 527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..................................................5, 7

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*
 647 F. Supp. 2d 1250 (W.D. Wash. 2009)....................................................5

*In re Late Fee & Over-Limit Litig.*
 528 F. Supp. 2d 953 (N.D. Cal. 2007) .........................................................5

*In re Packaged Ice Antitrust Litig.*
 2010 U.S. Dist. LEXIS 65549 (E.D. Mich. July 1, 2010) ....................2, 7, 10

*In re Presidential Life Sec.*
 857 F. Supp. 331 (S.D.N.Y. 1994)..............................................................10

*In re Refco, Inc. Sec. Litig.*
 503 F. Supp. 2d 611 (S.D.N.Y. 2007).........................................................6

*In re Static Random Access Memory (SRAM) Antitrust Litig.*
 580 F. Supp. 2d 896 (N.D. Cal 2008) .........................................................7

*Jung v. Ass'n of Am. Med. Colleges*
 300 F. Supp. 2d 119 (D.D.C. 2004).............................................................7

*Kendall v. Visa U.S.A., Inc.*
 518 F.3d 1042 (9th Cir. 2008) ....................................................................7

*Maple Flooring Mfrs. Ass'n v. U.S.*
 268 U.S. 563 (1925).....................................................................................5

*N. Tex. Speciality Physicians v. FTC*
 528 F.3d 346 (5th Cir. 2008) .......................................................................5

*Nat'l Soc'y of Prof'l Eng'rs v. United States*
 435 U.S. 679 (1978).................................................................................1, 5

*Starr v. Sony BMG Music Entertainment*
 592 F.3d 314 (2d Cir. 2010).....................................................................2, 9

*United States v. Armour & Co.*
 402 U.S. 673 (1971)...................................................................................10

*United States v. United States Gypsum Co.*
 438 U.S. 422 (1978).....................................................................................4

iii

**RULES**

Fed. R. Civ. P. 9(b) ....................................................................................................................7

**STATUTES**

15 U.S.C. § 1 ...............................................................................................................................9

15 U.S.C. § 45 .............................................................................................................................9

**OTHER AUTHORITIES**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2003).......................................5

Herbert J. Hovenkamp, "The Federal Trade Commission and the Sherman Act
        62 Fla. L. Rev. 871, 872 (2009) ...............................................................................................9

iv

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO NAMM'S MOTION TO DISMISS

**I.    INTRODUCTION**

Plaintiffs allege that manufacturers and retailers conspired to fix prices of new high-quality fretted instruments and guitar amplifiers ("Musical Instruments and Equipment").  The detailed allegations of the Consolidated Amended Class Action Complaint ("Complaint") place the National Association of Music Merchants, Inc. ("NAMM"), the primary trade association for the music products industry, at the center of the conspiracy.  NAMM's motion to dismiss lacks merit, as do all the challenges to the Complaint.

First, NAMM incorrectly contends that it cannot be liable under the Sherman Act, because it is a trade association.[1]  A large body of well-established case authority flatly contradicts this argument.  *See*, *e.g.*, *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 681 (1978).

Second, NAMM selectively parses portions of the Complaint to argue that Plaintiffs have not alleged enough evidentiary facts regarding NAMM's unlawful conduct.  Taken as a whole, however, the Complaint alleges facts showing that NAMM and the other Defendants conspired to eliminate retail price competition, that NAMM acted in furtherance of the conspiracy by facilitating the exchange of commercially-sensitive pricing information and strategies among competitors, and that the conspiracy successfully fixed and stabilized prices at the expense of consumers.  The Complaint's non-conclusory allegations satisfy the pleading requirements set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007).

Third, NAMM insists that Plaintiffs' allegations are not plausible.  But the bases for NAMM's argument—that it is too large to enter into the conspiracy, that it invited a single opponent of retail price maintenance to speak at a NAMM event, and that the conspiracy would adversely affect a limited number of its internet and discount retailer members—ignore Plaintiffs' allegations that the conspiracy greatly benefited NAMM's core membership of thousands of brick-and-mortar specialty music product stores. These stores simply could not afford to compete on the basis of price.  NAMM's participation in a conspiracy to support its core members is plausible on its face.

Fourth, NAMM argues that the investigation and enforcement action by the Federal Trade Commission ("FTC") against it does not support Plaintiffs' allegations.  Courts, however, routinely take

---

[1] NAMM does not address Plaintiffs' state law claims in its motion to dismiss.

account of parallel government investigations in examining the sufficiency of a private civil complaint.  *See, e.g., Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 325 (2d Cir. 2010); *Hinds County, Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010); *In re Packaged Ice Antitrust Litig.*, No. 08-MD-1952, 2010 U.S. Dist. LEXIS 65549, at *65 (E.D. Mich. July 1, 2010).  Moreover, the FTC's own analysis states that NAMM's conduct provided "no significant pro-competitive benefit" and "crossed the line that distinguishes legitimate trade association activity from unfair methods of competition."

NAMM's motion to dismiss should be denied in its entirety.

## II.    FACTUAL ALLEGATIONS

This litigation alleges that NAMM, Guitar Center, manufacturers Fender, Gibson, Yamaha, Hoshino, Kaman and Roland (collectively, the "Manufacturer Defendants"), and others conspired to fix the prices of Musical Instruments and Equipment.  (¶¶ 1, 4.)[2]  Defendants implemented the conspiracy through NAMM, a trade association whose 9,000 members include most U.S. manufacturers, distributors and specialty retailers of music products.  (¶¶ 5, 26, 84,  87.)  The conspiracy operated through agreements between manufacturers and retailers to observe Minimum Advertised Price Policies ("MAPPs").  The MAPPs precluded retailers from advertising prices for Musical Instruments and Equipment below specified amounts, or otherwise communicating a willingness to sell at lower prices.  (¶¶ 2, 86.)

NAMM, the other Defendants, and their co-conspirators fashioned, encouraged, and adopted MAPPs to maintain or increase profit margins beginning in the late 1990s and continuing throughout the Class Period.  (¶¶ 2-3, 77-85, 95-113.)   NAMM and its constituent retailers provided the impetus for the conspiracy.  (¶ 87.)  NAMM benefited from the conspiracy because MAPPs protected its core membership of specialty music stores from being undercut by internet and low-cost, big box retailers.  (*Id.*)  NAMM was able to further the conspiracy, because high level executives from Defendants Fender, Yamaha, Hoshino, Kaman and Roland all sat on NAMM's board of directors during the Class Period.  (¶¶ 28, 30-33, 94.)

NAMM organized meetings and programs that enabled its members to exchange cost and pricing

---

[2] "¶ __" refers to paragraphs of the Complaint.  "Mem." refers to the Memorandum of Points and Authorities in Support of the National Association of Music Merchants Inc.'s Motion To Dismiss (Dkt. 84-1).

1    information, and to discuss MAPPs and other ways to restrict retail price competition.  (¶¶ 34, 92-93, 95-

2    107.)  NAMM's semi-annual trade shows and invitation-only global summits for key industry leaders were

3    not open to the general public.  (¶¶ 75, 92, 96, 107.)  NAMM determined the scope of the information

4    exchanged at these meetings by selecting panel moderators and setting program agendas.  (¶¶ 97-98, 101-03,

5    110, 118.)  MAPPs were consistently rolled out at NAMM events.  (¶¶ 82-83, 95, 97, 101-02.)  As one

6    commentator describing a NAMM trade show observed, "mention of MAP pricing was routinely included in

7    just about every new product presentation."  (¶ 83.)

8        NAMM programs endorsed MAPPs as a means of reducing price competition and maintaining high

9    retail prices.  (¶¶ 97-103, 106.)  NAMM allowed presenters to identify and propose MAPP formulas.  (¶¶ 97,

10    101-02.)  Presenters at NAMM panels told their audiences that "prices would rapidly migrate down to 10%

11    over cost" without MAPPs, that MAPPs are "only as effective as [their] enforcement," and that MAPPs

12    should be revised "upwards to give retailers a better profit margin."  (¶ 100.)  Virtually all of NAMM's

13    members—from retailers to manufacturers—endorsed MAPPs and criticized the few hold-outs who opposed

14    these policies.  (¶¶ 98-105.)  As one member of NAMM's board of directors explained, the industry could

15    stay profitable if retailers and suppliers understood each others' needs in setting optimal MAPPs.  (¶ 104.)

16    In the years that the conspiracy was actively enforced and before the FTC's investigation, prices for Musical

17    Instruments and Equipment increased, despite significant declines in unit sales.  (¶¶ 70-73, 113.)

18        In March 2009, after a two-year investigation, the FTC filed a complaint against NAMM, alleging

19    that, "[b]etween 2005 and 2007, NAMM organized various meetings and programs at which competing

20    retailers of musical instruments were permitted to and encouraged to discuss strategies for implementing

21    minimum advertised price policies, the restriction of retail price competition, and the need for higher retail

22    prices." (¶¶ 6, 116-18.)  The FTC recognized that "no significant pro-competitive benefit" was derived from

23    NAMM's conduct.  (¶121.)  According to the FTC, "NAMM's activities crossed the line that distinguishes

24    legitimate trade association activity from unfair methods of competition."  (¶ 120.)  The FTC entered into a

25    settlement and consent order ("Consent Order") prohibiting NAMM from promoting anticompetitive

26    schemes and helping competing retailers or manufacturers exchange pricing information.  (¶¶ 121-22.)

27        NAMM  has changed its practices since it settled with the FTC.  NAMM has: (1) provided antitrust

28

3

1  training to its board of directors; (2) revised its antitrust policies; (3) had antitrust counsel attend NAMM

2  events; (4) provided speakers with its antitrust policy; (5) required speakers to give advance notice if they

3  intend to address price, terms, profit margins, MAPPs, or resale price maintenance; and (6) distributed an

4  overview of the antitrust laws to trade show attendees.  NAMM will begin future meetings by stating:  "Any

5  meeting such as this, where direct competitors such as manufacturers and retailers come together, has the

6  potential to create antitrust problems. … NAMM must not facilitate, encourage, or allow participants at its

7  events to engage in any conduct which restricts competition on price or output. … [A]ll NAMM members

8  must make pricing decisions independently of any agreement or understanding with competitors."  (¶ 125.)

9  **III.  ARGUMENT**

10  **A.  Plaintiffs' Allegations Against NAMM Are Plausible**

11  Contrary to NAMMs' argument (Mem. at 4-7), Plaintiffs' allegations that NAMM and the other

12  Defendants conspired to fix prices for Musical Instruments and Equipment are plausible.  NAMM and the

13  other Defendants agreed to implement MAPPs to eliminate retail price competition.  (¶¶ 3, 86.)   NAMM

14  allowed and facilitated Defendants and their co-conspirators to exchange critical price data at its meetings

15  and programs.  (¶¶ 84, 95-107).  *See United States v. United States Gypsum Co.*, 438 U.S. 422, 442 n.16

16  (1978) ("Exchanges of current price information, of course, have the greatest potential for generating

17  anticompetitive effects and although not *per se* unlawful have consistently been held to violate the Sherman

18  Act.").  NAMM determined the scope and content of the information exchanged at these meetings.  (¶¶ 97-

19  98, 101-03, 110, 118.)  As a result, retail prices increased while unit sales decreased, which is inconsistent

20  with expected behavior in a competitive market.  *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-361

21  (3d Cir. 2004) ("In a competitive industry, … a firm would cut its price with the hope of increasing its

22  market share if its competitors were setting prices above marginal costs.").  Not only are Plaintiffs'

23  allegations sufficient in and of themselves, but they are supported by the FTC.  In its Analysis of Agreement,

24  the FTC recognized that NAMM engaged in unfair methods of competition "by arranging and encouraging

25  the exchange among its members of competitively sensitive information that had the purpose, tendency, and

26  capacity *to facilitate price coordination and collusion among competitors*."  (¶ 119 (emphasis added).)

27  Plaintiffs' allegations are plausible.

28

4

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO NAMM'S MOTION TO DISMISS

**B.      NAMM Is Not Entitled To Any "Presumption" Of Lawfulness Or Immunity From Antitrust Liability Merely Because It Is A Trade Association**

NAMM argues, erroneously, that its activities are "presumptively lawful" because it is a trade association.  (Mem. at 4-5.)  NAMM's authorities do not support any such presumption.  Instead, they merely reiterate the unremarkable propositions that a trade association engaged in routine functions is not an antitrust conspiracy and that a defendant's membership in a trade association by itself does not amount to antitrust conspiracy.  *See Twombly*, 550 U.S. at 567 n.12 (membership in trade association alone does not show conspiracy); *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) ("If we allowed conspiracy to be inferred from [standard trade association] activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action."); *ADA v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010) ("[P]articipation in trade organizations provides no indication of conspiracy.").[3]

Trade associations are not immune from antitrust liability.  *See, e.g., Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 681, 697 (trade association violated the antitrust laws by prohibiting members from engaging in price-based competition); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1009 (3d Cir. 1994) ("Clearly, an association, as a combination of its members, can violate the antitrust laws through . . . conspiracy.").[4]  NAMM does not enjoy immunity, and the well-pled allegations concerning NAMM's encouragement of and participation in the conspiracy are more than sufficient.

NAMM urges the Court not to draw all reasonable inferences in Plaintiffs' favor when it argues that

---

[3] *See also Maple Flooring Mfrs. Ass'n v. U.S.*, 268 U.S. 563, 567 (1925) (cited in *Citric Acid*); *In re Late Fee & Over-Limit Litig.*, 528 F. Supp. 2d 953, 963-64 (N.D. Cal. 2007) (following *Citric Acid*); *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) (following *Citric Acid*); *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1257 (W.D. Wash. 2009) (following *GPU*).  *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954, 965 (N.D. Ill. 2007), also cited by NAMM, stands for the unremarkable proposition that a trade association, like any other defendant, cannot be liable for antitrust conspiracy without an agreement to enter into the conspiracy.  The Complaint specifically alleges that Defendants entered into a resulting conspiracy.  (¶¶ 85, 108, 110, 112.)

[4] *See also generally N. Tex. Speciality Physicians v. FTC*, 528 F.3d 346, 356 (5th Cir. 2008) ("When an organization is controlled by a group of competitors, it is considered to be a conspiracy of its members."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 1477 (2d ed. 2003) ("[T]he courts have had little difficulty in treating organizations created to serve their member-competitors or to regulate their market behavior as continuing conspiracies of the members.").

---

5

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO NAMM'S MOTION TO DISMISS

1  no one reached an agreement at or changed any business practices after a NAMM event.  (Mem. at 5-6.)

2  NAMM's argument cannot be squared with Plaintiffs' allegations that NAMM facilitated collusion by

3  enabling and encouraging competitors to exchange commercially-sensitive pricing policies and other

4  information (¶¶ 84, 95-107); that NAMM members did exchange such information as well as strategies for

5  implementing MAPPs, (¶¶ 119, 121); that NAMM panelists, including representatives from Yamaha,

6  Kaman and others were "unanimous, offering a guardedly positive assessment of MAP policies" (¶ 98); and

7  that retail prices increased while unit sales decreased as the conspiracy was enforced (¶¶ 70-73).  It is more

8  than reasonable to infer that Defendants conspired to and did fix prices at or following NAMM events.

9         **C.**    **NAMM's Piecemeal Reading Of The Complaint Cannot Support Dismissal**

10         NAMM makes a piecemeal attack on certain narrowly-drawn categories of Plaintiffs' allegations.

11  NAMM argues that the presence of the Manufacturer Defendants on NAMM's board and its organization of

12  trade shows and other meetings are insufficient to establish liability.  (Mem. at 6-7.)  NAMM also argues

13  that the Complaint does not distinguish NAMM's role in the conspiracy from that of the other Defendants

14  and fails to offer specific details about NAMM's conduct.  (*Id.*)

15         NAMM's argument is fundamentally flawed.  On a motion to dismiss, the Complaint must be read as

16  a whole.  *See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The

17  character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts,

18  but only by looking at it as a whole."); *In re Easysaver Rewards Litig.*, No. 09-CV-2094, 2010 U.S. Dist.

19  LEXIS 84043, at *31 (S.D. Cal. Aug. 13, 2010) (Anello, J.) (reading complaint as a whole and denying

20  motion to dismiss); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 658 (S.D.N.Y. 2007) ("[I]t is

21  elementary that, on a motion to dismiss, the Complaint must be read as a whole[.]").  NAMM may not parse

22  and weigh Plaintiffs' allegations in isolation.

23         Even if NAMM's analysis were correct—and it is not—NAMM mischaracterizes Plaintiffs'

24  allegations.  Plaintiffs do not contend that NAMM's organizing of trade shows and other meetings alone,

25  establish a conspiracy.  Such facts do, however, "show that putative conspirators had the opportunity and

26  means to develop and/or further their alleged collusive scheme." *In re Flash Memory Antitrust Litig.*, 643 F.

27  Supp. 2d 1133, 1148 (N.D. Cal. 2009); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F.

28

1   Supp. 2d 896, 903 (N.D. Cal 2008).  Plaintiffs allege that NAMM used its meetings as a means for its

2   members to exchange commercially-sensitive information on costs, pricing, and methods of restricting

3   competition.  (¶¶ 95-103, 106-107)  NAMM had the ability to direct the types of information exchanged,

4   because it selected panel moderators, set program agendas, and knew that the presentations favored resale

5   price maintenance.  (¶¶ 97-98, 101-103, 110, 118.)  NAMM's conduct was unlawful.

6          Likewise, Plaintiffs' allegations that officers of Defendants Fender, Yamaha, Ibanez, Kaman and

7   Roland all sat on NAMM's board of directors (¶¶ 28, 30-33, 94) are relevant to means and opportunity.  *See*

8   *Flash Memory*, 643 F. Supp. 2d at 1148; *In re SRAM*, 580 F. Supp. 2d at 903; *In re Packaged Ice*, 2010 U.S.

9   Dist. LEXIS 65549, at *89 (considering allegations regarding trade association director positions "in the

10  context of the entirety of Plaintiffs' allegations").

11         NAMM argues that paragraphs 77, 85, 108, and 112 are improper because they refer to "Defendants"

12  collectively and do not identify NAMM's specific role in the conspiracy.  (Mem. at 7.)  NAMM's argument

13  is factually incorrect.  Paragraphs 77, 85 and 108 each expressly name NAMM.  Thus, the decision cited by

14  NAMM, *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 163 (D.D.C. 2004), which involved a

15  complaint that lacked "any specific allegation" as to a trade association defendant, is readily distinguishable

16  from the detailed allegations here.  Paragraph 77 alleges that NAMM and others first developed MAPPs in

17  the late 1990s.  Paragraphs 84-85 allege that NAMM and the other Defendants later agreed to set MAPPs at

18  higher levels and to strictly enforce them.  Paragraph 108 alleges that NAMM implemented the conspiracy.

19  Paragraph 112 summarizes the allegations in paragraphs 77, 85 and 108.

20         Stretching this argument even further, NAMM contends that other allegations regarding the

21  conspiracy do not address basic questions of "who, did what, to whom (or with whom), where, and when."

22  (Mem. at 8.)  "*Twombly* does not require specific allegations of time, place or person." *In re Packaged Ice*,

23  2010 U.S. Dist LEXIS 65549 at *51-54.[5]  Moreover, the Complaint is specific:  beginning in 2004 (when),

24

25  ──────────────

26  [5] *See also GPU*, 527 F.Supp.2d at 1024 (Plaintiffs are not required to plead "specific back-room meetings between specific actors at which specific decisions were made."); *In re Flash Memory*, 643 F. Supp. 2d at 1148 (declining to apply Rule 9(b) to antitrust conspiracy allegations).  Compare *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (setting forth the *Twombly* standard, and later stating "*Even after*

27

28

1  NAMM (who) entered into a conspiracy with Guitar Center and the Manufacturer Defendants (with whom)

2  to fix retail prices for Musical Instruments and Equipment through strict enforcement of MAPP pricing

3  (what).  (¶¶ 2, 3, 84-89, 110-13.)  The Complaint identifies specific meetings and conferences at which

4  NAMM and the other Defendants discussed the implementation of the MAPPs, and sets forth examples of

5  the MAPP formulas used (where and what).  (¶¶ 92-107.)  No more is required.

6         **D.**    **NAMM's "Implausibility" Argument Lacks Merit**

7        There is no merit to NAMM's assertion that the alleged conspiracy is implausible.  (Mem. at 8-9.)

8  First, NAMM argues that it is too large an organization to enter into a conspiracy.  NAMM's size does not

9  render Plaintiffs' allegations implausible.  The Complaint alleges that NAMM, while large, "was composed

10  primarily of small independent specialty music retailers."  (¶ 87.)  These core NAMM members, whose

11  numbers had been dwindling in the face of emerging price competition by internet-based retailers and big

12  box stores, strongly supported and benefited from MAPPs.  (¶¶ 81-82, 85, 87, 90, 98-100, 102, 104-05.)

13  NAMM's agreement to boost retail prices for the benefit of its core members is plausible.[6]

14        Second, NAMM argues that the conspiracy allegations are implausible because it invited "opponents

15  to MAPP pricing" to meetings at which MAPPs were discussed.  (Mem. at 9.)  NAMM points to allegations

16  describing a panel discussion that included internet retailer Bryan Junk.  (¶¶ 99-100.)  The Complaint,

17  however, does not allege that NAMM knew Mr. Junk opposed MAPP pricing or that NAMM regularly

18  presented the viewpoints of MAPP opponents other than in this one instance.  Notably, Mr. Junk's criticism

19  of MAPPs were met with "audible boos" from an "auditorium packed with independent retailers" and did

20  not sway any other panel participants, who persisted in their support for the enforcement of MAPPs.  (*Id.*)

21        Third, NAMM questions why it would use its trade shows to support a conspiracy designed to limit

22  the success of certain of its internet and low-cost retailer members.  (Mem. at 9.)  There is no inconsistency,

23  _____

24  *the depositions taken*, the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?") (emphasis added).

25  [6] NAMM's suggestion that it would not join a conspiracy to increase prices for fretted instruments, because

26  such a conspiracy would harm some of its members by decreasing demand for amplifiers fails to recognize that price increases for both products more than offset diminished demand.  NAMM's argument lacks merit

27  for the same reasons discussed in Section IV.C of Plaintiffs' opposition to Roland's motion to dismiss.

28

however.  The Complaint alleges that NAMM is composed primarily of small specialty retailers.  (¶¶ 26, 87, 90.)  These core attendees of NAMM's trade shows benefited from the price-fixing conspiracy.  (¶¶ 81-82, 85, 87, 90, 98-100, 102, 104-05.)  It is plausible that NAMM would have conspired to support specialty retailers at the expense of a handful of its members, such as Best Buy, for whom Musical Instruments and Equipment constituted only a small fraction of their sales (¶ 59).  Plaintiffs' allegations are bolstered by the FTC's Consent Order and Analysis of Agreement, which highlight the importance of NAMM's trade shows to the exchange of commercially-sensitive pricing information among competitors.  (¶¶ 116-121.)

       **E.**      **The FTC's Investigation And Enforcement Action Support Plaintiffs' Allegations**

       Finally, NAMM is incorrect in arguing that the FTC's enforcement action and resulting Consent Order do not support Plaintiffs' allegations.  (Mem. at 9-10.)  NAMM first contends that the FTC proceeded under Section 5 of the FTC Act, 15 U.S.C. § 45, not Section 1 of the Sherman Act, 15 U.S.C. § 1.  (*Id.* at 9.)  This is not surprising.  "The FTC does not have explicit statutory authority to enforce the most important antitrust provision, however, which is the Sherman Act."  Herbert J. Hovenkamp, "The Federal Trade Commission and the Sherman Act," 62 Fla. L. Rev. 871, 872 (2009).  The Complaint accurately identifies Section 5 as the basis for the Consent Order and makes clear that the FTC's complaint against NAMM was for engaging in anticompetitive collusion.  (¶¶ 117-21.)  The FTC concluded that NAMM had "crossed the line that distinguishes legitimate trade association activity from unfair methods of competition."  (¶ 120.)  As NAMM's own authorities explain, conduct that violates Section 1 of the Sherman Act also violates Section 5 of the FTC Act.  *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986) (FTC Act "encompass[es] . . . practices that violate the Sherman Act and the other antitrust laws"); *accord In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 782 F. Supp. 481, 484 (C.D. Cal. 1991).  The FTC stated as much in its Analysis of Agreement.  (¶ 121.)

       NAMM's second argument—that the Consent Order does not support Plaintiffs' allegations because NAMM did not admit to any unlawful conduct (Mem. at 10)—is off the mark.  In *Starr*, 592 F.3d at 324-25, the Second Circuit held that government investigations into the underlying conduct alleged in the plaintiffs' complaint were factors supporting the plausibility of their Sherman Act claim.  The defendants argued that the investigations were irrelevant because they had been closed by the Department of Justice.  The Second

1  Circuit disagreed, finding no authority "to support the proposition that a civil antitrust complaint must be
2  dismissed because an investigation undertaken by the Department of Justice found no evidence of
3  conspiracy." *Id.* at 325.  *See also Hinds County*, 700 F. Supp. 2d at 394 ("[G]overnment investigations may
4  be used to bolster the plausibility of § 1 claims."); *In re Packaged Ice*, 2010 U.S. Dist. LEXIS 65549, at *65
5  ("government investigations … bolster the plausibility analysis"); *Hyland v. Homeservices of America, Inc.*,
6  No. 3:05-CV-612-R, 2007 U.S. Dist. LEXIS 65731, at *9 (W.D. Ky. Aug. 17, 2007) (finding that DOJ
7  enforcement actions supported Section 1 price-fixing allegations).[7]

8      NAMM's sole authority, *United States v. Armour & Co.*, 402 U.S. 673 (1971), is readily
9  distinguishable.  In *Armour*, the Court examined the scope of a consent decree in the context of a dispute
10 between the parties to that agreement.  *See id.* at 682.  The Court did not hold that consent decrees, much
11 less complaints and other documents prepared by regulators, cannot not be cited in private civil actions.

12      Third, NAMM argues that the Consent Order does not support a Sherman Act claim because the FTC
13 did not criminally prosecute any conspirators.  (Mem. at 10.)  Of course, it is the Department of Justice, not
14 the FTC, that has authority over criminal violations of the Sherman Act.  *See, e.g., In re Presidential Life*
15 *Sec.*, 857 F. Supp. 331, 336 n. 11 (S.D.N.Y. 1994).  NAMM also ignores the FTC's statement that the
16 closure of its investigation "is not to be construed as a determination that a violation may not have
17 occurred."  (¶ 128.)  In other words, the FTC did not exonerate NAMM or any other Defendant.

18 **IV.    CONCLUSION**

19      For the foregoing reasons, Plaintiffs respectfully request that the Court deny NAMM's motion to
20 dismiss in its entirety or grant leave to amend to cure any deficiencies.

---

[7] As discussed in Plaintiffs' opposition to NAMM's motion to strike, whether the Consent Order may be used to establish NAMM's liability is not at issue at the pleading stage.  *See also Corum Real Estate Group, Inc. v. Blackrock Realty Advisors, Inc.*, No. 09-CV-01680-DME-MEH, 2010 U.S. Dist. LEXIS 47782, at *13-14 (D. Colo. May 14, 2010) (addressing *Twombly* and *Iqbal*: "Whether Plaintiffs can prove [their] allegations through admissible evidence is not a question properly presented in a motion to dismiss.").

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO NAMM'S MOTION TO DISMISS

DATED:  September 24, 2010                    Respectfully submitted,

                                              **GIRARD GIBBS LLP**


                                              By: */s/ Elizabeth C. Pritzker*
                                                    Elizabeth C. Pritzker

                                              Daniel C. Girard
                                              Aaron M. Sheanin
                                              Philip B. Obbard
                                              Todd I. Espinosa
                                              601 California Street, 14th Floor
                                              San Francisco, CA 94108
                                              Telephone:  (415) 981-4800
                                              Facsimile:  (415) 981-4846

                                              *Lead-Liaison Counsel for Plaintiffs*

1

## <u>CERTIFICATE OF SERVICE</u>

2
      I hereby certify that on September 24, 2010 I caused the foregoing to be electronically filed with the

3
Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4
addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing

5
document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants

6
indicated on the Manual Notice List.

7
      I certify under penalty of perjury under the laws of the United States of America that the foregoing is

8
true and correct.  Executed on the 24th of September, 2010.

9

10
                        _/s/    Elizabeth C. Pritzker_____

11
                        GIRARD GIBBS LLP

12
                        601 California Street, 14th Floor
                        San Francisco, CA 94108

13
                        Telephone:  (415) 981-4800
                        Facsimile:  (415) 981-4846

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO NAMM'S MOTION TO DISMISS