Daniel C. Girard (SBN # 114826)
 dcg@girardgibbs.com
Elizabeth C. Pritzker (SBN # 146267)
 ecp@girardgibbs.com
Aaron M. Sheanin (SBN # 214472)
 ams@girardgibbs.com
Philip B. Obbard  (SBN # 135372)
 pbo@girardgibbs.com
Todd I. Espinosa (SBN # 209591)
 tie@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

*Lead-Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **IN RE: MUSICAL INSTRUMENTS AND EQUIPMENT ANTITRUST LITIGATION** ) ) ) ) | No. MDL 2121 CLASS ACTION |
| _____ ) This Document Relates To: ) ) ALL ACTIONS ) ) ) ) ) ) _____ ) | **PLAINTIFFS' OPPOSITION TO ROLAND CORPORATION U.S.'s MOTION TO DISMISS** Honorable Larry A. Burns Location:   Courtroom 9, 2nd Floor Date:  November 1, 2010 Time:  12:15 p.m. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................................1

II.   FACTUAL ALLEGATIONS ..............................................................................................2

III.  LEGAL STANDARD..........................................................................................................3

IV.   PLAINTIFFS STATE A CLAIM AGAINST ROLAND ..................................................4

      A.   The Complaint Alleges Sufficient Facts From Which It Is Plausible To Infer
           Roland's Participation In The Alleged Conspiracy ..............................................4

      B.   The FTC's Investigation Bolsters Plaintiffs' Allegations That Manufacturers,
           Including Roland, Engaged In The Conspiracy....................................................6

      C.   Roland's Involvement With NAMM Is Probative Of Means And Opportunity To
           Participate In The Conspiracy...............................................................................8

      D.   The Alleged Conspiracy Makes Economic Sense ................................................8

V.    CONCLUSION..................................................................................................................10

## TABLE OF AUTHORITIES

**Cases**

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007)..................................................................................3, 5, 8

*Brennan v. Concord EFS, Inc.*
    369 F. Supp. 2d 1127 (N.D. Cal. 2005)....................................................6

*Brunson Communications, Inc. v. Arbitron, Inc.*
    239 F. Supp. 2d 550 (E.D. Pa. 2002)........................................................9

*Continental Ore Co. v. Union Carbide & Carbon Corp.*
    370 U.S. 690 (1962)...................................................................................4

*DM Research, Inc. v. Coll. Of Am. Pathologists*
    170 F.3d 53 (1st Cir. 1999).........................................................................9

*Hinds County v. Wachovia Bank N.A.*
    700 F. Supp. 2d 378 (S.D.N.Y. 2010)....................................................4, 7

*In re Beef Indus. Antitrust Litig.*
    600 F.2d 1148 (5th Cir. 1979) .................................................................10

*In re Citric Acid Litig.*
    191 F.3d 1090 (9th Cir. 1999)....................................................................8

*In re Commercial Explosives Litig.*
    945 F. Supp. 489 (D. Utah 1996)...............................................................4

*In re Elevator Antitrust Litig.*
    502 F.3d 47 (2d Cir. 2007).........................................................................6

*In re Elevator Antitrust Litig.*
    2006 U.S. Dist. LEXIS 34517 (S.D.N.Y. May 30, 2006)........................8

*In re Fine Paper Antitrust Litig.*
    685 F.2d 810 (3d Cir. 1982).......................................................................4

*In re Flash memory Antitrust Litig.*
    643 F. Supp. 2d 1133 (N.D. Cal. 2009).............................................1, 4, 8

*In re Flat Glass Antitrust Litig.*
    385 F.3d 350 (3d Cir. 2004)...................................................................4, 10

*In re Graphics Processing Units Antitrust Litig.*
    527 F. Supp. 2d 1011 (N.D. Cal. 2007)..................................................6, 8

ii

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO ROLAND CORPORATION U.S.'S MOTION TO DISMISS

*In re Graphics Processing Units Antitrust Litig.*
  540 F. Supp. 2d 1085 (N.D. Cal. 2007)............................................................6

*In re Late Fee & Over-Limit Fee Litig.*
  528 F. Supp. 2d 953 (N.D. Cal 2007)...........................................................6. 8

*In re NASDAQ Market-Makers Antitrust Litig.*
  894 F. Supp. 703 (S.D.N.Y. 1995)..................................................................4

*In re OSB Antitrust Litig.*
  2007 U.S. Dist. LEXIS 56573 (E.D. Pa. Aug. 3, 2007)....................................4

*In re Packaged Ice Antritrust Litig.*
  2010 U.S. Dist. LEXIS 65549 (E.D. Mich. July 1, 2010).........................6, 7, 8

*In re Rubber Chemicals Antitrust Litig.*
  504 F. Supp. 2d 777 (N.D. Cal. 2007)............................................................5

*In re Southeastern Milk Antitrust Litig.*
  555 F. Supp. 2d 934 (E.D. Tenn. 2008)...........................................................4

*In re Static Random Access Memory (SRAM) Antitrust Litig.*
  580 F. Supp. 2d 896 (N.D. Cal. 2008).......................................................1, 4, 8

*In re Vitamins Antitrust Litig.*
  2000 U.S. Dist. LEXIS 7397 (D.D.C. May 9, 2000).........................................5

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*
  2007 U.S. Dist. LEXIS 89946 (C.D. Cal. Oct. 29, 2007)...................................6

*Kendall v. Visa U.S.A. Inc.*
  518 F.3d 1042 (9th Cir. 2008).........................................................................6

*Leegin Creative Leather Prods., Inc.*
  551 U.S. 877 (2007)......................................................................................2, 9

*Little Rock Cardiology Clinic, P.A. v. Baptist Health*
  573 F. Supp. 2d 1125 (E.D. Ark. 2008).........................................................10

*Sheridan v. Marathon Petroleum Co. LLC*
  530 F.3d 590 (7th Cir. 2008)........................................................................10

*Starr v. Sony BMG Music Entm't*
  592 F.3d 314 (2d Cir. 2010)....................................................................1, 6, 7

*Todd v. Exxon Corp.*
     275 F.3d 191 (2d Cir. 2001).........................................................................................8

*Toys "R" Us, Inc. v. F.T.C.*
     221 F.3d 928 (7th Cir. 2000).......................................................................................9

1    **I.      INTRODUCTION**

2        The Consolidated Class Action Complaint ("Complaint") alleges facts supporting plausible claims

3 that manufacturers including Roland Corporation U.S. ("Roland") conspired with dominant retailer Guitar

4 Center and others to fix prices for guitar amplifiers and fretted instruments through strict enforcement of

5 minimum advertised price policies ("MAPPs").  Like all other Defendants, Roland participated in meetings

6 sponsored by the leading trade organization, the National Association of Music Merchants ("NAMM"),

7 where Roland exchanged commercially-sensitive information about prices, margins, and MAPPs with

8 competitors.  At these meetings, Defendants advocated the use of MAPPs to stabilize retail prices.  Guitar

9 Center then used its market power to corral manufacturers into enforcing MAPPs with retailers, which

10 eliminated retail price competition and stabilized prices.  Based on the Complaint's detailed allegations,

11 which are also supported by an investigation of the Federal Trade Commission ("FTC"), it is plausible for

12 the Court to infer that all Defendants, including Roland, entered into the alleged conspiracy.

13        None of Roland's arguments warrants dismissal.  First, Plaintiffs need not provide greater detail

14 about Roland's involvement in the conspiracy.  *See In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d

15 1133, 1142 n.7 (N.D. Cal. 2009) ("[A]llegations of antitrust conspiracy need not be detailed on a 'defendant

16 by defendant' basis."); *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 325 (2d Cir. 2010) ("[P]laintiffs

17 [a]re not required to mention a specific time, place or person involved in each conspiracy allegation.").

18        Second, Roland fares no better in arguing that the FTC's investigation into price-fixing in the music

19 products industry was limited to the conduct of retailers.  The FTC's analysis and Consent Order make clear

20 that the investigation focused on the collusive exchange of commercially-sensitive pricing information and

21 strategies to enforce resale price maintenance policies *among competing manufacturers* as well.

22        Third, Roland incorrectly asserts that its participation in NAMM meetings and its service on

23 NAMM's board of directors are not probative of collusion.  These facts, along with Plaintiffs' other

24 allegations, show that Roland and its co-conspirators had the opportunity and means to further their scheme.

25 *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008)

26 ("Plaintiffs' allegations regarding Defendants' participation in various trade organizations … demonstrat[e]

27 how and when Defendants had opportunities to exchange information or make agreements.").

28        Fourth, there is no merit to Roland's contention that the alleged conspiracy is economically

1   irrational.  The type of conspiracy alleged here—where manufacturers fixed prices through vertical price

2   restraints dictated by a dominant retailer—was envisioned by the Supreme Court in *Leegin Creative Leather*

3   *Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 892-94 (2007).  Roland benefited from the conspiracy, which

4   stabilized and increased prices for guitar amplifiers at the wholesale and retail level.  Roland protests that it

5   would not enter into a conspiracy that would have increased the price of guitars, because demand for

6   amplifiers would have diminished.  Plaintiffs allege, however, that the conspiracy artificially inflated prices

7   for and profits from both types of products, more than off-setting any decreased demand, which is a

8   plausible reason for Roland to join the conspiracy.  Plaintiffs' allegations make economic sense.

9        Finally, Roland's suggestion that it is the only amplifier defendant and was sued as an afterthought in

10  a case otherwise about guitars ignores that Roland has been a defendant since October 2009, that the

11  Complaint alleges a conspiracy to manipulate the markets for guitar amplifiers and fretted instruments, and

12  that all other manufacturer Defendants manufactured and distributed amplifiers during the relevant time

13  period.  Roland's motion to dismiss should be denied in its entirety.

14  **II.    FACTUAL ALLEGATIONS**

15       This litigation alleges that manufacturers of high-quality fretted instruments and guitar amplifiers

16  engaged in a price-fixing conspiracy with Guitar Center, NAMM and others.  (¶¶ 1, 4.)[1]  The conspiracy

17  operated through agreements between manufacturers and retailers to strictly enforce MAPPs, which

18  precluded retailers from advertising prices below specified amounts, or otherwise communicating a

19  willingness to sell at lower prices.  (¶ 2.)  The MAPPs were designed solely to fix prices across the industry

20  and served no legitimate pro-competitive function.  (¶¶ 3-4, 84-86.)

21       Defendants and their co-conspirators fashioned, encouraged and adopted MAPPs to maintain or

22  increase profit margins beginning in the late 1990s and continuing throughout the Class Period.  (¶¶ 2-3, 77-

23  85, 94-113.)  Beginning in 2004, Defendants agreed to strictly enforce MAPPs to stave off internet and big-

24  box retailers whose ability to discount prices threatened to undercut specialty music stores and drive down

25  wholesale prices.  (¶¶ 3, 81-91.)  At NAMM meetings, Defendants exchanged commercially-sensitive

26  pricing information and agreed to enforce MAPPs, restrict retail price competition, and artificially increase

27

28  [1] "¶ __" refers to paragraphs of the Complaint.  "Mem." refers to Defendant Roland Corporation U.S.'s
    Memorandum of Points and Authorities in Support of Its Motion To Dismiss (Dkt. 81-1).

1   prices for fretted instruments and guitar amplifiers.  (¶¶ 34, 92-107.)

2        Guitar amplifiers constitute a relevant product market, independent of the markets for fretted

3   instruments.  (¶ 67.)  Roland—in addition to Fender, Gibson, Yamaha, Hoshino and Kaman—manufactured

4   and/or distributed guitar amplifiers during the Class Period.  (¶¶ 28-33.)[2]  As a result of their market power,

5   these manufacturers could force retailers to agree to MAPPs in their distribution contracts.  (¶ 68.)  Guitar

6   Center, by virtue of the volume of its purchases and dominance as a distribution channel, had market power

7   as well.  To maintain access to Guitar Center's retail distribution network, the manufacturers had little

8   choice but to accommodate Guitar Center's demand for strict enforcement of MAPPs.  (¶¶ 54-64.)

9        Roland agreed to participate in the conspiracy.  Like all other Defendants, Roland regularly attended

10   NAMM's semi-annual trade shows and other events, where it exchanged pricing information and agreed to

11   strictly enforce its MAPPs.  (¶¶ 34, 93.)  Roland's CEO and President, Dennis Houlihan, was a member of

12   NAMM's board of directors and its chairman in 2005-07.  As a result, Roland knew and approved of

13   NAMM's role in facilitating the exchange of commercially-sensitive information among competitors.  (¶¶

14   33, 94.)  Roland's participation made sense, as the conspiracy raised prices of guitar amplifiers and

15   increased its profits during the period of greatest enforcement (from 2005 to 2007).  (¶¶ 73, 91, 113-14.)

16        In March 2007, the FTC initiated an investigation into collusive practices in the music products

17   industry by retailers and manufacturers, including Roland.  (¶ 116.)  The FTC's 2009 Consent Order directed

18   NAMM to cease-and-desist its practices of permitting and encouraging competitors to discuss strategies for

19   implementing MAPPs, restricting retail price competition, and increasing retail prices.  (¶¶ 117-22.)  The

20   Consent Order and accompanying analysis clarify that the FTC was concerned about anticompetitive

21   practices not only among retailers, but also music product manufacturers.  (¶¶ 119, 121-22.)

22   **III.   LEGAL STANDARD**

23        A complaint for violation of Section 1 of the Sherman Act must provide "enough factual matter

24   (taken as true) to suggest that an agreement was made."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556

25   (2007).  The facts alleged must "raise a reasonable expectation that discovery will reveal evidence of illegal

26

27   [2] Roland's assertion that it was a "last minute addition" to the case is incorrect.  Roland was first named as a
    defendant in *Witherspoon v. National Association of Music Merchants, Inc.*, S.D. Cal. No. 3:09-CV-2178
28   BTM-CAB, which was filed on October 2, 2009 and is one of the actions underlying this litigation.

1   agreement." *Id.* "Asking for *plausible grounds* to infer an agreement does not impose a probability

2   requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that

3   discovery will reveal evidence of illegal agreement." *Id.* (emphasis added). The allegations must be viewed

4   as a whole. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The

5   character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts,

6   but only by looking at it as a whole."); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943-44

7   (E.D. Tenn. 2008) (rejecting defendants' attempts "to parse and dismember the complaints").

8   **IV.     PLAINTIFFS STATE A CLAIM AGAINST ROLAND**

9           **A.     The Complaint Alleges Sufficient Facts From Which It Is Plausible To Infer
10                  Roland's Participation In The Alleged Conspiracy**

11          Roland argues that Plaintiffs fail to identify its specific conduct in the conspiracy. (Mem. at 5-7.)

12   This argument lacks merit. "[A]llegations of antitrust conspiracy need not be detailed on a 'defendant by

13   defendant' basis." *In re Flash Memory*, 643 F. Supp. 2d at 1142 n.7; *see also Hinds County v. Wachovia

14   Bank N.A.,* 700 F. Supp. 2d 378, 395 (S.D.N.Y. 2010) (Plaintiffs "need not necessarily provide any

15   particular details about conduct undertaken by [a specific defendant] in furtherance of the conspiracy."); *In

16   re SRAM*, 580 F. Supp. 2d at 903-04 (plaintiffs need not allege each defendant's specific role); *In re

17   NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995) (same); *In re Fine Paper

18   Antitrust Litig.*, 685 F.2d 810, 822 (3d Cir. 1982) (court should not "compartmentalize" conspiracy claim by

19   conducting "a seriatim examination of the claims against each of five conspiracy Defendants as if they were

20   separate lawsuits"); *In re Commercial Explosives Litig.*, 945 F. Supp. 1489, 1492 (D. Utah 1996) (plaintiffs

21   may use term "defendants" to refer to all defendants where each is individually identified elsewhere).

22          Instead, "an antitrust complaint should be viewed as a whole, and the plaintiff must allege that each

23   individual defendant joined the conspiracy and played some role in it." *In re OSB Antitrust Litig.*, No. 06-

24   826, 2007 U.S. Dist. LEXIS 56573, at *13 (E.D. Pa. Aug. 3, 2007). Rule 8 requires only that the complaint

25   contain allegations linking the particular defendants to the conspiracy. *See In re Flat Glass Antitrust Litig.*,

26   385 F.3d 350, 363 (3d Cir. 2004) ("If six firms act in parallel fashion and there is evidence that five of the

27   firms entered into an agreement, for example, it is reasonable to infer that the sixth firm acted consistent

28   with the other five firms' actions because it was also party to the agreement. That is especially so if the

sister firm's behavior mirrored that of the five conceded coconspirators."); *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 790 (N.D. Cal. 2007) (allegations of defendant's involvement in agreement to implement price increases and other allegations of "general participation" in conspiracy sufficient to state antitrust claim). Pleading particular overt acts by each defendant is unnecessary, "because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits." *In re Vitamins Antitrust Litig.*, No. 99-197, 2000 U.S. Dist. LEXIS 7397, at *53 (D.D.C. May 9, 2000).

Plaintiffs have pleaded facts from which one could plausibly conclude that Roland participated in the conspiracy. The Complaint alleges that Roland, the other manufacturers of guitar amplifiers, NAMM and Guitar Center conspired to fix prices through the enforcement of MAPPs. Plaintiffs allege that Defendants, including Roland, regularly attended NAMM's meetings, where they exchanged pricing information; agreed to adopt, implement and enforce MAPPs; and otherwise conspired to restrict retail price competition. (¶¶ 3-5, 34, 85-86, 93, 108, 111-12.) Plaintiffs identify the specific NAMM events by date and location. (¶¶ 92-107.) Defendants, including Roland, and their co-conspirators agreed to uniformly implement and enforce MAPPs to increase profits by decreasing price competition between and among retailers and manufacturers. (¶¶ 4, 34, 111-12.) Roland knew and approved of NAMM's role in the conspiracy, including its facilitating the exchange of commercially-sensitive information among competitors, because Roland's CEO and President served on NAMM's board of directors for a decade and was its Chairman in 2005-07. (¶¶ 33, 94.)

The Complaint alleges that the conspiracy unreasonably restrained trade. Consistent with the FTC's analysis, Plaintiffs allege that Defendants, including Roland, did not employ MAPPs for pro-competitive purposes. (¶¶ 3-4, 34, 108-12.) There is no indication in the Complaint, for example, that Roland or its co-conspirators required retailers to increase customer services or imposed MAPPs to ensure that other retailers did not undercut those providing such services. Retail price data also supports Plaintiffs' allegations that the conspiracy restrained trade. Amplifier prices fell before the enforcement of the conspiracy in 2004, rose while the conspiracy was in effect, and then resumed their decline in 2008 after the FTC began its investigation. (¶ 73.) Thus, Plaintiffs describe the nature of the agreement between Roland and its co-conspirators, the opportunities they shared to conspire, the mechanism by which they implemented their agreement, the anticompetitive impact of the conspiracy, and the harm to consumers. These allegations provide plausible grounds to infer that Roland agreed to enter the scheme. *See Twombly*, 550 U.S. at 556.

5

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO ROLAND CORPORATION U.S.'S MOTION TO DISMISS

Roland is wrong to argue that Plaintiffs must plead the time, place or persons involved in the communications with greater specificity. *See Starr*, 592 F.3d at 325 ("[P]laintiffs were not required to mention a specific time, place or person involved in each conspiracy allegation."); *In re Packaged Ice Antitrust Litigation*, No. 08-MD-01952, 2010 U.S. Dist. LEXIS 65549, at *50 (E.D. Mich. July 1, 2010) (same); *In re Graphics Processing Units Antitrust Litig.,* 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) ("*GPUs I*") (Plaintiffs need not plead "specific back-room meetings between specific actors at which specific decisions were made.").

Roland's authorities are distinguishable, as none had the same level of detail as alleged in the Complaint here. *See Kendall v. Visa U.S.A. Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (allegations of parallel conduct coupled with conclusory allegation that defendants were co-conspirators were insufficient where plaintiffs already had deposed defendants' key executives); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal 2007) (single paragraph of complaint comprised of chart showing several defendants charged similar late fees was insufficient to suggest preceding agreement); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007) (non-specific allegations of parallel conduct, combined with failure to specify any particular activities by any defendant, and lack of facts establishing possible nexus between European conspiracy and conduct in U.S. were insufficient); *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1135-37 (N.D. Cal. 2005) (dismissing non-operating bank holding companies where complaint failed to allege scope of overall conspiracy or how those defendants participated at all); *Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, No. CV 07-00043 MMM (SSx), 2007 U.S. Dist. LEXIS 89946, at *37 (C.D. Cal. Oct. 29, 2007) (allegation that "the Group of 10 agreed to produce only compact video disc players compliant with the standard," failed to constitute an unreasonable restraint on trade).[3]

**B.    The FTC's Investigation Bolsters Plaintiffs' Allegations That Manufacturers, Including Roland, Engaged In The Conspiracy**

Roland argues that the FTC's investigation involved only retailers and had nothing to do with

---

[3] Roland cites *GPUs I*, but neglects to mention that Judge Alsup subsequently upheld an amended complaint alleging parallel conduct and a departure from historical pricing practices. *See In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1095 (N.D. Cal. 2007) ("*GPUs II*"). As in *GPUs II*, Plaintiffs allege that the markets for fretted instruments and amplifiers departed from historical pricing patterns, as retail unit prices increased during the period the conspiracy was enforced even while demand slumped, despite years of price declines and increased demand in the late 1990s and early 2000s. (¶73.) These allegations, coupled with other facts consistent with conspiracy detailed above, are more than sufficient.

1    Plaintiffs' allegations of collusive behavior among manufacturers and Guitar Center. (Mem. at 7.) Roland

2    is incorrect. The FTC's investigation involved price-fixing by manufacturers as well as retailers.

3          As alleged in the Complaint, the FTC issued a subpoena to Roland, along with the other

4    manufacturer defendants, Guitar Center and NAMM, in connection with its investigation. (¶ 116.) The

5    FTC's Analysis of Agreement with NAMM states: "[A]t meetings and programs sponsored by NAMM,

6    competing retailers of musical instruments *and other NAMM members* discussed strategies for raising retail

7    prices. … [S]uch discussions could lead competing NAMM members to refuse to deal with a manufacturer,

8    distributor, or retailer unless minimum advertised price policies, or increases in minimum advertised prices,

9    were observed and enforced against discounters." (¶ 121 (emphasis added).) The logical implication of the

10   FTC's statement is that the investigation concerned "the implementation of collusive strategies" not only by

11   NAMM's retail members, but also by NAMM's manufacturer members. (*Id.*)

12         This interpretation makes sense in light of the Consent Order itself. The FTC ordered NAMM to

13   cease and desist from "facilitating in any manner the exchange of information between or among *Musical*

14   *Product Manufacturers* or Musical Product Dealers relating to … the retail price of any Musical Product; or

15   … any term, condition or requirement upon which any *Musical Product Manufacturer* or Musical Product

16   Dealer deals, or is willing to deal, with any other *Musical Product Manufacturer* or Musical Product

17   Dealer…." (¶ 122 (emphasis added).) The Consent Order prohibits NAMM's involvement with MAPPs

18   and precludes NAMM from facilitating a Musical Product Manufacturer's entrance into or enforcement of

19   "any combination, conspiracy, agreement or understanding between or among any *Musical Product*

20   *Manufacturers* or Musical Product Dealers" concerning retail prices or other terms and conditions of

21   conducting business. (*Id.* (emphasis added).) Pursuant to the Consent Order, NAMM must give a new

22   antitrust disclaimer at the start of "[a]ny meeting such as this, where direct competitors *such as*

23   *manufacturers* and retailers come together." (¶ 125 (emphasis added).) All of these facts indicate that the

24   FTC investigated collusive conduct by and among manufacturers in addition to retailers.

25         The FTC's investigation and settlement with NAMM support the plausibility of Plaintiffs' claims.

26   *See, e.g., Starr*, 592 F.3d at 325; *Hinds County*, 700 F. Supp. 2d at 394; *In re Packaged Ice*, 2010 U.S. Dist.

27   LEXIS 65549, at *65. Roland's assertion to the contrary lacks merit.

28

---

1

2

**C.     Roland's Involvement With NAMM Is Probative Of Means And Opportunity To Participate In The Conspiracy**

3      Roland argues that its activities with respect to NAMM are presumptively legitimate.  (Mem. at 7-8.)

4      As described in Plaintiffs' opposition to NAMM's motion to dismiss, this argument has no merit.

5      Plaintiffs' allegations that Roland participated in and attended NAMM meetings may not be

6      sufficient, by themselves, to establish a conspiracy.  However, these facts "show that putative conspirators

7      had the opportunity and means to develop and/or further their alleged collusive scheme."  *In re Flash*

8      *Memory*, 643 F. Supp. 2d at 1148 (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001); *In re*

9      *SRAM*, 580 F. Supp. 2d at 903)).[4]  Plaintiffs allege much more than mere attendance at NAMM meetings.

10     According to the Complaint, Roland and its co-conspirators used NAMM meetings to exchange

11     commercially-sensitive information and "discuss strategies for implementing MAPPs, restricting retail price

12     competition, and maintaining or increasing retail prices for Musical Instruments and Equipment."  (¶ 93.)

13     Plaintiffs' allegations that Roland's President and CEO was a long-standing member of NAMM's board and

14     its Chairman during the Class Period are relevant to means and opportunity.  *See In re Packaged Ice*, 2010

15     U.S. Dist. LEXIS 65549, at *89 (considering allegations regarding trade association director positions "in

16     the context of the entirety of Plaintiffs' allegations").

17     Thus, taken together, the Complaint's allegations of Roland's intimate involvement with NAMM

18     provides an additional plausible basis from which one can infer that Roland conspired to fix prices.

19     **D.     The Alleged Conspiracy Makes Economic Sense**

20     There is no merit to Roland's contention that the conspiracy and its participation therein are

21     economically irrational.  (Mem. at 8-9.)  First, the type of conspiracy alleged here, in which a dominant

22     retailer (Guitar Center) had sufficient market power to coerce manufacturers (Roland and others) into

23

24     [4] Roland's authorities are not to the contrary.  *See Twombly*, 550 U.S. at 567 n.12 (membership in trade association alone does not demonstrate conspiracy); *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir.

25     1999) ("Gathering information about pricing and competition in the industry is standard fare for trade associations.  If we allowed conspiracy to be inferred from such activities alone, we would have to allow an

26     inference of conspiracy whenever a trade association took almost any action."); *In re Late Fee*, 528 F. Supp. 2d at 963-64 (following *Citric Acid*); *In re GPUs I*, 527 F. Supp. 2d at 1023 (following *Citric Acid*); *In re*

27     *Elevator Antitrust Litig.*, No. 04 CV 1178 (TPG), 2006 U.S. Dist. LEXIS 34517, at *29-30 (S.D.N.Y. May 30, 2006) ("generic assertions" that "defendants attended frequent trade association meetings together"

28     insufficient to infer agreement not to compete).

adopting and enforcing MAPPs, is not only plausible but was anticipated by the Supreme Court.  In *Leegin*, 551 U.S. at 892, the Court declared that vertical restraints setting minimum resale prices are to be evaluated under the rule of reason to determine whether they have a pro-competitive justification or are merely a guise for a firm to obtain monopoly profits through unlawful price-fixing.  As the Court stated in *Leegin*:

> Resale price maintenance … can be abused by a powerful manufacturer or retailer.  A dominant retailer, for example, might request resale price maintenance to forestall innovation in distribution that decreases costs.  A manufacturer might consider it has little choice but to accommodate the retailer's demands for vertical price restraints if the manufacturer believes it needs access to the retailer's distribution network.

*Id.* at 893-94.  The situation described by the Supreme Court is exactly that at issue in this case.  Plaintiffs allege that Roland and other manufacturers agreed to Guitar Center's demand that they strictly enforce MAPPs so they could retain access to Guitar Center's massive retail customer base.  (¶¶ 60, 89.)  In light of *Leegin*, Plaintiffs' theory of antitrust liability is plausible.  *See also Toys "R" Us, Inc. v. F.T.C.,* 221 F.3d 928 (7th Cir. 2000) (affirming FTC's finding that dominant retailer had used its market power to coerce manufacturers into vertical agreements that limited competition from discount retailers).

Second, Roland, like all other participants, stood to benefit economically, because the MAPPs limited the ability of discount retailers to place downward pressure on retail and wholesale prices.  (¶¶ 80-86.)  The alleged conspiracy also enabled Roland to preserve its brand image.  (¶ 91.)  Plaintiffs' claims are plausible.  *See Toys "R" Us,* 221 F.3d at 937 ("Taking steps to prevent a price collapse through coordination of action among competitors [is] illegal...."); *DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999) ("It is easy enough to understand why two manufacturers might agree to charge above-market prices; if taken together they have market power, the agreement can increase their profits.").[5]

Third, Roland argues that it would not plausibly enter into a conspiracy to increase prices for guitars because that would have decreased demand for the "complementary" products it manufactures, guitar amplifiers.[6]  (Mem. at 8.)  Roland's authorities teach that "raising the price of a product reduces the demand

---

[5] *Brunson Communications, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563 (E.D. Pa.  2002), cited by Roland, is off-point.  Unlike that complaint, which failed to explain what plausible benefit a television rating company might have in conspiring to exclude a small television station from test-runs of new technology, the allegation here that Roland would benefit through the maintenance of higher prices is plausible.

[6] Although the claims against Roland arise from its sales of guitar amplifiers, Roland also benefited from increased prices for guitars in light of a joint venture with Fender in which Roland manufactured component

1   for its complements." *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 593 (7th Cir. 2008). This

2   principle is consistent with Plaintiffs' allegations.

3        The other Defendants, which manufactured both guitars and amplifiers, would have expected

4   demand for amplifiers to decrease, and compensated for the potential loss by agreeing to raise amplifier

5   prices. As alleged, demand for both guitars and amplifiers did decrease, as the conspiracy artificially

6   increased prices for both products. (¶¶ 70-73.) The conspiracy would have failed without Roland's

7   participation, however. That amplifier prices did not decline supports Plaintiffs' allegations that Roland

8   entered into the conspiracy. *See, e.g., In re Flat Glass*, 385 F.3d at 360-61 ("[A]ssuming that the defendant

9   operated in a competitive market … [it] would cut its price with the hope of increasing its market share if the

10  competitors were setting prices above marginal costs."). According to the Complaint, the conspiracy

11  increased profits for Roland and the other manufacturers, more than offsetting any decreases in sales

12  volume. Plaintiffs' allegations concerning Rolands' participation therefore are plausible.

13       Roland's assertion that guitars and amplifiers are complements suggests only that they are not part of

14  the same relevant market. The Complaint recognizes as much. (¶ 67.) Roland cites no authority, however,

15  suggesting that a conspiracy to manipulate multiple product markets is economically implausible. *See*

16  *Sheridan*, 530 F.3d at 592-93 (discussing difficulty monopolist might face in tying complementary products

17  in context of tying claim); *Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125,

18  1142-46 (E.D. Ark. 2008) (rejecting interpretation of complaint as alleging that single product market

19  encompassed complementary services); *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1158 n.12 (5th Cir.

20  1979) (mentioning complementary goods only in dicta in case concerning applicability of *Illinois Brick*).

21  Roland's economic implausibility argument lacks merit.

22  **V.   CONCLUSION**

23       For the foregoing reasons, Plaintiffs respectfully request that the Court deny Roland's motion to

24  dismiss in its entirety or grant leave to amend to cure any deficiencies.

25

26

27

28  parts for certain Fender guitars. (http://www.thefreelibrary.com/Fender+%26+Roland+joint+
venture+yields+new+pedals+and+guitar-a0161011431.)

DATED:  September 24, 2010

Respectfully submitted,

**GIRARD GIBBS LLP**


By: ___*/s/ Elizabeth C. Pritzker*___
      Elizabeth C. Pritzker

Daniel C. Girard
Aaron M. Sheanin
Philip B. Obbard
Todd I. Espinosa
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

*Lead-Liaison Counsel for Plaintiffs*

1

**<u>CERTIFICATE OF SERVICE</u>**

2       I hereby certify that on September 24, 2010 I caused the foregoing to be electronically filed with the

3  Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing

5  document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants

6  indicated on the Manual Notice List.

7       I certify under penalty of perjury under the laws of the United States of America that the foregoing is

8  true and correct.  Executed on September 24, 2010.

9

10                                 */s/    Elizabeth C. Pritzker*
                                      Elizabeth C. Pritzker

11

12                          GIRARD GIBBS LLP

13                          601 California Street, 14th Floor
                          San Francisco, CA 94108

14                          Telephone:  (415) 981-4800
                          Facsimile:  (415) 981-4846

15

16

17

18

19

20

21

22

23

24

25

26

27

28