1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Daniel C. Girard (SBN # 114826)
  dcg@girardgibbs.com
Elizabeth C. Pritzker (SBN # 146267)
  ecp@girardgibbs.com
Aaron M. Sheanin (SBN # 214472)
  ams@girardgibbs.com
Philip B. Obbard  (SBN # 135372)
  pbo@girardgibbs.com
Todd I. Espinosa (SBN # 209591)
  tie@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

Lead-Liaison Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**IN RE MUSICAL INSTRUMENTS AND EQUIPMENT ANTITRUST LITIGATION**

This Document Relates To:

ALL ACTIONS

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 09-md-02121-LAB-POR

MDL No. 2121

CLASS ACTION

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**

Honorable Larry A. Burns
Location:   Courtroom 9, 2nd Floor

Hearing Date:  November 1, 2010
Hearing Time:  12:15 p.m.

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL ALLEGATIONS .................................................................................2

        A.      Plaintiffs Allege Agreement, Conspiracy Or Concerted Action.................2

        B.      Plaintiffs Allege Relevant Markets And Market Power .............................4

        C.      Plaintiffs Allege Antitrust Injury And Harm To Consumers......................6

        D.      Plaintiffs' Allegations Are Bolstered By Published Reports And The FTC
                Investigation...............................................................................................6

III.    DEFENDANTS' MOTIONS TO DISMISS ...........................................................8

IV.     LEGAL STANDARD............................................................................................8

V.      ARGUMENT ........................................................................................................9

        A.      The Allegations Are Sufficient To State A Claim Under *Twombly* .................................9

                1.      The Plausibility Analysis Under *Twombly* ...................................10

                2.      The Complaint Identifies A Plausible Conspiracy................................11

                3.      The Data Showing Unusual Retail Unit Price Increases During The
                        Conspiracy Period Lend Support To Plaintiffs' Claims .........................15

                4.      The FTC's Investigation Bolsters The Plausibility Of Plaintiffs' Claims ............17

        B.      Plaintiffs Plead All Required Elements of a "Hub-And-Spoke" Conspiracy ...................19

        C.      The Alleged Conspiracy Adversely Affected Competition ...............................20

                1.      The Complaint Alleges A Plausible Market For Fretted Instruments And
                        Guitar Amplifiers .......................................................................21

                2.      The Complaint Alleges That Defendants Had The Ability Or Capacity To
                        Adversely Affect Retail Price Competition In The Markets For Fretted
                        Instruments And Guitar Amplifiers .............................................22

        D.      Plaintiffs' State Law Claims Under the California Unfair Competition Law And
                Massachusetts Consumer Protection Law Are Well-Pleaded...............................25

VII.    CONCLUSION...................................................................................................25

i

## TABLE OF AUTHORITIES

**CASES**

*Arizona v. Shamrock Foods Co.*
    729 F.2d 1208 (9th Cir. 1984) ...................................................................20

*Ashcroft v. Iqba*
    129 S.Ct. 1937 (2009) ..........................................................................9

*Austin v. McNamara*
    979 F.2d 728 (9th Cir. 1992) ...................................................................10

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ...................................................................... passim

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*
    182 F.3d 1096 (9th Cir. 1999) ..................................................................21

*Brennan v. Concord EFS, Inc.*
    369 F. Supp. 2d 1127 (N.D. Cal. 2005) .........................................................11

*Broadway Delivery Corp. v. United Parcel Serv.*
    651 F.2d 122 (2d Cir. 1981)....................................................................23

*Brooke Group v. Brown & Williamson Tobacco Corp.*
    509 U.S. 209 (1993)...........................................................................16

*Brown Shoe Co. v. U.S.*
    370 U.S. 294 (1962)...........................................................................22

*California v. ARC Am. Corp.*
    490 U.S. 93 (1989)............................................................................20

*City of Moundridge v. Exxon Mobil Corp.*
    250 F.R.D. 1 (D.D.C. 2008)....................................................................16

*Conley v. Gibson*
    355 U.S. 41 (1957)............................................................................9

*Continental Ore Co. v. Union Carbide & Carbon Corp.*
    370 U.S. 690 (1962)...........................................................................9

*Davis v. Monroe County Bd. of Educ.*
    526 U.S. 629 (1999)...........................................................................8

*de la Fuente v. DCI Telecommunications, Inc.*
    259 F. Supp. 2d 250 (S.D.N.Y. 2003)........................................................18

*Eastman Kodak Co. v. Image Technical Servs., Inc.*
    504 U.S. 451 (1992)...................................................................................23

*Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*
    459 F. 2d 138 (6th Cir. 1972) ....................................................................19

*FTC v. Indiana Fed'n of Dentists*
    476 U.S. 447 (1986)...................................................................................23

*Gray v. Bayer Corp.*
    2010 U.S. Dist. LEXIS 33040 (D.N.J. March 31, 2010) ...........................18

*Hairstron v. Pacific 10 Conf.*
    101 F. 3d 1315 (9th Cir. 1996) ..................................................................21

*Hinds County v. Wachovia Bank N.A.*
    700 F. Supp. 2d 378 (S.D.N.Y. 2010) ..................................................11, 17

*Hyland v. Homeservices of America, Inc.*
    2007 U.S. Dist. LEXIS 65731 (W.D. Ky. Aug. 17, 2007) .........................18

*In re Citric Acid Litig.*
    191 F.3d 1090 (9th Cir. 1999) ...................................................................13

*In re Flash Memory Antitrust Litig.*
    643 F. Supp. 2d 1133 (N.D. Cal. 2009) .........................................11, 15, 16

*In re Flat Glass Antitrust Litig.*
    385 F.3d 350 (3d Cir. 2004).......................................................................14

*In re Graphics Processing Units Antitrust Litig.*
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................10, 13

*In re Graphics Processing Units Antitrust Litig.*
    540 F. Supp. 2d 1085 (N.D. Cal. 2007) ................................................14, 16

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*
    647 F. Supp. 2d 1250 (W.D. Wash. 2009)................................................13

*In re High Fructose Corn Syrup Antitrust Litig.*
    295 F. 3d 651 (7th Cir. 2002) ....................................................................14

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., CASE NO. 09-md-02121-LAB-POR
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In Re Ins. Antitrust Litig.*
    723 F. Supp. 464 (N.D. Cal. 1989) ...................................................................19

*In re NASDAQ Market-Makers Antitrust Litig.*
    894 F. Supp. 703 (S.D.N.Y. 1995)....................................................................11

*In re New Century*
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) .............................................................18

*In re Packaged Ice Antitrust Litig.*
    2010 U.S. Dist. LEXIS 65549 (E.D. Mich. July 1, 2010) ..................................12, 15, 17

*In re Pressure Sensitive Lablestock Antitrust Litig.*
    566 F. Supp. 2d 363 (M.D. Pa. 2008) ..................................................................9

*In Re Southeastern Milk Antitrust Litig.*
    555 F. Supp. 2d 934 (E.D. Tenn. 2008)...............................................................10

*In re Static Random Access Memory (SRAM) Antitrust Litig.*
    580 F. Supp. 2d 896 (N.D. Cal. 2008) ...........................................................11, 13

*In re Tableware Antitrust Litig.*
    363 F. Supp. 2d 1203 (N.D. Cal. 2005) ..............................................................18

*InterVest, Inc. v. Bloomberg, L.P.*
    340 F.3d 144 (3d Cir. 2003).............................................................................20

*Jamsports & Entm't, LLL v. Paradama Productions, Inc.*
    2003 U.S. Dist. LEXIS 6100 (N.D. Ill. Apr. 21, 2003) .......................................21

*Jung v. Ass'n of Am. Med. Colleges*
    300 F. Supp. 2d 119 (D.D.C. 2004)...................................................................11

*Kendall v. Visa U.S.A., Inc.*
    518 F.2d 1042 (9th Cir. 2008) .....................................................................14, 20

*Late Fee & Over-Limit Fee Litig.*
    528 F. Supp. 2d 953 (N.D. Cal. 2007) .............................................................14, 15

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*
    551 U.S. 877 (2007)....................................................................................11, 21

*Lubic v. Fid. Nat'l Fin., Inc.*
    2009 U.S. Dist. LEXIS 62092 (W.D. Wash. July 20, 2009) ...............................16

*Monsanto v. Spray-Rite Service Corp.*
    465 U.S. 752 (1984)................................................................20

*Newcal Indus., Inc. v. Ikon Office Solution*
    513 F.3d 1038 (9th Cir. 2008) ...................................................21, 23

*Oltz v. St. Peter's Community Hosp.*
    861 F.2d 1440 (9th Cir. 1988) ...................................................22

*Pacific Coast Agr. Export Ass'n v. Sunkist Growers, Inc.*
    526 F.2d 1196 (9th Cir. 1975) ...................................................24

*Parkway Gallery Furniture, Inc. v. Kittinger/Pa. House Group*
    878 F.2d 801 (4th Cir. 1989) ....................................................20

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*
    51 F.3d 1421 (9th Cir. 1995) .....................................................25

*Scheuer v. Rhodes*
    416 U.S. 232 (1974)................................................................9

*Standard Iron Works v. ArcelorMittal*
    639 F. Supp. 2d 877 (N.D. Ill. 2009) .........................................9

*Starr v. Sony BMG Music Entertainment*
    592 F.3d 314 (2d Cir. 2010).....................................................10, 17

*Thurman Indus., Inc. v. Pay 'N Pak Stores*
    875 F.2d 1369 (9th Cir. 1989) ...................................................22

*Todd v. Exxon Corp.*
    275 F.3d 191 (2d Cir. 2001)......................................................13

*Toys "R" Us, Inc. v. F.T.C.*
    221 F.3d 928 (7th Cir. 2000) ....................................................11

*TYR  Sport Inc. v. Warnaco Swimwear, Inc.*
    679 F. Supp. 2d 1120 (C.D. Cal. 2009) .....................................21

*United States v. United States Gypsum Co.*
    438 U.S. 422 (1978)................................................................13

*Virgin Atlantic Airways Ltd. v. British Airways PLC*
    257 F. 3d 246 (2d Cir. 2001).....................................................23

v

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., CASE NO. 09-md-02121-LAB-POR
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Zucco Partners, LLC v. Digimarc Corp.*
    552 F.3d 981 (9th Cir. 2009) .............................................................................................8

**RULES**

Fed. R. Civ. P.  8(a) ..............................................................................................................9

Fed. R. Civ. P. 12(b)(6)...............................................................................................8, 21, 25

1   **I.      INTRODUCTION**

2           The Consolidated Class Action Complaint ("Complaint") alleges facts supporting plausible claims

3   that the named defendant manufacturers[1] conspired with dominant retailer Guitar Center, Inc. ("Guitar

4   Center") and others to fix retail prices for guitar amplifiers and fretted instruments through strict

5   enforcement of minimum advertised price polices ("MAPPs").  The National Association of Music

6   Merchants, Inc. ("NAMM"), the leading music industry trade association, was the impetus for the

7   conspiracy.  Defendants participated in private meetings arranged by NAMM, where they exchanged

8   competitively-sensitive information about costs, prices and margins, and discussed MAPPs.  At these

9   meetings, Defendants advocated and agreed to use of MAPPs to stabilize retail prices. Guitar Center then

10  used its market dominance to corral manufacturers into enforcing MAPPs with retailers, which eliminated

11  retail price competition and stabilized prices.

12          The Complaint includes more than one hundred fifty paragraphs of extensive factual detail

13  describing the alleged conspiracy.  The Complaint identifies the dates and locations of the NAMM meetings,

14  and contains facts placing Defendants at the meetings.  It contains publicly available price data showing that

15  retail unit prices, after falling steadily in the years leading up to the conspiracy, stabilized and then increased

16  as the conspiracy was enforced.  It also references a Federal Trade Commission ("FTC") investigation of

17  collusive practices in the music products industry, culminating in charges that NAMM had engaged in

18  anticompetitive conduct for arranging meetings for competitors to share competitively-sensitive information

19  and discuss implementation and enforcement of the MAPPs.

20          Defendants jointly move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rule of

21  Civil Procedure.  None of Defendants' arguments warrants dismissal.

22          First, the Complaint alleges a plausible conspiracy.  The type of collusion alleged here—where

23  manufacturers fixed prices through vertical restraints dictated by a dominant retailer—was envisioned by the

24  Supreme Court in *Leegin Creative Leather Prods. Inc. v. PSKS, Inc.*, 551 U.S. 877, 892094 (2007); *see also*

25  *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000) (affirming FTC's finding that dominant retailer

26

27  _____

28  [1]   The Manufacturer Defendants are:  Fender Musical Instruments Corp. ("Fender"), Gibson Guitar Corp. ("Gibson"), Hoshino (U.S.A.), Inc. ("Hoshino"), Kaman Music Corp. ("Kaman"), Yamaha Corporation of America ("Yamaha"), and Roland Corporation U.S. ("Roland").

1   had used its market power to coerce manufacturers into vertical agreements that limited competition from

2   discount retailers).  Each of the Defendants benefitted from the conspiracy, which stablized and increased

3   prices for guitar amplifiers and fretted musical instruments (*i.e.*, acoustic guitars, electric guitars, bass

4   guitars, banjos and mandolins).

5   Second, Plaintiffs have pleaded the factual elements of the alleged conspiracy in accordance with the

6   mandates of Rule 8(a) of the Federal Rule of Civil Procedure and the Supreme Court's decision in *Bell*

7   *Atlantic v. Twombly*, 550 U.S. 544 (2007).  Defendants' assertion that more is necessary to show plausibility

8   is unwarranted.  *See In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d  1133, 1142, n.7 (N.D.Cal. 2009)

9   ("[A]llegations of antitrust conspiracy need not be detailed on a 'defendant by defendant' basis."); *Starr v.*

10  *Sony BMG Music Entm't,* 592 F.3d 314, 325 (2d Cir. 2010) ("*Starr*") ("[P]laintiffs [a]re not required to

11  mention a specific time, place or person involved in each conspiracy allegation.").

12  Third, the information set forth in the Complaint comes from public records, including records of the

13  FTC investigation and settlement with NAMM.  Records of governmental investigations are regarded as

14  reliable  sources  of  information.  Courts  routinely  look  to  those  materials  to  bolster  the  plausibility  of

15  Plaintiffs' claims.  *Starr*, 592 F.3d at 325.

16  Finally, the Complaint alleges appropriate product markets and contains sufficient facts to support

17  Plaintiffs' claims that the alleged conspiracy had an adverse competitive effect.  The motion to dismiss

18  should be denied in its entirety.

19  **II.     FACTUAL ALLEGATIONS**

20  **A.     Plaintiffs Allege Agreement, Conspiracy Or Concerted Action**

21  Plaintiffs allege that in the late 1990s and continuing thereafter, Guitar Center, the Manufacturer

22  Defendants and others fashioned, encouraged and adopted MAPP pricing as a means to maintain or increase

23  high profit margins.  (¶¶ 2, 77, 80-83, 108, 111.) [2]  Initially, the MAPPs were not universally enforced by

24  Guitar Center or its suppliers.  (¶ 79.)  Starting in about 2004, however, as Guitar Center and other brick-

25

26

27  [2] "¶ __" refers to paragraphs of the Complaint.  "Mem." refers to the Memorandum of Points and Authorities

28  in Support of Defendants' Motion To Dismiss (Dkt. 83-1).

1  and-mortar retailers faced increasing retail competition from internet-based resellers and "big-box" stores,[3]

2  Guitar Center agreed with the Manufacturer Defendants and other NAMM-member retailers to set MAPPs

3  at higher levels than before and to strictly enforce the MAPPs.  (¶¶ 84-85.)

4      The Complaint describes a "hub-and-spoke" retail price maintenance conspiracy, with Guitar Center

5  at its center.  Plaintiffs allege that Guitar Center, the Manufacturer Defendants and NAMM's other retail

6  members met and agreed to exchange competitive cost and pricing information, devise and implement

7  MAPPs for the Manufacturer Defendants' products, and strictly enforce the MAPPs by requiring that all

8  retailers charge minimum retail prices for the Manufacturer Defendants' products, and sanctioning

9  noncompliant retailers that failed to adhere to MAPP prices.  (¶¶ 85, 108, 110-13.)  Plaintiffs contend that

10  the conspiracy took the form of a series of vertical restraints on trade, or spokes (the MAPPs), which were

11  implemented and adhered to as between the Manufacturer Defendants, Guitar Center and other retailers.  (¶¶

12  86, 108, 111-12.)  The Manufacturer Defendants also agreed to implement horizontal restraints on trade, by

13  requiring and enforcing MAPPs with similar minimum advertising pricing terms with the knowledge that

14  other Manufacturer Defendants and competitors would require Guitar Center and competing retailers to

15  accept MAPPs as part of their written retail distribution contracts.  (¶¶ 86, 90, 108, 110-13.)  These

16  horizontal restraints form the "rim" of the alleged hub-and-spoke conspiracy.

17      The Complaint asserts that NAMM and its constituent retailer members provided the impetus for the

18  alleged conspiracy.  (¶ 87.)  Plaintiffs allege that, on specified dates between 2004 and 2008, NAMM

19  organized private meetings and programs at semi-annual trade shows and invitation-only global summits,

20  through which MAPPs were promoted and endorsed by NAMM as a means of reducing price competition

21  and maintaining high retail prices for NAMM's retail members.  (¶¶ 92-93, 97-103.)  Guitar Center and each

22  of the Manufacturer Defendants are members of NAMM.  (¶ 26.)  Plaintiffs allege that, during the period of

23  the alleged conspiracy, NAMM used these private meetings to enable Guitar Center, the Manufacturer

24  Defendants, and other NAMM members to exchange cost and pricing information, and to discuss MAPPs

25  and ways to restrict retail price competition.  (¶¶ 34, 75, 95-107.)  NAMM determined the scope of the

26  

27  [3] "Brick-and-mortar" refers to "a traditional business serving customers in a building as contrasted to an online business." *See* Merriam-Webster Online Dictionary.  A "big-box" store is a chain store having a

28  boxlike structure.  *Id.*  WalMart, KMart, and BestBuy are examples of "big-box" retailers.

IN RE: NAMM, MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1    information exchanged at these meetings by selecting panel moderators and setting program agendas.  (¶¶

2    97-98, 101-03, 118, 121.)  NAMM panelists consistently rolled out MAPPs at these meetings and told

3    attendees that "prices would rapidly migrate down to 10% over cost" without MAPPs, that MAPPs are "only

4    as effective as [their] enforcement," and that MAPPs already in place should be revised "upwards to give

5    retailers a better profit margin."  (¶¶ 82-83, 95, 97, 100.)

6         The Complaint describes Defendants' specific roles in furthering the alleged conspiracy.  Plaintiffs

7    allege that representatives from Guitar Center and each Manufacturer Defendant attended and participated in

8    NAMM events at which MAPPs were discussed.  (¶¶ 34, 93-94, 98-100, 103.)  They also allege that

9    between 2004 and 2008, top executives of several Defendants held positions on NAMM's board of

10   directors,[4] where they helped set NAMM's program agendas, furthered exchanges of cost and pricing

11   information, and knew of and facilitated discussions among Defendants and others about MAPPs, their

12   enforcement, and ways to restrict retail price competition.  (¶¶ 84, 93-94, 108.)

13        **B.      Plaintiffs Allege Relevant Markets And Market Power**

14        The Complaint uses "Musical Instruments and Equipment" to describe markets of new, high-quality

15   fretted instruments (including constituent sub-markets of acoustic guitars, electric guitars, bass guitars,

16   banjos, and mandolins) and guitar amplifiers.  (¶¶ 1, 38, 67.)  Plaintiffs use the term "new" to distinguish

17   the markets from markets for used musical instrument and equipment.  The term "high-quality" is used to

18   distinguish the markets from markets for toy, generic or unbranded products.

19        Plaintiffs allege that members of the public recognize the Musical Instruments and Equipment

20   markets described in the Complaint as distinct economic entities, and that the Manufacturer Defendants'

21   fretted instruments and guitar amplifiers serve as competitive substitutes for like products within those

22   markets.  Specifically, the Complaint alleges that the Manufacturer Defendants' fretted instruments and

23   guitar amplifiers require special manufacturing and production facilities, are used by professional musicians,

24

25   _____

26   [4]  Yamaha's Senior Vice President, Terry Lewis, served on NAMM's board of directors from 2003-2005.
     Kaman's Vice President of Marketing and Sales, Paul Damiano, served on NAMM's board from 2003
27   to 2006.  Roland's Chief Executive Officer and President, Dennis Houlihan, was a NAMM board member for
     nearly a decade, culminating in NAMM's first commercial chairman, a position held by Mr. Houlihan from
28   2005 through 2007.  Fender's Chief Executive Officer, Bill Mendello, and Hoshino's President, Bill Reim,
     held NAMM board positions from 2006 to 2009.  (¶¶ 28, 30-33.)

1    carry brand-names that consumers recognize and desire, and are sold primarily at specialty retail stores

2    including Guitar Center.  (¶¶ 29, 31-32, 64, 66, 69.)

3         Included within the markets described in the Complaint are specific types of fretted instruments—

4    acoustic guitars, electric guitars, bass guitars, banjos and mandolins—and guitar amplifiers that are

5    reasonably interchangeable with one another.  (¶ 1.)  An electric guitar manufactured by Fender, for

6    example, is reasonably interchangeable with an electric guitar manufactured by Yamaha, Gibson, Kaman or

7    Hoshino. Similarly, a guitar amplifier made by Roland is reasonably interchangeable with one made by

8    Fender, Gibson, Hoshino, Kaman or Yamaha.

9         Plaintiffs allege that Defendants had the market power or capacity to inhibit retail price competition

10   within the alleged product markets.  As alleged in the Complaint, the Manufacturer Defendants ranked

11   among the largest manufacturers and distributors of fretted instruments and guitar amplifiers between 2004

12   and 2008.  Collectively, they possessed significant market power over the relevant product markets.  (¶¶ 65,

13   67.) Plaintiffs allege that specialty music stores, including Guitar Center, were the main retail sales venues

14   for the Manufacturer Defendants' products during the relevant period and that Guitar Center was the

15   dominant specialty retail sales outlet above all others for these products.  (¶¶ 53-60.)[5]  Guitar Center

16   exercised market power by dictating MAPPs for fretted instruments and guitar amplifiers to manufacturers,

17   influencing product offerings and pricing factors, procuring preferential pricing and other preferences from

18   manufactures, and "strong-arming" manufacturers, including Yamaha and Fender, into not selling their

19   products to competing stores that planned to open near Guitar Center store locations.  (¶¶ 61-64, 88-89.)

20        The Complaint also alleges that NAMM, as the predominant trade association for the music products

21   industry, had the ability to control prices and exclude retail price competition from internet or big-box

22   retailers during the period of the alleged conspiracy.  NAMM is comprised of more than 9,000 members,

23   _____

24   [5]   According to publicly-available data, Guitar Center had nearly 30% of the total music retail sales in the
     United States between 2004 and 2008.  (¶ 56.)  This data is over-inclusive, as it includes products outside of

25   the relevant product market, such as generic or unbranded fretted instruments and guitar amplifiers and low-
     cost imports.  (¶ 70 n.2.)  Although Guitar Center's percentage of retail sales of new, high-quality fretted

26   instruments and guitar amplifiers is not publicly available, though presumably within Defendants'
     possessing, Plaintiffs allege additional facts suggesting that percentage was far greater.  (*Id.*)  During this

27   period, Guitar Center had eight times as many retail stores and five times as many sales revenues than its
     next largest competitor (¶¶ 55-57); was the largest retail customer of many of its manufacturers and

28   suppliers, including Defendants Fender and Gibson, (¶ 60); and enjoyed exclusive rights to sell new,
     "limited edition" fretted instruments made by certain Manufacturer Defendants, including Gibson (¶ 64).

1  including most U.S. manufacturers, distributors and specialty musical instrument retailers, and its meetings

2  are considered an indispensable resource for musical instrument manufacturers and retailers. (¶¶ 26, 74, 76,

3  87.) Plaintiffs allege that NAMM, given its preeminence in the industry, was able to facilitate the exchange

4  of competitively-sensitive cost and pricing information among Guitar Center, the Manufacturer Defendants,

5  and NAMM's other retail and manufacturing members, and to assist them in devising and implementing

6  MAPPs to increase retail prices and profit margins. (¶¶ 5, 75, 84-87, 95-107, 110.)

7     **C.     Plaintiffs Allege Antitrust Injury And Harm To Consumers**

8          Plaintiffs allege that the conspiracy to implement and enforce the MAPPs served no legitimate pro-

9  competitive function and was designed solely to fix retail prices for fretted instruments and guitar amplifiers.

10  (¶¶ 3, 108-12.)  According to the Complaint, Defendants' efforts to implement and enforce MAPPs for

11  fretted instruments and guitar amplifiers paid off in the form of higher retail prices. (¶¶ 3, 72, 73, 113.) The

12  Complaint alleges, based on publicly available data, that after falling for several years, consistent with the

13  enforcement of the alleged conspiracy, retail unit prices for fretted instruments and guitar amplifiers leveled

14  off or started to rise in 2004 even as demand slumped.  Retail prices continued to rise during the course of

15  the alleged conspiracy until 2008, when the FTC conducted its investigation. (¶¶ 70-73, 116-21.) Plaintiffs

16  allege that, as a result of the conspiracy, Plaintiffs and other consumers paid the higher prices that the

17  Manufacturer Defendants required and that Guitar Center and other retailers charged under the MAPPs,

18  resulting in damage to their business or property. (¶¶ 72, 73, 113, 140, 145, 150, 159.)

19     **D.     Plaintiffs' Allegations Are Bolstered By Published Reports And The FTC Investigation**

20          The Complaint's allegations are buttressed by facts drawn from media accounts of NAMM meetings,

21  publicly-available sales and pricing data, and published reports of an FTC investigation and complaint in

22  which the FTC alleged that, between 2005 and 2007, NAMM organized meetings at which its members

23  were encouraged to communicate, and did in fact share, information about prices and strategies for

24  implementing MAPPs, restricting retail price competition, and securing higher retail prices for musical

25  instruments and related equipment. (¶¶ 52-57, 59-60, 62-63, 70-74, 92, 95-107, 118-21.)  The FTC

26  investigation lends support to the plausibility of Plaintiffs' claims.

27          Among other things, Plaintiffs reference an FTC complaint issued after two years of investigation,

28  including a review of subpoenaed documents obtained from each of the Defendants named herein. (¶ 116.)

The FTC asserted in that complaint that, between 2005 and 2007: "NAMM organized meetings and programs at which competing retailers of musical instruments were permitted and encouraged to discuss strategies for implementing [MAPPs], the restriction of retail price competition, and the need for higher retail prices. Representatives of NAMM determined the scope of discussion by selecting moderators and setting the agenda for these programs. At these NAMM-sponsored events, competitors [including Defendants named herein] discussed the adoption, implementation and enforcement of minimum advertised price policies; the details and workings of such policies; appropriate and optimal retail prices and margins; and other competitively sensitive issues." (¶ 118 (citing FTC Complaint filed April 8, 2009 in *In the Matter of National Association of Music Merchants, Inc*., Docket No. C-4255, FTC File No. 001 0203).)

In assessing NAMM's conduct, the FTC was cognizant of the fact that trade associations "may serve valuable and pro-competitive functions, such as expanding the market in which its members sell; educating association members, the public and government officials; conducting market research; establishing inter-operability standards; and otherwise helping firms to function more efficiently." (¶ 121.) Nonetheless, the FTC concluded that "by arranging and encouraging the exchange among its members of competitively sensitive information that had the purpose, tendency, and capacity to facilitate price coordination and collusion among competitors," NAMM's activities "crossed the line that distinguishes legitimate trade association activity from unfair methods of competition." (¶¶ 119-20.) According to the FTC, "no significant pro-competitive benefit" was derived from NAMM's conduct during the period. (¶ 120.)

To settle these charges, the FTC entered into a Consent Order that prohibits NAMM from helping competing retailers or manufacturers exchange pricing information and from promoting anticompetitive schemes. (¶¶ 121-22.) In a published Analysis of Agreement ("Analysis"), the FTC explained that "[a] Respondent violates Section 1 of the Sherman Act and Section 5 of the FTC Act when it engages in concerted conduct that had the principal tendency or likely effect of harming competition and consumers. The conduct of a trade association or its authorized agents is generally treated as concerted action." (¶ 121.) The Consent Order's numerous references to the "exchange of information between or among Musical Product Manufacturers" make clear that the FTC's investigation concerned collusive conduct by and among manufacturers in addition to retailers. (¶ 122.)

NAMM is required by the FTC Consent Order to change its business practices to avoid

1    anticompetitive activities.  Since settling with the FTC, NAMM has:  (1) provided antitrust training to its

2    board of directors; (2) revised its antitrust policy; (3) had antitrust counsel attend NAMM events; (4)

3    provided speakers with its revised antitrust policy; (5) required speakers to give notice in advance if they

4    intend to address price, terms, profit margins, MAPPs or resale price maintenance; (6) distributed an

5    overview of the antitrust laws to attendees of its trade shows; and (7) included introductory statements at

6    NAMM meetings that "[a]ny meeting such as this, where direct competitors such as manufacturers and

7    retailers come together, has the potential to create antitrust problems," clearly advise that "NAMM must not

8    facilitate, encourage, or allow participants at its events to engage in any conduct which restricts competition

9    on price or output," and state that "NAMM members must make pricing decisions independently or any

10   agreement or understanding with competitors."  (¶¶ 124-25.)

11   **III.     DEFENDANTS' MOTIONS TO DISMISS**

12          The Court has before it three separate motions to dismiss pursuant to Rule 12(b)(6) of the Federal

13   Rule of Civil Procedure:  (1) an omnibus motion joined by all Defendants; (2) a separate motion brought

14   solely by Roland; and (3) a third motion brought solely by NAMM.  (Dkt. Nos. 81, 83-84.)  The Court

15   authorized the filing of separate dismissal motions, as necessary, to address unique, non-overlapping issues.

16   (Dkt. No. 55.)  As it turns out, the primary issue in each motion concerns whether Plaintiffs have alleged

17   sufficient facts to support a "plausible basis" for their claims, as required by *Bell Atl. Corp. v. Twombly*, 550

18   U.S. 544, 556 (2007).  (Dkt No. 81-1, at 3; Dkt No. 83-1, at 4-5; Dkt No. 84-1, at 2-3.)  Each of these

19   motions lacks merit and should be denied.  This memorandum addresses Defendants' omnibus motion to

20   dismiss.  As described, above, Plaintiffs' Complaint sets forth detailed factual allegations which, when

21   viewed as a whole and in context, provide a plausible basis for Plaintiffs' claims under applicable pleading

22   standards.

23   **IV.     LEGAL STANDARDS**

24          A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of

25   the claims in the complaint.  *See Davis v. Monroe County Bd. of Educ*., 526 U.S. 629, 633 (1999).

26   "[D]ismissal [is] inappropriate unless the plaintiffs' complaint fails to 'state a claim to relief that is plausible

27   on its face." *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 989 (9th Cir. 2009) (quoting *Twombly*,

28   550 U.S. at 570).  The Court must presume that all material allegations are true at this stage, and draw

8

IN RE: NAMM, MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1  reasonable inferences from them in Plaintiffs' favor.  *See Newdow v. Lefevre*, 598 F.3d 638, 642 (9th Cir.
2  2010).  To survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a
3  right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

4      The Court must look to the complaint as a whole, and not independently scrutinize its component
5  parts.  *See Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009) ("Defendants'
6  attempt to parse the complaint and argue that none of the allegations (i.e., quoted public statements, parallel
7  capacity decisions, trade association and industry meetings) support a plausible inference of conspiracy-is
8  contrary to the Supreme Court's admonition that '[t]he character and effect of a conspiracy are not to be
9  judge by dismembering it and viewing its separate parts.'") (quoting *Continental Ore Co. v. Union Carbide
10  & Carbon Corp.*, 370 U.S. 690, 698-00 (1962)).  *Accord In re Pressure Sensitive Lablestock Antitrust Litig.*,
11  566 F. Supp. 2d 363, 373 (M.D. Pa. 2008) (stating that nothing in *Twombly* "contemplates [a]
12  'dismemberment' approach to assessing the sufficiency of a complaint.  Rather, a district court must
13  consider the complaint in its entirety without isolating each allegation for individualized review.").

14      Rule 8(a) requires "only a short and plain statement of the claim showing the pleader is entitled to
15  relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests."
16  *Twombly*, 550 U.S. at 555 (internal quotations omitted).  Although *Twombly* rejected the "no set of facts"
17  standard from *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), the Supreme Court did "not require heightened
18  facts pleading of specifics, but enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

19      The test is not whether the plaintiff will "ultimately prevail but whether the claimant is entitled to
20  offer evidence to support the claims."  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (cited in *Twombly*, 550
21  U.S. at 563, n. 8).  A claim has facial plausibility when [Plaintiffs] plead factual content that allows the court
22  to draw the reasonable inference that [Defendants] are liable for the misconduct alleged."  *Ashcroft v. Iqbal*,
23  __ U.S. __, 129 S.Ct. 1937, 1949 (2009). Plaintiffs need only "nudge[] their claims across the line from
24  conceivable to plausible."  *Twombly*, 550 U.S. at 570.

25  **V.    ARGUMENT**
26      **A.    The Allegations Are Sufficient To State A Claim Under *Twombly***
27      Plaintiffs' central claim is that Defendants violated Section 1 of the Sherman Act, which prohibits
28  "any contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or

1    commerce." 15 U.S.C. § 1.  Plaintiffs allege that Defendants met with each other at NAMM-sponsored

2    meetings, shared competitively-sensitive cost and pricing information, and collectively agreed to implement,

3    adhere to and enforce MAPPs, the effect of which was to fix, raise, maintain or stabilize the retail prices

4    paid by Plaintiffs and other consumers for fretted instruments and guitar amplifiers made by the

5    Manufacturer Defendants during the Class Period.  (¶¶ 8, 38.)

6                    **1.       The Plausibility Analysis Under *Twombly***

7            To state a claim, the complaint must contain enough factual matter to plausibly suggest that

8    Defendants entered into a contract, agreement, or concerted action, which was an unreasonable restraint on

9    trade, and caused injury to competition.  *See Austin v. McNamara,* 979 F.2d 728, 738 (9th Cir. 1992).

10   "Asking for plausible grounds to infer an agreement" does not subject antitrust claims to any heightened

11   pleading standard.  *Twombly*, 550 U.S. at 556.  "[I]t simply calls for enough facts to raise a reasonable

12   expectation that discovery will reveal evidence of an illegal agreement."  *Id.*

13           Thus, to satisfy *Twombly*, Plaintiffs may either plead an express agreement or state circumstantial

14   facts that "raise[] a suggestion of a preceding agreement."  *Id.* at 557.  The Court can infer an agreement

15   from the factual context; Plaintiffs are not required to identify who entered into what agreements with what

16   terms on what dates.  *See Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 325 (2d Cir. 2010) (rejecting

17   defendants' argument that *Twombly* imposed an obligation to identify specifically the time, place and person

18   as to each allegation of the conspiracy); *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2010 U.S.

19   Dist. LEXIS 65549, at *50 (E.D. Mich. July 1, 2010) (same); *see also In re Graphics Processing Units*

20   *Antitrust Litig.,* 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (plaintiffs need not plead "specific back-room

21   meetings between specific actors at which specific decisions were made."); *In Re Southeastern Milk*

22   *Antitrust Litig.*, 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008) (complaints put defendants on notice and

23   stated claims "while not answering all specific questions about 'who, what, when and where.'").

24           Similarly, "allegations of antitrust conspiracy need not be detailed on a 'defendant by defendant'

25   basis."  *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1142 n.7 (N.D. Cal. 2009); *see also*

26   *Hinds County v. Wachovia Bank N.A.,* 700 F. Supp. 2d 378, 395 (S.D.N.Y. 2010) (Plaintiffs "need not

27   necessarily provide any particular details about conduct undertaken by [a specific defendant] in furtherance

28   of the conspiracy."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903-

04 (N.D. Cal. 2008) (plaintiffs need not allege each defendant's specific role); *In re NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995) (same)[6]

### 2.    The Complaint Identifies A "Plausible" Conspiracy

Here, there is an appropriate legal theory and sufficient factual content in the Complaint, viewed in its entirety, to put Plaintiffs' allegations in a context suggestive of a plausible conspiracy.

First, the type of conspiracy alleged in the Complaint, in which a dominant retailer has sufficient market power to coerce manufactures into adopting and enforcing a series of vertical price restraints, is not only plausible, but was anticipated by the United States Supreme Court:

> Resale price maintenance . . . can be abused by a powerful manufacturer or retailer.  A dominant retailer, for example, might request resale price maintenance to forestall innovation in distribution that decreases costs.  A manufacturer might consider it has little choice but to accommodate the retailer's demand for vertical price restraints if the manufacturer believe it needs access to the retailer's distribution network.

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 893-94 (2007).

The situation described in *Leegin* is exactly that at issue in this case.  Plaintiffs allege that the Manufacturer Defendants agreed to the demands of dominant retailer Guitar Center that they strictly enforce MAPPs, so they could retain access to Guitar Center's massive retail customer base.  (¶¶ 60, 89.)  In light of *Leegin*, Plaintiff's theory of antitrust liability is plausible.  *See also Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000) (affirming FTC's finding that dominant retailer had used its market power to coerce manufacturers into vertical agreements that limited competition from discount retailers).  Defendants' contention that MAPPs are "a perfectly legal business practice," (Mem. at 1.), is an improper attempt to dispute the well-pleaded allegations of the Complaint that Defendants' agreements to implement and enforce MAPPs and other resale price maintenance policies served no legitimate pro-competitive purpose.  (¶¶ 3-4, 34, 84-91, 108-12.)  These allegations are supported by the FTC.  (¶¶ 119-21.)

Second, the Complaint describes the factual setting in which Defendants met, shared competitively-sensitive cost and pricing information, and discussed strategies for implementing and enforcing MAPPs.  The

---

[6] Defendants cite cases in which the complaints failed to contain basic facts regarding the alleged conspiracies.  *See Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 164 (D.D.C. 2004) (dismissing claims where plaintiffs failed to allege "each individual defendant joined the conspiracy and played some role in it"); *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1135-37 (N.D. Cal. 2005) (dismissing claims where complaint failed to allege scope of overall conspiracy or how those defendants participated at all).  These cases are readily distinguishable from the detailed facts Plaintiffs allege in their Complaint.

1    meetings occurred at NAMM-sponsored events.  These include programs at semi-annual trade shows and

2    global summits sponsored by NAMM on particular dates between 2004 and 2008 in specified locations.  (¶¶

3    92-93, 95-103, 106-07.)  These facts are sufficient to put Defendants on notice as to where (Anaheim,

4    Carlsbad, Nashville, Indianapolis, and Austin) and when (the specific dates referenced in the Complaint)

5    Defendants are alleged to have participated or taken action in furtherance of the alleged conspiracy.

6         Third, the Complaint identifies the entities that were part of the alleged conspiracy.  Specifically, the

7    Complaint alleges that, during the Class Period, each Defendant was a member of NAMM.  (¶¶ 26.)

8    NAMM's role in the alleged conspiracy was to sponsor and arrange for private meetings for competing

9    retailers of musical instruments and other NAMM members to exchange information on competitively-

10   sensitive subjects—including prices, margins, MAPPs and their enforcement. (¶¶ 84-85, 92-107.)  NAMM

11   representatives set the agenda for these meetings and helped steer the discussions.  (¶¶ 74-75.)  Guitar

12   Center and the Manufacturer Defendants were aware of and participated in these discussions, and assisted

13   NAMM in facilitating the conspiracy.  At the time of these NAMM-sponsored meetings, the President of

14   Hoshino (Bill Reim), the CEO and President of Roland (Dennis Houlihan), a Senior Vice-President of

15   Yamaha (Terry Lewis), the Chief Executive Officer of Fender (Bill Mendello), and Kaman's Vice President

16   of Marketing and Sales served on NAMM's board of directors.  (¶¶ 28, 30-33.)  The Complaint alleges that,

17   by virtue of their NAMM Board roles, these Manufacturer Defendants were aware of and approved

18   NAMM's encouragement, implementation and enforcement of MAPPs during the Class Period, and/or

19   assisted  NAMM in facilitating the alleged price-fixing conspiracy.  (¶ 94.)  *See Packaged Ice*, 2010 U.S.

20   Dist. LEXIS 65549, at *89 (considering allegations regarding trade association director positions "in the

21   context of the entirety of Plaintiffs' allegations").  Published reports of NAMM meetings, where available,

22   also help to place specific representatives of Guitar Center, Yamaha, Kaman and Fender at specific NAMM

23   meetings where strategies for implementing and enforcing MAPPs were discussed.  (¶¶ 98, 103, 107.)  In

24   addition to these facts, the Complaint alleges that NAMM's trade shows and invitation-only Global Summits

25   were widely regarded as an "indispensable resource" for owners and key personnel in the musical instrument

26   industry.  (¶¶ 75-76, 106.)  This allegation also supports an inference that key representatives of each

27   Defendant knew and approved NAMM's role in the conspiracy.

28         Defendants criticisms of these allegations lack merit.  (Mem. at 9-11.)  Plaintiffs' allegations of

12

IN RE: NAMM, MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   Defendants' participation in trade associations demonstrate the plausibility of a price-fixing conspiracy.

2   "[S]uch participation demonstrates how and when Defendants had opportunities to exchange information or

3   make agreements." *SRAM*, 580 F. Supp. 2d at 902-03.[7]   The Supreme Court has held that "exchanges of

4   current price information," as alleged here, "of course, have the greatest potential for generating anti-

5   competitive effects and although not *per se* unlawful have consistently been held to violate the Sherman

6   Act." *United States v. United States Gypsum Co.*, 438 U.S. 422, 441, n. 16 (1978) (internal citations

7   omitted).   Courts recognize that trade association affiliations and attendance at industry events may be

8   alleged to show that putative conspirators had the opportunity and means to develop and/or further their

9   collusive scheme.  *See Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001) ("[T]he frequency of the

10  meetings is itself problematic for the same reason that the exchange of current price data is suspect: It tends

11  to facilitate the policing of price conspiracies.").[8]  Plaintiffs are not required to connect **each** Defendant with

12  a specific NAMM meeting, program or alleged conversation.  Proof of conspiracy can consist of the fact that

13  "defendants got together and exchanged assurances of common action or otherwise adopted a common plan

14  even though *no* meetings, conversations or exchanged documents are shown." *In re Flat Glass Antitrust*

15  *Litig.*, 385 F.3d 350, 361 (3d Cir. 2004);  *see also In re Graphics Processing Units Antitrust Litig.*, 540 F.

16  Supp. 2d 1085,  1096 (N.D. Cal. 2007) ("*GPUs II*") ("[D]irect allegations of conspiracy are not always

17  possible given the secret nature of conspiracies.  Nor are direct allegations necessary.").

18        Fourth, the Complaint identifies the subject of the alleged conspiracy—the MAPPs and their

19

20  ───────────────

21  [7] Defendants' authorities stand for the unremarkable proposition that a firm's membership in a trade association—standing alone—does not amount to antitrust conspiracy. *See, e.g., In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) ("Gathering information about pricing and competition in the industry is standard fare for trade associations.  If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action."); *Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962-64 (N.D. Cal. 2007) (following *Citric Acid*); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) (following *Citric Acid*).  As described throughout the Complaint, Plaintiffs allege far more than mere membership in NAMM and attendance at NAMM events.

26  [8] Defendants' citation to *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1257 (W.D. Wash. 2009), is not on point.  There, the plaintiffs made only "general allegations of membership in trade organizations[,]" which were determined by the court to be inadequate to support an antitrust claim in the absence of factual details regarding the dates and locations of actual trade association meetings.  Plaintiffs plead in their Complaint the precise factual detail missing in *Hawaiian & Guamanian Cabotage*.  (¶¶ 92, 95-100, 102-107)

───────────────

1   implementation and enforcement.  (¶¶ 1-5, 84-86, 93-113.)  For example, the Complaint asserts that reports

2   from the January 2002 NAMM trade show stated "mention of MAP pricing was routinely included in just

3   about every new product presentation" (¶ 83) and that at the 2004 NAMM Summer Show manufacturers

4   "announced higher MAP prices in a bid to shore up dealer margins" (¶ 95).  Regarding the terms and

5   enforcement of the MAPPs, the Complaint quotes a retailer who said that his company "had very little

6   choice but to honor manufacturer's policies on advertised prices because otherwise it risks having its

7   supplies cut off or being delisted as an authorized distributor."   (¶ 109.)

8          Defendants fault Plaintiffs for not identifying the specific terms and conditions of each alleged

9   MAPP agreement.  (Mem. at 7:23-28, 8:1-2.)  This argument confuses what Plaintiffs will need to prove at

10  trial with what Plaintiffs need to allege to withstand a motion to dismiss.  Conspiracies are typically

11  conducted in secret, and an antitrust complaint need not—and rarely does—contain detailed information of

12  the price-fixing agreement itself.  *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651,

13  662 (7th Cir. 2002) ("most cases are constructed out of tissue of such [ambiguous] statements and other

14  circumstantial evidence, since outright confession [of conspiracy] would ordinarily obviate the need for a

15  trial.").   Allegations that provide circumstantial evidence of an agreement, like the exchanges of

16  competitively sensitive cost and pricing  information alleged here, are sufficient under *Twombly* to "nudge"

17  the complaint "over the line from conceivable to plausible."

18         Defendants cite two cases—*Kendall v. Visa U.S.A., Inc*., 518 F.3d 1042 (9th Cir. 2008) and *In re

19  Late Fee & Over-Limit Fee Litig*., 528 F. Supp. 2d 953 (N.D. Cal. 2007)—in support of their contention that

20  *Twombly* requires a plaintiff to plead the specifics of time, place and person.   These cases are

21  distinguishable.  Neither involved the level of factual content proffered here.

22         In *Kendall*, plaintiffs sued defendant credit card companies and banks alleging conspiracy to set fees

23  charged to merchants for credit card sales.  The court noted, citing *Twombly*, that plaintiffs had failed, *even

24  having been a chance to conduct discovery*, to allege evidentiary facts as to the banks role in the conspiracy

25  beyond the collective legal conclusion that the "banks" knowingly participated in the alleged scheme.  518

26  F.3d at 1048.  Without more factual content the "banks," which were large institutions with hundreds of

27  employees, entering into contracts and agreements daily, would have no idea how to respond to the

28  allegations of a conspiracy.  *Id.* at 1047.  The court concluded that such "naked" assertions of conspiracy

14

1     stopped short of crossing the line between possibility and plausibility.

2         Similarly, in *Late Fee*, a case that involved allegations by credit card holders that major credit card

3 issuers charged excessive late-fees, the complaint failed to provide any information suggesting an

4 agreement. *Id.* at 956. As Judge Armstrong, who wrote the *Late Fee* decision later explained, "The

5 centerpiece of plaintiffs' claims was set forth in a single paragraph of the complaint which was comprised of

6 a chart showing that several of the defendants charged the same or similar late fees." *In re Flash Memory*,

7 643 F. Supp. 2d at 1146 (referencing *Late Fee*, 528 F. Supp. 2d at 962). Such generalized, unsupported

8 averments failed to satisfy the plausibility requirement. *Late Fee*, 528 F. Supp. 2d. at 962.

9         Here, unlike in *Kendall* or *Late Fee*, Plaintiffs allege detailed facts within a context that gives rise to

10 an inference of a collusive agreement. The Complaint describes the nature of the Defendants' agreement,

11 the opportunities they shared to conspire, the mechanism for implementing the agreement, the

12 anticompetitive impact of the conspiracy, and the harm to consumers. More detailed allegations as to

13 person, place and time are not required. *See Packaged Ice*, 2010 U.S. Dist. LEXIS 65549, at *50.

14
15       **3.**      **The Data Showing Unusual Retail Unit Price Increases During The Conspiracy Period Lend Support To Plaintiffs' Claims**

16         The Complaint includes retail price data drawn from publicly-available sources. These data show

17 that in the years leading up to the alleged conspiracy, retail unit prices for guitars and guitar amplifiers fell

18 even as the demand for these products grew. (¶¶ 70-73.) Beginning in 2004, however, and throughout the

19 period the alleged conspiracy was in effect, retail prices for guitars and guitar amplifiers increased and

20 continued to rise—even as demand for these products fell—until the FTC's investigation in 2008. (*Id.*)

21         Defendants contend that evidence of rising industry prices, even if proven, is insufficient in and of

22 itself to establish and inference of conspiracy, asserting that retail prices for fretted instruments and guitar

23 amplifiers can rise for any number of other lawful reasons. (Mem. at 8:26-28, 9:1-6.) Defendants'

24 arguments are misplaced, for two reasons.

25         First, it is not Plaintiffs' obligation at the pleading stage to completely foreclose the possibility that

26 prices might have risen for legitimate economic reasons. Defendants cannot succeed on their motion merely

27 by positing that there could be a lawful explanation for the price increases. "[A] complaint need not be

28

1    dismissed where it does not 'exclude the possibility of independent business action.'" *City of Moundridge v.*
2    *Exxon Mobil Corp.*, 250 F.R.D. 1, 5 (D.D.C. 2008) (*citing Twombly*, 550 U.S. at 557).

3         Second, Plaintiffs have satisfied *Twombly*'s pleading requirements by alleging retail price increases
4    that break with past industry practice.  In *GPUs II*, the court explained "that 'complex and historically
5    unprecedented changes in pricing structure made at the very same time by multiple competitors, and made
6    for no other discernable reason, would support a plausible inference of conspiracy." *GPUs II*, 540 F. Supp.
7    2d at 1092 (citing *Twombly*, 550 U.S. at 555, n.3).  Here, as in *GPUs II*, Plaintiffs allege that the markets for
8    fretted instruments and amplifiers departed from historical pricing patterns, as retail unit prices increased
9    when the conspiracy was enforced even while demand slumped, despite years of price declines and
10   increased demand in the late 1990s and early 2000s.  (¶¶ 70-73.) These allegations, coupled with other facts
11   consistent with conspiracy detailed above, are sufficient to state a claim.

12        The decisions cited by Defendants merely state that price increases, by themselves, do not plausibly
13   give rise to an inference of conspiracy.  *See Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S.
14   209, 237 (1993) ("[R]ising prices do not *themselves* permit an inference of a collusive market dynamic."
15   (emphasis added)); *Lubic v. Fid. Nat'l Fin., Inc.*, No. C08-0401 MJP, 2009 U.S. Dist. LEXIS 62092, at *12
16   (W.D. Wash. July 20, 2009) (quoting *Brooke*).  Here, the Complaint is not based on price increases alone.
17   Instead, the dramatic price shifts corroborate Plaintiffs' numerous specific factual allegations regarding the
18   operation of Defendants' conspiracy.  *Cf. In re Flash Memory*, 643 F. Supp. 2d at 1146 (distinguishing
19   *Brooke* where de facto price increases were accompanied by allegations of collusive agreements).

20        Defendants also contend that the pricing data in the Complaint, which is in aggregate form and
21   drawn from public sources, is inconclusive because it does not show the actual retail prices charged for the
22   Manufacturer Defendants' products, how specific product prices may have changed over time, or whether
23   the product mix within the reported category may have had an effect on the published average price.  (Mem.
24   at 8:14-23.)  This is just another way of saying that Defendants may be able to develop proof that the listed
25   price increases reflect legitimate economic realities.  These factual disputes can—and should—be resolved
26   at a later time on a developed evidentiary record.[9]

27
28   _____
     [9] Defendants maintain, and have produced to the FTC, the specific transactional data for the actual prices

1

### 4.   The FTC's Investigation Bolsters The Plausibility Of Plaintiffs' Claims

2   The FTC's investigation and the Consent Order bolster the plausibility of Plaintiffs' claims, and for

3   that reason, they may be considered by the Court.  As numerous courts recognize, allegations concerning

4   government investigations into conduct similar to that alleged in a private antitrust complaint support the

5   plausibility of such allegations under *Twombly*.

6   In *Starr*, 592 F.3d at 324-25, the Second Circuit reversed dismissal and held that government

7   investigations into the underlying conduct alleged in a private antitrust complaint were factors supporting

8   the plausibility of the plaintiffs' claim.  In rejecting the defendants' argument that those investigations were

9   irrelevant because they had been closed without charges, the Second Circuit found no authority "to support

10   the proposition that a civil antitrust complaint must be dismissed because an investigation undertaken by the

11   Department of Justice found no evidence of conspiracy." *Id.* at 325.  Instead, the court concluded that the

12   government investigations bolstered the plausibility of the plaintiffs' conspiracy allegations. *Id.  Starr* also

13   disposes of Defendants' argument that the "only reasonable inference to draw from the FTC closing its

14   investigation as to [defendants other NAMM] is that the FTC did not find even a suggestion of

15   wrongdoing."  (Mem. at 11:12-18.)  The Second Circuit squarely held that no such inference was available.

16   Other courts have held that the allegations concerning government investigations bolster the

17   plausibility of private antitrust allegations. *See Hinds County*, 700 F. Supp. 2d at 394) ("Although pending

18   government investigations may not, standing alone, satisfy an antitrust plaintiff's pleading burden,

19   government investigations may be used to bolster the plausibility of § 1 claims."); *Packaged Ice*, 2010 U.S.

20   Dist. LEXIS 65549, at *65 ("This Court finds that the government investigations surrounding the Packaged

21   Ice industry … to which Plaintiffs refer in the [complaint], while not determinative standing alone as to the

22   plausibility of Plaintiffs' claims of conspiracy, do bolster the plausibility analysis and heighten the Court's

23   expectation that 'discovery will reveal evidence of illegal agreement.'"); *Hyland v. Homeservices of*

24   *America, Inc*., No. No. 3:05-CV-612-R, 2007 U.S. Dist. LEXIS 65731, at *9 (W.D. Ky. Aug. 17, 2007)

25   (finding that Department of Justice enforcement actions supported price-fixing allegations); *In re Tableware*

26   *Antitrust Litig*., 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005) ("A plaintiff may surely rely on governmental

27

28   charged for the Manufacturer Defendants' products bearing on these issues.  Plaintiffs cannot be faulted for
not having pleaded this non-public information in the Complaint.

1    investigations, but must also … undertake his own reasonable inquiry and frame his complaint with

2    allegations of his own design.").

3          Courts routinely allow allegations regarding government complaints, consent decrees or similar

4    matters when the entities creating these types of documents are responsible for law enforcement in the

5    particular areas germane to the plaintiffs' claims.  Reciting such information is not only permissible at the

6    pleading stage, it is especially appropriate to include allegations that are based upon documents prepared by

7    such "reliable sources."  *See, e.g., Gray v. Bayer Corp.*, No. 08-4716 (JLL), 2010 U.S. Dist. LEXIS 33040,

8    at *83 (D.N.J. March 31, 2010) ("[T]he FTC is the type of organization specifically tasked with

9    investigating and prosecuting the very claims alleged by the Plaintiff in this matter.  Defendant cites no

10   binding legal authority for the proposition that a party may not rely on relevant action taken by the FTC to

11   provide a proper context for its own claims . . . ."); *de la Fuente v. DCI Telecommunications, Inc.*, 259 F.

12   Supp. 2d 250, 260 (S.D.N.Y. 2003) (SEC investigation); *In re New Century*, 588 F. Supp. 2d 1206, 1220

13   (C.D. Cal. 2008) (bankruptcy examiner's report).

14         The FTC's investigation and settlement with NAMM are relevant.  The FTC's investigation involves

15   the same key players and the same time period, and was directed to the same collusive behavior as is alleged

16   here.  The FTC's complaint, its Analysis, and other public statements support Plaintiffs' allegations that

17   Defendants entered into the price-fixing conspiracy alleged in the Complaint.  (¶ 121 ("'[A]t meetings and

18   programs sponsored by NAMM, competing retailers and other NAMM members discussed strategies for

19   raising retail prices. . . .[S]uch discussions could lead competing NAMM members to refuse to deal with a

20   manufacturer, distributor, or retailer unless minimum advertised price policies, or increases in minimum

21   advertised prices, were observed and enforced against discounters. … [F]irms also exchanged information

22   on competitively-sensitive subjects – prices, margins, minimum advertised price policies and their

23   enforcement.'") (quoting Analysis).)  The logical implication of the FTC's statement, its use of the broader

24   term  "NAMM members" in its Analysis, and its repeated references to the "***exchange of information***

25   ***between or among Musical Product Manufacturers***" in the Consent Order is that the FTC's investigation

26   concerned "the implementation of collusive strategies" not only by NAMM's "retail members," but also by

27   NAMM's "manufacturer" members.  (¶¶ 121-22 (emphasis added).)  That is precisely what Plaintiffs allege

28   here.  These facts, along with numerous others pleaded in the Complaint, raise Plaintiffs' "right to relief

---

18

1    above the speculative level." *Twombly*, 550 U.S. at 570.

2    **B.**    **Plaintiffs Plead All Required Elements of a "Hub-And-Spoke" Conspiracy**

3    Defendants next contend that Plaintiffs have not pleaded facts to show that each Manufacturer

4 Defendant conspired with Guitar Center as a "hub" to implement and enforce MAP policies for the

5 anticompetitive purpose of eliminating competition and increasing retail prices for the Manufacturer

6 Defendants' products. (Mem. at 11-12.)  A review of the Complaint shows otherwise.

7    To allege a "hub-and-spoke" conspiracy, a plaintiff must plead facts to show: (1) an overall unlawful

8 plan or "common design"; (2) knowledge that the others must be involved is inferable to each member; and

9 (3) a showing of each alleged member's participation. *See Elder-Beerman Stores Corp. v. Federated Dep't*

10 *Stores, Inc*., 459 F. 2d 138, 146 (6th Cir. 1972).  A plaintiff need not plead that each co-conspirator knew the

11 identity of all other conspirators or the full extent of the conspiracy. *See In Re Ins. Antitrust Litig*., 723 F.

12 Supp. 464, 483 (N.D. Cal. 1989), *rev'd on other grounds by* 938 F.2d 919 (9th Cir. 1991).  "But, there must

13 be a common agreement and understanding." *Elder-Beerman*, 459 F.2d at 483.  "[T]he allegations and

14 proof must reflect a wheel and spoke arrangement in which a single person at the hub implements the

15 conspiracy by a series of arrangements with others to carry out the purpose of their conspiracy. … There

16 must be a connection  among all the alleged participants sufficient to support a finding that they entered into

17 the conspiracy." *Id.* at 484.  Plaintiffs have satisfied these pleading mandates.

18    First, Plaintiffs have pleaded facts to support the existence of an overall plan or common design.  The

19 Complaint alleges that Guitar Center, its suppliers (the Manufacturer Defendants) and NAMM's other retail

20 members met and agreed on an overall plan to exchange competitive cost and pricing information, devise

21 and implement MAPPs for the Manufacturer Defendants' fretted instruments and guitar amplifiers, and

22 strictly enforce the MAPPs by requiring that all retailers charge minimum retail prices for the Manufacturer

23 Defendants' products, or face sanctions if they did not.  (¶¶ 85, 93, 108, 110-13.)

24    Second, Plaintiffs have pleaded facts to support an inference that each member of the alleged

25 conspiracy had knowledge of their co-conspirators' involvement in the plan.  The Complaint alleges that the

26 conspiracy was facilitated through NAMM, and Plaintiffs have pleaded facts to show that each Defendant

27 regularly attended NAMM's semi-annual trade shows and programs, where they exchanged pricing

28 information with each other and agreed to strictly enforce the MAPPs. (¶¶ 26, 28, 30-34, 75, 92-94, 98-99,

19

IN RE: NAMM, MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

101-02, 107, 121.)  The Complaint also alleges that the Manufacturer Defendants conspired with each other to implement horizontal restraints on trade by uniformly agreeing to impose and enforce the MAPPs with the understanding that its competitors would do the same to increase their profit margins.  (¶¶ 86, 90, 108, 110, 111-13.)[10]  These facts, and others cited in the Complaint, are sufficient to infer that the members of the alleged conspiracy had knowledge of their co-conspirators' involvement in the conspiracy.

Third, Plaintiffs have pleaded facts to show each Defendant's participation in the scheme.  As discussed above, Defendants' representatives regularly attended the NAMM meetings and many served on NAMM's board of directors.  (¶¶ 28, 30-34, 93-94, 98-99, 103, 107.)  These facts are sufficient to show that each Defendant furthered the exchange of cost and pricing information and knew of and facilitated discussions about MAPPs  and mechanisms to enforce them.[11]

## C.   The Alleged Conspiracy Adversely Affected Competition

Defendants challenge Plaintiffs' allegation that Guitar Center, as the dominant specialty music retailer, "was able to and did use its dominant position in the market to enforce the conspiracy by threatening manufacturers that were lax in their own enforcement of the MAPPs." (¶ 5.)  The Complaint describes this part of the conspiracy as a "series of vertical restraints on trade (the MAPPs), [that] had the effect of a horizontal restraint on trade because the Manufacturer Defendants agreed to enforce similar MAPPs." (*Id.*)

Defendants correctly point out that Section 1 claims involving vertical pricing conspiracies are now governed by *Leegin*, 551 U.S. at 877.  In *Leegin*, the Supreme Court held that vertical price restraints are not *per se* unlawful, but must instead be evaluated on a case-by-case basis under a "rule of reason" analysis.  *Id.*

---

[10] Defendants' citation to the *Illinois Brick* bar against the recovery of damages by indirect purchasers is inapposite.  *See Kendall v. Visa U.S.A., Inc.*, 518 F.2d 1042, 1049-50 (9th Cir. 2008) (citing *Illinois Brick v. Illinois*, 431 U.S. 720 (1977)).  Here, Plaintiffs purchased directly from the Manufacturer Defendants' co-conspirator, Guitar Center, and facts related to the conspiracy are alleged in detail in the Complaint.  *Illinois Brick* does not apply.  *See Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1212-14 (9th Cir. 1984).  Even if Plaintiffs are considered indirect purchasers, *Illinois Brick* would not preclude them from pursuing their state law claims.  *See California v. ARC Am. Corp.*, 490 U.S. 93, 97-98 (1989).

[11] Defendants assert that a manufacturer's reaction in response to a retailer's complaint is not by itself evidence of a conspiracy, citing three cases.  Those cases were not decided on motions to dismiss, so the plaintiffs were required to present *evidence* that tended to exclude the possibility that the defendants were acting independently.  *Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752, 763-764 (1984) (trial); *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 166 (3d Cir. 2003) (summary judgment); *Parkway Gallery Furniture, Inc. v. Kittinger/Pa. House Group*, 878 F.2d 801 (4th Cir. 1989) (summary judgment).  At this stage, Plaintiffs are only required to demonstrate that their claims are plausible.

at 889.  To succeed under a "rule of reason" analysis, a plaintiff must show that the alleged vertical price restraint produces "significant anticompetitive effects" within a "relevant market."  *Hairstron v. Pacific 10 Conf.*, 101 F.3d 1315, 1317 (9th Cir. 1996).  At the pleading stage, however, a plaintiff need only allege that: (1) a relevant market exists, and (2) the defendants have power within that market or the alleged had an adverse competitive effects.  *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008).  The Complaint satisfies these requirements.

> **1.      The Complaint Alleges A Plausible Market For Fretted Instruments And Guitar Amplifers**

Market definition for antitrust purposes involves a "deeply factual inquiry," and "for this reason a court must hesitant to grant a motion to dismiss for failure to plead a relevant market."  *Jamsports & Entm't, LLL v. Paradama Productions, Inc.*, No. 02-C-2298, 2003 U.S. Dist. LEXIS 6100, at *17 (N.D. Ill. Apr. 21, 2003).  There is no requirement that market definition be pled with specificity.  *TYR Sport Inc. v. Warnaco Swimwear, Inc.*, 679 F. Supp. 2d 1120, 1127-28 (C.D. Cal. 2009) (denying motion to dismiss and rejecting defendants' argument that market definition was insufficient because it contained no allegations regarding interchangeability or cross-elasticity of demand).  As the Ninth Circuit has explained:

> An antitrust complaint . . . survives a Rule 12(b)(6) motion unless it is apparent from the face of  the complaint that an alleged market suffers a fatal defect.  And since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial.

*Newcal*, 513 F.3d at 1045.

A plaintiff satisfies the relevant market requirement if the complaint contains facts that suggest an "'area of effective competition in which buyers of the[] products can find alternative sources of supply [and] there are no other products that are interchangeable . . . . within this geographic market.'"  *TYR Sport*, 679 F. Supp. 2d at 1129 (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999)).  A product market typically is defined to include the pool of goods that qualify as economic substitutes because they enjoy reasonable interchangeability of use and cross-elasticity of demand.  *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988).  It also may be narrowed to account for identifiable submarkets or product clusters.  *See Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962); *Thurman Indus., Inc. v. Pay 'N Pak Stores*, 875 F.2d 1369, 1374 (9th Cir. 1989).  Industry or public recognition of the market or submarket as a separate economic entity, the product's peculiar characteristics

1    and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and

2    specialized vendors are among the practical criteria a Court may use to determine whether a plausible

3    relevant market has been alleged in a particular case.  *See Brown Shoe*, 370 U.S. at 325.

4         The Complaint satisfies these standards.  It defines the relevant markets as the U.S. retail markets for

5    new, high-quality fretted instruments and new, high-quality guitar amplifiers.  (¶ 1, 38, 54, 58, 67.)  Fretted

6    instruments, in turn, includes identifiable product clusters, *e.g.*, electric guitars, acoustic guitars, bass guitars,

7    banjos and mandolins.  (*Id.*)  This is consistent with *Brown Shoe*, where the Supreme Court upheld the trial

8    court's finding that men's, women's and children's shoes made up separate submarkets, in light of the

9    distinct customer groups for and the particular characteristics of each type of shoe.  370 U.S. at 326.[12]

10        The market definitions use the term "new" to distinguish the defined markets and submarkets from

11   markets for used or second-hand products, and the term "high-quality" is distinguish the defined markets

12   and submarkets from the markets for toys, generics, knock-offs, or unbranded products.  This is sensible.

13   While it is reasonable to infer that an electric guitar manufactured by Fender may be reasonably

14   interchangeable with one made by Yamaha, Gibson, Kaman or Hoshino,  consumers seeking to purchase a

15   new, high-quality electric guitar likely would not switch to a low cost knock-off—or to another instrument,

16   such as an electric keyboard—simply because of a retail price increase in "high-quality" electric guitars.

17        Consistent with *Brown Shoe*, the Complaint also contains other details that support the plausibility of

18   the product markets and submarkets alleged here.  The Complaint also alleges that  "new, high-end" fretted

19   instruments and guitars amplifiers require special production facilities, are used by professional musicians,

20   carry recognizeable, desireable brand-names, and are sold primarily at specialty retail stores, such as Guitar

21   Center.  (¶¶ 11-25, 31-32, 53, 64, 66, 69.)

22        **2.    The Complaint Alleges That Defendants Had The Ability Or Capacity To**
           **Adversely Affect Retail Price Competition In The Markets For Fretted**
23         **Instruments And Guitar Amplifiers**

24        To meet the second "rule of reason" pleading element, the adverse-effect requirement, Plaintiffs must

25   allege facts to plausibly suggest either that the alleged conspiracy had an adverse competitive effect within

26   _____

27   [12] Plaintiffs agree with Defendants' assertion "it is implausible to suggest consumers who intend to purchase
     mandolins, for example, would "switch" to purchasing banjos or guitars if retailers increased the prices that
28   they charge for mandolins" (Mem. at 16:20-21, 17:1-2), but the argument misses the mark.  As these
     authorities make plain, product markets may properly contain identifiable submarkets or product clusters.

1    the defined markets or that Defendants have power within those markets.  *See Newcal*, 513 F.3d at 1044.

2    These are alternative pleading standards.  Where plausible allegations of actual competitive injury are made,

3    it is not necessary to plead market power.  *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61

4    (1986) ("'proof of actual detrimental effects'. . . can obviate the need for an inquiry into market power'")

5    (internal citation omitted)).

6        An actual adverse impact may be asserted "by examining factors like reduced output, increased

7    prices and decreased quality."  *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F. 3d 246, 264 (2d

8    Cir. 2001).  Here, Plaintiffs allege that the efforts of Defendants to implement and enforce MAPPs for

9    fretted instruments and guitar amplifiers had the adverse impact of higher retail prices.  (¶¶ 3, 70-73, 113,

10   117-121, 140, 145, 150, 159.)  *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 477

11   (1992) ("It is clearly reasonable to infer that Kodak has market power to raise prices and drive out

12   competition in the aftermarkets, since respondents offer direct evidence that Kodak did so.")  Plaintiffs

13   allege facts to suggest that discovery will reveal an actual anticompetitive injury in the form of higher retail

14   prices for Manufacturing Defendants' fretted instruments and guitar amplifiers.  This is sufficient.

15       Plaintiffs also allege that Guitar Center has market power as both a purchaser and seller of fretted

16   instruments and guitar amplifiers.  Market power has been defined as "the power to control prices or exclude

17   competition."  *Broadway Delivery Corp. v. United Parcel Serv.*, 651 F.2d 122, 126-27 (2d Cir. 1981).  It

18   may be shown by evidence of "specific conduct indicating the defendant's power to control prices or

19   exclude competition."  *Id.* at 130.  Market share may be used as a proxy for market power.  *See id.*  Plaintiffs

20   have alleged facts to show that Guitar Center, while not a monopolist, enjoys a dominant position—both as a

21   buyer and seller of fretted instruments and guitar amplifiers.

22       During the Class Period, Guitar Center was the dominant specialty retail sales outlet for these

23   products.  (¶¶ 53-56, 58-63.)  Guitar Center had a national and online presence, and eight times as many

24   retail stores and five times as many sales revenues as its next largest competitor, Sam Ash.  (¶¶ 55-57.)

25   Perhaps most telling, in 2007, Guitar Center's estimated annual revenues of $2.1 billion exceeded the

26   combined revenues of the 100 next largest specialty music retailers. (¶ 57.)  Guitar Center's dominance over

27   the manufacturers was, therefore, a factor of both its rank as the largest retail outlet and the fragmentation of

28   the rest of the industry.  *See, e.g, Pacific Coast Agr. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196,

23

IN RE: NAMM, MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1   1204 (9th Cir. 1975) (45%-75% market share could be a monopoly where rest of industry was fragmented);

2   *Dickson v. Microsoft Corp.*, 309 F.3d 193, 209 n.20 (4th Cir. 2002) (noting that being the "largest" in a

3   relevant market "says nothing of a firm's ability to affect competition in that market" absent information

4   about the distribution the market).

5         Guitar Center had nearly 30% of the total U.S. music retail sales between 2004 and 2008.  (¶ 56.)  It

6   is plausible that Guitar Center enjoyed a much larger market share within retail the fretted instrument and

7   guitar amplifiers markets alleged here.  Guitar Center was the largest retail customer of many of its

8   manufacturers and suppliers, including Defendants Fender and Gibson.  (¶ 60.)  Therefore, Guitar Center

9   was able to use its power to enforce collusion among its various suppliers.  The Complaint details how

10   Guitar Center exercised its market substantial power to facilitate the alleged conspiracy by dictating MAPPs

11   to manufacturers, influencing product offerings and pricing factors, procuring preferential pricing from

12   manufacturers, and "strong-arming" manufacturers, including Yamaha and Fender, into not selling their

13   products to competing stores that planned to open near Guitar Center store locations.  (¶¶ 60-65, 88-89.)

14   These facts support a plausible inference that Guitar Center had the ability to amplify its own market power

15   by playing favorites—or even threatening to play favorites—among its suppliers, and to punish those who

16   failed to adhere to or honor the MAPPs.

17         Regarding barriers to entry, if Guitar Center threatened to cancel or delay a purchase in 2007, then a

18   manufacturer would need to double its sales through each of the 100 next largest retailers to compensate for

19   the loss.  The lag time before the 100 next largest retailers could substitute as distribution outlets, as well as

20   the likely increase in inefficiency, gave Guitar Center significant market power.  The relevant barrier to

21   entry in this case is not the difficulty with which a retailer could set up a store and compete with a single

22   Guitar Center location, it is the difficulty with which a manufacturer could replace Guitar Center as a

23   distribution outlet for 30% of its sales.  Defendants' authorities addressing a prospective retailer's cost of

24   opening a new store are off-point.

25         Plaintiffs' allegations also plausibly suggest that the combined market power of the Manufacturing

26   Defendants was significant. The Complaint alleges that the Manufacturer Defendants ranked among the

27   largest manufacturers and distributors of fretted instruments and guitar amplifiers between 2004 and 2008.

28

1    When they decided to impose and enforce restrictive MAPPs, the Manufacturing Defendants had leverage to

2    coerce retailers to accept MAPPs in their distribution contracts. (¶¶ 65-68.)

3            Defendants argue that there is a presumption that a 30 percent share of a market is insufficient to

4    confer market power.  The Ninth Circuit has, however, stated:  "We are reluctant to apply such bright-line

5    rules regarding market share in deciding whether a defendant has market power."  *Rebel Oil Co., Inc. v.*

6    *Atlantic Richfield Co.*, 51 F.3d 1421, 1438 n.10 (9th Cir. 1995).  Instead, the Ninth Circuit states that "the far

7    wiser approach" is to use market share as one factor among many in evaluating market power.  *Id.*[13]

8

9            **D.    Plaintiffs' State Law Claims Under the California Unfair Competition Law And
              Massachusetts Consumer Protection Law Are Well-Pleaded.**

10           Plaintiffs' claims under California and Massachusetts law, while distinct from the Sherman Act

11   claim, arise from the same allegations and assert the same price-fixing conspiracy.[14]  Because Plaintiffs'

12   Sherman Act claim is plausible, the state law claims also withstand Defendants' motion to dismiss.

13   **VII.   <u>CONCLUSION</u>**

14           For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny Defendants'

15   omnibus motion to dismiss under Rule 12(b)(6).  In the event that the Court finds that the Complaint is

16   lacking in some respect, Plaintiffs seek leave to file an amended complaint.

17   DATED:  September 24, 2010                    Respectfully submitted,

18                                                 **GIRARD GIBBS LLP**

19

20                                        By:   <u>  */s/ Elizabeth C. Pritzker*  </u>
21                                               Elizabeth C. Pritzker

22
     _____

23   [13] The cases cited by Defendants primarily involve attempted monopolization.  *See, e.g., Rebel Oil*, 51 F.3d
24   at 1438 (collecting attempted monopolization cases).  Defendants thus confuse monopoly power (which
     except in extraordinary circumstances does not exist at market share levels below 60% of 70%) with market
25   power under the rule of reason, which may and often does occur at lower levels.

26   [14] California's Cartwright Act is similar in language and purpose with the Sherman Act, but has different
     origins and can yield different results in certain situations.  *Freeman v. San Diego Ass'n of Realtors*, 77 Cal.
27   App.4th 171, 183 n.9 (1999).  The California Unfair Competition Law and the Massachusetts Consumer
     Protection Act are both broader than the Sherman Act, but are given similar application where the alleged
28   unfair business practices concerns antitrust violations.  *Chavez v. Whirlpool Corp.*, 93 Cal. App.4th 363, 375
     (2001); *Suzuki of Western Mass, Inc. v. Outdoor Sports Expo, Inc.*, 126 F. Supp. 2d 40, 50 (D. Mass. 2001).

Daniel C. Girard
Aaron M. Sheanin
Philip B. Obbard
Todd I. Espinosa
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

*Lead-Liaison Counsel for Plaintiffs*

IN RE: NAMM, MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIG., NO. MDL 2121
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 24, 2010 I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 24, 2010.

  */s/    Elizabeth C. Pritzker*
Elizabeth C. Pritzker

GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

27