Daniel C. Girard (SBN # 114826)
  dcg@girardgibbs.com
Eric H. Gibbs (SBN # 178658)
  ehg@girardgibb.com
Elizabeth C. Pritzker (SBN # 146267)
  ecp@girardgibbs.com
Geoff A. Munroe (SBN # 228590)
  gam@girardgibbs.com
Amy M. Zeman (SBN # 273100)
  amz@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

*Lead-Liaison Counsel for Plaintiffs*

[Additional Counsel Listed On Signature Page]

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE:  MUSICAL INSTRUMENTS AND EQUIPMENT ANTITRUST LITIGATION** | No. MDL 2121 |
| This Document Relates To: | **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| ALL ACTIONS | DEMAND FOR JURY TRIAL |

Plaintiffs, individually and on behalf of all others similarly situated, allege as follows.  Except as to Plaintiffs' own actions, this complaint is based upon information and belief and the investigation of counsel:

## NATURE OF THE ACTION

1.    This case arises out of an alleged conspiracy to raise, fix, maintain or stabilize the prices of new, high-end acoustic and electric guitars, bass guitars and guitar amplifiers, by the National Association of Music Merchants ("NAMM"), Guitar Center, Inc. ("Guitar Center"), and several manufacturers and retailers of these products.   For purposes of this First Amended Complaint and simplicity, Plaintiffs use the term "Guitars" to refer to acoustic and electric guitars and bass guitars, collectively.  The phrase "Guitars and Guitar Amplifiers" refers to the relevant product(s) in the litigation.

2.    At all relevant times, Guitar Center was the dominant retailer of Guitars and Guitar Amplifiers.  Guitar Center had nearly 30% of total music industry retail sales in the United States, and an even greater percentage of U.S. retail sales of Guitars and Guitar Amplifiers.  Guitar Center used its dominant market power, including its influence with NAMM and the NAMM leadership, to conspire with and coerce manufacturers of these products – Fender, Gibson, Yamaha, Kaman and Ibanez (collectively referred to herein as the "Manufacturer Defendants") – into agreeing to adopt, implement and enforce Minimum Advertised Price Policies (or "MAPPs").  The agreements among the Manufacturing Defendants to adopt, implement and enforce the MAPPs were horizontal agreements effectuated by a vertical restraint on trade – the MAPPs themselves.  The MAPPs constituted vertical price restraints because they prevented music retailers, "big box" stores and internet retailers from advertising prices for Guitars and Guitar Amplifiers below specified amounts, or communicating to potential customers their willingness to discount or sell these products below the MAPP price.  Guitar Center's purpose in entering the conspiracy was to forestall innovation in distribution by big-box stores and internet retailers that would decrease costs and thus lower prices that the big-box stores and internet sellers were able to charge versus Guitar Center.   NAMM, the main trade association for the music product industry, joined in and facilitated the conspiracy by organizing meetings for Guitar Center and

1  the Manufacturer Defendants -- NAMM's board members and most influential constituents – to meet

2  with one another, exchange sensitive cost and pricing and information, and agree upon strategies for

3  implementing and enforcing MAPPs.

4        3.     Guitars and Guitar Amplifiers are an important component of commerce in the specialty

5  music retail industry, generating approximately 20% of total retail sales of musical instruments and

6  related products in the United States.  In the late 1990s, prior to the Class Period, manufacturers and

7  specialty brick-and-mortar retailers in the retail musical instrument industry entered into and/or agreed

8  to observe MAPPs in effort to maintain or generate additional profit margins.  These MAPPs were

9  vertical contracts between individual manufacturers and retailers.  The MAPPS were not enforced

10  rigorously, however.

11        4.     Starting in the early 2000s, the retail music industry was threatened by the emergence of

12  new, internet-based retailers and "big box" retailers in the music business. These new, emerging retailers

13  sold Guitars and Guitar Amplifiers at prices below those the traditional, brick-and-mortar music retailers

14  could offer.

15        5.     In response, beginning in or about 2004, Guitar Center, other retailers, including those

16  acting through and with NAMM, and the Manufacturer Defendants, met and entered into a contract,

17  combination or conspiracy to raise, fix, maintain and/or stabilize the prices of Guitars and Guitar

18  Amplifiers through implementation and strict enforcement of MAPPs.  The conspiracy to implement and

19  enforce the MAPPs served no legitimate pro-competitive function and was designed solely to fix retail

20  prices for the Manufacturer Defendants' products.

21        6.     The MAPPs between the Manufacturer Defendants, on the one hand, and Guitar Center

22  and other retailers, on the other, were neither independent contracts implemented unilaterally by

23  manufacturers nor designed to increase inter-brand competition.  Rather, the MAPPs were the product of

24  conspiratorial conduct among and between the Manufacturer Defendants, Guitar Center and NAMM.

25  The MAPPs were substantially standardized across the retail Guitar and Guitar Amplifier industry so

26  that all retailers would have the same minimum prices for the Manufacturer Defendants' products.

27        7.     As the dominant specialty music retailer, Guitar Center was able to and did use its

28

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

dominant position in the market to enforce the conspiracy by threatening manufacturers that were lax in their own enforcement of the MAPPs.  Specifically, Guitar Center would threaten to drop the Manufacturer Defendants' products from distribution in Guitar Center's retail outlets.  Because the Manufacturer Defendants believed that the could not afford to lose access to Guitar Center's stores, the Manufacturer Defendants agreed to implement and enforce the MAPPs.  The vertical restraints adopted in concert became a facilitating device of the conspiracy.  The conspiracy was a horizontal agreement among the Manufacturing Defendants that was effectuated by a vertical restraint on trade (the MAPPs).

8.    NAMM, the predominant trade association for the music product industry, was the primary vehicle for the alleged conspiracy.  NAMM sponsored trade shows, meetings and invitation only summits in order to facilitate meetings at which Guitar Center, the Manufacturer Defendants and other unnamed co-conspirators exchanged cost and pricing information and discussed strategies for implementing and enforcing MAPPs as a means of reducing retail price competition and  increasing retail prices for the Manufacturer Defendants' Guitars and Guitar Amplifiers.

9.    The Federal Trade Commission ("FTC") investigated NAMM's actions, and found NAMM's conduct to be anticompetitive.  On March 4, 2009, the FTC filed a complaint alleging that "[b]etween 2005 and 2007, NAMM organized various meetings and programs at which competing retailers of musical instruments were permitted to and encouraged to discuss strategies for implementing minimum advertised price policies, the restriction of retail price competition, and the need for higher retail prices." *In the Matter of National Association of Music Merchants, Inc.*, FTC File No. 001 0203.  After reviewing and analyzing documents subpoenaed from various industry participants, the FTC and NAMM entered into a negotiated settlement.  The published FTC analysis of the NAMM complaint and settlement stated, "the allegation is that here – taking into account the type of information involved, the level of detail, the absence of procedural safeguards, and overall market conditions – the exchange of information engineered by NAMM lacked a pro-competitive justification." The FTC concluded that NAMM's acts and practices "constitute[d] unfair methods of competition in or affecting commerce" in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and issued a cease and desist order.

10.    Plaintiffs are consumers who purchased new, high quality Guitars and Guitar Amplifiers

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  directly from Guitar Center.  Plaintiffs contend that, as a result of Defendants' anticompetitive conduct,

2  they and other similarly-situated consumers paid inflated prices for their Guitars and Guitar Amplifiers.

3      11.    Plaintiffs bring this action on behalf of themselves and a proposed nationwide Class of

4  persons who purchased Guitars and/or Guitar Amplifiers from Guitar Center from January 1, 2004

5  through March 4, 2009 ("Class Period").  Plaintiffs and the proposed Class assert that NAMM, Guitar

6  Center, the Manufacturer Defendants and unnamed co-conspirators violated the Sherman Antitrust Act,

7  15 U.S.C. § 1, as well as the antitrust and consumer protection laws of California.  Plaintiffs also assert

8  claims on behalf of a Massachusetts subclass under the consumer protection laws of Massachusetts.

9  <u>**JURISDICTION AND VENUE**</u>

10     12.    Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§

11  15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for

12  Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  The Court has subject

13  matter jurisdiction pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a) and 28 U.S.C. § 1331

14  and 1337.  The Court also has jurisdiction over state law claims brought pursuant to the California

15  Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*., the California Unfair Competition Law, Cal.

16  Bus. & Prof. Code § 17200 *et seq*., and the Massachusetts Consumer Protection Act, Mass. G. L. 93A §

17  2 *et seq*., under 28 U.S.C. §§ 1332(d)(2) and 1367(a).

18     13.    Venue is proper in this federal judicial district under 15 U.S.C. §§ 15 and 22 and 28

19  U.S.C. § 1391(b) and (c) because, during the Class Period, Defendants resided, transacted business,

20  were found, or had agents in this district, and because a substantial part of events giving rise to

21  Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce

22  described below has been carried out, in this district.

23  <u>**PARTIES**</u>

24     **A.    Plaintiffs**

25     14.    Plaintiff Alex Bohl is a resident of Sacramento, California.  During the Class Period, Mr.

26  Bohl purchased a Gibson Epiphone hollow body electric guitar and a Fender Hot Rod Deluxe guitar

27  amplifier from Guitar Center retail stores in California.

28

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

15.     Plaintiff David Giambusso is a resident of Jersey City, New Jersey.  During the Class Period, Mr. Giambusso purchased a Fender Stratocaster guitar from a Guitar Center retail store in New Jersey.

16.     Plaintiff Jeremy Haskell is a resident of Portland, Maine.  During the Class Period, Mr. Haskell purchased an Ibanez Artcore AF75D guitar from a Guitar Center retail store in Massachusetts.

17.     Plaintiff David Keel is a resident of Corona Del Mar, California.  During the Class Period, Mr. Keel purchased a Fender guitar from a Guitar Center retail store in California.

18.     Plaintiff Robert Lesko is a resident of Modesto, California.  During the Class Period, Mr. Lesko purchased a Gibson Les Paul guitar, an Ovation CSD225-RRB double neck acoustic guitar, and a Fender '65 Deluxe Reverb guitar amplifier from Guitar Center retail stores in California.

19.     Plaintiff Kenneth Manyin is a resident of Cherry Hill, New Jersey.  During the Class Period, Mr. Manyin purchased a Gibson Epihone-brand bass guitar from a Guitar Center retail store in New Jersey.

20.     Plaintiff Ronald A McCain is a resident of Austin, Texas.  During the Class Period, Mr. McCain purchased a Gibson Flying V Guitar, a Fender Geddy Lee Jazz Bass Guitar and a Yamaha FG750S Acoustic Guitar from Guitar Center retail stores in Texas.

21.     Plaintiff Suzanne Ondre is a resident of San Francisco, California.  During the Class Period, Ms. Ondre purchased a Takamine guitar from a Guitar Center retail store in California.

22.     Plaintiff Bonnie Ornitz is a resident of Granada Hills, California.  During the Class Period, Ms. Ortiz purchased a Fender Stratocaster guitar from a Guitar Center retail store in California.

23.     Plaintiff Dr. David Palmer is a resident of Portland, Maine.  During the Class Period, Dr. Palmer purchased two Fender guitars, including a Fender American Standard Stratocaster guitar, from Guitar Center retail stores in Maine.

24.     Plaintiff Niranjan Parikh is a resident of Houston Texas.  During the Class Period, Mr. Parikh purchased a Fender guitar and a Fender guitar amplifier from a Guitar Center retail store in Texas.

25.     Plaintiff Lisa Pritchett is a resident of San Mateo, California.  During the Class Period,

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    Ms. Pritchett purchased an Ibanez AF75D-TOR Artcore Series Hollowbody Transparent Orange guitar

2    from a Guitar Center retail store in California.

3        26.    Plaintiff Johan Edward Rigor is a resident of Burlingame, California.  During the Class

4    Period, Mr. Rigor purchased a Sound Gear by Ibanez SR 305DX bass guitar from a Guitar Center retail

5    store in California.

6        27.    Plaintiff Joshua Seiler is a resident of Allston, Massachusetts.  During the Class Period,

7    Mr. Seiler purchased a Fender Telecaster guitar, as well as a Vox speaker cabinet and Vox amplifier

8    head from a Guitar Center retail store in Massachusetts.

9        28.    Plaintiff Alexander Teller is a resident of Chicago, Illinois.  During the Class Period, Mr.

10    Teller purchased a Fender Rumble 100 Combo guitar amplifier from a Guitar Center retail store in

11    Illinois.

12    **B.    Defendants**

13        29.    Defendant National Association of Music Merchants, Inc. ("NAMM") is a New York

14    corporation with its principal place of business located at 5790 Armada Drive, Carlsbad, California

15    92008.  NAMM is a music industry trade association comprised of more than 9,000 members.  Most

16    U.S. manufacturers, distributors and dealers of musical instruments and related products, including

17    Guitar Center and the named Manufacturer Defendants in this case, are members of NAMM.

18        30.    Defendant Guitar Center, Inc. ("Guitar Center") is a Delaware corporation with its

19    principal place of business at 5795 Lindero Canyon Road, Westlake Village, California.  Guitar Center

20    is the leading retailer of Guitars and Guitar Amplifiers in the United States with 315 stores and the

21    nation's largest direct response retailer (both catalog and online) of musical instruments.

22        31.    Defendant Fender Music Instruments Corporation ("Fender") is a Delaware corporation

23    with its principal place of business at 8860 East Chaparral Road, Suite 100, Scottsdale, Arizona.  Fender

24    manufactures and distributes guitars – including the highest-selling line of guitars in the United States –

25    and guitar amplifiers.  Fender's Chief Executive Officer, Bill Mendello, served on the NAMM board

26    from 2006 to 2009.

27        32.    Defendant Gibson Guitar Corporation d/b/a Gibson U.S.A. ("Gibson") is a Delaware

28

6

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  corporation with its principal place of business located at 309 Plus Park Boulevard, Nashville,

2  Tennessee 37217.  Gibson manufactures and distributes guitars and guitar amplifiers.  Gibson is best

3  known for its specialty-product lines such as the Les Paul guitar.

4          33.    Defendant Yamaha Corporation of America ("Yamaha") is a California corporation with

5  its principal place of business located at 6600 Orangethrope Avenue, Buena Park, CA 90620.  Yamaha

6  manufactures and distributes guitars and guitar amplifiers.  Terry Lewis, as Senior Vice President at

7  Yamaha, served on the NAMM board of directors from 2003-2005.  In 2009, Yamaha Senior Vice

8  President, Rick Young, was elected to the NAMM board of directors.  Mr. Young's board term ends in

9  2012.

10         34.    Defendant Hoshino U.S.A., Inc. ("Hoshino" or "Ibanez") is a Pennsylvania corporation

11  with its principal place of business located at 1726 Winchester Rd, Bensalem, PA 19020-4542.  Hoshino

12  manufactures and distributes guitars and guitar amplifiers under the Ibanez brand.  Hoshino's President,

13  Bill Reim, served on the NAMM board of directors from 2006 to 2009.

14         35.    Defendant Kaman Music Corp. ("Kaman") has been a wholly owned subsidiary of

15  Fender since 2008, and has its principal place of business located at 55 Griffin Road South, Bloomfield,

16  Connecticut, 06002-0507.  Kaman manufactures and distributes guitars under various brand names, such

17  as Ovation, Adamas, Takamine, and Hamer brands, as well as guitar amplifiers.  Paul Damiano,

18  Kaman's Vice President of Marketing and Sales, served on the NAMM board of directors from 2003 to

19  2006.  Fender purchased Kaman in early 2008 for $124 million.

20         36.    Guitar Center is a member of NAMM.  Fender, Gibson, Yamaha, Ibanez and Kaman

21  (collectively the "Manufacturer Defendants") also are members of NAMM.  Each of the Defendants

22  regularly attended NAMM's biannual trade show and convention as product manufacturers and/or as

23  participants in NAMM-sponsored seminars and roundtables, or as NAMM board members.  Before and

24  during the Class Period, the Defendants participated in meetings and discussions organized and

25  facilitated by NAMM, and conspired among themselves and with NAMM to share pricing information;

26  adopt, implement and enforce MAPPs; restrict retail price competition; eliminate price discounting;

27  restrain competition and/or artificially increase the retail prices of Guitars and Guitar Amplifiers.

28

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1   Various persons or entities not named as Defendants participated as co-conspirators in the wrongful

2   conduct and violations of law alleged herein and performed acts or made statements in furtherance

3   thereof.  Following additional investigation and the opportunity for discovery, Plaintiffs may seek leave

4   to name additional persons or entities as Defendants at a later date.

5         37.    "Defendants" as used herein, includes, in addition to those named specifically above,

6   each of Defendants' predecessors, including those merged with or acquired by the named Defendants,

7   and each named Defendant's wholly-owned or controlled divisions, subsidiaries or affiliates that

8   manufactured, distributed or sold Guitars and/or Guitar Amplifiers in interstate commerce to purchasers

9   in the United States during the Class Period.

10        38.    The acts herein alleged against the Defendants were authorized, ordered or performed by

11   their officers, agents, employees or representatives while actively engaged in the management or

12   operation of Defendants' business or affairs.  All Defendants were active, knowing participants in the

13   conspiracy alleged herein, and their conduct was known to and approved by their respective corporate

14   officers and directors, parents, subsidiaries or affiliates.

15                  **CO-CONSPIRATORS**

16        39.    Various persons or entities not named as Defendants participated as co-conspirators in the

17   wrongful conduct and violations of law alleged herein and performed acts or made statements in

18   furtherance thereof.  Following additional investigation and the opportunity for discovery, Plaintiffs may

19   seek leave to name additional persons or entities as Defendants as a later date.

20        40.    Each of the Defendants named herein acted as the agent or joint venturer of or for the

21   other Defendants with respect to the act, transactions, violations and common course of conduct alleged

22   herein.

23               **CLASS ACTION ALLEGATIONS**

24        41.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to

25   Federal Rules of Civil Procedure 23 on behalf of the following Class:

26        All persons who directly purchased one or more of the products within the below defined

27        subclasses from Guitar Center, Inc. in the United States from January 1, 2004 through March 4, 2009:

28

a.    All purchasers of new Guitars or Guitar Amplifiers manufactured or distributed by Fender Music Instruments Corporation or its affiliates, including Kaman;

b.    All purchasers of new Guitars or Guitar Amplifiers manufactured or distributed by Gibson Guitars d/b/a Gibson USA or its affiliates;

c.    All purchasers of new Guitars or Guitar Amplifiers manufactured or distributed by Hoshino U.S.A., Inc. or its affiliates;

d.    All purchasers of new Guitars or Guitar Amplifiers manufactured or distributed by Yamaha Corporation of America USA or its affiliates;

42.    Excluded from the Class are Defendants; the subsidiaries and affiliates of any Defendant; any person or entity who is a partner, officer, director, or controlling person of any Defendant; members of Defendants' immediate families and their legal representatives, heirs, successors or assigns; and any entity in which any Defendant has or had a controlling interest.

43.    This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

44.    **Numerosity.**  Members of the Class are so numerous that their individual joiner is impracticable.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of Class members.  Plaintiffs also believe that Class members are sufficiently numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

45.    **Existence and predominance of common questions.**  Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members.  These common questions include:

a.    Whether Defendants conspired or engaged in concerted action in restraint of trade;

b.    The identities of the co-conspirators;

c.    The duration of the alleged combination or conspiracy and nature and character of the acts done in furtherance of the alleged combination or conspiracy;

d.    Whether Defendants' conduct as alleged herein caused Plaintiffs and Class members to pay more for Guitars and Guitar Amplifiers than they otherwise would have paid in an

9

1   unrestrained, competitive market;

2           e.      Whether the alleged combination or conspiracy violated Section 1 of the

3   Sherman Act;

4           f.      Whether the acts challenged in this Complaint, including but not limited to the

5   alleged combination or conspiracy, and the nature and character of the acts done in furtherance of the

6   alleged combination or conspiracy, violated the California Cartwright Act, California Business and

7   Professions Code §§ 16700 *et seq.*, the California Unfair Competition Law, California Business and

8   Professions Code §§ 17200 *et seq.*, and/or the unfair business practices law of Massachusetts;

9           g.      Whether Defendants actively concealed the contract, combination or conspiracy

10  from Plaintiffs and other Class members;

11          h.      Whether Plaintiffs and Class members paid supra-competitive prices for

12  Guitars and Guitar Amplifiers during the Class Period.

13          i.      Whether Plaintiffs and other members of the Class were injured by the conduct

14  of defendants and their co-conspirators and, if so, the appropriate class-wide measure of damages and

15  appropriate injunctive relief; and

16          j.      Whether Plaintiffs and the Class are entitled to declaratory, equitable or

17  injunctive relief.

18          46.     **Typicality.**  Plaintiffs' claims are typical of the claims of the Class in that each of the

19  Plaintiffs, like other Class members: purchased Guitars and/or Guitar Amplifiers described in the Class

20  definition directly from Defendant Guitar Center; lost money or property and/or were damaged as a

21  result of the same wrongful conduct of the Defendants as alleged herein; and seek relief common to the

22  Class.

23          47.     **Adequacy.**  Plaintiffs are adequate representatives of the Class because their interests do

24  not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs have

25  retained counsel competent and experienced in complex class action litigation, and intend to prosecute

26  this action vigorously.  The interests of the members of the Class will be fairly and adequately protected

27  by Plaintiffs and their counsel.

28

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

48.    **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joiner of all members is impracticable.  Furthermore, while the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

49.    Even if the Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, is in fact manageable, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  The benefits of adjudicating this controversy as a class action far outweigh any difficulties that may occur in managing the Class.

50.    In the alternative, the Class may be certified under the provisions of Federal Rules of Civil Procedure 23(b)(1) and/or 23(c)(4) because:

a.    The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members and would establish incompatible standards of conduct for defendants;

b.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive  of the interests of other Class members not parties to the adjudications, or substantially impair or impede the ability of other Class members to protect their interests;

c.    Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief with respect to the members of the Class as a whole an appropriate form of relief; and

d.    The claims of Class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

1

## **TRADE AND COMMERCE**

2      51.    The relevant product market(s) in this litigation is/are new, high-end Guitars and Guitar

3 Amplifiers sold at retail in the United States, and excludes used guitars or guitar amplifiers, and products

4 that qualify or are recognized by the public or the music product industry as toys, generics, knock-offs

5 or unbranded products.  As used herein, Guitars means acoustic, electric and bass guitars.  The products

6 that are alleged to fall within the relevant market(s) are reasonably interchangeable by consumers for the

7 same purposes.  In other words, as defined herein, an acoustic, electric or bass guitar or Guitar Amplifier

8 manufactured or distributed by one manufacturer and sold at retail in the United States is reasonably

9 interchangeable for another acoustic, electric or bass guitar or Guitar Amplifier sold at retail in the

10 United States.

11      52.    The music products industry includes companies that manufacture, supply, distribute or

12 sell musical instruments and products for amplifying music, including Guitars and Guitar Amplifiers,

13 recording equipment and accessories.

14      53.    According to *The Music Trades*, a leading industry publication, from 2004 to 2007, retail

15 sales of musical instruments and related products in the United States ranged from approximately $7.3

16 billion to $7.5 billion.  Sales of fretted musical instruments (that is, stringed instruments played with

17 fingers or a pick), plus guitar amplifiers, generated $1.545 billion in retail sails in 2004 and almost

18 $1.667 billion in retail sales in 2007 – roughly 20% of the total sales of musical instruments and related

19 products in the United States.

20      54.    The Manufacturer Defendants dominated the relevant product market(s) during the Class

21 Period.  The Manufacturer Defendants ranked among the largest manufacturers and distributors of

22 Guitars and Guitar Amplifiers between 2004 and 2008.  Limited publicly-available data shows that the

23 combined market power of the Manufacturer Defendants over the retail market(s) for new, high-end

24 Guitars and Guitar Amplifiers was significant.

25      55.    As described in more detail below, Guitar Center was the dominant U.S. retailer for the

26 Manufacturer Defendants' Guitars and Guitar Amplifiers during the period.  Between 2004 and 2008,

27 Guitar Center had nearly 30% of the total U.S. music retail sales overall, and a much larger share within

28

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1   the retail markets for Guitars and Guitar Amplifiers.  (*See* ¶¶ 61-63, *infra*).  Guitar Center had a national

2   and significant online presence during this period, and eight times as many retail stores and five times as

3   much sales revenues as its next largest competitor, Sam Ash Corporation ("Sam Ash").  (*See id*).  In

4   2007, Guitar Center's estimated annual revenues of $2.1 billion exceeded the combined annual revenues

5   of the next 100 largest specialty music retailers.  (*See* ¶ 64, *infra*).  In addition, Guitar Center was the

6   largest retail customer of many of its suppliers, including Fender and Gibson.  (*See* ¶ 66, *infra*).  Guitar

7   Center therefore was able to and did use its substantial market power to dictate MAPPs to

8   manufacturers, including the Manufacturer Defendants, and to enforce the MAPPs by punishing those

9   who failed to adhere to or honor the MAPPs.  *Compare Toys "R" Us v. Federal Trade Commission*, 221

10   F.3d 928, 930-33, 935-37 (7th Cir. 2000) (upholding FTC' determination that Toys "R" Us, which sold

11   approximately 20% of all toys sold in the United States, and bought approximately 30% of toy

12   companies' total output, used its substantial market power to implement, coordinate and enforce an

13   unlawful horizontal agreement among toy manufacturers to restrict distribution of products to low-

14   priced warehouse club stores, on the condition that other manufacturers would do the same).

15        56.    The retail industry for high-end Guitars and Guitar Amplifiers is characterized by

16   significant entry barriers.  To compete with existing retailers, new entrants, including warehouse

17   retailers seeking to sell high-end Guitars and Guitar Amplifiers, effectively must make large investments

18   in real estate, retail selling space and inventory.

19        57.    As one NAMM observer reported in the March 1, 2008 issue of *The Music Trades*:  "To

20   generate reasonable sales volumes, you need a lot of SKUs ["Stock Keeping Units," *i.e.,* unique items

21   for sale]. I am not sure [Best Buy] will be able to achieve the kind of volume they're hoping for in just

22   2500 square feet of space."  To emphasize the point, Guitar Center has publicly reported that its average

23   large store selling space is 12,000 to 30,000 square feet and includes average inventory of approximately

24   7,200 core SKUs.  By contrast, Best Buy devotes relatively few (2500) square feet within its retail store

25   to musical instruments and related products, and offers consumers only approximately 1000 SKUs – or

26   approximately one-seventh of the product inventory offered at a large Guitar Center store.

27        58.    The activities of Defendants, as described herein, were within the flow of, and

28

13

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1   substantially affected, interstate commerce.

2        59.    In the conduct of their businesses, Defendants directly or indirectly have used the means

3   and instrumentalities of interstate commerce in furtherance of the acts and communications alleged

4   herein.  The alleged meetings and exchanges of information arranged by Defendant NAMM were

5   initiated and effectuated by and through, among other things, the United States postal system,

6   nationwide telecommunication networks and/or the nation's common carrier or transportation systems.

7   Guitar Center and the Manufacturer Defendants were members of NAMM.

8        60.    During the Class Period, these Defendants marketed, sold, distributed or shipped

9   substantial quantities of Guitars and Guitar Amplifiers in a continuous and uninterrupted flow of

10   interstate commerce to customers located in states other than the states in which these Defendants

11   manufactured, produced, distributed, marketed or sold such products.

12

13   **SUBSTANTIVE ALLEGATIONS**

14       **A.**    **Guitar Center Is The Dominant Retailer Of Guitars And Guitar Amplifiers And Enjoys Market Power In Its Dealings With Manufacturers**

15        61.    Specialty music retail stores are the main retail sales venue for music instrument sales in

16   the United States, and Guitar Center is, by far, the dominant retail outlet for these products.

17        62.    Over the last decade, Guitar Center has grown through acquisitions of former

18   competitors, and achieved dominance in an ever-more-concentrated retail market.  In June 1999, Guitar

19   Center acquired Musicians Friend, Inc., an Oregon-based catalog and e-commerce instrument retailer.

20   In April 2001, Guitar Center bought American Music Group, Ltd., a musical instrument retailer, with 12

21   retail stores, specializing in the sale and rental of band instruments and accessories serving the student

22   and family market.  In April 2005, Guitar Center purchased Music and Arts Center, Inc., a Maryland-

23   based musical instruments retailer with 80 store locations.  In February 2007, Guitar Center acquired out

24   of a bankruptcy proceeding substantially all of the assets of Dennis Bamber, Inc., also known as The

25   Woodwind & The Brasswind, a catalog and internet retailer.  As a result of acquisitions and decreased

26   competition, Guitar Center's share of the retail market for musical instruments and related products

27   grew from 6.1% to 26.6% during the period 1997-2007.

28

63.     As of 2008, Guitar Center had 315 retail stores – eight times the number of retail stores of its next largest competitor, Sam Ash.  Guitar Center is also the nation's largest catalog and online retailer musical instruments.

64.     Guitar Center consistently ranks as nation's retail sales leader in *The Music Trades* annual report, Retail Top 200.  *The Music Trades* estimated that Guitar Center's estimated retail sales were $1.5 billion in 2004 and rose to $2.1 billion in 2007.  Based on these estimates, during the Class Period, Guitar Center had nearly 30% of the total music industry retail sales in the United States.  Guitar Center had an even greater percentage of total retail sales of high-end Guitars and Guitar Amplifiers in the United States.

65.     Guitar Center's market dominance increased over the Class Period.  Guitar Center's estimated annual revenues of $1.5 billion in 2004 were approximately equal to the combined annual revenues of the 28 next largest specialty music retailers, according to data published by *The Music Trades*.  By 2007, Guitar Center's estimated annual revenues of $2.1 billion exceeded the combined revenues of the 100 next largest specialty music retailers.  Guitar Center's 2007 estimated annual revenues were almost five times those of its next largest competitor, Sam Ash, and over eight times the revenues of American Music Supply, the third largest specialty music retailer.

66.     According to publicly-available financial reports filed in 2007, Guitar Center serves as the largest retail customer of many of its instrument manufacturers and suppliers, including Fender and Gibson.  Guitar Center had significant market power in its relationships with the manufacturers of high-end Guitars and Guitar Amplifiers during the Class Period, because the volume of its purchases and its dominance as a distribution channel enabled it to control prices and exclude competition.  Manufacturers of Guitars and Guitar Amplifiers, including the Manufacturer Defendants, had little choice but to accommodate Guitar Center's demands for vertical price restraints (the MAPPs), because they needed access to Guitar Center's retail customer base.

67.     In testimony before the Federal Trade Commission ("FTC") at the 2002 FTC public workshop entitled "Possible Anticompetitive Efforts to Restrict Competition on the Internet," former FTC Commissioner Sheila Anthony underscored the potential threat to competition posed by a dominant

15

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

retailer, such as Guitar Center, whom suppliers, like the Manufacturer Defendants, cannot do without. The concern is that a dominant retailer, such as Guitar Center, will use its significant market power to coerce key suppliers into disadvantaging competing retailers, and thereby protect and preserve its market dominance:

> Competition among distributors for a given manufacturer's favor is almost certainly healthy. But problems may arise where distributors in one channel exercise their market power to disadvantage distributors in another channel.

> * * *

> [C]an Internet distribution even gain a strong foothold in some product areas where the entrenched distribution channel, members who manufacturers cannot do without, at least until e-commerce matures, use hardball tactics to make sure the transition period never begins?

*See* FTC, Public Workshop: Possible Anticompetitive Effects to Restrict Competition on the Internet, transcript of proceedings, at 797:12-16, 799:7-12 (October 10, 2002) (remarks of Commissioner Sheila Anthony).

68.    Guitar Center's dominant power in the retail market for Guitars and Guitar Amplifiers manifested itself in various ways. For example, according to former Guitar Center employees, Guitar Center "strong armed" manufacturers, including Yamaha and Fender, into not selling their products to competing stores that planned to open near Guitar Center store locations. In addition, Guitar Center corporate personnel have acknowledged to store managers that Guitar Center dictated the MAPPs for Guitars and Guitar Amplifiers to manufacturers, including Gibson.

69.    According to independent retailers, Guitar Center wields enormous power in the Guitars and Guitar Amplifiers market, enabling it to influence product offerings and pricing factors. For instance, in an interview in the April 2007 issue of *Musical Merchandise Review*, Alan Levin of Chuck Levin's Washington Music Center stated: "The biggest concern [for independent retailers] is Guitar Center. They are many manufacturers' biggest customers and changes are being made . . . to suit them alone."

70.    At a discussion published in *The Music Trades* in February 2007, a retailer commented

IN RE: MUSICAL INSTRUMENTS & INDUSTRY ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  on Guitar Center's power, stating, "As big as GC is, what's a little manufacturer to do?  Not

2  surprisingly, they do what GC demands."  Another retailer similarly stated, "With GC's deep pockets, I

3  suspect that they're getting special deals . . . ."  Similarly, another member of NAMM was quoted in the

4  March 1, 2008 issue of *The Music Trades* as saying, "Guitar Center has too much leverage [with

5  suppliers]. . . ."

6      71.    Guitar Center also exercised its market power, as a matter of common practice, by

7  obtaining exclusive rights to sell new "limited edition" guitars from the Manufacturer Defendants.  For

8  example, Gibson offered Guitar Center the exclusive right to sell its limited edition Billy Gibbons

9  "Pearly Gates" electric guitar (a replica of a rare 1959 Gibson Les Paul Standard electric guitar) named

10  after a guitarist from ZZ Top.

11

12      **B.    The Manufacturer Defendants Enjoy Market Power In Their Dealings With Retailers Other Than Guitar Center**

13      72.    Fretted instruments are among one of the largest segments of the music products industry.

14  Throughout the Class Period, sales of fretted instruments in the United States constituted approximately

15  16% to 17% of total domestic music product sales.  Guitars are by far the largest component of the

16  fretted instruments category.  The Manufacturer Defendants rank among the largest manufacturers and

17  distributors of Guitars and Guitar Amplifiers.

18      73.    The manufacturing industry for high-end Guitars and Guitar Amplifiers is characterized

19  by significant barriers to entry.  For example, new production facilities, such as the plant that Fender

20  opened in 1998, can cost as much as $20 million.

21      74.    High-quality Guitars and Guitar Amplifiers constitute the relevant product market(s) in

22  the litigation.  The Manufacturer Defendants dominate the relevant product market(s).  The limited

23  publicly-available data shows that the Manufacturer Defendants collectively possess market power over

24  the relevant product market(s).

25      75.    During the Class Period, the Manufacturer Defendants and their affiliates collectively had

26  significant market power in their relationships with retailers other than Guitar Center, because the

27  volume of their sales and their dominance in the relevant product market(s) enabled them to coerce these

28

retailers to agree to MAPPs in their distribution contracts, on threat of termination.

76.     Most of the famous rock guitarists play the Manufacturer Defendants' guitars, giving these companies dominant stature in the relevant product market(s) and serving as an additional barrier to entry by potential new competitors.  For example, rock and country musicians Keith Richards of The Rolling Stones, Frank Black of The Pixies, Chrissie Hynde of The Pretenders, Tom Petty, Sheryl Crow and Merle Haggard all play a Fender Stratocaster guitar (among other guitars).  Peter Frampton and Aerosmith's Joe Perry play a Gibson Les Paul guitar (among others).  Billie Joe Armstrong of Green Day plays a Gibson Flying V guitar.  The Edge of U2 plays a variety of acoustic and electric guitars made by Gibson (*e.g.*, the SJ-200 Standard Acoustic-Electric guitar, the Epiphone Sheraton II electric guitar and the ES-175 and ES-335 Reissue electric guitars), Fender (including a Fender Stratocaster) and others.  Corey Taylor of Slipknot and Stone Sour plays an Ibanez Artcore hollow body guitar.  Carlos Santana and James Taylor play a Yamaha electric guitar (among others).  Joe Walsh of The Eagles, Doug Aldrich of Whitesnake, Bruce Springsteen and Kenny Chesney all play a Kaman (Takamine) acoustic guitar (and other instruments).  Many of these musicians also use or have used guitar amplifiers made by Fender and other Manufacturer Defendants.

## C.    Pricing Changes In The Market For Guitars And Guitar Amplifiers During The Class Period

77.     **Guitars.**  The Manufacturer Defendants and their affiliates manufactured and distributed acoustic or electric guitars and bass guitars during and before the Class Period. In the years leading up to the Class Period, the Guitar segment of the music products industry (exclusive of other fretted instruments) saw a significant increase in unit volume sales.  The number of units sold between 1997 and 2004 increased over 300 percent.  As indicated in Table 1 below, the number of guitar units sold leveled off in 2004, and thereafter declined.

### Table 1:  Electric and Acoustic Guitars

| Year | Electric and Acoustic Guitars units sold | % Change year over year | Average retail price per unit | % change year over year |
|------|------|------|------|------|
| 1997 | 1,090,329 | -0.33% | $652 | 0.93% |
| 1998 | 1,153,915 | 5.83% | $602 | -7.67% |

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

| Year | Electric and Acoustic Guitars units sold | % Change year over year | Average retail price per unit | % change year over year |
|------|------|------|------|------|
| 1999 | 1,337,347 | 15.90% | $570 | -5.32% |
| 2000 | 1,648,595 | 23.30% | $560 | -1.75% |
| 2001 | 1,742,498 | 5.70% | $529 | -5.52% |
| 2002 | 1,942,625 | 11.49% | $474 | -10.42% |
| 2003 | 2,341,551 | 20.54% | $386 | -18.64% |
| 2004 | 3,302,670 | 41.05% | $310 | -19.71% |
| 2005 | 3,309,722 | 0.21% | $350 | 13.03% |
| 2006 | 2,991,260 | -9.62% | $372 | 6.13% |
| 2007 | 2,868,000 | -4.12% | $389 | 4.82% |
| 2008 | 2,769,650 | -3.43% | $375 | -3.65% |

78.    Although the demand for Guitars increased steadily from 1997 to 2004, when the Class Period begins, the increase in demand did not translate to higher prices.  Instead, the estimated average retail sales price of Guitars decreased, falling steadily from 1997 to 2001 and then plummeting from $529 in 2001 down to $310 in 2004.

79.    Beginning in 2004, Defendants reversed the decline in unit sales prices by engaging in the collusive activities described herein.  Consistent with the formation of the alleged conspiracy, retail unit prices leveled off and began to rise from 2004 to 2007, as shown in Table 1, above.  Although prices fell somewhat during the course of the FTC's investigation in 2008, the conspiracy enabled Defendants to continue to maintain or stabilize these prices at higher levels than they would have been in a competitive market.

80.    **Guitar Amplifiers**:  The Manufacturer Defendants and their affiliates manufactured and distributed Guitar Amplifiers.  From 1997 to 2003 the number of units sold increased gradually, peaked in 2004 and thereafter began to fall.  Retail unit prices of Guitar Amplifiers steadily decreased from 1997 to 2004, and then, consistent with the formation of the alleged conspiracy, leveled off and began to rise after 2004.  As with Guitars, although prices for Guitar Amplifiers fell somewhat during the course of the FTC's investigation in 2008, the conspiracy enabled Defendants to continue to maintain or stabilize these prices at higher levels than they would have been in a competitive market.  The relevant data is as follows:

19

**Table 2:  Guitar Amplifiers**

| Year | Guitar amplifier units sold | % Change year over year | Average retail price per unit | %  change year over year |
|------|------|------|------|------|
| 1997 | 574,250 | 0.34% | $630 | -4.00% |
| 1998 | 562,760 | -2.00% | $605 | -8.93% |
| 1999 | 635,900 | 13.00% | $551 | -11.07% |
| 2000 | 749,500 | 17.86% | $490 | -3.47% |
| 2001 | 764,496 | 2.00% | $473 | 3.56% |
| 2002 | 825,120 | 7.93% | $435 | -7.93% |
| 2003 | 974,000 | 18.04% | $348 | -20.02% |
| 2004 | 1,279,300 | 31.34% | $291 | -16.38% |
| 2005 | 1,240,921 | -3.00% | $320 | 9.97% |
| 2006 | 1,092,000 | -12.00% | $330 | 3.13% |
| 2007 | 1,112,000 | 1.83% | $339 | 2.73% |
| 2008 | 1,096,000 | -0.01% | $310 | -8.55% |

81.    Below is a graph depicting the above retail pricing changes for Guitars and Guitars before, during and after the Class Period.  As depicted below, consistent with the formation of the alleged conspiracy, after years of steady declines, retail unit prices for Guitars and Guitar Amplifiers began to rise from 2004 to 2007, and then declined somewhat in 2008, after the FTC's investigation.



IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**D.    NAMM Was The Industry Vehicle For Discussing And Controlling Prices**

82.    NAMM is the predominant trade association for the music product industry.  NAMM is comprised of more than 9,000 members, including most U.S. manufacturers, distributors and dealers of musical instruments and related products.  As the FTC observed in its March 4, 2009 press release, entitled *National Association of Music Merchants Settles FTC Charges of Illegally Restraining Competition*, NAMM "serves the economic interests of its members by, among other things, promoting consumer demand for musical instruments, lobbying the government, offering seminars and organizing trade shows.  In the United States, NAMM sponsors two major trade shows each year, where manufacturers introduce new products and meet with dealers and competing manufacturers, distributors and retailers of musical instruments meet and discuss issues of concern to the industry."

83.    From the mid-1990s through at least 2008, NAMM sponsored two major trade shows each year where manufacturers introduced new products and met with dealers and competing manufacturers, distributors and retailers to discuss issues of concern to the industry.  NAMM also hosted an invitation-only "Global Economic Summit" or "Global Summit" once every three years where key industry leaders, including representatives of the Defendants named herein, met to explore emerging markets, reinforce relationships and share visions for industry growth.  At each of these meetings and programs, NAMM members were encouraged to and did exchange cost and pricing information, and discussed strategies for implementing MAPPs, restricting retail price competition and increasing retail prices for Guitars and Guitar Amplifiers.

84.    NAMM trade shows are considered an indispensable resource by Music Product retailers.  As one NAMM member stated in an interview published in the *Musical Merchandise Review* in February 2007:

> Many years ago, the importance of attending a NAMM show may not have seemed important, today it is absolutely necessary.  Owners and key personnel should be at NAMM . . . the education seminars are priceless.  The interaction with the industry people and colleagues is priceless.

**E.    Before The Class Period, Defendants' Efforts To Fix Prices Had Limited Success**

85.    Commencing in the late 1990s and continuing thereafter, NAMM and the other

21

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  Defendants and their co-conspirators fashioned, encouraged and adopted MAPP pricing as a means to

2  maintain or increase high profit margins.

3      86.    The FTC Complaint asserts that numerous leading musical instrument manufacturers

4  adopted MAPPs beginning in 1999. *Musical Merchandise Review* reported in 2006 that MAPPs had

5  been a staple of the music instruments industry for more than a decade.

6      87.    Certain manufacturers enforced MAPPs in the late 1990s or early 2000s, sanctioning or

7  terminating retailers that sold below the MAPP approved retail price. The MAPPs were not, however,

8  enforced consistently by all manufacturers in the late 1990s and early 2000s.

9      88.    On August 1, 2001, *The Music Trades* published a report on how Music Product

10  manufacturers and retailers could use MAPPs to protect or increase revenues. The report stated:

> Last year [2000] when we polled leading m.i. dealers about the value of minimum
> advertised price (MAP) policies, only 31% said they had a positive effect on gross
> margins. 60% said that MAP had no effect at all on selling prices, while 9% said the
> programs actually decreased margins. When asked the same questions this year [2001],
> retailers expressed a major change of heart. 51% said that MAP policies had improved
> their gross margins during the past 12 months, and only 44% deemed the policies
> ineffectual.

15      89.    *The Music Trades* concluded that this 20-point shift in opinion, over the one-year period

16  from 2000 to 2001, was due to the fact that "the biggest benefit of MAP policies has been to rid the

17  internet of loss-leader pricing." The report continues:

> As a result [of the MAP policies], these days when you type the name of a popular
> product into a search engine, you'll get a screen full of results offering the same MAP
> regulated price. As our poll indicates, brick-and-mortar retailers obviously appreciate the
> fact that they don't have to deal with a legion of customers coming into the store
> brandishing a computer printout and demanding, "Why can't you beat this price?"

21      90.    At the January 2001 NAMM trade show there was significant discussion of MAPPs. *The*

22  *Music Trades* reported on the trade show as follows:

> For the first time in memory, manufacturers seemed to be doing more than paying lip
> service to retail profit concerns, as evidenced by the flurry of new and more restrictive
> Minimum Advertised Price (MAP) policies that were rolled out at NAMM. … The trend
> is towards more expansive MAP policies that prohibit phone or email price quotes below
> MAP price, all in a bid to give brick and mortar stores an incentive to lay in inventory.

91.     The existence and effectiveness of MAPPs remained a concern a year later at the January 2002 NAMM trade show.  *The Music Trades* reported on the trade show and stated, "Manufacturers have acknowledged the retail concern with profitability by instituting minimum advertised price, or MAP policies.  In fact, mention of MAP pricing was routinely included in just about every new product presentation."

**F.     During The Class Period Defendants Entered Into A Contract, Combination Or Conspiracy To Fix Prices For Guitars And Guitar Amplifiers Through Strict Enforcement Of MAPPs**

92.     Starting in or about 2004, NAMM facilitated discussions among its members to prop up retail prices for Guitars and Guitar Amplifiers by preventing discounting from MAPPs.  These discussions were designed to forestall innovation in distribution that decreases costs and thus eliminate retail price competition.

93.     NAMM, Guitar Center, the Manufacturer Defendants, and NAMM's retailer members agreed to set MAPPs at higher levels than before and to strictly enforce the MAPPs.  By uniformly requiring and enforcing MAPPs with higher retail prices, the Manufacturer Defendants could maintain and increase their wholesale prices to the Guitar Center and other retailers, which could then sell to consumers without the risk of inter- or intra-brand price competition.

94.     The Manufacturing Defendants agreed to require and enforce MAPPs with similar terms. The Manufacturer Defendants required retailers to agree to MAPPs as part of written retail distribution contracts, and to implement and enforce those MAPPs.  The MAPPs were substantially similar across the industry.  They were not distinct contracts implemented by manufacturers to increase inter-brand competition.  The conspiracy therefore took the form of a horizontal agreement among Manufacturing Defendants that was effected by a vertical restraint on trade (the MAPPs) that was implemented and enforced by Guitar Center and the Manufacturing Defendants.

95.     The conspiracy benefited Guitar Center which, as the largest traditional bricks and mortar specialty music retailer, was threatened by competition from internet-based retailers and other low-cost retailers.  Maintaining stability in the industry permitted Guitar Center to continue enjoying its advantages over small independent retailers (name recognition, volume discounts from wholesalers,

23

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    etc.), increase its profits, and remain the dominant specialty music retailer.  Moreover, the conspiracy

2    enabled Guitar Center to use its market power to procure and enter into preferential contracts with

3    manufacturers.  Guitar Center continued to seek and obtain quantity discounts, free goods, and

4    discontinued goods and closeouts, preferential pricing from manufacturers, and other preferences

5    relating to transportation, shipping, and warehousing.

6        96.    NAMM and its constituent retailer members provided the impetus for the conspiracy.

7    The conspiracy benefited NAMM, because it was composed primarily of small independent specialty

8    music retailers, and it had seen a steady year-to-year erosion of its member base before the Class Period.

9    The conspiracy was intended to protect NAMM's dwindling members from competition from internet-

10   based retailers and other low-cost retailers.

11       97.    Guitar Center was at the hub of the conspiracy.  Guitar Center was the dominant retailer

12   for Guitars and Guitar Amplifiers, had market power that allowed it to enforce violations of MAPPs, and

13   was in a position to monitor industry prices.  Guitar Center could and did threaten to order fewer

14   products or terminate its relationship with those manufacturers that failed to enforce their MAPPs.

15   Because Guitar Center was the most important distribution outlet for all manufacturers, it could enforce

16   the MAPPs for all Guitars and Guitar Amplifiers and thereby limit price erosion of its own products.

17       98.    NAMM was motivated to further the conspiracy, and to encourage the Manufacturer

18   Defendants, Guitar Center and others to share cost and pricing information, and discuss strategies for

19   adopting, implementing and enforcing MAPPs and restricting retail price competition.  Guitar Center

20   and the Manufacturer Defendants, due to their collective market dominance, were among NAMM's

21   most influential members.  The conspiracy benefited these more influential members, by protecting

22   Guitar Center, especially, and other specailty music retailers, indirectly, from price competition from

23   internet-based and other low-cost retailers, and by maintaining higher retail prices and profit margins for

24   Guitars and Guitar Amplifiers for NAMM's most influential constituents.

25       99.    The conspiracy benefited the smaller independent specialty music retailers, because it

26   protected them from competition from internet-based retailers and other low-cost retailers of Guitars and

27   Guitar Amplifiers.  Maintaining stability in the industry permitted the independent specialty music

28

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  retailers to continue competing with Guitar Center, internet-based retailers, and low-cost retailers on

2  service and convenience, but eliminated retail price competition.

3       100.    The conspiracy benefited the Manufacturer Defendants, because it permitted them to

4  stabilize and increase wholesale prices.  In addition, maintaining higher retail prices assisted the

5  individual Manufacturer Defendants in preserving their brand images.

6       101.    NAMM held industry shows twice every year, providing an opportunity for competitors

7  to meet, to exchange information, and to collude regarding the setting of prices in an effort to increase

8  profits for manufacturers and retailers to the detriment of consumers.  The shows were not open to the

9  general public.  NAMM held the following semi-annual shows during the Class Period:

**Table 3:  NAMM Semi-Annual Shows**

| Show | Dates | Location |
| --- | --- | --- |
| 2004 NAMM Winter Show | January 16-18, 2004 | Anaheim, California |
| 2004 NAMM Summer Show | July 23-25, 2004 | Nashville, Tennessee |
| 2005 NAMM Winter Show | January 20-23, 2005 | Anaheim, California |
| 2005 NAMM Summer Show | July 22-24, 2005 | Indianapolis, Indiana |
| 2006 NAMM Winter Show | January 19-22, 2006 | Anaheim, California |
| 2006 NAMM Summer Show | July 14-16, 2006 | Austin, Texas |
| 2007 NAMM Winter Show | January 18-21, 2007 | Anaheim, California |
| 2007 NAMM Summer Show | July 27-29, 2007 | Austin, Texas |
| 2008 NAMM Winter Show | January 17-20, 2008 | Anaheim, California |
| 2008 NAMM Summer Show | July 20-22, 2008 | Nashville, Tennessee |

21      102.    The Manufacturer Defendants attended NAMM events and, on information and belief,

22  met with each other, Guitar Center, NAMM and other co-conspirators to exchange information and

23  discuss strategies for implementing MAPPs, restricting price competition, and maintaining or increasing

24  retail prices for Guitars and Guitar Amplifiers.

25      103.    As Guitar Center and most of the Manufacturer Defendants were represented on

26  NAMM's Board of Directors during the Class Period, they knew or were aware of, participated in or

27  approved NAMM's encouragement, implementation and enforcement of MAPPs, and assisted NAMM

28

25

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1   in facilitating the conspiracy.

2          104.    At the 2004 NAMM Summer Show, manufacturers and retailers, including Guitar Center

3   and the Manufacturer Defendants, discussed the need for and effectiveness of MAPPs.  On information

4   and belief, Guitar Center and the Manufacturer Defendants shared sensitive cost and pricing information

5   and agreed to devise, adopt, impose and enforce MAPPs.  Reporting on the 2004 NAMM Summer

6   Show, *The Music Trades* wrote:  "A number of exhibitors also announced higher MAP prices in a bid to

7   shore up dealer margins."

8          105.    NAMM hosted its Fifth Global Economic Summit or Global Summit in August 2004 in

9   Carlsbad, California.  This was an invitation-only meeting to bring key industry leaders, media and

10  advisors together "to explore emerging markets, reinforce global relationships and share different

11  visions of the path to long-term, sustainable industry growth." On information and belief, Guitar Center

12  and the Manufacturer Defendants attended the Summit and agreed upon a scheme to devise, adopt,

13  impose and enforce MAPPs.

14         106.    At the 2005 NAMM Summer Show, NAMM hosted a discussion entitled "Does the

15  Industry Need a MAP makeover?"  According to a November 2005 article published in *The Music*

16  *Trades*, at this session, Music for Everyone, an association of thirteen Greater Los Angeles musical

17  instrument retailers, presented a "voluntary MAP formula/guideline" which was urged and

18  "recommended for general use" by Music Product retailers.  On information and belief, Guitar Center

19  and the Manufacturer Defendants attended the 2005 NAMM Summer Show, shared sensitive cost and

20  pricing information and agreed to devise, adopt, impose and enforce MAPPs.

21         107.    At the 2006 NAMM Winter Show, NAMM again hosted a panel discussion on MAPPs.

22  The panel included several industry leaders, including Tom Sumner, vice-president and general manager

23  of Yamaha's Pro-Audio and Combo Division; Bob LeClaire, sales manager of Avedis Zildjian; and

24  Robert Lee, sales manager at Kaman; and several retailers.  As reported in the March 1, 2006 edition of

25  *The Music Trades*, the panelists were "unanimous, offering a guardedly positive assessment of MAP

26  policies."    On information and belief, Guitar Center and the Manufacturer Defendants attended the

27  2006 NAMM Winter Show, shared sensitive cost and pricing information and agreed to devise, adopt,

28

1    impose and enforce MAPPs.

2        108.    At this panel discussion, only one independent internet retailer, Bryan Junk of

3    massmusic.net, spoke in favor of price competition for the benefit of consumers, stating:  "We're

4    supposed to compete, aren't we?"  *The Music Trades* captured some of the dialogue in its March 1, 2006

5    publication:

6        Whether or not you agree with him, Bryan Junk, an internet retailer, deserves credit for
        staring down an auditorium packed with independent retailers and stating that MAP
7        should be scrapped.  To audible boos, he declared, "*Consumers like low prices, and we
        try to give them what they want.  Why shouldn't we be able to grow our business by
8        offering the lowest possible prices without interference from the manufacturers?*"
        [Emphasis added.]

9        109.    Mr. Junk did not sway his fellow panelists, however.  As reported in *The Music Trades*,

10    panel members persisted in their views that:  (i) absent MAPPs "prices would rapidly migrate down to

11    10% over cost . . ."; (ii) MAPPs are "only as effective as [their] enforcement"; and (iii) current MAPP

12    pricing guidelines should be revised "upwards to give retailers a better profit margin."

13        110.    At a separate session hosted by NAMM at the 2006 NAMM Winter Show, Music for

14    Everyone published and presented with NAMM's participation and consent two MAP pricing formula

15    schedules based on retail costs, which were proposed and "designed for all instruments and all combo

16    and audio products":

17    
18        Proposed MAP Formula
        Recommended Minimum Profit Formulas for A & B Discounts

19        Retail [$1-$149] x.05 x.2.00 = MAP (0% off retail)*
        Retail [$150-$249] x 0.5 x. 1.90 = MAP (5% off retail)*
20        Retail [$240-$299] x 0.5 x 1.85 = MAP (7.5% off retail)*
        Retail [$300-$349] x 0.5 x 1.80 = MAP (10% off retail)**
21        Retail [$350-$399] x 0.5 x 1.75 = MAP (12.5% off retail)**
        Retail [$400-$449] x. 0.5 x. 1.70 = MAP (15% off retail)*
22        Retail [$450-$499] x 0.5 x 1.65 = MAP (17.5% off retail)*
        Retail [$500 and up] x 0.5 x. 1.60 = MAP (20% off retail)*
23        Retail [$500-$599] x 0.5 x 1.55 = MAP (22.5% off retail)**

24        *   Formula A
        ** Formula B
25

26        111.    In its NAMM presentation, Music for Everyone encouraged manufacturers to adopt the

27    MAPP pricing reflected in the Formula A schedule, capping permitted discounts at 20 percent.  Music

28

27

1    For Everyone urged that no MAPP price should be lower than that reflected in the Formula B schedule,

2    stating "the formula B profits are the minimum the brick-and-mortar full service music instrument

3    retailers require to survive, and hopefully thrive."

4         112.    At the 2006 NAMM Summer Show, NAMM again sponsored a roundtable discussion on

5    MAPPs, profitability and competition.  This session featured NAMM President and CEO Joe Lammond,

6    Tom Sumner of Yamaha Electronics Corporation, and Fender Chairman and CEO, Bill Mendelo, among

7    others.  NAMM described this discussion in its preview materials as follows:  "In the two-hour session

8    suppliers and retailers of all sizes will be able to share views about critical issues affecting profitability,

9    including MAP[P] pricing . . . and the entrance of mass consumer merchandisers into the industry."

10   Among the topics discussed at this session were MAPP prices that were set too low and industry profit

11   margins.  On information and belief, Guitar Center and the Manufacturer Defendants attended the 2006

12   NAMM Summer Show, shared sensitive cost and pricing information and agreed to devise, adopt,

13   impose and enforce MAPPs.

14        113.    A roundtable discussion of dealers conducted by *The Music Trades* in February 2007

15   highlighted that retailers knew MAPPs were designed to limit competition and prop up retail prices for

16   Guitars and Guitar Amplifiers.  As part of the roundtable discussion, George Hines, of George's Music

17   Stores located in Berwyn, Pennsylvania, and a member of NAMM's Board of Directors from 2003-

18   2005, stated that the industry's "great challenge" was to get "all distribution channels [independents,

19   national chains, mass merchants and internet providers] working together for the health of the industry."

20   He expressed his view that MAPPs could keep the industry profitable as long as retailers and suppliers

21   understood each others' needs in setting the best MAPP pricing.  Hines stated that allowing market

22   forces to control the industry would "not necessarily be for the better" and that what was needed was a

23   "joint effort" to keep independents as the "heart and soul" of the industry with "manufacturer support."

24   He noted that the internet had commoditized products and pricing in the music industry.

25        114.    Also during the roundtable, Frank Hayhurst of Zone Music in Cotati, California stated

26   that manufacturers would follow the lead of Guitar Center.  He urged retailers to join together with those

27

28

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1   "whom they used to consider their 'competitors' and create strategic alliances for their mutual benefit."

2   Regarding the use of MAPPs specifically, Hayhurst said:

3       Some very clever work was done suggesting a sliding scale of much higher MAPs on
        lower price point products, higher MAPs on medium price point products, and slightly
4       higher MAPs on higher cost products. The common theme is that MAPs need to go up,
        but everyone is afraid to do that because some other manufacturer might not. The
5       solution? Independents need to band together and favor manufacturers that provide a
        MAP system that allows for independents to stay in business.

6

7       115.    NAMM continued to facilitate industry discussions of MAPPs and MAPP pricing at the

8   2007 NAMM Winter Show.  At least one roundtable discussion focused on, among other things, profit

9   margins and MAPP pricing.  *See, e.g., The Music Trades* (Jan. 1, 2007), "Why Going to NAMM is a

10  total no-brainer: new products, smart people, and tons of educational seminars add up to the single

11  biggest business opportunity of the year.  If you're serious, there's only one thing to do:  Show Up!";

12  NAMM 2007 PREVIEW; Calendar.  On information and belief, Guitar Center and the Manufacturer

13  Defendants attended the 2007 NAMM Winter Show and agreed to adopt, impose and enforce MAPPs.

14      116.    NAMM held its Sixth Global Summit in 2007, in Carlsbad, California.  According to one

15  press account published in the October 17, 2007 issue of *The Music and Sound Retailer*, NAMM Global

16  Summit attendees "primarily consist[] of supplier decision makers as well as retailers."  On information

17  and belief, Guitar Center and the Manufacturer Defendants met with one another at the Summit, and

18  agreed to adopt, impose and enforce MAPPS.  Guitar Center's Chief Executive Officer, Marty

19  Albertson, addressed the assembly at Summit.  Albertson or other key representatives of Guitar Center

20  also attended or participated in prior NAMM-sponsored Global Summit events.

21
        **G.      Defendants Unreasonably Restrained Trade, Prevented Competition, And Imposed
22              Supra-Competitive Prices On Consumers**

23      117.    Defendants agreed to and did adopt, impose or enforce MAPPs throughout the Class

24  Period.  The MAPPs imposed and enforced by Defendants went well beyond typical cooperative

25  advertising programs where manufacturers place restraints on the prices dealers may advertise in

26  advertisements funded in whole or in part by the manufacturer.  Instead, with NAMM's knowledge,

27  cooperation and assistance, Defendants and other unnamed co-conspirators devised a plan to exact

28

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1   agreements from Music Product manufacturers that sold through Guitar Center and other NAMM

2   retailers to require, on penalty of termination and as a condition of doing business, that the manufacturer

3   ensure that its other retailers maintain the MAPPs and/or refrain from discounting.

4       118.    The MAPPs imposed on music retailers by Defendants are anticompetitive.  According to

5   a *Wall Street Journal* report dated October 23, 2008, Bradley Reed, sales manager for Musician's

6   Advocate, Inc., said that his company "had very little choice but to honor manufacturer's policies on

7   advertised prices because otherwise it risks having its supplies cut off or being delisted as an authorized

8   distributor."

9       119.    As detailed above, NAMM arranged meetings and discussions, assisted and encouraged

10  its members to exchange competitively sensitive information, and sought and obtained the agreement of

11  its members, to impose and enforce these MAPPs, which had no legitimate pro-competitive purpose.

12      120.    The Manufacturer Defendants did not simply enter into a series of vertical restraints on

13  trade or unilaterally suggest retail prices to retailers; require retailers to maintain minimum retail prices

14  to protect brand image; require retailers to provide levels of advertising or service and, in return, assure

15  retailers that they would not be undercut by other retailers in intra-brand completion; announce or

16  enforce policies of sanctioning or terminating retailers that failed to maintain the MAPP price; and

17  sanction or terminate retailers that failed to maintain the MAPP price.  Rather, Defendants and their co-

18  conspirators entered into a contract, combination or conspiracy that was, in form and effect, a horizontal

19  restraint on trade.  The Manufacturer Defendants did not act unilaterally or merely in their own

20  individual economic interest when they entered into and strictly imposed MAPPs on retailers.  Instead,

21  they colluded to avoid free competition and to deprive consumers of competitive prices for Guitars and

22  Guitar Amplifiers.

23      121.    The efforts of Defendants to adopt, implement and enforce MAPPs during the Class

24  Period paid off in the form of higher retail prices.  After falling for several years, the average unit prices

25  of Guitars and Guitar Amplifiers all leveled off or started to rise in 2004 and 2005.  Consequently,

26  consumers paid the higher prices that manufacturers required and retailers charged under the MAPPs.

27

28

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**H.    The Anticompetitive Effects Of Defendants' Conduct**

122.    Defendants' actions in adopting, implementing and enforcing MAPPs have had the following anticompetitive effects:

        a.    Competition has been unreasonably restrained or suppressed;

        b.    Purchasers of Guitars and Guitar Amplifiers have been denied the benefits of competition in a free and open market and have been forced to pay artificially high prices for such products;

        c.    Defendants have enjoyed, and will continue to enjoy, supra-competitive profits to the detriment of competitors and purchasers of Guitars and Guitar Amplifiers.

123.    The anticompetitive effects of Defendants' conduct in the relevant product market(s) outweigh any conceivable pro-competitive benefits.

**I.    The FTC Found That NAMM's Actions Were Anticompetitive And Served No Legitimate Business Purpose**

124.    On March 7, 2007, the FTC initiated a non-public investigation into price fixing in the music products industry.  The FTC subsequently issued subpoenas to Guitar Center, Fender, Gibson, Yamaha, Ibanez, and others regarding price fixing, MAPPs, and the sharing of confidential cost, pricing and other business information at NAMM events.

125.    Following a two year investigation, on March 4, 2009, the FTC publicly issued a proposed cease and desist order to NAMM and at the same time announced that it had tentatively settled FTC charges that NAMM had "permitted and encouraged" acts constituting violations of Section 5 of the FTC Act, 15 U.S.C. §45 and had engaged in acts and practices that "constitute unfair methods of competition in or affecting commerce," also in violation of 15 U.S.C. § 45.  The FTC's press release stated that the proposed consent order was "designed to remedy NAMM's anticompetitive conduct."

126.    The FTC's Complaint alleged that between 2005 and 2007, NAMM organized various meetings and programs for its members, such as Defendants herein, at which competing retailers of Guitars and Guitar Amplifiers and others "were permitted and encouraged to discuss strategies for implementing MAPPs, the restriction of retail price competition, and the need for higher retail prices."

31

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    The FTC asserted that NAMM was the lynchpin of this anticompetitive activity, stating

2    "Representatives of NAMM determined the scope of information exchange and discussion by selecting

3    moderators and setting the agenda for these programs."  The FTC complaint further alleged that "[a]t

4    these NAMM sponsored events, competitors discussed the adoption, implementation, and enforcement

5    of minimum advertised price policies; the details and workings of such policies, appropriate and optimal

6    retail prices and margins; and other competitively sensitive issues."  The Commission voted to approve

7    the complaint and proposed consent order by a 4-0 vote.

8         127.    Following a 30 day period for comment, the FTC issued its Decision and Order on April

9    10, 2009.  The FTC states in its "Analysis of Agreement" that NAMM settled charges that it violated

10   Section 5 "by arranging and encouraging the exchange among its members of competitively sensitive

11   information that had the purpose, tendency, and capacity to facilitate price coordination and collusion

12   among competitors."  Although the FTC's Decision and Order is directed to NAMM, the FTC's

13   conclusion that an order was required to stop NAMM from arranging and encouraging collusive

14   behavior presupposes the existence of the collusive behavior between and among NAMM's members,

15   including Guitar Center and the other Defendants.

16        128.    In assessing NAMM's conduct, the FTC was cognizant of the fact that trade associations

17   may "serve numerous valuable and pro-competitive functions, such as expanding the market in which its

18   members sell; educating association members, the public and government officials; conducting market

19   research; establishing inter-operability standards; and otherwise helping firms to function more

20   efficiently."  Nonetheless, the FTC also noted:

21            At the same time, it is imperative that trade association meetings not serve as a forum for
22            rivals to disseminate or exchange competitively-sensitive information, particularly where
             such information is highly detailed, disaggregated, and forward-looking. The risk is two-
23            fold. First, a discussion of prices, output, or strategy may mutate into a conspiracy to
             restrict competition. Second, and even in the absence of an explicit agreement on future
24            conduct, an information exchange may facilitate coordination among rivals that harms
             competition.
25

26   In light of these considerations, the FTC concluded that, "NAMM's activities crossed the line that

27   distinguishes legitimate trade association activity from unfair methods of competition."

28

129.    In its Analysis of Agreement, the FTC offered the following reasoning for its finding that NAMM's conduct during the Class Period lacked a legitimate business purpose:

A Respondent violates Section 1 of the Sherman Act and Section 5 of the FTC Act when it engages in concerted conduct that had the principal tendency or the likely effect of harming competition and consumers. *California Dental Ass'n v. Federal Trade Commission*, 526 U.S. 756 (1999) (footnote omitted). The conduct of a trade association or its authorized agents is generally treated as concerted action. *E.g., California Dental Ass'n v. Federal Trade Commission*, 526 U.S. 756 (1999); *North Texas Specialty Physicians v. FTC*, 528 F.3d 346, 356 (5th Cir. 2008) ("When an organization is controlled by a group of competitors, it is considered to be a conspiracy of its members.").

The Complaint alleges that at meetings and programs sponsored by NAMM, competing retailers of musical instruments and other NAMM members discussed strategies for raising retail prices. Firms also exchanged information on competitively-sensitive subjects – prices, margins, minimum advertised price policies and their enforcement. And not only did NAMM sponsor these meetings, but its representatives set the agenda and helped steer the discussions. The antitrust concern is that this joint conduct can facilitate the implementation of collusive strategies going forward (footnote omitted). For example, such discussions could lead competing NAMM members to refuse to deal with a manufacturer, distributor, or retailer unless minimum advertised price policies, or increases in minimum advertised prices, were observed and enforced against discounters (footnote omitted). Alternatively, NAMM members could lessen price competition in local retail markets. Any or all of these strategies may result in higher prices and harm consumers of musical instruments. Any savings from lower manufacturing costs would be reserved to NAMM members, and not shared with consumers in the form of lower retail prices.

The potential for competitive harm from industry-wide discussions must be weighed against the prospect of legitimate efficiency benefits. Here, the Complaint alleges that no significant pro-competitive benefit was derived from the challenged conduct. The Commission does not contend the exchange of information among competitors is categorically without benefit (footnote omitted). Rather, the allegation is that here – taking into account the type of information involved, the level of detail, the absence of procedural safeguards, and the overall market conditions – the exchange of information engineered by NAMM lacked a pro-competitive justification.

130.    As part of the settlement and consent order, the FTC ordered NAMM to cease and desist from:

    1.    Urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers or Musical Product Dealers relating to:

        a.    the retail price of any Musical Product; or

33

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

       b.     any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including but not limited to Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies.

  2.    Entering into, adhering to, enforcing, urging, encouraging, advocating, suggesting, assisting or otherwise facilitating any Musical Product Manufacturer or Musical Product Dealer to enter into, adhere to or enforce any combination, conspiracy, agreement or understanding between or among any Musical Product Manufacturers or Musical Product Dealers relating to:

       a.     the retail price of any Musical Product;

       b.     any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies; or

       c.     the refusal to do business, or the reduction of business, with particular Musical Product Manufacturers or Musical Product Dealers.

131.    The Commission approved the NAMM consent order by a 4-0 vote.

132.    The FTC's consent order requires NAMM to file periodic compliance reports. In those reports, NAMM represented to the FTC that it has provided antitrust training to its board of directors, has revised its Antitrust Policy, and has had antitrust counsel attend NAMM events. NAMM represented that it provided each speaker at a recent NAMM show with a copy of its Antitrust Policy and required the speakers to provide NAMM with advance notice if the speaker intended to present any remarks or written materials regarding price terms, margins, profits, minimum advertised price policies, or resale price maintenance policies. NAMM also represented to the FTC that it distributed copies of its Antitrust Policies to its members and provided approximately 1,000 attendees with an overview of the antitrust laws and guidance on how to comply with those laws.

133.    Before future meetings, NAMM will read a statement to attendees that states, in pertinent part: "Any meeting such as this, where direct competitors such as manufacturers and retailers come together, has the potential to create antitrust problems. . . . NAMM must not facilitate, encourage, or

34

1  allow participants at its events to engage in any conduct which restricts competition on price or output. .

2  . . Remember, all NAMM members must make pricing decisions independently of any agreement or

3  understanding with competitors."

4      134.    These substantial changes in NAMM's policies, practices and procedures confirm that

5  during the Class Period, NAMM had violated the antitrust laws by facilitating the price-fixing

6  conspiracy among Defendants.

7      135.    Even after the FTC's investigation, its cease and desist order, and the revisions to

8  NAMM's antitrust policies, practices, and procedures, not all NAMM members appreciate the

9  seriousness of price-fixing.  After hearing the NAMM antitrust statement at the start of a recent trade

10  association meeting, one NAMM member stated, "MAP[P] is legal; you just can't talk about it."

11      136.    The FTC continued its investigation following the entry of the NAMM consent order on

12  April 10, 2009.  Several months later, on August 24, 2009, the FTC closed the investigation.  The FTC's

13  letters to the other subjects of the investigation stated, "This action [the closure] is not to be construed as

14  a determination that a violation may not have occurred. . . . The Commission reserves the right to take

15  such action as the public interest may require."

16  **PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS**

17      137.    Plaintiffs did not discover and could not have discovered through the exercise of

18  reasonable diligence the existence of the claims sued upon herein until March 4, 2009, when the FTC

19  announced its investigation had resulted in a proposed cease and desist order.

20      138.    Defendants' actions were unlawful, unfair and deceptive.  As a consequence, unwary

21  consumers were injured by Defendants' unlawful conduct.  Defendants are estopped from relying on any

22  statute of limitations defense because of their unlawful, unfair or deceptive conduct.

23      139.    Defendants' conduct was, by its nature, self-concealing.  Defendants, through a series of

24  affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal

25  conduct, and actively foreclosed Plaintiffs and the Class from learning of their anti-competitive, illegal,

26  unfair and/or deceptive acts.

27      140.    Any applicable statutes of limitations have been tolled by Defendants' affirmative acts of

28

35

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  fraudulent concealment and continuing misrepresentations.  Because of the self-concealing nature of

2  Defendants' actions and their affirmative acts of concealment, Plaintiffs and the Class assert the tolling

3  of any applicable statutes of limitations affecting the claims raised herein.

4          141.    By reason of the foregoing, the claims of Plaintiffs and the Class are timely under any

5  applicable statute of limitations, pursuant to the discovery rule, estoppel principles, and the equitable

6  tolling and fraudulent concealment doctrines.

7                                    **FIRST CLAIM FOR RELIEF**
                            **(Against all Defendants for Violations of Section 1**
8                            **of the Sherman Antitrust Act, 15 U.S.C. § 1)**

9          142.    Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set

10  forth herein.

11          143.    Beginning on or about January 1, 2004, Defendants and their co-conspirators entered into

12  a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in

13  violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by artificially reducing or elimination

14  competition in the relevant market(s) for Guitars and Guitar Amplifiers sold in the United States.

15          144.    Defendants combined or conspired to raise, fix, maintain or stabilize the price of Guitars

16  and Guitar Amplifiers sold in the United States.

17          145.    The contract, combination or conspiracy among Defendants consisted of a continuing

18  agreement, understanding or concerted action among Defendants and their co-conspirators.

19          146.    Defendants and their co-conspirators committed acts or made statements in furtherance of

20  formulating and effectuating their contract, combination or conspiracy, including:

21          a.      Participating in meetings and conversations to discuss the prices and supply of

22  Guitars and Guitar Amplifiers;

23          b.      Communicating in writing or orally to fix target prices, floor prices or price

24  margins for Guitars and Guitar Amplifiers;

25          c.      Exchanging competitively sensitive information to facilitate their combination or

26  conspiracy, including information concerning minimum advertising pricing factors, schedules and

27  policies, the details and workings of such policies, appropriate and optimal retail prices and margins,

28

1  strategies for raising retail prices for Guitars and Guitar Amplifiers, and other commercially or

2  competitively sensitive information;

3          d.      Agreeing to manipulate prices and the supply of Guitars and Guitar Amplifiers

4  sold in the United States in a manner that deprived the market of free and open competition; and

5          e.      Selling Guitars and Guitar Amplifiers to customers in the United States at

6  artificially-inflated, noncompetitive prices.

7          147.    The actions of the Defendants directly or through NAMM constitute a combination in

8  restraint of trade.  NAMM and the other Defendants are liable for the creation, maintenance and

9  enforcement of their agreements under applicable "per se," "quick look" or "rule of reason" standards.

10  There was no legitimate, pro-competitive business justification for Defendants' combination or

11  conspiracy, or their constituent agreements to restrain competition and artificially inflate the price of

12  Guitars and Guitar Amplifiers.  Even if there were some conceivable justification, the individual

13  agreements were broader than necessary to achieve any legitimate purpose.

14          148.    Plaintiffs and members of the Class were injured in their business or property by the

15  collusion and combination or conspiracy alleged above, which facilitated, enabled, assisted or furthered

16  Defendants' actions to substantially limit competition in the relevant market(s).  Plaintiffs and the other

17  members of the Class have been forced to pay higher prices for Guitars and Guitar Amplifiers than they

18  would have paid in the absence of Defendants' unlawful conduct.

19                          **SECOND CLAIM FOR RELIEF**
                   **(Against Defendants for Violations of California's Cartwright Act,**
20                       **Cal. Bus. & Prof. Code § 16700 *et seq*.)**

21          149.    Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set

22  forth herein.

23          150.    Defendants entered into the unlawful conspiracy and combination described above in the

24  State of California and the effects of that conspiracy occurred within and emanated from the State of

25  California.  As alleged above, NAMM and Guitar Center devised, implemented and directed a scheme

26  from their principal places of business in California through which Guitar Center, Manufacturer

27  Defendants and other co-conspirators met and exchanged information, discussed strategies for

28

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1 implementing MAPPs, and combined or conspired to restrict price competition and/or maintain or

2 increased the retail prices for Guitars and Guitar Amplifiers.

3     151.    Defendants Guitar Center, NAMM, and the other Defendants combined or conspired with

4 each other and co-conspirators to unreasonably restrain trade and commerce by artificially reducing or

5 eliminating competition in the United States and/or by raising, fixing, maintaining or stabilizing the

6 prices for Guitars and Guitar Amplifiers in the United States.

7     152.    Defendants' acts and practices, as described herein, amount to vertical price-fixing and

8 unlawful combinations in restraint of trade in per se violation of Cal. Bus. & Prof. Code §§ 16700 *et seq.*

9 *Harris v. Capitol Records Distrib. Corp.*, 64 Cal.2d 454, 463 (1966); *Mailand v. Burckle*, 20 Cal.3d 367,

10 377 (1978); *Chavez v. Whirlpool Corp.*, 93 Cal.App.4th 363, 369 (2001); *Kunert v. Mission Fin. Servs.*

11 *Corp.*, 110 Cal.App.4th 242, 263, 2003.

12     153.    Plaintiffs and members of the Class were injured in their business or property by the

13 collusion and combination or conspiracy alleged above, which facilitated, enabled, assisted or furthered

14 Defendants' actions to substantially limit competition in the relevant market(s).  Plaintiffs and the other

15 members of the Class have been forced to pay higher prices for Guitars and Guitar Amplifiers than they

16 would have paid in the absence of Defendants' unlawful conduct.

17
### THIRD CLAIM FOR RELIEF
**(Against Defendants for Violations of California's Unfair Competition Law,**
18 **Cal. Bus. & Prof. Code § 17200 *et seq.*)**

19     154.    Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set

20 forth herein.

21     155.    Defendants entered into the unlawful conspiracy and combination described above in the

22 State of California and the effects of that conspiracy occurred within and emanated from the State of

23 California.  As alleged above, NAMM and Guitar Center devised, implemented and directed a scheme

24 from their principal places of business in California through which Guitar Center, Manufacturer

25 Defendants and other co-conspirators met and exchanged information, discussed strategies for

26 implementing MAPPs, and combined or conspired to restrict price competition and/or maintain or

27 increased the retail price for Guitars and Guitar Amplifiers.

28

156.    The acts and practices of Defendants, as described herein, constitute unlawful business practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*, in that Defendants combined or conspired with other Defendants and co-conspirators to unreasonably restrain trade and commerce by artificially reducing or eliminating competition in the United States and/or by raising, fixing, maintaining or stabilizing the prices for Guitars and Guitar Amplifiers in the United States, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*

157.    The acts and practices of Defendants, as described herein, also constitute unfair business practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*, because the utility of Defendants' alleged  acts and practices in restricting competition in the United States market for Guitars and Guitar Amplifiers in the United States is significantly outweighed by the gravity of the harm that such acts and practices impose on Plaintiffs and Class members.  Defendants' acts and practices also are oppressive, unscrupulous or substantially injurious to Plaintiffs and Class members.

158.    Plaintiffs and Class members have suffered injury in fact and have lost money or property as a result of these Defendants' acts and practices, in that Plaintiffs and Class members paid artificially high prices for Guitars and Guitar Amplifiers due to Defendants' unlawful agreement, combination or conspiracy and their unlawful, anticompetitive practices.

159.    Plaintiffs and Class members have suffered harm as a proximate result of the wrongful conduct of Defendants, and Plaintiffs therefore seek appropriate restitution.  Plaintiffs and Class members also seek an order, pursuant to Cal. Bus. & Prof. Code § §17200 and 17203, enjoining Defendants from continuing to engage in the unlawful, unfair and fraudulent acts and practices described herein.

**FOURTH CLAIM FOR RELIEF**
**(Against Defendants for Violation Massachusetts Consumer Protection Act,**
**Mass. G. L.93A § 2 *et seq.*)**

160.    Plaintiffs Haskell and Seiler hereby incorporate by reference each preceding paragraph as though fully set forth herein.

161.    Plaintiffs Haskell and Seiler assert this claim on behalf of themselves and a Subclass of

persons who directly purchased Guitars and/or Guitar Amplifiers from Guitar Center, Inc. in Massachusetts during the Class Period ("Massachusetts Subclass").

162.    Defendants are engaged in trade or commerce as defined by M.G.L. c. 93A, § 1(b).

163.    Defendants have engaged in unfair competition or unfair acts or practices in violation of Mass. G.L. c. 93A § 2, which states:  "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

164.    The Massachusetts Legislature has specifically stated in Mass. G.L. 93A c. 93A, § 2(b):  "It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended."

165.    The acts committed by Defendants as alleged herein were  in violation of M.G.L. c. 93A, § 2, and against public policy for all of the same reasons that they were in violation of the Sherman Act as set forth in the First Claim for Relief, above.  Under Massachusetts law, a violation of Section 1 of the Sherman Act is a per se violation of Mass. Gen. L. c. 93A.

166.    Defendants also are separately liable under Mass. G.L. c. 93A for any and all actions alleged herein that were intended to artificially and improperly raise the prices of Guitars and Guitar Amplifiers.  These activities include attempting to collude or conspire to fix the prices of Guitars and Guitar Amplifiers, exchanging (and encouraging the exchanging) of competitive information through NAMM (and otherwise), discussing and/or implementing MAPPs, and otherwise improperly limiting (and attempting to limit) competition and restricting (or attempting to restrict) discount pricing in the Guitar and Guitar Amplifier market(s).

167.    Defendants' intentional and purposeful anticompetitive acts described above, including but not limited to, the exchange of competitive information, acts designed to encourage the exchange of competitive information, discussing and/or implementing MAPPs, acts of collusion to set prices, and the actual act of price fixing itself, were intended to and did in fact cause Plaintiffs Haskell and Seiler and the Massachusetts Subclass members to pay supra-competitive prices for Guitars and Guitar Amplifiers

40

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

purchased from Defendants or their Co-Conspirators in the Commonwealth of Massachusetts.

168.   The violations of Mass. G.L. c. 93A by Defendants were done willfully, knowingly, or in bad faith, entitling Plaintiffs Haskell and Seiler and the Massachusetts Subclass to double or treble damages.

169.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Haskell and Seiler and the Massachusetts Subclass have been injured in their businesses and property in that they paid more for Guitars and Guitar Amplifiers than they otherwise would have paid in the absence of Defendants' unlawful conduct.

170.   Demand has been made upon Defendants pursuant to Mass. G.L. c. 93A, §§ 2, 9 more than 30 days prior to filing this claim for relief under Mass. G.L. c. 93A. More than thirty days have passed since the demand letter was served, and each Defendant served has failed to make a settlement offer. In the alternative, service of a demand letter on Defendants that did not maintain a place of business within Massachusetts was excused.

171.   As a result of Defendants' and their co-conspirators' violation of Mass. G.L. 93A, Defendants are liable to Plaintiffs Haskell and Seiler and the Massachusetts Subclass for up to three times the damages that they incurred, or at the very least the statutory minimum award of $25 per purchase of each Guitar or Guitar Amplifiers, together with all related court costs and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that:

A.   The Court determine that his action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and enter an order appointing Plaintiffs as class representatives for the Class and appointing Plaintiffs' counsel as Class Counsel;

B.   The acts and practices herein alleged be adjudged and decreed to violate Section 1 of the Sherman Act, the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.,* the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and the Massachusetts Consumer Protection Act, Mass. G. L. c. 93A *et seq*., and that Defendants be enjoined from further violative conduct;

C.       Plaintiffs and each member of the Class recover damages determined to have been sustained by each of them, plus treble damages and any statutory or liquidated damages;

D.       Plaintiffs and each member of the Class recover restitution, including disgorgement of profits, determined to be owed to them as permitted by the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17203;

E.       Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, litigation costs and expert fees as provided by law;

F.       Judgment be entered against Defendants and in favor of Plaintiffs and the Class; and

G.       Plaintiffs and the Class be granted such other appropriate relief as may be determined to be just, equitable and proper by this Court.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on those claims that can be tried to a jury.


DATED:  September 22, 2011                Respectfully submitted,

                                         **GIRARD GIBBS LLP**


                                         By: */s/ Elizabeth C. Pritzker*
                                               Elizabeth C. Pritzker

                                         Daniel C. Girard
                                         Eric H. Gibbs
                                         Geoff A. Munroe
                                         Amy M. Zeman
                                         601 California Street, 14th Floor
                                         San Francisco, CA 94108
                                         Telephone:  (415) 981-4800
                                         Facsimile:  (415) 981-4846

                                         *Lead-Liaison Counsel for Plaintiffs*

Additional Counsel for Plaintiffs:

Kenneth Gilman
**GILMAN AND PASTOR LLP**
16 14th Avenue
Wareham, Massachusetts 02571
Telephone: (508) 291-8400
Facsimile: (508) 291-3258

Gerald J. Rodos
Jeffrey B. Gittleman
**BARRACK, RODOS, & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

Gilbert T. Adams, III
**LAW OFFICES OF GILBERT T. ADAMS**
1855 Calder Avenue at Third Street
PO Box Drawer 3688
Beaumont, Texas 77704
Telephone: (409) 835-3000
Facsimile: (409) 832-6162

Bruce W. Steckler
Denyse F. Clancy
Melissa K. Hutts
**BARON & BUDD PC**
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Telephone: (214) 251-3605
Facsimile: (214) 520-1181

Shpetim Ademi
Guri Ademi
**ADEMI & O'REILLY LLP**
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Telephone: (866) 264-3995
Facsimile: (414) 482-8001

Eric L. Brown
**BARON & BUDD PC**
9465 Wilshire Blvd., Suite 460
Beverly Hills, California 90212
Telephone: (310) 860-0476
Facsimile: (310) 860-0480

Donald Amamgbo
**AMAMGBO & ASSOCIATES**
7901 Oakport Street, Suite 4900
Oakland, California 94621
Telephone: (510) 615-6000
Facsimile: (510) 615-6025

J. Burton Leblanc, IV
**BARON & BUDD PC**
9015 Bluebonnet Blvd.
Baton Rouge, Louisiana 70810
Telephone: (225) 927-5441
Facsimile: (225) 927-5449

Stephen R. Basser
Samuel M. Ward
**BARRACK, RODOS, & BACINE**
One American Plaza
600 West Broadway, Suite 900
San Diego, California 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

Heather A. Barnes
**ATTORNEY AT LAW**
86 Longview Drive
Vacaville, California 95687
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

James G. Stranch, III
J. Gerard Stranch, IV
Steven J. Simerlein
**BRANSETTER STRANCH
 & JENNINGS PLLC**
227 2nd Avenue North, 4th Floor
Nashville, Tennessee 37201
Telephone: (615) 254-8801

Gregory L. Davis
**LAW OFFICES OF GREGORY L.
DAVIS LLC**
6987 Halcyon Park Drive
Montgomery, Alabama 36117
Telephone: (334) 832-9080
Facsimile: (334) 409-7001

Michael J. Flannery
James J. Rosemergy
**CAREY & DANIS LLC**
8235 Forsyth Blvd., Suite 1100
St. Louis, Missouri 63105
Telephone: (314) 725-7700
Facsimile: (314) 721-0905

William J. Doyle, II
John A. Lowther
**DOYLE LOWTHER LLP**
9466 Black Mountain Road, Suite 210
San Diego, California 92126
Telephone: (619) 573-1700
Facsimile: (619) 573-1701

Kathleen C. Chavez
**CHAVEZ LAW FIRM PC**
28 North First Street, #2
Geneva, Illinois 60134
Telephone: (630) 232-4480
Facsimile: (630) 845-8982

Robert M. Foote
Matthew J. Herman
**FOOTE MEYERS MIELKE &
FLOWERS LLC**
3 North Second Street, Ste. 300
St. Charles, Illinois 60174
Telephone: (630) 232-6333
Facsimile: (630) 845-8982

Steven N. Williams
Neil J. Swarztberg
**COTCHETT, PITRE & MCCARTHY**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Mark K. Gray
Doris A. Kim
**FRANKLIN GRAY & WHITE**
The Speed Mansion
505 W. Ormsby Avenue
Louisville, Kentucky 40202
Telephone: (502) 585-2060
Facsimile: (502) 581-1933

Peter L. Currie
**THE LAW FIRM OF PETER L.
CURRIE**
536 Wing Lane
St. Charles, Illinois 60174
Telephone: (630) 862-1130
Facsimile: (630) 845-8982

Eric D. Freed
Jeffrey A. Leon
**FREED & WEISS LLC**
111 West Washington Street, Suite 1331
Chicago, Illinois 60602
Telephone: (866) 779-9610
Facsimile: (312) 220-7777

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Gary B. Friedman
**FRIEDMAN LAW GROUP**
270 Lafayette Street, 14th Floor
New York, New York 10012
Telephone: (212) 680-5150

Steve W. Berman
Anthony D. Shapiro
**HAGENS BERMAN SOBOL**
 **SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Robert J. Gralweski Jr.
Brooke E. Hodge
**GERGOSIAN & GRALEWSKI LLP**
750 Broadway Street, Suite 1250
San Diego, California 92101
Telephone: (619) 237-9500
Facsimile: (619) 237-9555

Elizabeth A. Fegan
**HAGENS BERMAN SOBOL**
 **SHAPIRO LLP**
1144 W. Lake St., Suite 400
Oak Park, Illinois 60301
Telephone: (708) 628-4949
Facsimile: (708) 628-4950

Daniel E. Gustafson
Daniel Hedlund
**GUSTAFSON & GLUEK**
650 Northstar East
608 Second Avenue South
Minneapolis, Minnesota 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622

Michael D. Hausfeld
Hilary K. Ratway
**HAUSFELD LLP**
1700 K Street, NW Suite 650
Washington D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201

Lee M. Gordon
Elaine T. Byszewski
**HAGENS BERMAN SOBOL**
 **SHAPIRO LLP**
700 South Flower Street, Suite 2940
Los Angeles, California 90017
Telephone: (213) 330-7150
Facsimile: (213) 330-7152

Laurie A. Traktman
Jay E. Smith
Michael D. Weiner
**GILBERT & SACKMAN ALC**
3699 Wilshire Blvd., Suite 1200
Los Angeles, California 90010
Telephone: (323) 938-3000
Facsimile: (323) 937-9139

Mark S. Goldman
Brian D. Penny
**GOLDMAN SCARLATO & KARON**
101 West Elm Street, Suite 360
Conshohocken, Pennsylvania 19428
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Eric D. Holland
Steven J. Stolze
**HOLLAND GROVES SCHNELLER & STOLZE LLC**
300 North Tucker Blvd., Suite 801
St. Louis, Missouri 63101
Telephone: (314) 241-8111
Facsimile: (314) 241-5554

Hollis Salzman
Kellie Lerner
**LABATON SUCHAROW**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

J. Barton Goplerud
**HUDSON, MALLANEY, SCHINDLER, P.C.**
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Telephone: (515) 223-4567
Facsimile: (515) 223-8887

William C. Wright
**LEOPOLD-KUVIN, P.A.**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, Florida 33410
Telephone: (561) 515-1400
Facsimile: (561) 515-1401

Raymond P. Boucher
Paul R. Kiesel
Michael C. Eyerly
**KIESEL, BOUCHER, & LARSON LLP**
8648 Wilshire Blvd.
Beverly Hills, California 90211
Telephone: (310) 854-4444
Facsimile: (310) 854-0812

L. Tracee Lorens
**LORENS & ASSOCIATES, APLC**
701 "B" Street, Suite 1400
San Diego, California 92101
Telephone: (619) 239-1233
Facsimile: (619) 239-1178

Kimberly A. Kralowec
**THE KRALOWEC LAW GROUP**
188 Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 546-6800
Facsimile: (415) 546-6801

Donna F. Solen
**MASON LLP**
1625 Massachusetts Avenue NW, Ste. 605
Washington, District of Columbia 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294

Mark I. Labaton
**KREINDLER AND KREINDLER**
707 Wilshire Blvd., Suite 4100
Los Angeles, California 90017
Telephone: (866) 386-2531

John P. McCarthy
Philip A. Steinberg
**LAW OFFICE OF JOHN P. McCARTHY**
217 Bay Avenue
Somers Point, New Jersey 08244
Telephone: (609) 653-1094
Facsimile: (609) 653-3029

46

Patricia A. Meyer
**PATRICIA A. MEYER**
**& ASSOCIATES APC**
444 West C Street, Suite 330
San Diego, California 92101
Telephone: (619) 235-8636
Facsimile: (619) 235-0510

Jeffrey S. Goldenberg
**MURDOCK GOLDENBERG**
**SCHNEIDER & GROH, LPA**
35 East Seventh Street, Suite 600
Cincinnati, Ohio 45202
Telephone: (513) 345-8291
Facsimile: (513) 345-8294

Paul F. Novak
Peter G. Safirstein
Peggy J. Wedgworth
**MILBERG LLP**
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 617-1975

Brian P. Murray
Lee Albert
Brian D. Brooks
**MURRAY FRANK & SAILER LLP**
275 Madison Avenue, 8th Floor
New York, New York 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

Jeff Westerman
**MILBERG LLP**
One California Plaza
300 South Grand Avenue, Suite 3900
Los Angeles, California 90017
Telephone: (213) 617-1200
Facsimile: (213) 617-1975

William N. Riley
Joseph N. Williams
**PRICE WAICUKAUSKI**
**& RILEY LLC**
301 Massachusetts Avenue
Indianapolis, Indiana 46204
Telephone: (317) 633-8787
Facsimile: (317) 633-8797

Daniel J. Mogin
Kristy L. Fischer
**THE MOGIN LAW FIRM PC**
110 Juniper Street
San Diego, California 92101
Telephone: (619) 687-6611
Facsimile: (619) 687-6610

Mark Reinhardt
Garrett D. Blanchfield
**REINHARDT WENDORF**
**& BLANCHFILED**
E1250 First National Bank Bldg.
332 Minnesota Street
St. Paul, Minnesota 55101
Telephone: (651) 287-2100
Facsimile: (651) 287-2103

G. Scott Emblidge
Sylvia M. Sokol
**MOSCONE EMBLIDGE LLP**
220 Montgomery Street, Suite 2100
San Francisco, California 94104
Telephone: (415) 362-3599
Facsimile: (415) 362-2006

Christopher Paul Ridout
Devon M. Lyon
**RIDOUT & LYON LLP**
555 East Ocean Blvd., Suite 500
Long Beach, California 90802
Telephone: (562) 216-7383
Facsimile: (562) 216-7385

47

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Bonny E. Sweeney
David W. Mitchell
Carmen A. Medici
**ROBBINS GELLER RUDMAN**
 **& DOWD LLP**
655 West Broadway, Suite 1900
San Diego, California 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

Joseph P. Guglielmo
**SCOTT & SCOTT LLP**
500 5th Avenue, Floor 40
New York, New York 10110
Telephone: (800) 404-7770
Facsimile: (212) 223-6364

Brian J. Robbins
George C. Aguilar
Ashley R. Palmer
**ROBBINS UMEDA LLP**
600 B. Street, Suite 1900
San Diego, California 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Mark Shane
**SHANE AND WHITE LLC**
1676 Route 27
Edison, New Jersey 08817
Telephone: (732) 819-9100
Facsimile: (732) 572-9641

Kathleen S. Rogers
**LAW OFFICES OF KATHLEEN S. ROGERS**
140 Fourteenth Ave.
San Mateo, California 94402
Telephone: (650) 766-3126

Charles E. Tompkins
**SHAPIRO HABER & URMY LLP**
53 State Street, 13th Floor
Boston, Massachusetts 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

Simon B. Paris
**SALTZ MONGELUZZI BARRETT & BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, Pennsylvania, 19103
Telephone: (215) 496-8282
Facsimile: (215) 496-0999

Jeffrey L. Kodroff
Jeffrey J. Corrigan
Jay S. Cohen
Jonathan M. Jagher
**SPECTOR ROSEMAN KODROFF & WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Christopher M. Burke
**SCOTT & SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508

Ryan F. Stephen
James B. Zouras
**STEPHAN ZOURAS, LLP**
205 N. Michigan Avenue, Suite 2560
Chicago, Illinois 60601
Telephone: (312) 233-1550
Facsimile: (312) 233-1560

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY LLP**
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067
Telephone: (310) 789-3100

Olimpio L. Squitieri
**SQUITIERI & FEARON LLP**
32 East 57th Street, 12th floor
New York, New York 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553

Reginald V. Terrell
**THE TERRELL LAW GROUP**
PO Box 13315, PMB #148
Oakland, California 94661
Telephone: (510) 237-9700
Facsimile: (510) 237-4616

Kenneth A. Wexler
**WEXLER WALLACE LLP**
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 589-6270
Facsimile: (312) 589-6271

Mark J. Tamblyn
**WEXLER WALLACE LLP**
455 Capitol Mall, Suite 231
Sacramento, California 95814
Telephone: (916) 492-1100
Facsimile: (916) 492-1124

49

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2011 I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.  Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

I also certify that I will cause the forgoing to be served along with a court issued summons in accordance with Rule 4 of the Federal Rules of Civil Procedure on all defendants who have not been previously been served in this litigation.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 22, 2011.

_/s/    Elizabeth C. Pritzker_
Elizabeth C. Pritzker

GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

50