Daniel C. Girard (SBN # 114826)
    dcg@girardgibbs.com
Eric H. Gibbs (SBN # 178658)
    ehg@girardgibb.com
Elizabeth C. Pritzker (SBN # 146267)
    ecp@girardgibbs.com
Amy M. Zeman (SBN # 273100)
    amz@girardgibbs.com
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

*Lead-Liaison Counsel for Plaintiffs*

[Additional Counsel Listed On Signature Page]

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:  MUSICAL INSTRUMENTS AND EQUIPMENT ANTITRUST LITIGATION | ) ) ) ) |
| This Document Relates To: | ) ) ) |
| ALL ACTIONS | ) ) ) ) ) ) |

No. MDL 2121

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of all others similarly situated, allege as follows. Except as to Plaintiffs' own actions, this complaint is based upon information and belief, limited discovery produced by the Defendants, and the independent investigation of counsel:

## NATURE OF THE ACTION

1.      This case arises out of an alleged conspiracy to raise, fix, maintain or stabilize the retail prices of new, high-end acoustic and electric guitars, bass guitars and guitar amplifiers by the National Association of Music Merchants ("NAMM"), the main trade association for the music products industry, Guitar Center, Inc. ("Guitar Center"), the industry's leading retailer, and five of the most dominant manufacturers and distributors of Guitars and Guitar Amplifiers in the United States, during the period January 1, 2004 through March 4, 2009 ("the Class Period"). For purposes of this Second Amended Complaint, Plaintiffs use the term "Guitars" to refer to acoustic, electric and bass guitars, collectively. The phrase "Guitars and Guitar Amplifiers" refers to the relevant products in the litigation.

**A.      Guitar Center and Manufacturing Defendants Entered Into a Contract, Combination or Conspiracy to Fix Prices for Guitars and Guitar Amplifiers Through Implementation and Strict Enforcement of Minimum Advertised Pricing Policies, or MAPs.**

2.      During the Class Period, the music products industry generated $7.3 to $7.5 billion in retail sales of musical instruments and related products in the United States from 2004 to 2007. Guitars and Guitar Amplifiers were important components of this retail commerce. According to publicly-available data, Guitars and Guitar Amplifiers accounted for $1.545 billion in retail sales in 2004, and $1.667 billion in retail sales in 2007 – roughly 20% of all retail sales of musical instruments and related products in the United States in these years.

3.      At all relevant times, Guitar Center was the dominant retailer of Guitars and Guitar Amplifiers in the United States. During the Class Period, Guitar Center accounted for nearly 30% of total music industry retail sales in the United States, and an even greater percentage of the nation's annual retail sales of Guitars and Guitar Amplifiers.

4.      Also during the Class Period, Fender, Gibson, Yamaha, Kaman and Hoshino/Ibanez (collectively referred to herein as the "Manufacturer Defendants") were among the nation's leading

1

manufacturers of Guitars and Guitar Amplifiers. Fender and Yamaha were the top two U.S. producers of musical instruments and related products, including Guitars and Guitar Amplifiers, during this period, and Gibson, Kaman and Hoshino/Ibanez were consistently ranked among the top 25 producers of such products. Collectively, the five Manufacturer Defendants had a substantial market share of the wholesale market for Guitars and Guitar Amplifiers during the Period.

5.       Plaintiffs allege that Guitar Center and the Manufacturer Defendants, with the participation and consent of NAMM, the leading musical instrument trade association, collaborated, agreed, conspired and coordinated their efforts to use, expand and enforce Minimum Advertised Pricing policies (or "MAPs") to stabilize and fix the retail prices for Guitars and Guitar Amplifiers.

6.       Beginning in the 1990's and early 2000's, the retail music industry was threatened by new, internet-based retailers and the emergence of "big box" and mass merchant retailers in the musical instruments business. These new retail competitors, due to their economy of size, relatively low overhead and other retail advantages, could sell Guitars and Guitar Amplifiers at retail prices below those of traditional, brick-and-mortar retailers that exclusively sold musical products, such as Guitar Center. As a result of this new competition, the established retail prices in the music industry saw a steep decline.

7.       During the late 1990's and early 2000's, the Manufacturer Defendants, Guitar Center, and NAMM acted in combination and/or conspiracy to adopt, revise, and increase enforcement of MAP polices in response to this new competition from internet and mass merchant retailers and the decline of retail prices. Although each Manufacturer Defendant had distributed its Guitars and Guitar Amplifiers to retail dealers without MAPs for years (indeed, for decades), in the early 2000's the Manufacturer Defendants collectively changed their business practices, and began to implement, modify or strengthen their pricing policies to require dealer adherence to MAPs and MAP pricing.

8.       Guitar Center used its dominant market power, including its influence within NAMM, to enforce the price-fixing conspiracy. Guitar Center used its economic power as the nation's leading retailer to conspire and collaborate with the Manufacturing Defendants, and pressure them into adopting, implementing and enforcing MAPs for their products. The Manufacturer Defendants' MAPs contained

substantially similar terms, advertising restrictions and enforcement provisions, and were implemented within a relatively short period of time – factors that strongly suggest concerted action and tacit collaboration, rather than unilateral or independent decision-making.  Given Guitar Center's dominant market position, manufacturers were forced to work with Guitar Center to standardize and strictly enforce the MAPs, or risk losing access to Guitar Center's distribution and sales network.

9.      The MAPs between the Manufacturer Defendants, on the one hand, and Guitar Center and other retailers, on the other, were vertical restraints on trade because they prevented music retailers from freely advertising retail prices for Guitar and Guitar Amplifiers below specified amounts, and had the effect of setting the retail price for these products..  By controlling the minimum advertised price at which retailers could advertise prices to consumers, the predetermined MAP price for these products became the "street" or actual retail price.  This prevented internet and mass merchant retailers from using their competitive retail advantages to offer lower retail prices than traditional brick-and-mortar retail stores.  As a result, by 2004 retail prices for Guitars and Guitar Amplifiers reversed their downward trajectory and had begun to steadily increase after years of decline.  Guitar Center, as the dominant brick-and-mortar retailers in the music products industry, directly benefitted from the implementation and stringent enforcement of MAPs.

10.     As alleged herein, the Defendants' conspiratorial and concerned actions and the resulting restraint on trade was unreasonable and for an anticompetitive purpose.  Guitar Center and the Manufacturer Defendants agreed and collectively implemented, revised and/or enforced the MAPs in order to forestall innovation in distribution by mass merchant and internet retailers that decreased costs and thus lowered retail prices that the new retailers could profitably charge for Guitars and Guitar Amplifiers, versus Guitar Center and other traditional, brick-and-mortar retailers.  The MAPs accomplished that purpose.  As a result of the conspiracy, price discounting was reduced.  Retail prices for Guitars and Guitar Amplifiers, which had been steadily falling prior to the Class Period, leveled off and began to rise.

11.     The combined actions and concerted efforts of the Manufacturer Defendants, during the Class Period, to implement, revise and/or strictly enforce MAPs containing substantially similar terms

and restrictions also amounted to a horizontal restraint on trade – one that was effectuated through coordinated vertical restraints on trade, the MAPs themselves. As alleged herein, the MAPs were not independent contracts implemented unilaterally by the Manufacturer Defendants. Nor were they designed to increase inter-brand competition. On the contrary, the Manufacturer Defendants were aware of the impact that retail price discounting by internet or "big box" retailers had on each other's margins and on traditional musical instrument retailers' profits, and used collaborative efforts and concerted action to craft, implement and enforce MAPs to counteract competition from these new market entrants and protect their own profit margins as well as those of its primary retail customer.

12.     Coordination and collective action by the Manufacturer Defendants during the Class Period was an economically attractive option. Due to increased discounting and competition from internet retailers and "big box" stores, Manufacturer Defendants would not have been able to impact retail prices for their Guitars and Guitar Amplifiers, market-wide, had only some of the Manufacturer Defendants implemented, enacted or enforced MAPs with dissimilar terms, restrictions or prohibitions. Collective implementation, revision and enforcement of MAPs with similar terms was necessary to achieve the Defendants' goals, Plaintiffs contend, because it enabled the Manufacturer Defendants to stabilize or raise the retail prices for Guitars and Guitar Amplifiers market-wide by way of uniform price advertising. These facts, taken together, strongly suggest a conspiracy, coordination or tacit combination among the Manufacturer Defendants in horizontal restraint of trade.

**B.     The National Association of Music Merchants ("NAMM") Was an Active Participant in and Facilitated the Alleged Conspiracy.**

13.     NAMM, the predominant trade association for the music products industry, joined in and facilitated the alleged conspiracy. NAMM was in favor of Guitar Center's and the Manufacturer Defendants' collective efforts with respect to the MAPs. During the Class Period, NAMM actively promoted the conspiracy and the use of the MAPs as a means of reducing retail price competition, protecting NAMM manufacturer-member's margins, and increasing retail prices for Guitars and Guitar Amplifiers for NAMM's retail members.

4

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

14.     NAMM also sponsored non-public events and invitation only summits to facilitate meetings at which Guitar Center, the Manufacturer Defendants and unnamed co-conspirators exchanged cost and pricing information and discussed strategies for implementing, revising and enforcing MAPs. The Federal Trade Commission ("FTC") investigated NAMM's actions – which the FTC alleged went beyond the proper role of a trade association.

15.     Specifically, on March 4, 2009, the FTC filed a complaint alleging that "[b]etween 2005 and 2007, NAMM organized various meetings and programs at which competing retailers of musical instruments were permitted to and encouraged to discuss strategies for implementing minimum advertised price policies ["MAPs"], the restriction of retail price competition, and the need for higher retail prices." *In the Matter of National Association of Music Merchants, Inc.*, FTC File No. 001 0203. After reviewing and analyzing documents subpoenaed from various industry participants, the FTC and NAMM entered into a negotiated settlement. The published FTC analysis of the NAMM complaint and settlement stated, "the allegation is that here – taking into account the type of information involved, the level of detail, the absence of procedural safeguards, and overall market conditions – the exchange of information engineered by NAMM lacked a pro-competitive justification." The FTC alleged that NAMM's acts and practices "constitute[d] unfair methods of competition in or affecting commerce" in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and issued a cease and desist order.

16.     Consistent with the formation of the alleged conspiracy, after years of steady decline, retail prices for Guitars and Guitar Amplifiers in the United States leveled off and began to rise from 2004 to 2007. The retail prices for these products fell somewhat in 2008, after the FTC's investigation.

**C.      Plaintiffs Assert Claims Under Antitrust and Consumer Protection Laws**

17.     Plaintiffs are consumers who purchased new, high-end Guitars and Guitar Amplifiers made by one or more of the Manufacturer Defendants directly from Guitar Center from January 1, 2004 through March 4, 2009 ("Class Period"). Plaintiffs contend that, as a result of Defendants' conspiratorial and anticompetitive conduct, Plaintiffs and other similarly-situated consumers paid inflated prices for their Guitars and Guitar Amplifiers during the Class Period.

18.     Plaintiffs bring this action on behalf of themselves and a proposed nationwide Class of

5

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

persons who purchased Guitars and/or Guitar Amplifiers from Guitar Center during the Class Period.. Plaintiffs and the proposed Class assert that NAMM, Guitar Center, the Manufacturer Defendants and unnamed co-conspirators violated the Sherman Antitrust Act, 15 U.S.C. § 1, as well as the antitrust and consumer protection laws of California. Plaintiffs also assert claims on behalf of a Massachusetts subclass under the consumer protection laws of Massachusetts.

## JURISDICTION AND VENUE

19.     Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The Court has subject matter jurisdiction pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a) and 28 U.S.C. § 1331 and 1337. The Court also has jurisdiction over state law claims brought pursuant to the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and the Massachusetts Consumer Protection Act, Mass. G. L. 93A § 2 *et seq.*, under 28 U.S.C. §§ 1332(d)(2) and 1367(a).

20.     Venue is proper in this federal judicial district under 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

## PARTIES

**A.      Plaintiffs**

21.     Plaintiff Alex Bohl is a resident of Sacramento, California. During the Class Period, Mr. Bohl purchased a Gibson Epiphone hollow body electric guitar and a Fender Hot Rod Deluxe guitar amplifier from Guitar Center retail stores in California.

22.     Plaintiff David Giambusso is a resident of Jersey City, New Jersey. During the Class Period, Mr. Giambusso purchased a Fender Stratocaster guitar from a Guitar Center retail store in New Jersey.

6

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

23.     Plaintiff Jeremy Haskell is a resident of Portland, Maine.  During the Class Period, Mr. Haskell purchased an Ibanez Artcore AF75D guitar from a Guitar Center retail store in Massachusetts.

24.     Plaintiff David Keel is a resident of Corona Del Mar, California.  During the Class Period, Mr. Keel purchased a Fender guitar from a Guitar Center retail store in California.

25.     Plaintiff Robert Lesko is a resident of Modesto, California.  During the Class Period, Mr. Lesko purchased a Gibson Les Paul guitar, an Ovation CSD225-RRB double neck acoustic guitar, and a Fender '65 Deluxe Reverb guitar amplifier from Guitar Center retail stores in California.

26.     Plaintiff Kenneth Manyin is a resident of Cherry Hill, New Jersey.  During the Class Period, Mr. Manyin purchased a Gibson Epiphone-brand bass guitar from a Guitar Center retail store in New Jersey.

27.     Plaintiff Ronald A McCain is a resident of Austin, Texas.  During the Class Period, Mr. McCain purchased a Gibson Flying V Guitar, a Fender Geddy Lee Jazz Bass Guitar and a Yamaha FG750S Acoustic Guitar from Guitar Center retail stores in Texas.

28.     Plaintiff Suzanne Ondre is a resident of San Francisco, California.  During the Class Period, Ms. Ondre purchased a Takamine guitar from a Guitar Center retail store in California.

29.     Plaintiff Bonnie Ornitz is a resident of Granada Hills, California.  During the Class Period, Ms. Ortiz purchased a Fender Stratocaster guitar from a Guitar Center retail store in California.

30.     Plaintiff Dr. David Palmer is a resident of Portland, Maine.  During the Class Period, Dr. Palmer purchased two Fender guitars, including a Fender American Standard Stratocaster guitar, from Guitar Center retail stores in Maine.

31.     Plaintiff Niranjan Parikh is a resident of Houston, Texas.  During the Class Period, Mr. Parikh purchased a Fender guitar and a Fender guitar amplifier from a Guitar Center retail store in Texas.

32.     Plaintiff Lisa Pritchett is a resident of San Mateo, California.  During the Class Period, Ms. Pritchett purchased an Ibanez AF75D-TOR Artcore Series Hollowbody Transparent Orange guitar from a Guitar Center retail store in California.

33.     Plaintiff Johan Edward Rigor is a resident of Burlingame, California.  During the Class

7

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Period, Mr. Rigor purchased a Sound Gear by Ibanez SR 305DX bass guitar from a Guitar Center retail store in California.

34.     Plaintiff Joshua Seiler is a resident of Allston, Massachusetts.  During the Class Period, Mr. Seiler purchased a Fender Telecaster guitar, as well as a Vox speaker cabinet and Vox amplifier head from a Guitar Center retail store in Massachusetts.

35.     Plaintiff Alexander Teller is a resident of Chicago, Illinois.  During the Class Period, Mr. Teller purchased a Fender Rumble 100 Combo guitar amplifier from a Guitar Center retail store in Illinois.

**B.     Defendants**

36.     Defendant National Association of Music Merchants, Inc. ("NAMM") is a New York corporation with its principal place of business located at 5790 Armada Drive, Carlsbad, California 92008.  NAMM is a music industry trade association comprised of more than 9,000 members.  Most U.S. manufacturers, distributors and dealers of musical instruments and related products, including Guitar Center and the named Manufacturer Defendants in this case, are members of NAMM.  As the FTC observed in its March 4, 2009 press release, entitled *National Association of Music Merchants Settles FTC Charges of Illegally Restraining Competition*, NAMM "serves the economic interests of its members by, among other things, promoting consumer demand for musical instruments, lobbying the government, offering seminars and organizing trade shows.  In the United States, NAMM sponsors two major trade shows each year, where manufacturers introduce new products and meet with dealers and competing manufacturers, distributors and retailers of musical instruments to discuss issues of concern to the industry."

37.     Defendant Guitar Center, Inc. ("Guitar Center") is a Delaware corporation with its principal place of business at 5795 Lindero Canyon Road, Westlake Village, California.  Guitar Center is the leading retailer of Guitars and Guitar Amplifiers in the United States with 315 stores and is the nation's largest direct response retailer (both catalog and online) of musical instruments.  A publicly-traded company until 2007, Guitar Center is now owned by the private equity firm, Bain Capital.

38.     Defendant Fender Music Instruments Corporation ("Fender") is a Delaware corporation

8

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

with its principal place of business at 8860 East Chaparral Road, Suite 100, Scottsdale, Arizona. Fender manufactures and distributes guitars – including the highest-selling line of guitars in the United States – and guitar amplifiers. Fender has manufactured Guitars and Guitar Amplifiers since its inception in 1946. Fender's best-known products include the Telecaster® electric guitar, first introduced in 1951, and Stratocaster® electric guitar which Fender describes as "[e]ssentially unchanged since its 1954 debut, it is the most popular and influential electric guitar ever." Fender also manufactures and distributes acoustic and/or electric guitars under the Squier® and Jackson® brand names. In 2003, Fender began distributing Gretsch® brand acoustic and electric guitars. Fender's Chief Executive Officer, Bill Mendello, served on the NAMM board from 2006 to 2009.

39. Defendant Gibson Guitar Corporation d/b/a Gibson U.S.A. ("Gibson") is a Delaware corporation with its principal place of business located at 309 Plus Park Boulevard, Nashville, Tennessee 37217. Gibson manufactures and distributes guitars and guitar amplifiers. Gibson is best known for its specialty-product lines, such as: the J-45 acoustic-electric guitar, first introduced in 1942; the L-00 acoustic guitar, first made in 1937 and reintroduced in 1991 and again in 1999; the J-200 line of acoustic guitars, produced since the 1950s; the Flying V electric guitar, first introduced in the 1960s and brought back into production in 1982; and the well-known Les Paul series of electric guitars, which experienced their first launch in 1952 and were reintroduced in 1982. Gibson purchased the Epiphone guitar company in the 1950s, and continues to manufacture and distribute guitars and guitar amplifiers under the Epiphone® brand name.

40. Defendant Yamaha Corporation of America ("Yamaha") is a California corporation with its principal place of business located at 6600 Orangethrope Avenue, Buena Park, CA 90620. Yamaha manufactures and distributes guitars and guitar amplifiers. Yamaha's products include: the FG- and L-series of acoustic guitars, first introduced in the 1970s and revised in the early-1980s; the APX line of acoustic-electric guitars, first introduced in 1987; and the Pacifica line of electric guitars, first introduced in 1996. Terry Lewis, as Senior Vice President at Yamaha, served on the NAMM board of directors from 2003-2005. In 2009, Yamaha Senior Vice President, Rick Young, was elected to the NAMM board of directors. Mr. Young's board term ends in 2012.

9

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

41.     Defendant Hoshino U.S.A., Inc. ("Hoshino" or "Ibanez") is a Pennsylvania corporation with its principal place of business located at 1726 Winchester Rd, Bensalem, PA 19020-4542. Hoshino manufactures and distributes guitars and guitar amplifiers under the Ibanez brand. Hoshino's products include the Artwood (formerly the Tama) series acoustic guitar and Artist model series electric guitar, first popularized in the early 1970s. Hoshino's President, Bill Reim, served on the NAMM board of directors from 2006 to 2009.

42.     Defendant Kaman Music Corp. ("Kaman") has been a wholly owned subsidiary of Fender since 2008, and has its principal place of business located at 55 Griffin Road South, Bloomfield, Connecticut, 06002-0507. Kaman manufactures and distributes guitars under various brand names, such as Ovation (electric guitar), Takamine (acoustic guitar), and Hamer (electric guitar), as well as guitar amplifiers. Paul Damiano, Kaman's Vice President of Marketing and Sales, served on the NAMM board of directors from 2003 to 2006. Fender purchased Kaman in early 2008 for $124 million.

43.     Guitar Center is a member of NAMM. Fender, Gibson, Yamaha, Ibanez and Kaman (collectively the "Manufacturer Defendants") also are members of NAMM. Each of the Defendants regularly attended NAMM's semi-annual trade show and convention as product manufacturers and/or as participants in NAMM-sponsored seminars and roundtables, or as NAMM board members. Before and during the Class Period, the Defendants participated in meetings and discussions organized and facilitated by NAMM, and conspired among themselves and with NAMM to share pricing information; adopt, implement and enforce MAPs; restrict retail price competition; eliminate price discounting; restrain competition; and/or artificially increase the retail prices of Guitars and Guitar Amplifiers. Various persons or entities not named as Defendants participated as co-conspirators in the wrongful conduct and violations of law alleged herein and performed acts or made statements in furtherance thereof. Following additional investigation and the opportunity for discovery, Plaintiffs may seek leave to name additional persons or entities as Defendants at a later date.

44.     "Defendants" as used herein, includes, in addition to those named specifically above, each of Defendants' predecessors, including those merged with or acquired by the named Defendants, and each named Defendant's wholly-owned or controlled divisions, subsidiaries or affiliates that

10

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

manufactured, distributed or sold Guitars and/or Guitar Amplifiers in interstate commerce to purchasers in the United States during the Class Period.

45. The acts herein alleged against the Defendants were authorized, ordered or performed by their officers, agents, employees or representatives while actively engaged in the management or operation of Defendants' business or affairs. All Defendants were active, knowing participants in the conspiracy alleged herein, and their conduct was known to and approved by their respective corporate officers and directors, parents, subsidiaries or affiliates.

## CO-CONSPIRATORS

46. Various persons or entities not named as Defendants participated as co-conspirators in the wrongful conduct and violations of law alleged herein and performed acts or made statements in furtherance thereof. Following additional investigation and the opportunity for discovery, Plaintiffs may seek leave to name additional persons or entities as Defendants as a later date.

47. Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the act, transactions, violations and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

48. Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23 on behalf of the following Class:

All persons who directly purchased one or more of the products within the below defined subclasses from Guitar Center, Inc. in the United States from January 1, 2004 through March 4, 2009:

a. All purchasers of new Guitars or Guitar Amplifiers manufactured or distributed by Fender Music Instruments Corporation or its affiliates, including Kaman;

b. All purchasers of new Guitars or Guitar Amplifiers manufactured or distributed by Gibson Guitars d/b/a Gibson USA or its affiliates;

c. All purchasers of new Guitars or Guitar Amplifiers manufactured or distributed by Hoshino U.S.A., Inc. or its affiliates;

d. All purchasers of new Guitars or Guitar Amplifiers manufactured or distributed by Yamaha Corporation of America USA or its affiliates;

49.     Excluded from the Class are Defendants; the subsidiaries and affiliates of any Defendant; any person or entity who is a partner, officer, director, or controlling person of any Defendant; members of Defendants' immediate families and their legal representatives, heirs, successors or assigns; and any entity in which any Defendant has or had a controlling interest.

50.     This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

51.     **Numerosity.** Members of the Class are so numerous that their individual joinder is impracticable.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of Class members.   Plaintiffs also believe that Class members are sufficiently numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

52.     **Existence and predominance of common questions.** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members.   These common questions include:

a.     Whether Defendants conspired or engaged in concerted action in restraint of trade;

b.     The identities of the co-conspirators;

c.     The duration of the alleged combination or conspiracy and nature and character of the acts done in furtherance of the alleged combination or conspiracy;

d.     Whether Defendants' conduct as alleged herein caused Plaintiffs and Class members to pay more for Guitars and Guitar Amplifiers than they otherwise would have paid in an unrestrained, competitive market;

e.     Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

f.     Whether the acts challenged in this Complaint, including but not limited to the alleged combination or conspiracy, and the nature and character of the acts done in furtherance of the alleged combination or conspiracy, violated the California Cartwright Act, California Business and

12

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Professions Code §§ 16700 *et seq.*, the California Unfair Competition Law, California Business and Professions Code §§ 17200 *et seq.*, and/or the unfair business practices law of Massachusetts;

g. Whether Defendants actively concealed the contract, combination or conspiracy from Plaintiffs and other Class members;

h. Whether Plaintiffs and Class members paid supra-competitive prices for Guitars and Guitar Amplifiers during the Class Period.

i. Whether Plaintiffs and other members of the Class were injured by the conduct of defendants and their co-conspirators and, if so, the appropriate class-wide measure of damages and appropriate injunctive relief; and

j. Whether Plaintiffs and the Class are entitled to declaratory, equitable or injunctive relief.

53. **Typicality.** Plaintiffs' claims are typical of the claims of the Class in that each of the Plaintiffs, like other Class members: purchased Guitars and/or Guitar Amplifiers described in the Class definition directly from Defendant Guitar Center; lost money or property and/or were damaged as a result of the same wrongful conduct of the Defendants as alleged herein; and seek relief common to the Class.

54. **Adequacy.** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and intend to prosecute this action vigorously. The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

55. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, while the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

13

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

56. Even if the Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, is in fact manageable, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. The benefits of adjudicating this controversy as a class action far outweigh any difficulties that may occur in managing the Class.

57. In the alternative, the Class may be certified under the provisions of Federal Rules of Civil Procedure 23(b)(1) and/or 23(c)(4) because:

a. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members and would establish incompatible standards of conduct for defendants;

b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede the ability of other Class members to protect their interests;

c. Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief with respect to the members of the Class as a whole an appropriate form of relief; and

d. The claims of Class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

## TRADE AND COMMERCE

58. The relevant product market(s) in this litigation is/are new, high-end Guitars and Guitar Amplifiers sold at retail in the United States, and excludes used guitars or guitar amplifiers, and products that qualify or are recognized by the public or the music product industry as toys, generics, knock-offs or unbranded products. As used herein, Guitars means acoustic, electric and bass guitars. The products that are alleged to fall within the relevant market(s) are reasonably interchangeable by consumers for the

14

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

same purposes.  In other words, as defined herein, an acoustic, electric or bass guitar or Guitar Amplifier manufactured or distributed by one manufacturer and sold at retail in the United States is reasonably interchangeable for another acoustic, electric or bass guitar or Guitar Amplifier sold at retail in the United States.

59.     The music products industry includes companies that manufacture, supply, distribute or sell musical instruments and products for amplifying music, including Guitars and Guitar Amplifiers, recording equipment and accessories.

60.     According to *The Music Trades*, a leading industry publication, from 2004 to 2007, retail sales of musical instruments and related products in the United States ranged from approximately $7.3 billion to $7.5 billion.  Sales of fretted musical instruments (that is, stringed instruments played with fingers or a pick), plus guitar amplifiers, generated $1.545 billion in retail sales in 2004 and almost $1.667 billion in retail sales in 2007 – roughly 20% of the total sales of musical instruments and related products in the United States.

61.     The Manufacturer Defendants dominated the relevant product market(s) during the Class Period.  The Manufacturer Defendants ranked among the largest manufacturers and distributors of Guitars and Guitar Amplifiers between 2004 and 2008.  Limited publicly-available data shows that the combined market power of the Manufacturer Defendants over the retail market(s) for new, high-end Guitars and Guitar Amplifiers was significant.

62.     As described in more detail below, Guitar Center was the dominant U.S. retailer for the Manufacturer Defendants' Guitars and Guitar Amplifiers during the period.  Between 2004 and 2008, Guitar Center had nearly 30% of the total U.S. music retail sales overall, and a much larger share within the retail markets for Guitars and Guitar Amplifiers.  (*See* ¶¶ 68-73, *infra*).  Guitar Center had a national and significant online presence during this period, and eight times as many retail stores and five times as much sales revenues as its next largest competitor, Sam Ash Corporation ("Sam Ash").  (*See id*).  In 2007, Guitar Center's estimated annual revenues of $2.1 billion exceeded the combined annual revenues of the next 100 largest specialty music retailers.  (*See* ¶ 72, *infra*).  In addition, Guitar Center was the

15

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

largest retail customer of many of its suppliers, including Fender and Gibson. (*See* ¶ 73, *infra*).[1] Guitar Center therefore was able to and did use its substantial market power to dictate MAPs to manufacturers, including the Manufacturer Defendants, and to enforce the MAPs by punishing those who failed to adhere to or honor the MAPs. *Compare Toys "R" Us v. Federal Trade Commission*, 221 F.3d 928, 930-33, 935-37 (7th Cir. 2000) (upholding FTC' determination that Toys "R" Us, which sold approximately 20% of all toys sold in the United States, and bought approximately 30% of toy companies' total output, used its substantial market power to implement, coordinate and enforce an unlawful horizontal agreement among toy manufacturers to restrict distribution of products to low-priced warehouse club stores, on the condition that other manufacturers would do the same).

63.     The retail industry for high-end Guitars and Guitar Amplifiers is characterized by significant entry barriers. To compete with existing retailers, new entrants, including warehouse retailers seeking to sell high-end Guitars and Guitar Amplifiers, effectively must make large investments in real estate, retail selling space and inventory.

64.     As one NAMM observer reported in the March 1, 2008 issue of *The Music Trades*: "To generate reasonable sales volumes, you need a lot of SKUs ["Stock Keeping Units," *i.e.,* unique items for sale]. I am not sure [Best Buy] will be able to achieve the kind of volume they're hoping for in just 2500 square feet of space." To emphasize the point, Guitar Center has publicly reported that its average large store selling space is 12,000 to 30,000 square feet and includes average inventory of approximately 7,200 core SKUs. By contrast, Best Buy devotes relatively few (2500) square feet within its retail store to musical instruments and related products, and offers consumers only approximately 1000 SKUs – or approximately one-seventh of the product inventory offered at a large Guitar Center store.

65.     The activities of Defendants, as described herein, were within the flow of, and substantially affected, interstate commerce.

---

[1]  Fender was Guitar Center's largest supplier during the Class Period, accounting for approximately 40% of Guitar Center's product inventory.

16

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

66. In the conduct of their businesses, Defendants directly or indirectly have used the means and instrumentalities of interstate commerce in furtherance of the acts and communications alleged herein. The alleged meetings and exchanges of information arranged by Defendant NAMM were initiated and effectuated by and through, among other things, the United States postal system, nationwide telecommunication networks and/or the nation's common carrier or transportation systems. Guitar Center and the Manufacturer Defendants were members of NAMM.

67. During the Class Period, these Defendants marketed, sold, distributed or shipped substantial quantities of Guitars and Guitar Amplifiers in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which these Defendants manufactured, produced, distributed, marketed or sold such products.

## SUBSTANTIVE ALLEGATIONS

**A. Guitar Center Served as the Dominant Retailer of Guitars and Guitar Amplifiers and Enjoyed Substantial Market Power in Its Dealings With Manufacturers.**

68. Specialty music retail stores are the main retail sales venue for music instruments in the United States, and Guitar Center is, by far, the dominant retail outlet for these products.

69. Over the last decade, Guitar Center has grown through acquisitions of former competitors, and achieved dominance in an ever-more-concentrated retail market. In June 1999, Guitar Center acquired Musicians Friend, Inc., an Oregon-based catalog and e-commerce instrument retailer. In April 2001, Guitar Center bought American Music Group, Ltd., a musical instrument retailer, with 12 retail stores, specializing in the sale and rental of band instruments and accessories serving the student and family market. In April 2005, Guitar Center purchased Music and Arts Center, Inc., a Maryland-based musical instruments retailer with 80 store locations. In February 2007, Guitar Center acquired out of a bankruptcy proceeding substantially all of the assets of Dennis Bamber, Inc., also known as The Woodwind & The Brasswind, a catalog and internet retailer. As a result of acquisitions and decreased competition, Guitar Center's share of the retail market for musical instruments and related products grew from 6.1% to 26.6% during the period 1997-2007.

17

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

70.     As of 2008, Guitar Center had 315 retail stores – eight times the number of retail stores of its next largest competitor, Sam Ash.  Guitar Center is also the nation's largest catalog and online retailer of musical instruments.

71.     Guitar Center consistently ranks as nation's retail sales leader in *The Music Trades* annual report, Retail Top 200.  *The Music Trades* estimated that Guitar Center's retail sales were $1.5 billion in 2004 and rose to $2.1 billion in 2007.  Based on these estimates, during the Class Period, Guitar Center had nearly 30% of the total music industry retail sales in the United States.  Guitar Center had an even greater percentage of total retail sales of high-end Guitars and Guitar Amplifiers in the United States.

72.     Guitar Center's market dominance increased over the Class Period.  Guitar Center's estimated annual revenues of $1.5 billion in 2004 were approximately equal to the combined annual revenues of the 28 next largest specialty music retailers, according to data published by *The Music Trades*.  By 2007, Guitar Center's estimated annual revenues of $2.1 billion exceeded the combined revenues of the 100 next largest specialty music retailers.  Guitar Center's 2007 estimated annual revenues were almost five times those of its next largest competitor, Sam Ash, and over eight times the revenues of American Music Supply, the third largest specialty music retailer.

73.     According to publicly-available financial reports filed in 2007, Guitar Center serves as the largest retail customer of many of its instrument manufacturers and suppliers, including Fender and Gibson.  Guitar Center had significant market power in its relationships with the manufacturers of high-end Guitars and Guitar Amplifiers during the Class Period, because the volume of its purchases and its dominance as a distribution channel enabled it to control prices and exclude competition.

74.     Guitar Center used its market power during the Class Period to affect product pricing and distribution of Guitars and Guitar Amplifiers.  Due to its market dominance, Guitar Center was able to coerce manufacturers into adopting, implementing or enhancing their MAP policies, and adjust their MAP pricing, in exchange for Guitar Center's agreement to purchase large volumes of the manufacturers' product stock.  Guitar Center also negotiated specific MAP pricing arrangements with manufacturers (forcing other retail distributors to implement and enforce the same MAP agreements)

which, due to volume discount wholesale pricing, generated additional profit margins for Guitar Center to the detriment of other retailers who could not avail themselves of similar volume wholesale pricing discounts. Manufacturers of Guitars and Guitar Amplifiers, including the Manufacturer Defendants, had little choice but to accommodate Guitar Center's demands for vertical price restraints (the MAPs), because they needed access to Guitar Center's retail customer base.

75. In testimony before the Federal Trade Commission ("FTC") at the 2002 FTC public workshop entitled "Possible Anticompetitive Efforts to Restrict Competition on the Internet," former FTC Commissioner Sheila Anthony underscored the potential threat to competition posed by a dominant retailer, such as Guitar Center, whom suppliers, like the Manufacturer Defendants, cannot do without. The concern is that a dominant retailer, such as Guitar Center, will use its significant market power to coerce key suppliers into disadvantaging competing retailers, and thereby protect and preserve its market dominance:

> Competition among distributors for a given manufacturer's favor is almost certainly healthy. But problems may arise where distributors in one channel exercise their market power to disadvantage distributors in another channel.
>
> * * *
>
> [C]an Internet distribution even gain a strong foothold in some product areas where the entrenched distribution channel, members who manufacturers cannot do without, at least until e-commerce matures, use hardball tactics to make sure the transition period never begins?

*See* FTC, Public Workshop: Possible Anticompetitive Effects to Restrict Competition on the Internet, transcript of proceedings, at 797:12-16, 799:7-12 (October 10, 2002) (remarks of Commissioner Sheila Anthony).

76. Guitar Center's dominant power in the retail market for Guitars and Guitar Amplifiers manifested itself in various ways. For example, according to former Guitar Center employees, Guitar Center "strong armed" manufacturers, including Yamaha and Fender, into not selling their products to competing stores that planned to open near Guitar Center store locations. In addition, Guitar Center

corporate personnel have acknowledged to store managers that Guitar Center dictated the MAPs for Guitars and Guitar Amplifiers to manufacturers, including Gibson.

77.     According to independent retailers, Guitar Center wields enormous power in the Guitars and Guitar Amplifiers market, enabling it to influence product offerings and pricing factors.  For instance, in an interview in the April 2007 issue of *Musical Merchandise Review*, Alan Levin of Chuck Levin's Washington Music Center stated:  "The biggest concern [for independent retailers] is Guitar Center.  They are many manufacturers' biggest customers and changes are being made . . . to suit them alone."

78.     At a discussion published in *The Music Trades* in February 2007, a retailer commented on Guitar Center's power, stating, "As big as GC is, what's a little manufacturer to do?  Not surprisingly, they do what GC demands."  Another retailer similarly stated, "With GC's deep pockets, I suspect that they're getting special deals . . . ."  Similarly, another member of NAMM was quoted in the March 1, 2008 issue of *The Music Trades* as saying, "Guitar Center has too much leverage [with suppliers]. . . ."

79.     Guitar Center also exercised its market power, as a matter of common practice, by obtaining exclusive rights to sell new "limited edition" guitars from the Manufacturer Defendants.  For example, Gibson offered Guitar Center the exclusive right to sell its limited edition Billy Gibbons "Pearly Gates" electric guitar (a replica of a rare 1959 Gibson Les Paul Standard electric guitar) named after a guitarist from ZZ Top.

**B.      The Manufacturer Defendants Enjoyed Market Power In Their Dealings With Guitar Center and Other Retailers.**

80.     The Manufacturer Defendants rank among the largest manufacturers and distributors of musical products.  Fretted instruments are among one of the largest segments of the music products industry.  Throughout the Class Period, sales of fretted instruments in the United States constituted approximately 16% to 17% of total domestic music product sales.  Guitars are by far the largest component of the fretted instruments category.

81. The manufacturing industry for high-end Guitars and Guitar Amplifiers is characterized by significant barriers to entry. For example, new production facilities, such as the plant that Fender opened in 1998, can cost as much as $20 million.

82. High-end Guitars and Guitar Amplifiers constitute the relevant product market(s) in the litigation. The Manufacturer Defendants dominate the relevant product market(s).

83. During the Class Period, the Manufacturer Defendants and their affiliates collectively had significant market power in their relationships with retailers other than Guitar Center, because the volume of their sales and their dominance in the relevant product market(s) enabled them to coerce these retailers to adhere to MAPs, on threat of termination of authorized dealer agreements and/or refusal to sell certain products to the retailer.

84. Most of the famous rock guitarists play the Manufacturer Defendants' guitars, giving these companies dominant stature in the relevant product market(s) and serving as an additional barrier to entry by potential new competitors. For example, musicians Keith Richards of The Rolling Stones, Frank Black of The Pixies, Chrissie Hynde of The Pretenders, Tom Petty, Sheryl Crow and Merle Haggard all play a Fender Stratocaster guitar (among other guitars). Peter Frampton and Aerosmith's Joe Perry play a Gibson Les Paul guitar (among others). Billie Joe Armstrong of Green Day plays a Gibson Flying V guitar. The Edge of U2 plays a variety of acoustic and electric guitars made by Gibson (*e.g.*, the SJ-200 Standard Acoustic-Electric guitar, the Epiphone Sheraton II electric guitar and the ES-175 and ES-335 Reissue electric guitars), Fender (including a Fender Stratocaster) and others. Corey Taylor of Slipknot and Stone Sour plays an Ibanez Artcore hollow body guitar. Carlos Santana and James Taylor play a Yamaha electric guitar (among others). Joe Walsh of The Eagles, Doug Aldrich of Whitesnake, Bruce Springsteen and Kenny Chesney all play a Kaman (Takamine) acoustic guitar (and other instruments). Many of these musicians also use or have used guitar amplifiers made by Fender and other Manufacturer Defendants.

**C.** **Guitar Center and the Manufacturing Defendants Entered Into a Contract, Combination or Conspiracy to Fix Prices for Guitars and Guitar Amplifiers Through Implementation and Enforcement of MAPs.**

85.     Beginning in the early 2000s, Guitar Center and the Manufacturing Defendants, with the support and assistance of NAMM and the NAMM leadership, entered into a trade-restraining arrangement, conspiracy or concerted action to stabilize or fix the retail prices of Guitars and Guitar Amplifiers. The conspiracy was effectuated through the collaborative adoption and implementation of MAPs for the Manufacturing Defendants' Guitars and Guitar Amplifiers. The purpose of the alleged conspiracy, combination or concerted action was to craft, implement and strictly enforce the MAPs to: (a) eliminate price competition and discounting of Guitars and Guitar Amplifiers on a market-wide basis; (b) stabilize or increase retail prices for these products (which had been steadily falling for years); and (c) improve wholesale and retail profit margins for the Manufacturing Defendants, Guitar Center and other traditional musical instrument retailers.

**(i)     Before the Class Period, Efforts to Fix Retail Prices Had Limited Success**

86.     In the late 1990's, prior to the Class Period, manufacturers and specialty brick-and-mortar retailers in the retail musical instrument industry began to enter into and/or agree to MAPs in an effort to maintain or generate additional wholesale or retail profit margins.

87.     According to the FTC Complaint, in or around 1999, numerous leading manufacturers had adopted MAPs. These MAPs were vertical contracts between individual music instrument manufacturers and retailers. The MAPs contained several loopholes, however. The pricing restrictions did not apply to all products or to all forms of advertising. Certain manufacturers enforced MAPs in the late 1990's and early 2000's by sanctioning or terminating retailers that sold below the MAPP approved retail price. The MAPs were not, however, consistently enforced, and price discounting and retail price competition continued.

**(ii)    New Internet and "Big-Box" Retailers Threatened to Lower Retail Prices of Guitars and Guitar Amplifiers.**

88.     Starting in the early 2000's however, the retail music industry was threatened by new, internet-based retailers and the entry of "big box" retailers, such as WalMart, Costco and Best Buy, into

the music instrument business. These new and emerging retail players, due to their wholesale purchasing power, economy of scale, and comparatively low overhead, were able to sell musical instruments, including Guitars and Guitar Amplifiers, at lower prices than Guitar Center and other traditional musical instrument retailers could offer.

89. On August 1, 2001, *The Music Trades* published a report on how music product manufacturers and retailers had begun to respond to these new competitive forces, by using MAPs to protect or increase revenues. The report stated:

> Last year [2000] when we polled leading m.i. dealers about the value of minimum advertised price (MAP) policies, only 31% said they had a positive effect on gross margins. 60% said that MAP had no effect at all on selling prices, while 9% said the programs actually decreased margins. When asked the same questions this year [2001], retailers expressed a major change of heart. 51% said that MAP policies had improved their gross margins during the past 12 months, and only 44% deemed the policies ineffectual.

90. *The Music Trades* concluded that this 20-point shift in opinion, over the one-year period from 2000 to 2001, was due to the fact that "the biggest benefit of MAP policies has been to rid the internet of loss-leader pricing." The report continues:

> As a result [of the MAP policies], these days when you type the name of a popular product into a search engine, you'll get a screen full of results offering the same MAP regulated price. As our poll indicates, brick-and-mortar retailers obviously appreciate the fact that they don't have to deal with a legion of customers coming into the store brandishing a computer printout and demanding, "Why can't you beat this price?"

91. In January 2001, NAMM held a semi-annual trade-only show. At that time, manufacturers and retailers had begun to tout their efforts to adopt and implement MAPs with increasingly strict advertisement provisions, in an effort to protect traditional distribution channels and retail profitability. *The Music Trades* reported on the trade show as follows:

> For the first time in memory, manufacturers seemed to be doing more than paying lip service to retail profit concerns, as evidenced by the flurry of new and more restrictive Minimum Advertised Price (MAP) policies that were rolled out at NAMM. ... The trend is towards more expansive MAP policies that prohibit phone or email price quotes below MAP price, all in a bid to give brick and mortar stores an incentive to lay in inventory.

92. A year later, at the January 2002 NAMM show, the trade press reported that an increasing number of manufacturers and retailers had entered into minimum advertised pricing arrangements as a means to control retail competition and shore up profit margins. *The Music Trades*

reported on the trade show and stated, "Manufacturers have acknowledged the retail concern with profitability by instituting minimum advertised price, or MAP policies. In fact, mention of MAP pricing was routinely included in just about every new product presentation."

<blockquote>

**(iii)  Defendants Changed Their Practices and Began to Collectively Implement or Enforce MAPs With Similar Terms at Similar Times.**

</blockquote>

93.     Facing aggressive competition from these new market entrants, beginning in or about 2004, Guitar Center used its dominant market power, including its influence with NAMM and the NAMM leadership, to conspire with and coerce the Manufacturing Defendants into agreeing to collectively adopt, implement and enforce MAPs for their products. These MAPs were designed to restrict the minimum price points at which the Manufacturer Defendants' Guitars and Guitar Amplifiers may be advertised for sale to the public.

94.     Guitar Center was at the hub of the conspiracy. Guitar Center was the dominant retailer for Guitars and Guitar Amplifiers and was in a position to monitor retail pricing in the marketplace. As the dominant specialty music retailer, Guitar Center was able to and did use its dominant position in the market to enforce the price-fixing conspiracy by threatening manufacturers that were lax in their own enforcement of the MAPs. Specifically, Guitar Center would threaten to drop the Manufacturer Defendants' products from distribution in Guitar Center's retail outlets if they did not agree to rigorously enforce their restrictive advertising provisions.

95.     Because the Manufacturer Defendants believed that they could not afford to lose access to Guitar Center's stores, and foreseeing the impact decreasing retail sales could have on their wholesale profit margins, the Manufacturer Defendants responded to Guitar Center's pressure and coercion. Although each Manufacturer Defendant had distributed its Guitars and Guitar Amplifiers to retail dealers without MAPs for years (indeed, for decades),[2] the Manufacturer Defendants collectively changed their business practices, and began to implement, modify or strengthen their pricing policies to require dealer adherence to MAPs and MAP pricing.

96.     ████████████████████████████████████████████████████

---

[2]  *See, e.g.,* ¶¶ 38-42, supra.

24

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

97.    On information and belief, based on the independent investigation of Plaintiffs' counsel and limited discovery produced to date, Yamaha, Gibson, Kaman and Kamam/Ibanez also implemented, modified or expanded their MAPs beginning in or about 2004 and continuing through approximately 2007, so that the MAPs of each Manufacturing Defendant contained substantially similar terms and advertising restrictions.

98.    During the Class Period, the Manufacturer Defendants announced their revised, modified and/or expanded MAPs in retailer communications, in the trade press or in product presentations made in conjunction with NAMM's semi-annual trade shows.  On information and belief, the Manufacturer Defendants' new or revised MAPs included aggressive enforcement provisions to ensure market-wide compliance and easy detection of violators.

99.    The MAPs between the Manufacturer Defendants, on the one hand, and Guitar Center and other retailers, on the other, were vertical restraints on trade because they prevented music retailers

from freely advertising retail prices for Guitar and Guitar Amplifiers below specified amounts, or communicating to potential customers their willingness to discount or sell these products below the established MAP price.

100.   The combined actions and concerted efforts of the Manufacturer Defendants, during the Class Period, to implement, revise and/or strictly enforce MAPs containing substantially similar terms and restrictions also amounted to a horizontal restraint on trade – one that was effectuated through a vertical restraint on trade, the MAPs themselves.  As alleged herein, the MAPs were not independent contracts implemented unilaterally by the Manufacturer Defendants.  Nor were they designed to increase inter-brand competition.  On the contrary, the Manufacturer Defendants knew or were aware of the impact that retail price discounting by internet or "big box" retailers had on each other's margins, and on traditional, brick-and-mortar retail profits.

101.   Additionally, the Manufacturer Defendants knew or were aware of each other's efforts, during the Class Period, concerning the MAPs and their enforcement.  Based on the independent investigation of counsel and limited discovery, corporate leaders and high-level management from each Manufacturer Defendant regularly attended or participated in NAMM's semi-annual, non-public trade shows.  By virtue of their attendance and participation in NAMM, the Manufacturer Defendants knew or were aware of each other's efforts, during the Class Period, concerning MAPs and their enforcement.  At these shows, Guitar Center and the Manufacturer Defendants shared and discussed cost and MAP pricing of other Manufacturer Defendants' Guitars and Guitar Amplifiers.

102.   The Manufacturer Defendants similarly knew or were aware that each Manufacturing Defendant was pressured by Guitar Center to implement, revise, and/or expand the provisions of its MAP to ensure continued access to Guitar Center's retail network.  Based on the independent investigation of counsel and limited discovery, Guitar Center served as the primary product outlet for the Manufacturer Defendants' Guitars and Guitar Amplifiers during the Class Period.

103.   On information and belief, based on the independent investigation of counsel and limited discovery, during the Class Period, each Manufacturing Defendant implemented, revised, or enhanced its MAP policy, relatively close in time with, and in a substantially similar way as, the other

Manufacturer Defendants. The Manufacturer Defendants' MAPs, therefore, were substantially similar across the industry. They were not distinct contracts independently implemented by manufacturers to increase inter-brand competition. Thus, Plaintiffs allege, the conspiracy took the form of a horizontal arrangement, collaboration or coordinated effort among Manufacturer Defendants that was effectuated by a vertical restraint on trade (the MAPs), which was collectively implemented and enforced by Guitar Center and the Manufacturer Defendants.

104. Coordination and collective action by the Manufacturer Defendants during the Class Period also was economically the more attractive alternative. With increased discounting and competition from internet retailers and "big box" stores, the Manufacturer Defendants would not have been able to impact retail prices for their Guitars and Guitar Amplifiers, market-wide, had only some of the Manufacturer Defendants implemented MAPs, or enacted or enforced MAPs with dissimilar terms, restrictions, or prohibitions. Collective implementation, revision and enforcement of MAPs with similar terms, advertising restrictions and enforcement provisions was more attractive, Plaintiffs contend, because it enabled the Manufacturer Defendants to stabilize or raise the retail prices for Guitars and Guitar Amplifiers market-wide – by way of uniform price advertising – without those price increases appearing discordant to consumers.

105. The conspiracy benefited the Manufacturer Defendants, because it permitted them to stabilize and increase wholesale prices. In addition, maintaining higher retail prices assisted the individual Manufacturer Defendants in preserving their brand images.

106. The conspiracy also benefited Guitar Center. As the largest traditional bricks and mortar specialty music retailer in the marketplace, Guitar Center's market dominance was threatened by the emerging competition from internet-based retailers and other low-cost retailers. Maintaining stability in the industry permitted Guitar Center to continue enjoying its advantages over small independent retailers (name recognition, volume discounts from wholesalers, etc.), stave off competition from new market entrants with lower overhead costs, increase Guitar Center's profits, and remain the dominant specialty music retailer. Moreover, the conspiracy enabled Guitar Center to use its market power to continue to procure and enter into preferential contracts with manufacturers. Guitar Center

continued to seek and obtain quantity discounts, free goods, and discontinued goods and closeouts, preferential pricing from manufacturers, and other preferences relating to transportation, shipping, and warehousing.

107. Defendants' actions and the resulting restraint on trade were unreasonable and for an anticompetitive purpose. As alleged herein, Guitar Center and the Manufacturer Defendants agreed, collaborated or coordinated their efforts to implement, revise and/or enforce MAPs to forestall innovation in distribution by "big box" stores and internet retailers that decreased costs and thus lowered retail prices that the new retailers could profitably charge for Guitars and Guitar Amplifiers, versus Guitar Center and other traditional, brick-and-mortar retailers. The MAPs accomplished that purpose. By controlling the minimum advertised price at which the Manufacturer Defendants' Guitars and Guitar Amplifiers could freely advertise to consumers in any medium, including internet communications, displays and in-store signage, and by prohibiting retailers from engaging in discount promotions or advertising, the predetermined MAP price for the Manufacturer Defendants' Guitars and Guitar Amplifiers became, within a few short years, the "street" or actual retail price in the United States for the Defendants' products market-wide.

108. Defendants' actions also resulted in price-fixing effects. During the Class Period, price discounting in the marketplace was reduced. At the same time, retail prices for Guitars and Guitar Amplifiers, which had been steadily falling for several years prior to the Class Period, leveled off and began to rise.

**D. NAMM Was an Active Participant in and Facilitated the Conspiracy.**

109. NAMM, the predominant trade association for the music products industry, also played a central role in the alleged conspiracy. NAMM is comprised of more than 9,000 members, including most U.S. manufacturers, distributors and dealers of musical instruments and related products.

110. During the Class Period, NAMM actively promoted the conspiracy and the use of MAPs as a means of reducing retail price competition, protecting NAMM manufacturer-member's margins, and increasing retail prices for Guitars and Guitar Amplifiers for NAMM's retail members. NAMM participated in and facilitated the conspiracy with programs at its non-public semi-annual trade

28

IN RE: MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

shows. NAMM also sponsored meetings and invitation-only events at which retailers and manufacturers, including Guitar Center and the Manufacturing Defendants, exchanged cost and pricing information and discussed strategies for implementing, revising and enforcing the MAPs.

111. NAMM sponsors two major trade shows each year, providing an opportunity for competitors to meet, to exchange information, and to collude regarding the setting of prices in an effort to increase profits for manufacturers and retailers to the detriment of consumers. These trade shows are not open to the general public and, in fact, are touted by NAMM as indispensable, "trade only" events where company presidents and key corporate decision makers meet with their competitors and counterparts to discuss issues of concern to the industry. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ One NAMM member described the importance of the NAMM trade shows to badge-holding members of the music products industry in an interview published in the *Musical Merchandise Review* in February 2007 thusly:

> Many years ago, the importance of attending a NAMM show may not have seemed important, today it is absolutely necessary. Owners and key personnel should be at NAMM . . . the education seminars are priceless. The interaction with the industry people and colleagues is priceless.

112. Key decision-makers from each Defendant regularly attended the NAMM trade shows. These decision-makers included Manufacturer Defendant representatives that had responsibility for adopting MAP policies and prices for Guitars and Guitar Amplifiers. Many of these individuals had participated in NAMM trade shows for many years and have held positions with multiple Defendants, increasing the opportunity for, and likelihood of, the sharing of sensitive information. For example, Jay Wanamaker was a Vice-President of Yamaha until 2000, at which time he became a Vice-President of Guitar Center. Similarly, Michael Doyle worked for Fender before becoming the Director of Purchasing for Guitars and Amplification at Guitar Center, and Keith Brawley was employed by Fender before becoming a Vice-President at Guitar Center.

113.    NAMM has held these trade-only shows for over 100 years.  During the Class Period, NAMM held the following semi-annual shows, providing an opportunity for presidents and key decision makers of Guitar Center and Manufacturing Defendants to meet with one another, and others, to exchange information and to collude, collaborate or coordinate their actions with respect to the implementation and enforcement of MAPs as a means of stabilizing or fixing retail prices and increasing wholesale and retail profits:

### Table 3:  NAMM Semi-Annual Shows

| Show | Dates | Location |
|------|-------|----------|
| 2004 NAMM Winter Show | January 16-18, 2004 | Anaheim, California |
| 2004 NAMM Summer Show | July 23-25, 2004 | Nashville, Tennessee |
| 2005 NAMM Winter Show | January 20-23, 2005 | Anaheim, California |
| 2005 NAMM Summer Show | July 22-24, 2005 | Indianapolis, Indiana |
| 2006 NAMM Winter Show | January 19-22, 2006 | Anaheim, California |
| 2006 NAMM Summer Show | July 14-16, 2006 | Austin, Texas |
| 2007 NAMM Winter Show | January 18-21, 2007 | Anaheim, California |
| 2007 NAMM Summer Show | July 27-29, 2007 | Austin, Texas |
| 2008 NAMM Winter Show | January 17-20, 2008 | Anaheim, California |
| 2008 NAMM Summer Show | July 20-22, 2008 | Nashville, Tennessee |

114.    NAMM was in favor of Guitar Center's and the Manufacturer Defendants' collective efforts with respect to the MAPs.  During the Class Period, NAMM actively promoted the conspiracy and the use of the MAPs as a means of reducing retail price competition, protecting NAMM manufacturer-member's margins, and increasing retail prices for Guitars and Guitar Amplifiers for NAMM's retail members. ███████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

███  ████████████████████████████████████████

██████████████████████████████████████████████

which were trade-only shows and not open to the public, thereby providing an opportunity and venue for Guitar Center and the Manufacturer Defendants, its most influential members, to meet to discuss the MAPs, to adopt and revise them, and to share new methods for enhancing and enforcing the MAPs against recalcitrant dealers and price discounters.

116. The Manufacturing Defendants announced their adopted or revised MAPs in retailer communications or in product presentations made in conjunction with the NAMM show. As the Music Trades wrote when reporting on the 2004 NAMM Summer Show: "A number of exhibitors also announced higher MAP prices in a bid to shore up dealer margins."

117. NAMM openly supported collaboration between and among its retail and manufacturer members to implement and enforce standardized MAPs for their musical instrument products.

118. At the 2005 NAMM Summer Show, for example, NAMM hosted a discussion entitled "Does the Industry Need a MAP makeover?" According to a November 2005 article published in *The Music Trades*, at this session, Music for Everyone, an association of thirteen Greater Los Angeles musical instrument retailers, presented a "voluntary MAP formula/guideline" which was urged and "recommended for general use" by Music Product retailers.

119. At the 2006 NAMM Winter Show, NAMM again hosted a panel discussion on MAPs. The panel included several industry leaders, including Tom Sumner, vice-president and general manager of Yamaha's Pro-Audio and Combo Division; Bob LeClaire, sales manager of Avedis Zildjian; and Robert Lee, sales manager at Kaman; and several retailers. Yamaha and Sumner used this discussion to publicize Yamaha's efforts to enforce its MAPs against recalcitrant retailers who used creative means to try to get around Yamaha's MAPs pricing and strict advertising prohibitions. NAMM also used the panel to further support the use of MAPs to stabilize or fix retail prices for musical instruments on a market-wide basis. As reported in the March 1, 2006 edition of *The Music Trades*, the panelists were "unanimous, offering a guardedly positive assessment of MAP policies." Only one independent internet retailer, Bryan Junk of massmusic.net, spoke in favor of price competition for the benefit of consumers, stating: "We're supposed to compete, aren't we?" *The Music Trades* captured some of the dialogue in its March 1, 2006 publication:

Whether or not you agree with him, Bryan Junk, an internet retailer, deserves credit for staring down an auditorium packed with independent retailers and stating that MAP should be scrapped. To audible boos, he declared, "*Consumers like low prices, and we try to give them what they want. Why shouldn't we be able to grow our business by offering the lowest possible prices without interference from the manufacturers?*" [Emphasis added.]

120. Mr. Junk did not sway his fellow panelists, however. As reported in *The Music Trades*, the panel members, including Yamaha's Tom Sumner and Kaman's Robert Lee, persisted in their views that: (i) absent MAPs "prices would rapidly migrate down to 10% over cost . . ."; (ii) MAPs are "only as effective as [their] enforcement"; and (iii) current MAP pricing guidelines should be revised "upwards to give retailers a better profit margin."

121. At a separate session hosted by NAMM at the 2006 NAMM Winter Show, an association of retailers known as Music for Everyone published and presented with NAMM's participation and consent two MAP pricing formula schedules based on retail costs, which were proposed and "designed for all instruments and all combo and audio products":

Proposed MAP Formula
Recommended Minimum Profit Formulas for A & B Discounts

Retail [$1-$149] x.05 x.2.00 = MAP (0% off retail)*
Retail [$150-$249] x 0.5 x. 1.90 = MAP (5% off retail)*
Retail [$240-$299] x 0.5 x 1.85 = MAP (7.5% off retail)*
Retail [$300-$349] x 0.5 x 1.80 = MAP (10% off retail)**
Retail [$350-$399] x 0.5 x 1.75 = MAP (12.5% off retail)**
Retail [$400-$449] x. 0.5 x. 1.70 = MAP (15% off retail)*
Retail [$450-$499] x 0.5 x 1.65 = MAP (17.5% off retail)*
Retail [$500 and up] x 0.5 x. 1.60 = MAP (20% off retail)*
Retail [$500-$599] x 0.5 x. 1.55 = MAP (22.5% off retail)**

*   Formula A
** Formula B

122. In its presentation, and with NAMM's support, Music for Everyone encouraged manufacturers to adopt market-wide the MAP pricing reflected in the Formula A schedule, capping permitted discounts at 20 percent. Music For Everyone urged that no MAP price should be lower than that reflected in the Formula B schedule, stating "the formula B profits are the minimum the brick-and-mortar full service music instrument retailers require to survive, and hopefully thrive."

123. At the 2006 NAMM Summer Show, NAMM again sponsored a roundtable discussion on MAPs, profitability and competition. This session featured NAMM President and CEO Joe Lamond,

Tom Sumner of Yamaha Electronics Corporation, and Fender Chairman and CEO, Bill Mendelo, among others. NAMM described this discussion in its preview materials as follows: "In the two-hour session suppliers and retailers of all sizes will be able to share views about critical issues affecting profitability, including MAP pricing . . . and the entrance of mass consumer merchandisers into the industry." Among the topics discussed at this session were MAP prices that were set too low, and methods or proposals by which manufacturers and retailers can protect industry profit margins.

124. NAMM continued to promote the use of MAPs and MAP pricing at the 2007 Winter Show. At that show, at least one NAMM roundtable discussion focused on, among other things, profit margins and MAP pricing. *See, e.g., The Music Trades* (Jan. 1, 2007), "Why Going to NAMM is a total no-brainer: new products, smart people, and tons of educational seminars add up to the single biggest business opportunity of the year. If you're serious, there's only one thing to do: Show Up!"; NAMM 2007 PREVIEW; Calendar.

125. ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████ As part of a roundtable discussion of dealers conducted by the *Music Trades* in February 2007, for example, George Hines, a member of NAMM's Board of Directors from 2003-2005, stated that the industry's "great challenge" was to get "all distribution channels [independents, national chains, mass merchants and internet providers] working together for the health of the industry." Hines expressed his view that MAPs could keep the industry profitable as long as retailers and suppliers understood each other's needs in setting the best MAP pricing. He stated that allowing market forces to control the industry would "not necessarily be for the better" and that what was needed was a "joint effort" to keep independents as the "heart and soul" of the industry with "manufacturer support."

126. Also during the February 2007 *Music Trades* roundtable, Frank Hayhurst of Zone Music in Cotati, California stated that manufacturers would follow the lead of Guitar Center. He urged retailers to join together with those "whom they used to consider their 'competitors' and create strategic alliances for their mutual benefit." Regarding the use of MAPs specifically, Hayhurst said:

Some very clever work was done suggesting a sliding scale of much higher MAPs on lower price point products, higher MAPs on medium price point products, and slightly higher MAPs on higher cost products. The common theme is that MAPs need to go up, but everyone is afraid to do that because some other manufacturer might not. The solution? Independents need to band together and favor manufacturers that provide a MAP system that allows for independents to stay in business.

127.    Also during the Class Period, NAMM sponsored a series of non-public and "invitation only" summits to facilitate discussions at which Guitar Center, the Manufacturer Defendants and other retailer and manufacturer members of NAMM exchanged cost and pricing information, and discussed strategies for implementing, revising and enforcing MAPs.

128.    These sessions included NAMM's Fifth Global Economic Summit, held in Carlsbad, California in 2004.  This was an invitation-only meeting that brought key industry leaders, media and advisors together "to explore emerging markets, reinforce global relationships and share different visions on the path to long-term, sustainable industry growth."  Fender, Yamaha and Kaman all provided financial support for the Summit and, on information and belief, representatives from Guitar Center and certain of the Manufacturer Defendants attended the Summit.

129.    NAMM held its Sixth Global Summit in 2007 in Carlsbad, California.  According to one press account published in the October 27, 2007 issue of *The Music and Sound Retailer*, NAMM Global Summit attendees "primarily consisted of supplier decision makers as well as retailers."  Fender, Yamaha and Kaman again provided financial support for the Summit.  Guitar Center's Chief Executive Officer, Marty Albertson, addressed the assembly at the Summit.  On information and belief, certain of the Manufacturer Defendants participated in the Summit.

130.    NAMM was motivated to further the conspiracy, and to encourage the Manufacturer Defendants, Guitar Center and others to share cost and pricing information, and discuss strategies for adopting, implementing and enforcing MAPs and restricting retail price competition, as alleged herein. Guitar Center and the Manufacturer Defendants, due to their collective market dominance, were among NAMM's most influential members.  The conspiracy benefited these more influential members, by protecting Guitar Center, especially, and other specialty music retailers, indirectly, from price competition from internet-based and other low-cost retailers, and by maintaining higher retail prices and profit margins for Guitars and Guitar Amplifiers for NAMM's most influential constituents.

34

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

131.    The conspiracy also benefited the smaller independent specialty music retailers who held NAMM memberships, because it protected them from competition from internet-based retailers and other low-cost retailers of Guitars and Guitar Amplifiers.  Maintaining stability in the industry permitted the independent specialty music retailers to continue competing with Guitar Center, internet-based retailers, and low-cost retailers on service and convenience, but eliminated retail price competition.

E.    **The FTC Took Action Against NAMM. Contending That It's Actions Were Anticompetitive And Served No Legitimate Business Purpose**

132.    On March 7, 2007, the FTC initiated a non-public investigation into price fixing in the music products industry.  The FTC subsequently issued subpoenas to Guitar Center, Fender, Gibson, Yamaha, Ibanez, and others regarding price fixing, MAPs, and the sharing of confidential cost, pricing and other business information at NAMM events.

133.    Following a two year investigation, on March 4, 2009, the FTC publicly issued a proposed cease and desist order to NAMM and at the same time announced that it had tentatively settled FTC charges that NAMM had "permitted and encouraged" acts constituting violations of Section 5 of the FTC Act, 15 U.S.C. §45 and had engaged in acts and practices that "constitute unfair methods of competition in or affecting commerce," also in violation of 15 U.S.C. § 45.  The FTC's press release stated that the proposed consent order was "designed to remedy NAMM's anticompetitive conduct."

134.    The FTC's Complaint alleged that between 2005 and 2007, NAMM organized various meetings and programs for its members, such as Defendants herein, at which competing retailers of Guitars and Guitar Amplifiers and others "were permitted and encouraged to discuss strategies for implementing MAPs, the restriction of retail price competition, and the need for higher retail prices." The FTC asserted that NAMM was the lynchpin of this anticompetitive activity, stating "Representatives of NAMM determined the scope of information exchange and discussion by selecting moderators and setting the agenda for these programs."  The FTC complaint further alleged that "[a]t these NAMM sponsored events, competitors discussed the adoption, implementation, and enforcement of minimum advertised price policies; the details and workings of such policies, appropriate and optimal

retail prices and margins; and other competitively sensitive issues." The Commission voted to approve the complaint and proposed consent order by a 4-0 vote.

135. Following a 30 day period for comment, the FTC issued its Decision and Order on April 10, 2009. The FTC states in its "Analysis of Agreement" that NAMM settled charges that it violated Section 5 "by arranging and encouraging the exchange among its members of competitively sensitive information that had the purpose, tendency, and capacity to facilitate price coordination and collusion among competitors." Although the FTC's Decision and Order is directed to NAMM, the FTC's conclusion that an order was required to stop NAMM from arranging and encouraging collusive behavior presupposes the existence of the collusive behavior between and among NAMM's members, including Guitar Center and the other Defendants.

136. In assessing NAMM's conduct, the FTC was cognizant of the fact that trade associations may "serve numerous valuable and pro-competitive functions, such as expanding the market in which its members sell; educating association members, the public and government officials; conducting market research; establishing inter-operability standards; and otherwise helping firms to function more efficiently." Nonetheless, the FTC also noted:

> At the same time, it is imperative that trade association meetings not serve as a forum for rivals to disseminate or exchange competitively-sensitive information, particularly where such information is highly detailed, disaggregated, and forward-looking. The risk is two-fold. First, a discussion of prices, output, or strategy may mutate into a conspiracy to restrict competition. Second, and even in the absence of an explicit agreement on future conduct, an information exchange may facilitate coordination among rivals that harms competition.

In light of these considerations, the FTC alleged that, "NAMM's activities crossed the line that distinguishes legitimate trade association activity from unfair methods of competition."

137. In its Analysis of Agreement, the FTC offered the following reasoning for its finding that NAMM's conduct during the Class Period lacked a legitimate business purpose:

> A Respondent violates Section 1 of the Sherman Act and Section 5 of the FTC Act when it engages in concerted conduct that had the principal tendency or the likely effect of harming competition and consumers. *California Dental Ass'n v. Federal Trade Commission*, 526 U.S. 756 (1999) (footnote omitted). The conduct of a trade association or its authorized agents is generally treated as concerted action. *E.g., California Dental*

*Ass'n v. Federal Trade Commission*, 526 U.S. 756 (1999); *North Texas Specialty Physicians v. FTC*, 528 F.3d 346, 356 (5th Cir. 2008) ("When an organization is controlled by a group of competitors, it is considered to be a conspiracy of its members.").

The Complaint alleges that at meetings and programs sponsored by NAMM, competing retailers of musical instruments and other NAMM members discussed strategies for raising retail prices. Firms also exchanged information on competitively-sensitive subjects – prices, margins, minimum advertised price policies and their enforcement. And not only did NAMM sponsor these meetings, but its representatives set the agenda and helped steer the discussions. The antitrust concern is that this joint conduct can facilitate the implementation of collusive strategies going forward (footnote omitted). For example, such discussions could lead competing NAMM members to refuse to deal with a manufacturer, distributor, or retailer unless minimum advertised price policies, or increases in minimum advertised prices, were observed and enforced against discounters (footnote omitted). Alternatively, NAMM members could lessen price competition in local retail markets. Any or all of these strategies may result in higher prices and harm consumers of musical instruments. Any savings from lower manufacturing costs would be reserved to NAMM members, and not shared with consumers in the form of lower retail prices.

The potential for competitive harm from industry-wide discussions must be weighed against the prospect of legitimate efficiency benefits. Here, the Complaint alleges that no significant pro-competitive benefit was derived from the challenged conduct. The Commission does not contend the exchange of information among competitors is categorically without benefit (footnote omitted). Rather, the allegation is that here – taking into account the type of information involved, the level of detail, the absence of procedural safeguards, and the overall market conditions – the exchange of information engineered by NAMM lacked a pro-competitive justification.

138.    As part of the settlement and consent order, the FTC ordered NAMM to cease and desist from:

1.    Urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers or Musical Product Dealers relating to:

a.    the retail price of any Musical Product; or

b.    any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including but not limited to Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies.

2.    Entering into, adhering to, enforcing, urging, encouraging, advocating, suggesting, assisting or otherwise facilitating any Musical Product Manufacturer

or Musical Product Dealer to enter into, adhere to or enforce any combination, conspiracy, agreement or understanding between or among any Musical Product Manufacturers or Musical Product Dealers relating to:

a.   the retail price of any Musical Product;

b.   any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies; or

c.   the refusal to do business, or the reduction of business, with particular Musical Product Manufacturers or Musical Product Dealers.

139.   The Commission approved the NAMM consent order by a 4-0 vote.

140.   The FTC's consent order requires NAMM to file periodic compliance reports.  In those reports, NAMM represented to the FTC that it has provided antitrust training to its Board of Directors, has revised its Antitrust Policy, and has had antitrust counsel attend NAMM events.   NAMM represented that it provided each speaker at a recent NAMM show with a copy of its Antitrust Policy and required the speakers to provide NAMM with advance notice if the speaker intended to present any remarks or written materials regarding price terms, margins, profits, minimum advertised price policies, or resale price maintenance policies.   NAMM also represented to the FTC that it distributed copies of its Antitrust Policies to its members and provided approximately 1,000 attendees with an overview of the antitrust laws and guidance on how to comply with those laws.

141.   Before future meetings, NAMM will read a statement to attendees that states, in pertinent part:  "Any meeting such as this, where direct competitors such as manufacturers and retailers come together, has the potential to create antitrust problems. . . . NAMM must not facilitate, encourage, or allow participants at its events to engage in any conduct which restricts competition on price or output. . . . Remember, all NAMM members must make pricing decisions independently of any agreement or understanding with competitors."

142. These substantial changes in NAMM's policies, practices and procedures strongly suggest that during the Class Period, NAMM had likely violated the antitrust laws by facilitating the price-fixing conspiracy among Defendants.

143. Even after the FTC's investigation, its cease and desist order, and the revisions to NAMM's antitrust policies, practices, and procedures, not all NAMM members appreciate the seriousness of price-fixing. After hearing the NAMM antitrust statement at the start of a recent trade association meeting, one NAMM member was reported to offer this wry comment: "MAP is legal; you just can't talk about it."

144. The FTC continued its investigation following the entry of the NAMM consent order on April 10, 2009. Several months later, on August 24, 2009, the FTC closed the investigation. The FTC's letters to the other subjects of the investigation stated, "This action [the closure] is not to be construed as a determination that a violation may not have occurred. . . . The Commission reserves the right to take such action as the public interest may require."

**F.    Defendants Unreasonably Restrained Trade, Prevented Competition, and Imposed Supra-Competitive Prices on Consumers**

145. As alleged herein, Defendants conspired, collaborated and/or agreed to and did adopt, impose or enforce MAPs throughout the Class Period. The MAPs imposed and enforced by Defendants went well beyond typical cooperative advertising programs where manufacturers place restraints on the prices dealers may advertise in advertisements funded in whole or in part by the manufacturer. Instead, with NAMM's knowledge, cooperation and assistance, Defendants and other unnamed co-conspirators devised a plan to exact agreements from manufacturers that sold through Guitar Center and other NAMM retailers to require, on penalty of termination and as a condition of doing business, that the manufacturer ensure that its other retailers maintain the MAPs and/or refrain from discounting.

146. The MAPs imposed on music retailers by Defendants are anticompetitive. According to a *Wall Street Journal* report dated October 23, 2008, Bradley Reed, sales manager for Musician's Advocate, Inc., said that his company "had very little choice but to honor manufacturers' policies on

39

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

advertised prices because otherwise it risks having its supplies cut off or being delisted as an authorized distributor."

147. As detailed above, NAMM arranged meetings and discussions, assisted and encouraged its members to exchange competitively sensitive information, and sought and obtained the agreement of its members, to impose and enforce these MAPs, which had no legitimate pro-competitive purpose.

148. The Manufacturer Defendants did not simply enter into a series of unilateral vertical restraints on trade; require retailers to maintain minimum retail prices to protect brand image; require retailers to provide levels of advertising or service and, in return, assure retailers that they would not be undercut by other retailers in intra-brand completion; announce or enforce policies of sanctioning or terminating retailers that failed to maintain the MAPP price; and sanction or terminate retailers that failed to maintain the MAPP price. Rather, Defendants and their co-conspirators entered into a contract, combination or conspiracy that was, in form and effect, a horizontal restraint on trade. The Manufacturer Defendants did not act unilaterally or merely in their own individual economic interest when they entered into and strictly imposed MAPs on retailers. Instead, they colluded to avoid free competition and to deprive consumers of competitive prices for Guitars and Guitar Amplifiers.

### G. The Alleged Conspiracy Resulted In Higher Retail Prices For Guitars And Guitar Amplifiers During The Class Period.

149. The efforts of Defendants to adopt, implement and enforce MAPs during the Class Period paid off in the form of higher retail prices. After falling for several years, the average unit prices of Guitars and Guitar Amplifiers all leveled off or started to rise in 2004 and 2005. Consequently, consumers paid the higher prices that manufacturers required and retailers charged under the MAPs

150. **Guitars.** The Manufacturer Defendants and their affiliates manufactured and distributed acoustic or electric guitars and bass guitars during and before the Class Period. In the years leading up to the Class Period, the Guitar segment of the music products industry (exclusive of other fretted instruments) saw a significant increase in unit volume sales. The number of units sold between 1997 and 2004 increased over 300 percent. As indicated in Table 1 below, the number of guitar units sold leveled off in 2004 to 2005, and thereafter declined.

40

**Table 1: Electric and Acoustic Guitars**

| Year | Electric and Acoustic Guitars units sold | % Change year over year | Average retail price per unit | % change year over year |
|------|------|------|------|------|
| 1997 | 1,090,329 | -0.33% | $652 | 0.93% |
| 1998 | 1,153,915 | 5.83% | $602 | -7.67% |
| 1999 | 1,337,347 | 15.90% | $570 | -5.32% |
| 2000 | 1,648,595 | 23.30% | $560 | -1.75% |
| 2001 | 1,742,498 | 5.70% | $529 | -5.52% |
| 2002 | 1,942,625 | 11.49% | $474 | -10.42% |
| 2003 | 2,341,551 | 20.54% | $386 | -18.64% |
| 2004 | 3,302,670 | 41.05% | $310 | -19.71% |
| 2005 | 3,309,722 | 0.21% | $350 | 13.03% |
| 2006 | 2,991,260 | -9.62% | $372 | 6.13% |
| 2007 | 2,868,000 | -4.12% | $389 | 4.82% |
| 2008 | 2,769,650 | -3.43% | $375 | -3.65% |

151. Although the demand for Guitars increased steadily from 1997 to 2004, when the Class Period begins, the increase in demand did not translate to higher prices. Instead, the estimated average retail sales price of Guitars decreased, falling steadily from 1997 to 2001 and then plummeting from $529 in 2001 down to $310 in 2004.

152. Beginning in 2004, Defendants reversed the decline in unit sales prices by engaging in the collusive activities described herein. Consistent with the formation of the alleged conspiracy, retail unit prices leveled off and began to rise from 2004 to 2007, as shown in Table 1, above. Although prices fell somewhat during the course of the FTC's investigation in 2008, the conspiracy enabled Defendants to continue to maintain or stabilize these prices at higher levels than they would have been in a competitive market.

153. **Guitar Amplifiers**: The Manufacturer Defendants and their affiliates manufactured and distributed Guitar Amplifiers. From 1997 to 2003 the number of units sold increased gradually, peaked in 2004 and thereafter began to fall. Retail unit prices of Guitar Amplifiers steadily decreased from 1997 to 2004, and then, consistent with the formation of the alleged conspiracy, leveled off and began to rise after 2004. As with Guitars, although prices for Guitar Amplifiers fell somewhat during

the course of the FTC's investigation in 2008, the conspiracy enabled Defendants to continue to maintain or stabilize these prices at higher levels than they would have been in a competitive market. The relevant data is as follows:

**Table 2:  Guitar Amplifiers**

| Year | Guitar amplifier units sold | % Change year over year | Average retail price per unit | %  change year over year |
|------|------|------|------|------|
| 1997 | 574,250 | 0.34% | $630 | -4.00% |
| 1998 | 562,760 | -2.00% | $605 | -8.93% |
| 1999 | 635,900 | 13.00% | $551 | -11.07% |
| 2000 | 749,500 | 17.86% | $490 | -3.47% |
| 2001 | 764,496 | 2.00% | $473 | 3.56% |
| 2002 | 825,120 | 7.93% | $435 | -7.93% |
| 2003 | 974,000 | 18.04% | $348 | -20.02% |
| 2004 | 1,279,300 | 31.34% | $291 | -16.38% |
| 2005 | 1,240,921 | -3.00% | $320 | 9.97% |
| 2006 | 1,092,000 | -12.00% | $330 | 3.13% |
| 2007 | 1,112,000 | 1.83% | $339 | 2.73% |
| 2008 | 1,096,000 | -0.01% | $310 | -8.55% |

154.    Below is a graph depicting the above retail pricing changes for Guitars and Guitars before, during and after the Class Period.



IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

155.     As depicted above, consistent with the formation of the alleged conspiracy, after years of steady decline, retail unit prices for Guitars and Guitar Amplifiers began to rise from 2004 to 2007, and then declined somewhat in 2008, after the FTC's investigation.

**H.     The Anticompetitive Effects Of Defendants' Conduct**

156.     Defendants' actions in adopting, implementing and enforcing MAPs have had the following anticompetitive effects:

a.     Competition has been unreasonably restrained or suppressed;

b.     Purchasers of Guitars and Guitar Amplifiers have been denied the benefits of competition in a free and open market and have been forced to pay artificially high prices for such products;

c.     Defendants have enjoyed, and will continue to enjoy, supra-competitive profits to the detriment of competitors and purchasers of Guitars and Guitar Amplifiers.

157.     The anticompetitive effects of Defendants' conduct in the relevant product market(s) outweigh any conceivable pro-competitive benefits.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

158.     Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until March 4, 2009, when the FTC announced its investigation had resulted in a proposed cease and desist order.

159.     Defendants' actions were unlawful, unfair and deceptive.  As a consequence, unwary consumers were injured by Defendants' unlawful conduct.  Defendants are estopped from relying on any statute of limitations defense because of their unlawful, unfair or deceptive conduct.

160.     Defendants' conduct was, by its nature, self-concealing.  Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and actively foreclosed Plaintiffs and the Class from learning of their anti-competitive, illegal, unfair and/or deceptive acts.

161.     Any applicable statutes of limitations have been tolled by Defendants' affirmative acts

43

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

of fraudulent concealment and continuing misrepresentations. Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiffs and the Class assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

162. By reason of the foregoing, the claims of Plaintiffs and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, estoppel principles, and the equitable tolling and fraudulent concealment doctrines.

## FIRST CLAIM FOR RELIEF
### (Against all Defendants for Violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1)

163. Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set forth herein.

164. Beginning on or about January 1, 2004, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by artificially reducing or eliminating competition in the relevant market(s) for Guitars and Guitar Amplifiers sold in the United States.

165. The Manufacturer Defendants, at the insistence of Guitar Center and with the encouragement of NAMM, combined or conspired to implement and enforce minimum advertised price policies to prevent competition in the Guitars and Guitar Amplifiers market and increase retail prices for these products.

166. The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding or concerted action among Defendants and their co-conspirators.

167. Defendants and their co-conspirators committed acts or made statements in furtherance of formulating and effectuating their contract, combination or conspiracy, including:

a. coordinating the adoption, implementation, and enforcement MAPs for their products as alleged herein;

b. agreeing to manipulate prices and the supply of Guitars and Guitar Amplifiers sold in the United States in a manner that deprived the market of free and open competition; and

c. selling Guitars and Guitar Amplifiers to customers in the United States at

1 artificially-inflated, noncompetitive prices.

2     168.    The actions of the Defendants directly or through NAMM constitute a combination in

3 restraint of trade. NAMM and the other Defendants are liable for the creation, maintenance and

4 enforcement of their agreements under applicable "per se," "quick look" or "rule of reason" standards.

5 There was no legitimate, pro-competitive business justification for Defendants' combination or

6 conspiracy, or their constituent agreements to restrain competition and artificially inflate the price of

7 Guitars and Guitar Amplifiers. Even if there were some conceivable justification, the individual

8 agreements were broader than necessary to achieve any legitimate purpose.

9     169.    Plaintiffs and members of the Class were injured in their business or property by the

10 collusion and combination or conspiracy alleged above, which facilitated, enabled, assisted or furthered

11 Defendants' actions to substantially limit competition in the relevant market(s). Plaintiffs and the other

12 members of the Class have been forced to pay higher prices for Guitars and Guitar Amplifiers than they

13 would have paid in the absence of Defendants' unlawful conduct.

14 **SECOND CLAIM FOR RELIEF**
**(Against Defendants for Violations of California's Cartwright Act,**
15 **Cal. Bus. & Prof. Code § 16700 *et seq.*)**

16     170.    Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set

17 forth herein.

18     171.    Defendants entered into the unlawful conspiracy and combination described above in

19 the State of California and the effects of that conspiracy occurred within and emanated from the State of

20 California. As alleged above, NAMM and Guitar Center devised, implemented and directed a scheme

21 from their principal places of business in California through which the Manufacturer Defendants, at the

22 insistence of Guitar Center and with the encouragement of NAMM, combined or conspired to

23 implement and enforce minimum advertised price policies to prevent competition in the Guitars and

24 Guitar Amplifiers market and increase retail prices for these products

25     172.    Defendants Guitar Center, NAMM, and the other Defendants combined or conspired

26 with each other and co-conspirators to unreasonably restrain trade and commerce by artificially reducing

27 or eliminating competition in the United States and/or by raising, fixing, maintaining or stabilizing the

28

prices for Guitars and Guitar Amplifiers in the United States.

173.    Defendants' acts and practices, as described herein, amount to vertical price-fixing and unlawful combinations in restraint of trade in per se violation of Cal. Bus. & Prof. Code §§ 16700 *et seq*. *Harris v. Capitol Records Distrib. Corp*., 64 Cal.2d 454, 463 (1966); *Mailand v. Burckle*, 20 Cal.3d 367, 377 (1978); *Chavez v. Whirlpool Corp*., 93 Cal.App.4[th] 363, 369 (2001); *Kunert v. Mission Fin. Servs. Corp.*, 110 Cal.App.4[th] 242, 263, 2003.

174.    Plaintiffs and members of the Class were injured in their business or property by the collusion and combination or conspiracy alleged above, which facilitated, enabled, assisted or furthered Defendants' actions to substantially limit competition in the relevant market(s).  Plaintiffs and the other members of the Class have been forced to pay higher prices for Guitars and Guitar Amplifiers than they would have paid in the absence of Defendants' unlawful conduct.

**THIRD CLAIM FOR RELIEF**
**(Against Defendants for Violations of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200 *et seq*.)**

175.    Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set forth herein.

176.    Defendants entered into the unlawful conspiracy and combination described above in the State of California and the effects of that conspiracy occurred within and emanated from the State of California.  As alleged above, NAMM and Guitar Center devised, implemented and directed a scheme from their principal places of business in California through which the Manufacturer Defendants, at the insistence of Guitar Center and with the encouragement of NAMM, combined or conspired to implement and enforce minimum advertised price policies to prevent competition in the Guitars and Guitar Amplifiers market and increase retail prices for these products

177.    The acts and practices of Defendants, as described herein, constitute unlawful business practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq*., in that Defendants combined or conspired with other Defendants and co-conspirators to unreasonably restrain trade and commerce by artificially reducing or eliminating competition in the United States and/or by raising, fixing, maintaining or stabilizing the prices for Guitars and Guitar Amplifiers in the United States, in violation

of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*

178.    The acts and practices of Defendants, as described herein, also constitute unfair business practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*, because the utility of Defendants' alleged  acts and practices in restricting competition in the United States market for Guitars and Guitar Amplifiers in the United States is significantly outweighed by the gravity of the harm that such acts and practices impose on Plaintiffs and Class members.  Defendants' acts and practices also are oppressive, unscrupulous or substantially injurious to Plaintiffs and Class members.

179.    Plaintiffs and Class members have suffered injury in fact and have lost money or property as a result of these Defendants' acts and practices, in that Plaintiffs and Class members paid artificially high prices for Guitars and Guitar Amplifiers due to Defendants' unlawful agreement, combination or conspiracy and their unlawful, anticompetitive practices.

180.    Plaintiffs and Class members have suffered harm as a proximate result of the wrongful conduct of Defendants, and Plaintiffs therefore seek appropriate restitution.   Plaintiffs and Class members also seek an order, pursuant to Cal. Bus. & Prof. Code § §17200 and 17203, enjoining Defendants from continuing to engage in the unlawful, unfair and fraudulent acts and practices described herein.

**FOURTH CLAIM FOR RELIEF**
**(Against Defendants for Violation Massachusetts Consumer Protection Act,**
**Mass. G. L.93A § 2 *et seq.*)**

181.    Plaintiffs Haskell and Seiler hereby incorporate by reference each preceding paragraph as though fully set forth herein.

182.    Plaintiffs Haskell and Seiler assert this claim on behalf of themselves and a Subclass of persons who directly purchased Guitars and/or Guitar Amplifiers from Guitar Center, Inc. in Massachusetts during the Class Period ("Massachusetts Subclass").

183.    Defendants are engaged in trade or commerce as defined by M.G.L. c. 93A, § 1(b).

184.    Defendants have engaged in unfair competition or unfair acts or practices in violation of Mass. G.L. c. 93A § 2, which states:  "Unfair methods of competition and unfair or deceptive acts or

47

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

practices in the conduct of any trade or commerce are hereby declared unlawful."  Specifically, the Manufacturer Defendants, at the insistence of Guitar Center and with the encouragement of NAMM, combined or conspired to implement and enforce minimum advertised price policies to prevent competition in the Guitars and Guitar Amplifiers market and increase retail prices for these products

185.     The Massachusetts Legislature has specifically stated in Mass. G.L. 93A c. 93A, § 2(b): "It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended."

186.     The acts committed by Defendants as alleged herein were  in violation of M.G.L. c. 93A, § 2, and against public policy for all of the same reasons that they were in violation of the Sherman Act as set forth in the First Claim for Relief, above.  Under Massachusetts law, a violation of Section 1 of the Sherman Act is a per se violation of Mass. Gen. L. c. 93A.

187.     Defendants also are separately liable under Mass. G.L. c. 93A for any and all actions alleged herein that were intended to artificially and improperly raise the prices of Guitars and Guitar Amplifiers.  These activities include attempting to collude or conspire to fix the prices of Guitars and Guitar Amplifiers, exchanging (and encouraging the exchanging) of competitive information through NAMM (and otherwise), discussing and/or implementing MAPs, and otherwise improperly limiting (and attempting to limit) competition and restricting (or attempting to restrict) discount pricing in the Guitar and Guitar Amplifier market(s).

188.     Defendants' intentional and purposeful anticompetitive acts described above, including but not limited to, sharing competitive information, discussing and/or implementing MAPs, acts of collusion to set prices, and the actual act of price fixing itself, were intended to and did in fact cause Plaintiffs Haskell and Seiler and the Massachusetts Subclass members to pay supra-competitive prices for Guitars and Guitar Amplifiers purchased from Defendants or their Co-Conspirators in the Commonwealth of Massachusetts.

189.     The violations of Mass. G.L. c. 93A by Defendants were done willfully, knowingly, or

48

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

in bad faith, entitling Plaintiffs Haskell and Seiler and the Massachusetts Subclass to double or treble damages.

190.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs Haskell and Seiler and the Massachusetts Subclass have been injured in their businesses and property in that they paid more for Guitars and Guitar Amplifiers than they otherwise would have paid in the absence of Defendants' unlawful conduct.

191.     Demand has been made upon Defendants pursuant to Mass. G.L. c. 93A, §§ 2, 9 more than 30 days prior to filing this claim for relief under Mass. G.L. c. 93A. More than thirty days have passed since the demand letter was served, and each Defendant served has failed to make a settlement offer. In the alternative, service of a demand letter on Defendants that did not maintain a place of business within Massachusetts was excused.

192.     As a result of Defendants' and their co-conspirators' violation of Mass. G.L. 93A, Defendants are liable to Plaintiffs Haskell and Seiler and the Massachusetts Subclass for up to three times the damages that they incurred, or at the very least the statutory minimum award of $25 per purchase of each Guitar or Guitar Amplifiers, together with all related court costs and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that:

A.     The Court determine that his action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and enter an order appointing Plaintiffs as class representatives for the Class and appointing Plaintiffs' counsel as Class Counsel;

B.     The acts and practices herein alleged be adjudged and decreed to violate Section 1 of the Sherman Act, the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.,* the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and the Massachusetts Consumer Protection Act, Mass. G. L. c. 93A *et seq.*, and that Defendants be enjoined from further violative conduct;

C.     Plaintiffs and each member of the Class recover damages determined to have been sustained by each of them, plus treble damages and any statutory or liquidated damages;

D.      Plaintiffs and each member of the Class recover restitution, including disgorgement of profits, determined to be owed to them as permitted by the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17203;

E.      Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, litigation costs and expert fees as provided by law;

F.      Judgment be entered against Defendants and in favor of Plaintiffs and the Class; and

G.      Plaintiffs and the Class be granted such other appropriate relief as may be determined to be just, equitable and proper by this Court.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on those claims that can be tried to a jury.


DATED:  February 22, 2012                Respectfully submitted,

                                         **GIRARD GIBBS LLP**


                                         By: */s/ Elizabeth C. Pritzker*
                                                Elizabeth C. Pritzker

                                         Daniel C. Girard
                                         Eric H. Gibbs
                                         Amy M. Zeman
                                         601 California Street, 14th Floor
                                         San Francisco, CA 94108
                                         Telephone:  (415) 981-4800
                                         Facsimile:  (415) 981-4846

                                         *Lead-Liaison Counsel for Plaintiffs*

50

IN RE:  MUSICAL INSTRUMENTS & EQUIPMENT ANTITRUST LITIGATION, NO. MDL 2121
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2012 I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List. Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the document(s) upon confirmation of e-filing.

I also certify that I will cause the forgoing to be served along with a court issued summons in accordance with Rule 4 of the Federal Rules of Civil Procedure on all defendants who have not been previously been served in this litigation.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 22, 2012.

_/s/    Elizabeth C. Pritzker_
Elizabeth C. Pritzker

GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846