# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: National Association of Music Merchants, Musical Instruments and Equipment Antitrust Litigation | MDL No. 2121<br><br>(USDC Case Nos. 09cv2002, 09cv2146, 09cv2151, 09cv2211, 09cv2267, 09cv2285, 09cv2332, 09cv2418, 09cv2423)<br><br>**ORDER DISMISSING FEDERAL CLAIMS; AND**<br><br>**ORDER CERTIFYING ISSUE FOR APPEAL** |

On August 22, 2011, the Court granted in part Defendants' motions to dismiss the consolidated complaint, and granted Plaintiffs limited discovery solely for the purpose of permitting them to obtain information sufficient to plead their claims, if they could do so.

After discovery was complete, Defendants joined in a motion to dismiss. After full briefing, the Court held a hearing on that motion at which the parties appeared through counsel. For reasons discussed at that hearing, and set forth in this order, it is clear Plaintiffs' federal claim, the first claim in their Second Amended Consolidated Class Action Complaint (SAC, Docket no. 178) must be dismissed with prejudice for failure to state a claim.

/ / /

## I.     The Claims

The SAC alleges Defendants engaged in a conspiracy to fix retail prices of acoustic, electric, and bass guitars, and guitar amplifiers. Their theory is that certain guitar manufacturers and retailers, faced with price competition from internet merchants and "big box" retailers, sought ways to stabilize or increase guitar and amplifier prices. They allegedly did this with the support and assistance of the National Association of Music Merchants (NAMM) by requiring that dealers adhere to policies setting minimum advertised prices (MAPs).[1]

Plaintiffs identify section one of the Sherman Antitrust Act, and certain state statutes as giving rise to their claims, and are pursuing their claims as a putative class action with subclasses whose claims arise under state law.

## II.    Legal Standards

The complaint must meet the pleading standard set forth in *Bell Atlantic v. Twombly*., 550 U.S. 544 (2007). The first element of a claim under § 1 of the Sherman Act is the existence of a "contract, combination, or conspiracy." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). *See also William O. Gilley Enterprises, Inc. v. Atlantic Richfield*, 588 F.3d 659, 663 (9th Cir. 2009) (citing Sherman Act § 1) ("Whether a plaintiff pursues a per se claim or a rule of reason claim under § 1, the first requirement is to allege a "contract, combination in the form of trust or otherwise, or conspiracy.") Even assuming Plaintiffs have made out a claim for anticompetitive behavior (which is the second element of a § 1 claim), the allegations must be sufficient to show that the behavior was the product of one or more agreements, and must exclude mere parallel action without any agreement or conspiracy. *Bell Atlantic*, 550 U.S. at 554 (noting the "inadequacy of showing parallel conduct or interdependence, without more"). *See also id.* at 556 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.") At argument, the Court focused on the question of whether

---

[1] MAP policies do not limit the actual sales price. Rather, depending on their terms, they prevent retailers from advertising or quoting prices lower than the MAP to customers. Sometimes the limitations apply to particular media, such as internet sites, emails, or phone quotes. *See* SAC, ¶¶ (9 (alleging how MAPs operated), 91 (quoting trade publication on how MAP policies work).

an agreement or conspiracy had been adequately alleged, although some argument on other issues (such as the effect of MAP policies) was also entertained.

The Supreme Court has made clear that factual allegations in support of a § 1 claim must suggest that an unlawful agreement was made. *Bell Atlantic*, 550 U.S. at 556. "Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id*. at 557. Generally, the pleading standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id*. at 556. But here, where discovery concerning possible agreements has already taken place, the complaint should contain factual allegations of those agreements. Unless the factual allegations are adequate now, there is no reasonable expectation they will ever be adequate to support a claim.

**III.    Discussion**

Plaintiffs have alleged Defendants' representatives attended large trade show meetings or other large meetings attended by a wide variety of people, where MAPs were discussed or advocated as being good for the industry. But unilateral advocacy, particularly in an open and public forum, is not itself an agreement or conspiracy. And independent responses to public advocacy without an agreement, even if consciously parallel to other entities' activity, would simply be permissible parallel conduct. *See Bell Atlantic*, 550 U.S. at 557. The touchstone of an agreement is a "meeting of the minds," creating a sense of mutual obligation among the alleged conspirators. *Id*. at 557 and n.4.  In this context, an agreement, conspiracy, or combination would involve Defendants communicating with one another in some fashion and agreeing on a course of action. Defendants have argued the SAC fails to allege even a single meeting or communication where an illegal agreement was reached..

Nor does attendance at trade shows or other large meetings imply an agreement or conspiracy.  As the Court's earlier rulings reflect, this is normal business activity, and doesn't imply any kind of illegality. This is particularly true of large meetings attended by numerous other people, including press representatives. Although Plaintiffs characterize these as

"invitation-only" meetings, Defendants have pointed out that hundreds of attendees received invitations. While the meetings, strictly speaking, were not open to the general public, it is undisputed they were open to a large group of people in the musical instruments and equipment industry, including members of the trade press, who published articles on what took place there. The presence of numerous uninvolved observers at such meetings tends to dispel any specter of illegality. Furthermore, if any price-fixing agreements were made during such meetings, the presence of numerous witnesses would allow Plaintiffs to allege the specifics of such agreements.

In their opposition to the motion to dismiss, Plaintiffs argued that they were not required to allege direct evidence of conspiratorial meetings (Opp'n at 19), which is correct. *See In re Graphics Processing Units Antitrust Litigation*, 527 F. Supp. 2d 1011, 1024 (N.D.Cal., 2007) ("This is not to say that to survive a motion to dismiss, plaintiffs must plead specific back-room meetings between specific actors at which specific decisions were made.") At the same time, under *Bell Atlantic*, Plaintiffs must allege one or more agreements or conspiracies. *See id.* (quoting *Bell Atlantic*, 550 U.S. at 557) (noting that, under *Bell Atlantic*, "parallel conduct does not show conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"). Simply alleging that Defendants on a number of occasions had the opportunity to agree, is insufficient. *Id*.

Plaintiffs argue, however, that the *Bell Atlantic* standard merely requires that they allege enough to "raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." (Opp'n at 19:12–13.) The fly in the ointment, however, is that they already have been given discovery on this issue and have come up empty-handed. There is no reasonable likelihood that additional discovery would uncover any agreements or meetings they haven't yet alleged. At oral argument, the Court specifically asked Plaintiffs' counsel if they could identify any private meetings or communications where agreements were, or could have been, reached. They admitted they couldn't, but argued that their allegations of parallel conduct, combined with several "plus factors," was sufficient.

The "plus factors," according to Plaintiffs, are that the MAP policies were similar and adopted around the same time (tending to negate independent action); that the MAP policies were against manufacturers' individual self-interest and would succeed only if all manufacturers participated; that manufacturers' key decision-makers met at summits or trade shows; and that trade show announcements and open discussions were designed to signal, announce, and police compliance.

In support of Plaintiffs' arguments that parallel action together with "plus factors" can suffice, Plaintiffs in their opposition and at argument cited *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314 (2d. Cir. 2010), *In re Packaged Ice Antitrust Litigation*, 723 F. Supp. 2d 987 (E.D. Mich. 2010); and *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2011 WL 2678879 (E.D.Cal., July 7, 2011). They cite these cases by way of distinguishing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047–48 (9th Cir. 2008), which held that to plead a claim under § 1 of the Sherman act, a plaintiff must plead evidentiary facts beyond mere parallel conduct, legal conclusions, and ultimate facts (such as a conspiracy). *Kendall*, which is binding on this Court, and which also dealt with allegations after discovery had been taken, explained further:

> [Plaintiffs] do not allege any facts to support their theory that [certain defendants] conspired or agreed with each other or with [other entities] to restrain trade. Although appellants allege [these defendants] "knowingly, intentionally and actively participated in an individual capacity in the alleged scheme" to fix the interchange fee or the merchant discount fee, this allegation is nothing more than a conclusory statement. There are no facts alleged to support such a conclusion. Even after the depositions taken, the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?

*Id.* at 1048 (citation omitted).

The Court has reviewed the other cases Plaintiffs believe help them distinguish *Kendall*, and they are insufficient to rescue Plaintiffs' claims. Each of them is essentially in agreement with *Kendall* that a plaintiff must plead facts sufficient to show that defendants entered into a conspiracy or agreement. Those facts need not be of any particular kind (such as documentary evidence), but it is absolutely clear they must be sufficient to allege an agreement or conspiracy. The most helpful is *Starr*, which held that "plaintiffs were not

required to mention a specific time, place or person involved in each conspiracy allegation." *Starr*, in contrast to *Kendall*, read some of *Bell Atlantic*'s language about the specificity of pleading as dicta. But *Starr* also required plaintiffs to plead facts to exclude the possibility that defendants' behavior was legal and motivated by self-interest (or some other permissible motive other than a conspiracy). *Id*. In any case, the Court is bound to follow *Kendall*, which is the law of this circuit, rather than the Second Circuit's guidance in *Starr*.

Turning to the "plus factors," it is apparent they are not as helpful as Plaintiffs argue. In support of the contention about trade show announcements and discussions, Plaintiffs' counsel cited an email from NAMM president Joe Lemond. But the email in question simply outlines Lemond's "talking points" and gives a draft script for a presentation at NAMM's large trade show, among which was the issue of MAP pricing. Moreover, the communications identified in the email and draft script were delivered to a large, general audience. So in fact, this isn't a "plus factor" at all.

The "plus factor" that, in the absence of an agreement or conspiracy, adopting MAP policies would have been against individual manufacturers' self-interest, likewise is not adequately explained, in part because there is no explanation of how Defendants would have arranged to agree on what the terms of each manufacturer's MAP policy should be and how they were to be enforced. The allegations also imply that manufacturers (and other attendees at NAMM's trade shows) were publicly told that adopting MAP policies was in each of their individual self-interests, and that they adopted them over an extended period of time. *See* SAC, ¶¶ 8 (discussing purpose of MAP policies), 13 (alleging that NAMM promoted the use of MAPs as a way of protecting manufacturers' price margins), 91 (quoting industry publication's report on why MAP policies require brick and mortar stores to keep more inventory), 92 (quoting trade press a year later as saying that manufacturers and retailers had increasingly begun adopting MAP policies as a means of preventing price erosion), 125 (quoting from roundtable discussion at trade show where a director of NAMM expressed the view that MAPs could help the entire industry), 126 (quoting independent retailer's remark

/ / /

at trade show discussion urging other independent retailers to favor manufacturers that provided a MAP system).

Although the SAC alleges the MAP policies were similar and announced around the same time, the allegations are qualified to the extent they do very little to make the claim more plausible. *See* SAC, ¶ 8 (alleging that MAP policies "were implemented within a relatively short period of time" and "contained substantially similar terms, advertising restrictions and enforcement provisions"). Although announcing MAP policies whose terms showed signs of coordinated effort might support a conspiracy allegation, the only allegation here is that the terms were similar. This could just as easily be attributable to a similar business model or similar business conditions. Likewise, announcing MAP policies at around the same time is consistent with a response to the same market conditions. It is commonplace, and legitimate, for businesses in the same industry to be aware of how their competitors have responded to problems, and to adopt solutions that have seemed to work. *See Bell Atlantic*, 550 U.S. at 553–54 (noting that conscious parallelism a common reaction of firms in a concentrated market).

Although Plaintiffs contend they are not required to plead specific terms or time periods (which the Court accepts, *arguendo*), ambiguous or overly generalized allegations leave open the distinct possibility that Defendants' behavior was entirely normal and legitimate. In addition, allegations that a time period was "relatively short" or that the terms of MAP policies were "substantially similar" are conclusory; they incorporate Plaintiffs' own judgments about whether the time was suspiciously short, or the MAP policies' terms were similar or identical in ways that would suggest they were the product of a conspiracy. This "plus factor" is therefore not really a "plus factor" after all.

The only "plus factors" that remain are the fact that Defendants' key decision-makers met at trade shows and summits that were also attended by many others, and that announcements about MAPs were made at these meetings. These don't really amount to "plus factors" either, because all they show is that Defendants' decision-makers had the opportunity to communicate or meet to reach agreements, or to enter into a conspiracy —

not that they did. As the Court's earlier orders pointed out, it is commonplace for industry leaders to attend the same trade shows, open meetings, and the like. The opportunity to meet and conspire that such meetings would give rise to isn't suspicious. *See In re Graphics Processing Units Antitrust Litigation*, 527 F. Supp. 2d at 1023 ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more.") Likewise, making announcements about new practices or developments is common and doesn't imply illicit or surreptitious signaling was going on.

It is also worth noting that the complaint itself expresses no real certainty whether Defendants entered into a conspiracy or agreement, or whether they merely knew or expected that other Defendants would engage in parallel action. *See* SAC, ¶¶ 8 (arguing that MAP policies' similar terms "strongly suggest concerted action and tacit collaboration"), 12 ("These facts, taken together, strongly suggest a conspiracy, coordination or tacit combination among the Manufacturer Defendants in horizontal restraint of trade.") Parallel action, even conscious parallel action, is not illegal. *Bell Atlantic*, 550 U.S. at 553–54. While a tacit agreement or combination can support a claim, *id.* at 553 (agreement to restrain trade may be tacit or express), the kind of behavior alleged in the remainder of the complaint is consistent only with some kind of conspiracy, agreement, or combination based on express meetings or communications.

Although the parties did not address the contents of the MAP policies in great detail, the Court's earlier order specified that when Plaintiffs amended their complaint after discovery, they would have to plead enough of the MAPs' terms ot show how they restrained competition. (Docket no. 133 at 10:16–18.) Plaintiffs don't dispute that they have obtained some MAP policies.  Nevertheless, the SAC doesn't allege much of what the MAP policies say. Their opposition to the motion to dismiss argues the SAC alleges enough of those terms (Docket no. 183 at 9), but the cited paragraphs really don't include much detail. The most detail is included in paragraph 96 (which is sealed), but even that just alleges each MAP policy included certain types of terms, including terms specifying how MAPs are calculated, what instruments and advertising media were covered, who the parties were, and what the

enforcement provisions were. Plaintiffs haven't pointed out how any of this would be remarkable or suspicious, or how it suggests a coordinated effort by Defendants. MAP policies including these types of terms could just as easily be the product of an awareness of common terms included in such agreements.

In short, the SAC fails to meet the pleading standard set forth in *Bell Atlantic*. It doesn't sufficiently allege Defendants conspired or agreed to fix prices using MAP policies. Without sufficient allegations of a conspiracy, the Court's analysis of the various possible types of conspiracies and whether they would restrain trade and thus be illegal would be speculative. But it is unnecessary; without a conspiracy, there is no federal claim, and claims premised on violations of federal law must also fail. At oral argument, Plaintiffs agreed they had no other theory than the ones they included in the SAC.

### IV. Conclusion and Order

For the reasons set forth above, Defendants' motion to dismiss is **GRANTED** as to Plaintiffs' first claim for relief only, and this claim is **DISMISSED WITH PREJUDICE**. Pursuant to Fed. R. Civ. P. 52(b), the Court determines that there is no just reason to delay entry of judgment on this claim, and therefore directs the Clerk to enter judgment as to this one claim only so that Plaintiffs, if they wish, may take an immediate appeal.

If Plaintiffs do not intend to appeal, they are requested to promptly notify the Court. If they so notify the Court, or if they do not file a notice of appeal within the time permitted, the Court will issue a further order respecting any cases that include non-dismissed claims to be remanded.

**IT IS SO ORDERED**.

DATED: August 17, 2012

*Larry A. Burns*

**HONORABLE LARRY ALAN Burns**
United States District Judge